1    <u>**TRANSCRIBED FROM DIGITAL RECORDING**</u>

2               IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
3                       EASTERN DIVISION

RENEE ROBINSON, RICHARD MYERS,    )
4   ANNETTE FIRST, CASEY GADDY,       )
STEVEN GOUISIE, ROBERT            )
5   PLUNKETT, FRANCOIS STEIGER,       )  Case No. 24 CV 164
JAMES ULRICH, GABRIEL VOILES,     )
6   JOHN WAUDBY, and LAKESHA          )  Chicago, Illinois
WELLS, on behalf of themselves    )  May 2, 2024
7   and all others similarly         )  1:04 p.m.
situated,                         )
8                                     )
                 Plaintiffs,      )
9                                     )
    -vs-                              )
10                                    )
HP, INC., a Delaware              )
11  corporation,                      )
                                  )
12                   Defendant.       )

13          TRANSCRIPT OF PROCEEDINGS - Motion Hearing
      BEFORE THE HONORABLE GABRIEL A. FUENTES, MAGISTRATE JUDGE
14

APPEARANCES:
15

For the Plaintiffs:    MILBERG COLEMAN BRYSON PHILLIPS
16                         GROSSMAN, PLLC
                       BY:  MR. AUSTIN M. KRTAUSCH
17                          MR. S. JARRET RAAB
                            MR. JIMMY W. MINTZ (via telephone)
18                         201 Sevilla Avenue
                       2nd Floor
19                         Coral Gables, Florida 33134

20       **PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION**
           NOTE:  FAILURE TO STAND NEAR THE MICROPHONE MAKES
21           PORTIONS UNINTELLIGIBLE AND INAUDIBLE

22  Transcriber:
                 SANDRA M. TENNIS, CSR, RPR, RMR, FCRR
23                   Official Court Reporter
                 United States District Court
24         219 South Dearborn Street, Room 2260
                 Chicago, Illinois  60604
25            Telephone:  (312) 554-8244
               Sandra_Tennis@ilnd.uscourts.gov

```
 1   APPEARANCES:   (Continued)

 2   For Defendant:          GIBSON, DUNN & CRUTCHER
                             BY:  MS. COURTNEY L. SPEARS
 3                           3161 Michelson Drive
                             Suite 1200
 4                           Irvine, California 92612

 5                           GIBSON, DUNN & CRUTCHER LLP
                             BY:  MS. ILISSA S. SAMPLIN
 6                                (via telephone)
                             333 South Grand Avenue
 7                           Los Angeles, California 90071

 8                           EIMER STAHL LLP
                             BY:  MR. JOHN K. ADAMS
 9                           224 South Michigan Avenue
                             Suite 1100
10                           Chicago, Illinois 60604

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings heard in open court:)

2          THE CLERK:  Calling Case Number 24 CV 164, Robinson,

3     *et al* vs. HP, Inc., for motion hearing.

4          THE COURT:  Okay.  Let's have our counsel make their

5     appearances.  Maybe have plaintiffs go first, and then HP.

6          MR. KRTAUSCH:  Good afternoon, your Honor.  Austin

7     Krtausch and Jarret Raab on behalf of plaintiffs.  We also

8     have Jimmy Mintz on the line.

9          THE COURT:  Who's on the line?

10          MR. KRTAUSCH:  Jimmy Mintz.

11          THE COURT:  And pronounce your last name for me so I

12     get it right.

13          MR. KRTAUSCH:  It's Krtausch.  And for the record

14     it's K-r-t-a-u-s-c-h.

15          THE COURT:  Okay, great.  Thank you.  Thank you.  And

16     welcome.  Welcome to the Northern District of Illinois.

17          How about defense?

18          MS. SPEARS:  Good afternoon, your Honor.  Courtney

19     Spears from Gibson, Dunn & Crutcher for defendant HP.  And I

20     have with me my colleague John Adams from Eimer Stahl, also

21     for defendant HP.

22          THE COURT:  Okay.

23          MS. SPEARS:  And on the line we have Ilissa Samplin

24     from Gibson Dunn & Crutcher for HP.

25          THE COURT:  Okay, great.  Welcome again to the court,

1    to the Northern District.  One second.

2         What I want to do is have you make your arguments.  I

3    don't know at this point whether I would then rule today from

4    the bench and issue a written text order that would say for

5    the reasons stated on the record.  Frankly, that's the more

6    efficient way, given the volume of motions that we have here.

7    Perhaps more would be warranted.  Perhaps another brief will

8    be warranted.  I doubt it.  Perhaps a little more time for me

9    to think about it might be warranted.

10        But why don't we go ahead with the movant going

11   first.  So that's going to be the defense, Ms. Spears.  And

12   then we'll hear from Mr. Krtausch after that.  And then,

13   Ms. Spears, you can rebut.  I'm not particularly interested in

14   limiting anybody time-wise, but be reasonably concise within

15   the bounds of good advocacy.  Trust your judgment.  And I also

16   made clear that when we do this, when we invite parties to

17   have attorneys with lesser levels of experience argue, that

18   supervisory-level attorneys, partners, what have you, welcome

19   not only to attend but to add to or jump in as they may

20   believe to be necessary.  I think I would do that to give the

21   clients comfort that their argument, you know, won't somehow

22   fall short.  The fact is that every time we've done this,

23   supervisory people have not had to jump in, have not had to

24   add anything.  The performances have been really, really

25   great.  So my thought is, if you're here as a

1  supervisory-level person, go ahead and supervise.  You might

2  want to take a moment to confer, you can do that, if you want.

3  If there's something you want to say, I want to let you say

4  it.  I'd rather that you save it until the end, though.  I'd

5  rather we proceed with the arguments uninterrupted as they

6  would be as if arguing counsel didn't have somebody looking

7  over their shoulders, so to speak.

8          So with that said, Ms. Spears, why don't you go

9  ahead.  And as you argue I hope you will address the nature of

10 what you've described as the standing issue, which the

11 defendant -- the plaintiffs have said that they're I think

12 somewhat questioning whether it's truly standing issue,

13 whether it's truly a threshold issue.  Because I think that

14 might be at the core of what this motion is about.  So just

15 sharing with you some thoughts at the beginning.  But, please,

16 go ahead.

17         MS. SPEARS:  Sure.  Thank you, your Honor.  Would you

18 like me to stay here or come up to the lectern?

19         THE COURT:  Oh, I should have mentioned, counsel

20 welcome to remain at counsel table.  Just, if you can, speak

21 into the microphones so that the Liberty recording picks you

22 up rather than sharing a single microphone a couple feet apart

23 in today's day and ago.  So go ahead, Ms. Spears.

24         MS. SPEARS:  Sure.  Thank you.  Would you like me to

25 begin as to the standing issue, or just would you like me to

1    ensure that I touch upon it?

2           THE COURT:  Why don't you begin as you like.  But I'm

3    telling you, I hope that gets addressed.  Go ahead.

4           MS. SPEARS:  Yes, your Honor.  Thank you.

5           Good afternoon.  HP did not bring the instant motion

6    to cause this case to come to the halt.  To the contrary, HP

7    tried having a meaningful conversation with plaintiffs about

8    appropriate limited discovery that should proceed while HP's

9    motion remains pending.  But plaintiffs refused our offer and

10   did not counter.  HP was --

11          THE COURT:  Okay, but they didn't have to go along

12   with your stay motion; right?  I mean, if they want to

13   discover everything under the sun that the Court is going to

14   allow them to, they could do that; right?

15          MS. SPEARS:  Sure.  We understood that the law coming

16   out of the Supreme Court in *Twombly*, and that many courts in

17   this district and within the Seventh Circuit have recognized,

18   that discovery in antitrust cases is very complex and

19   burdensome and expensive.  And with that in mind, and

20   understanding that many courts in this district are inclined

21   to grant stays, we thought that rather than bring this case

22   completely to a halt with a stay, we would try to reach some

23   compromise of what could we do that would be meaningfully

24   reasonably as our motion to dismiss is pending.

25          THE COURT:  Okay.  Please go ahead.  I might

1    interrupt you from time to time.  I'm sorry.

2            MS. SPEARS:  No, totally fair.  Thank you, your

3    Honor.

4            As I mentioned, courts routinely grant stays,

5    especially in antitrust cases where discovery is enormously

6    burdensome and expensive.  And the 79-count class action

7    antitrust complaint here is exactly the type of complex case

8    that *Twombly* and its successors have cautioned against

9    allowing early discovery in.

10           And when courts in this district consider whether to

11   grant a stay, they consider three factors.  The first is

12   whether a stay will prejudice the non-moving party.  The

13   second is whether a stay will simplify the issues in question.

14   And the third is whether a stay will reduce the burdens of

15   litigation on the parties and the court.  Each of these

16   factors here, counsel is in favor of granting a stay of

17   discovery pending ruling on HP's motion to dismiss and until

18   the pleadings are closed.

19           THE COURT:  Are you about to go on to the factors?

20           MS. SPEARS:  Yes.

21           THE COURT:  Before you do, I have a couple questions.

22   Districts -- courts in the district you mention routinely

23   grant stays, particularly in more complex cases.  But doesn't

24   that also mean that there are magistrate judges and district

25   judges, in this district and elsewhere, who might routinely

1    deny them who might be skeptical of them?  Fair?

2          MS. SPEARS:  Sure, I recognize that many courts in

3    this district also deny stays.

4          THE COURT:  And I, of course, am among them.  That's

5    why you got an order that said I didn't really like your

6    opening memorandum, I thought you should address the case I

7    like, Judge Rowland.  Right?

8          MS. SPEARS:  Uh-huh.

9          THE COURT:  So routinely granting them in antitrust

10    cases, that was another thing I stumbled over a little bit.

11    You cited this *Limestone* case in your reply.  As I recall,

12    that wasn't an antitrust case, it was like a RICO, 1983 case,

13    if I remember it right.  It had a line in there that referred

14    to big cases and big antitrust cases maybe being stayed.  But

15    I don't think it cited to any cases where that had happened at

16    least or had been approved at the Seventh Circuit level.

17          So where I'm going with this is, I'm wondering if

18    there's -- if I missed it or it's in there and you -- I know

19    you'll tell me.  Is there some Seventh Circuit authority that

20    has said big, complicated antitrust case, motion to dismiss

21    could resolve all of it, some of it, whether they did or did

22    not discuss the threshold nature of the requirement, maybe

23    they didn't, said:  Good idea to stay the case, Big Antitrust

24    Matter.  Are there any in your -- in your briefing?

25          MS. SPEARS:  I'm not sure right off the top of my

1    head whether there are any Seventh Circuit cases where the

2    issue of whether a stay is appropriate has been raised.  As

3    you know, this issue is an abuse of discretion standard.  So

4    for that to be raised to the Seventh Circuit seems somewhat

5    unlikely.

6            THE COURT:  Right.

7            MS. SPEARS:  But I think perhaps more important is

8    that the Supreme Court in *Twombly* cautioned against allowing

9    discovery in the antitrust cases because of the burden and

10   expense and that plaintiffs' pleadings really need to be put

11   to the test before we're going to put defendants to that

12   burden and expense.

13           THE COURT:  Yeah, Supreme Court precedent, *Twombly*.

14   What year was *Twombly* decided?

15           MS. SPEARS:  2007.

16           THE COURT:  Eighteen years ago.

17           MS. SPEARS:  Has it already been 18 years?

18           THE COURT:  Seventeen years.  I'm just wondering if

19   today's court would necessarily agree.  I guess we don't know.

20           MS. SPEARS:  I would be inclined to think that

21   today's Supreme Court would probably agree, but perhaps not.

22           THE COURT:  Well, they'd probably have to follow the

23   test they've developed for when precedent should be set aside.

24   That test was articulated in the *Casey* case.  Then *Casey* was

25   kind of overturned.  And I don't know -- I'm not sure what the

1   standard is on the stare decisis now.  We'll overturn if we

2   think it's egregiously wrong, maybe that's the standard.  I

3   don't know.

4        But I kind of wonder how much weight I should put in

5   what *Twombly* said about the complexity of the discovery

6   because many pieces of federal litigation are complex.  And

7   the filing of a motion to dismiss, if we were to hold it and

8   stave off discovery in all or most of those cases, then we

9   would be doing very little discovery.  And then in many cases

10  the motion winds up getting denied at some point, not all of

11  these are granted, and then nothing has happened during the

12  interim period.

13       So I'm kind of articulating for you the nature of my

14  skepticism on a couple of different levels, including the

15  weight of the precedent and the practicality.  It was a lot I

16  just said.  But I'm looking for you to react to any of that,

17  if you'd like to.

18       MS. SPEARS:  Thank you, your Honor.  I think to the

19  extent you're questioning whether *Twombly* would be upheld

20  today, I think that there is a pretty good argument that

21  discovery today versus in 2007 is more burdensome, given the

22  increase in e-mails and chats and the amount of electronic

23  communications and data that's at our disposal.  I mean, if

24  you look at the sheer number of pages that are being produced

25  in these cases, that's vastly larger than it was even, I

1    think, 17 years ago.  And so I think from a burden

2    perspective, if the Court thought then that the burden in

3    antitrust cases was great, then it would even more see that

4    today.

5         To your latter point, which I am now somewhat

6    forgetting.

7         THE COURT:  That's okay, it was too big a mouthful.

8         I think my other point was that the heart of Judge

9    Rowland's opinion in *New England Carpenter*s was that a lot of

10   times these motions do get dismissed.  If the rules had

11   provided for stays, they would have been in the rule.  You

12   know, so practically speaking, if I'm the pragmatist, as a

13   judge, which I sort of am, you know, why wouldn't I -- why

14   wouldn't I let at least some substantial amount of discovery

15   go forward and whatever happens on that motion, whenever it

16   happens, it happens.  Why wouldn't I do that?  And now we're

17   kind of getting to the threshold issue a little bit.

18        MS. SPEARS:  Yes.  Thank you, your Honor.  Apologies

19   that I did not recall your question.

20        THE COURT:  Don't apologize.  Only apologize when

21   there's a compelling reason to do so.

22        MS. SPEARS:  Okay.

23        THE COURT:  And I mean that.  Go ahead.

24        MS. SPEARS:  I think somewhat actually to my prior

25   point, it is interesting that Judge Rowland has a more recent

1  opinion from 2022, where she actually granted a stay.  That's

2  in the *Calderon* case that I think we cited --

3          THE COURT:  Yeah.

4          MS. SPEARS:  -- in each of our briefs.  And we think

5  that's probably one of our best cases.  That's not even an

6  antitrust case, it's a class action that's pretty complex.

7  And I think that --

8          THE COURT:  Yeah, what was the threshold issue there

9  that she found?  She did find one; right?

10          MS. SPEARS:  I do not believe there was a threshold

11  issue in that case.

12          THE COURT:  Oh, what was her -- restate for me her

13  grounds.  I'd have to review it again.  You cited so many

14  cases, many helpful, but I want to read *Calderon* again.  But

15  tell me, what's persuasive about *Calderon*?  Maybe was it a

16  shift in Judge Rowland, how she looks at the world since *New*

17  *England*, or maybe just a different application of the same

18  principles?

19          MS. SPEARS:  And I apologize, I misspoke.  She did

20  find a threshold issue, it just was not the central point of

21  her opinion.

22          THE COURT:  Okay.

23          MS. SPEARS:  But she did note that there -- it raises

24  a threshold issue of whether plaintiffs possess standing to

25  maintain certain claims.

1          THE COURT:  Okay.

2          MS. SPEARS:  So that was her threshold issue.  But

3    she kind of, in her opinion, puts it at the tail end.  It

4    seems it's not the forefront of her reasoning.

5          THE COURT:  What was the nature of the claims in

6    *Calderon* again?

7          MS. SPEARS:  It is a consumer protection claim.

8          THE COURT:  Okay.

9          MS. SPEARS:  And there were, I think, 15 state

10   consumer protection claims.

11         THE COURT:  So it was complicated.

12         MS. SPEARS:  Yes.

13         THE COURT:  And she found that -- she found there was

14   a standing issue that she was deciding on the -- she was

15   district judge at the time, 2022.  She had yet to decide a

16   standing issue relative to these consumer protection claims;

17   right?

18         MS. SPEARS:  I believe that's the case.

19         THE COURT:  Okay.  Go ahead.  I interrupt sometimes

20   more -- just go ahead.

21         MS. SPEARS:  Thanks, your Honor.  So getting into the

22   factors, the first, whether plaintiffs are prejudiced by a

23   stay.  And I think this -- this a little bit gets to your

24   further question about why should we just put these cases to a

25   halt.  The courts in this district have discussed that the

1   mere fact of just waiting for -- for the outcome they seek or

2   delay alone is not prejudice.  And that's -- that's all that

3   plaintiffs have articulated would be the prejudice to them.

4   They say that they -- they would suffer financial harm because

5   they're not able to use their ink cartridges with non-HP chips

6   in them while this case is pending.  And if a stay happens,

7   then that might push things out even further.  But that really

8   is just delay by another name.  They're saying that they're

9   going to continue to suffer financial harm as they await the

10  resolution they seek in this matter.

11          Really, when courts look to this prejudice, they're

12  looking at whether any immediate relief has been sought, which

13  it has not here; or, if there is any sort of concern that

14  witnesses may not be available.  No such concern has been

15  raised, and we're not aware of any such issue.

16          So we don't think that there is any prejudice to

17  plaintiffs here, as prejudice is recognized as a factor in

18  this district.  And accordingly, this factor weighs in favor

19  of granting a stay.

20          As to the second factor, whether a stay will simplify

21  the issues, and this gets into the standing issue, HP's

22  argument is that HP's motion to dismiss will either completely

23  dispose of or streamline massively the case here.  And, you

24  know, courts -- many courts here don't require a threshold

25  issue to be raised.  Obviously HP understands that your Honor

1  thinks that -- that is something that should be present, or at

2  least you're contemplating the issue.  And HP meets that

3  standard as well.  HP brings a standing claim or raises the

4  issue of standing in its motion to dismiss.  And that issue

5  has the potential to massively streamline the issues in this

6  case.

7           THE COURT:  So a big part of the pushback that you

8  got on the response that plaintiffs filed was that the

9  standing issue as a threshold issue couldn't really be

10  characterized as threshold as to all of the claims.  At least

11  that was how I read their opposition, part of it.  And it

12  looked like you were saying, well, it doesn't matter.  It

13  would be within the Court's discretion if the Court thought

14  that practically resources are being conserved and, you know,

15  the factors you've described are met if a substantial amount

16  of the claims would fall into that threshold category, insofar

17  as you're moving to dismiss them.

18           MS. SPEARS:  Right.

19           THE COURT:  So talk about that a little bit.  How

20  extensively does your motion to dismiss, if granted, eliminate

21  or streamline these claims?  I've looked at the motion.

22  There's a number of grounds.  But address that any way you

23  want to.

24           MS. SPEARS:  Sure.  Thank you, your Honor.

25           So as to the numbers themselves, plaintiffs have 79

1   causes of action.  74 of those are state law causes of action.

2   But the named plaintiffs have no connection to 42 states in

3   the District of Columbia under which they bring those state

4   counts.  So if HP's motion to dismiss is granted on the

5   standing issue as to the state law claims, 80 percent of their

6   state law claim will be dismissed.

7           THE COURT:  Is that the *Illinois Brick* issue?

8           MS. SPEARS:  No, that is not the *Illinois Brick*

9   issue.

10          THE COURT:  Okay.  Tell me what that issue is.  Just

11  direct purchaser?

12          MS. SPEARS:  No.

13          THE COURT:  No. I must be missing it.

14          MS. SPEARS:  The issue is that -- the issue is that

15  the named plaintiffs don't have standing to bring claims under

16  the laws of states that they don't have a connection because

17  they weren't -- they don't live there and they weren't injured

18  there.

19          THE COURT:  Okay.  Okay.  Yet, they have brought

20  those claims?

21          MS. SPEARS:  Yeah, they have brought those claims.

22          THE COURT:  And that's -- you put that in front of

23  Judge Pacold?

24          MS. SPEARS:  Yes, your Honor.

25          THE COURT:  Okay.  Go ahead.

1    MS. SPEARS:  And then relatedly is that the named

2  plaintiffs don't have standing to bring claims for printers --

3  printer models that they did not purchase.  So plaintiffs

4  assert, I think it's 43 printer models.  And they themselves,

5  the named plaintiffs, have not purchased 36 of those.  So at

6  the end of the day, if HP's motion is granted, 84 percent of

7  the printer models that their complaint calls into question

8  will be out of the case.

9    THE COURT:  Okay.

10    MS. SPEARS:  So if granted as to just the standing

11  issue -- and HP maintains that its motion to dismiss should be

12  granted in its entirety.  But if granted only as to the

13  standing issue, we'd be left with 20 percent of the claims

14  left as to only seven printer models instead of 43.

15    THE COURT:  Okay.  Go ahead.

16    MS. SPEARS:  And to the extent plaintiffs have argued

17  that this -- the threshold issue needs to be dispositive as to

18  all claims, numerous courts evaluate a threshold issue,

19  including *Calderon* that we just discussed.  They call on that

20  threshold issue as a reason in part for granting a stay even

21  when it's only as to certain claims.

22    THE COURT:  Okay.

23    MS. SPEARS:  And then, so, you know, because --

24  because the motion to dismiss is dispositive in its entirety

25  and would completely do away with plaintiffs' complaint.  And

1   alternatively, you know, if this Court finds more persuasive

2   the reasoning that if a motion to dismiss raises a threshold

3   issue, we've also met that standard as well.  So this factor

4   leans in favor of granting a stay.

5           THE COURT:  Okay.

6           MS. SPEARS:  And then the last issue is whether a

7   stay is going to reduce the burdens of litigation on the

8   parties and the Court.  And I think, you know, this is kind of

9   in our earlier discussion about how antitrust cases are very

10  burdensome.  And, you know, HP early on raised with plaintiffs

11  the type of discovery -- or raised in our briefing the type of

12  discovery that plaintiffs in these cases normally seek, into

13  financials, marketing, technology, and design information.

14  It's company-wide sprawling discovery.  Plaintiffs never

15  dispute that notion.  They have essentially conceded that they

16  will, in fact, pursue discovery on all those grounds.  And

17  that's exactly the type of burdensome discovery that courts

18  caution against allowing to proceed at this stage of the case

19  in antitrust and other complex cases.

20          And I think with that, your Honor, I'm happy to

21  answer any other questions, or --

22          THE COURT:  This may be a lingering question I have.

23  That is, if 80 or 84 percent of the case is gone, if those

24  aspects of the motion to dismiss that you described are

25  granted, I guess I was just wondering why -- and answer this

1    any way you want to.  Why do they have to get to page 26 or

2    27, really 27, to get to those?  It seemed like that's like

3    the fourth of the four arguments that you've mentioned on the

4    motion to dismiss.  Maybe they were all kind of in equipoise.

5    But it seemed like that argument was kind of buried in your

6    motion a little bit.  I'm just wondering if you have anything

7    you could tell me about that.

8              MS. SPEARS:  In the motion to dismiss, your Honor?

9              THE COURT:  Yeah.  Wouldn't the motion to dismiss, if

10   it was really going to knock out 80 to 84 percent of the

11   claims, why wouldn't you have led with that?  I guess that's

12   the question.  Maybe it's a tactical question.

13             MS. SPEARS:  I -- you know, I can't speak as the only

14   person who had any hand in drafting our brief.

15             THE COURT:  Yeah, it's kind of an unfair question.

16             MS. SPEARS:  But I will say, the heart of this case

17   is an antitrust case.  So I think that our inclination was to

18   deal with the antitrust cases first, and then kind of handle

19   the state cases that follow on after.  Because, you know, as I

20   mentioned, it wasn't like the first 26 pages were a lead-up to

21   that end argument.  Our argument is that those first 26 pages

22   are dispositive and that -- that warrant granting HP's motion

23   to dismiss in its entirety.

24             THE COURT:  Okay.  The only other question -- well,

25   let me just check something, make sure.  One moment.

1          Okay.  Can you tell me whether anybody working on the

2    briefing on the motion to stay or the motion to dismiss on

3    behalf of HP used a form of generative AI that would have, in

4    effect, written the brief, or at least written a draft of it?

5    Do you know whether that was done?

6          MS. SPEARS:  I -- I can say I am nearly certain it

7    was not done.  As to, you know, the great majority of the

8    briefing that I did, it absolutely was not done.  And I think

9    we have firm policies against that.  But I cannot say for

10   certain.  But I know that is not our practice.

11         THE COURT:  Okay.  You need say no more.  I don't

12   usually ask.  The reason why I did was there's a citation on

13   page 30 of the motion to dismiss brief, N.D. Illinois, but

14   it's N.D. 111.  In other words, it just looks curious.

15         MS. SPEARS:  Hmm.

16         THE COURT:  It looks like something a robot would do.

17   That's why I asked.  But you answered all my questions.

18         So why don't we turn to the plaintiffs.  And that

19   would be you, Mr. Krtausch.  And tell me, why should this stay

20   be denied?

21         MR. KRTAUSCH:  Thank you, your Honor.  To start off,

22   I think we need to make it clear that the burden is on the

23   defense to establish good cause as to why a stay should be

24   granted in this case.  They're relying on just the mere fact

25   that, a category case, that this is an antitrust case.  I hear

1    *Twombly*.  And I can speak kind about *Twombly* because that was

2    one of our cases from our firm.  *Twombly* involved no less than

3    five large telecommunication providers.  And in that case,

4    there was an alleged widespread, vast conspiracy scheme.

5            This is a case, we have one defendant and a very

6    simple, straightforward facts.  While we agree there may be

7    some legal complex questions to be answered by the Court,

8    factually it's straightforward.  This is not the typical

9    antitrust case.

10            To get into the threshold matter, your Honor, I think

11   HP's motion to dismiss does not raise any immunity from suit

12   issue.  There's no lack of subject matter jurisdiction or the

13   like that courts find appropriate to grant a stay if those

14   were raised in a motion to dismiss.  Rather, there's two --

15   there's multiple things raised by HP.  But if granted --

16   what's essentially raised by HP in their motion to dismiss is

17   that our complaint doesn't allege sufficient facts.  If

18   granted -- and we disagree with that contention, but if

19   granted, we'll certainly have an opportunity to amend, and

20   this case will proceed.

21            In addition, as it relates to what they're labeling

22   as a threshold issue, HP claims that some class reps don't

23   have standing to assert claims regarding every printer model.

24   But it's immaterial that they're labeling that as a threshold

25   standing issue.

1    And the reason why it's buried in page 26, or so, of

2    their brief is because the courts in this district agree with

3    us.  And our reply -- our opposition toward the motion to

4    stay, we have a footnote with multiple cases just in two years

5    alone, that in the past two years alone that agree with us on

6    this.

7    This quote-unquote standing question that HP is

8    raising is, in reality, an adequacy of the class reps under

9    Rule 23.  It's not a rule -- it's not a 12(b) or Article III

10   argument.

11   But even if the Court were to disagree with the

12   majority and come up with a ruling on this quote-unquote

13   standing issue at the motion to dismiss stage, the litigation

14   would still continue.  HP's standing argument --

15   THE COURT:  Why would it only be an adequacy of

16   representation issue if the standing doctrine doesn't really

17   allow a plaintiff to make a claim related to a -- some act

18   that didn't cause that plaintiff an injury?  And the way I

19   think I heard defense counsel argue this was those plaintiffs

20   who bought certain printer models that were not the ones at

21   issue in the complaint wouldn't be in a position to argue an

22   injury of fact as to those printers they didn't buy.

23   So why is that just a class adequacy question and not

24   an injury Article III case-for-controversy question?

25   MR. KRTAUSCH:  Well, your Honor, and I think HP

1   agrees with me with this, they're not questioning our standing

2   to pursue the class rep's injuries.  I think they agree with

3   us that we allege injury in fact as to the actual class reps

4   and those printers that they paid for.  And those are the same

5   factual allegations that will carry against any of the

6   printers.  So even if this goes forward on just those eight,

7   it's the same factual questions.

8           THE COURT:  So if 80 percent or 84 percent of the

9   claims were to drop out because those plaintiffs didn't buy

10  the right printer, are you saying the existence of the claims

11  for the plaintiffs who bought the printers in question still

12  have to be litigated?

13          MR. KRTAUSCH:  Of course --

14          THE COURT:  And, therefore, the discovery and its

15  association with that would have roughly the same scope?  Is

16  that what you're saying?  Don't let me put words in your

17  mouth, but that's what I was extrapolating.

18          MR. KRTAUSCH:  It's essentially the same litigation.

19  While not to change the factual issues that need to be

20  discovered in this case, but, Judge, we point out to *Freeman*

21  and *Broiler Chicken Antitrust Litigation*.  At this stage, at

22  the motion to dismiss stage, we only need to allege injury in

23  fact for our class reps.  Now, whether or not our class reps

24  are sufficient to adequately represent the class as a whole

25  and those other printers, that's something that the courts

1    typically in this district decide at the Rule 23 class

2    certification stage.

3          THE COURT:  Okay.  So what practically would happen

4    if the class doesn't get certified because of class rep

5    inadequacy?  Does the case die, or do other class reps, do

6    they get proposed and amended complaints filed?  What happens?

7          MR. KRTAUSCH:  We could always add plaintiffs, your

8    Honor, absolutely.  And the fact that we're having this

9    discussion favors denying their motion to stay because we're

10   effectively arguing a motion to dismiss.  That's not what

11   we're here for.  If we're looking at the merits or the likely

12   success of their motion to dismiss, they have not reached

13   their burden to have a blanket stay of discovery in this case.

14         THE COURT:  Well, I guess I'm not interested in

15   trying to decide whether the motion to dismiss -- motion to

16   dismiss is valid or not.  That's not any of my business right

17   now.  But I'm more interested in trying to figure out how much

18   of the case would get resolved if it were to be granted.  And

19   so that's why the question was, even if it's granted, it's not

20   entirely resolved at least as to the plaintiffs who live in

21   the states in which they sued under particular state laws and

22   who bought the printers that had been alleged to have had the

23   antitrust issues.  Or have I misstated that?  It was

24   convoluted.  And I think you probably already answered

25   affirmatively.

1      MR. KRTAUSCH:  Yeah, Judge, even if those state

2  court -- those state antitrust law claims are dismissed by

3  Judge Pacold, it will be the same facts that need to be

4  discovered -- same facts at issue.  So it would not streamline

5  or limit this case at all.

6      THE COURT:  Okay.  What else do you want to add?  Not

7  that there has to be more, you've done a fine job.  What else

8  do you want to talk about?

9      MR. KRTAUSCH:  Judge, we do want to put on the record

10  that we are entitled to discovery to determine the adequacy of

11  the class reps as well.

12      THE COURT:  So has discovery in this case been

13  bifurcated between merits and class?  I don't think it has.

14  You tell me if I'm wrong.

15      MR. KRTAUSCH:  Not at this time, your Honor.

16      THE COURT:  Has not.  Nobody so moved for

17  bifurcation?

18      MR. KRTAUSCH:  So, again, just to come back --

19      THE COURT:  Nobody has asked that that discovery be

20  bifurcated in that way; right?

21      MR. KRTAUSCH:  No, Judge.

22      THE COURT:  Okay.  Tell me, what else do you want to

23  say?

24      MR. KRTAUSCH:  Judge, I just -- we're here on

25  speculation.  We have not had any discovery requests.  They

1   have the burden to establish good cause to stay discovery, and

2   they cannot with the facts that we have here.  They don't know

3   what the -- what they're even alleging as what may be our

4   requests.  They have similar cases where they're litigating

5   similar facts.  So it -- they have not come forward with any

6   affidavit, any data, any information whatsoever would support

7   the content -- their notion or their argument that discovery

8   in this case will be expensive.  They know where a lot of this

9   information is or how to get it based on those other cases,

10  and they haven't put it in their papers, and they haven't

11  filed any support to say that this would be expensive, other

12  than the fact that this is an antitrust case.

13          But as I said earlier, Judge, this case, the factual

14  allegations in this claim are exceedingly straightforward.

15  And I would invite you to do what -- the Court to do what it

16  did in *Scott v. Jeffreys* and examine the complaint, and I'm

17  confident that the Court will find that this case does not

18  present an unusually thorny or difficult set of factual issues

19  to be explored.

20          THE COURT:  Okay.  Was there a government

21  investigation in this case, or no?

22          MR. KRTAUSCH:  To our knowledge, no.

23          THE COURT:  No.  So if discovery, though, in this

24  case were to proceed, wouldn't it delve into the pricing for

25  the computer printers at issue in the case?

1      MR. KRTAUSCH:  It will get into the pricing of the

2  ink, yes.

3      THE COURT:  And the decisional process as to how to

4  reach whatever pricing the company wanted to put on it?

5      MR. KRTAUSCH:  Yes.

6      THE COURT:  There's a tying claim.  You want

7  discovery there; right?

8      MR. KRTAUSCH:  Yes, Judge.

9      THE COURT:  Probably want a lot of internal

10  communications between the salespeople, the marketing people.

11  All the kind of typical things we see in the plaintiffs'

12  antitrust discovery request which usually consists of, well, I

13  don't know, sometimes more than 100 or more Rule 34 requests.

14  Right?

15      MR. KRTAUSCH:  Your Honor --

16      THE COURT:  Maybe you see where I'm going.

17      MR. KRTAUSCH:  They haven't been prepared at this

18  point, so I don't want to -- I see where you're going, your

19  Honor.

20      THE COURT:  I'm having a hard time believing that

21  this is not going to be expensive, burdensome discovery based

22  on the claims you've made.  That's all I'm saying.  I don't

23  know that I need an affidavit to figure that out.  I've

24  propounded those requests, I've responded to them in my

25  career.  I'm just saying.

1        MR. KRTAUSCH:  And a denial of their motion to stay

2   does not waive any of their objections to the burdensomeness

3   of any specific request.

4        THE COURT:  Sure.

5        MR. KRTAUSCH:  We're entitled to propound those

6   discovery requests, and we can litigate them.  And we have no

7   intention of being overly harassing.  We just want what we're

8   entitled to.

9        THE COURT:  Yeah.

10        MR. KRTAUSCH:  So if there's something that a search

11   term comes up with millions and millions of hits, we'll work

12   with the defense to come up with, you know, better terms to

13   make this as smooth as possible.

14        THE COURT:  That's how -- but we're getting ahead of

15   ourselves, though.  I was really just pushing you a little bit

16   on the idea that they would have to somehow aver that it's

17   going to be expensive and set forth specifics.  A case like

18   this, I don't -- I don't see that.

19        MR. KRTAUSCH:  In any event, Judge, what they're

20   labeling as a threshold standing issue has been routinely

21   found by courts in this district to not be.  These issues are

22   going to be -- or have been decided multiple times in the past

23   two years.  We've cited them in our opposition brief at the

24   Rule 23 class cert stage.  So discovery -- but even if -- even

25   if Judge Pacold disagrees, as I said earlier, the factual

1  allegations are the same.  So even if those -- even if Judge

2  Pacold grants their motion to dismiss as to those issues,

3  discovery is not going to change.  We're still going to get

4  this information.

5         THE COURT:  Okay.  What's your best one or two cases

6  on the proposition that their motion to dismiss doesn't really

7  present a standing question, therefore, it doesn't really

8  present a threshold question under *New England Carpenters*?

9  What would you say your best couple of cases are?

10        MR. KRTAUSCH:  So first would be *Freeman verse MAM*

11 *USA Corp.* It's 528 F. Supp. 3d 849.

12        THE COURT:  Yeah, that's one of my cases.  But

13 you're -- that's a district judge decision I'll probably need

14 to look at.  A very recent; isn't it?

15        MR. KRTAUSCH:  Correct, Judge.

16        THE COURT:  Yeah, okay.

17        MR. KRTAUSCH:  That was March 23, 2021, by Judge

18 Chang.

19        THE COURT:  Okay.

20        MR. KRTAUSCH:  And also *Broiler Chicken Antitrust*

21 *Litigation*.  It's a 2017 case.  290 F. Supp. 3d 772.

22        THE COURT:  Okay.

23        MR. KRTAUSCH:  And just so I can give the Court a

24 quick quote from -- this is Freeman:  What MAM is really

25 challenging is whether Freeman (or, actually, any Illinois

1    resident who bought pacifiers only in Illinois) can satisfy

2    the Civil Rule 23 class certification requirements as applied

3    to a nationwide and multi-state class.  Indeed, when this case

4    reaches a class certification decisional stage, it might very

5    well be that MAM will have solid arguments against certifying

6    nationwide or multi-state classes, especially if the state

7    laws have different substantive legal standards.  Adequacy,

8    commonality, and predominance can be tough questions in

9    deciding whether to certify a multi-state class, so close

10   scrutiny is warranted.  But that is a question to be answered

11   after discovery on the propriety of a class certification, not

12   right out of the box by an overbroad application of Article

13   III standing to proposed class actions.

14          THE COURT:  Okay.

15          MR. KRTAUSCH:  And, Judge, I just want to make one

16   more point.

17          THE COURT:  That was from Freeman; right?

18          MR. KRTAUSCH:  Correct.

19          THE COURT:  Okay.

20          MR. KRTAUSCH:  Yes, Judge.  And that's on page 859 to

21   860.

22          And I just want to make one more point.  The *Calderon*

23   case that HP is heavily relying upon, yes, Judge Rowland found

24   that there's a, quote-unquote, standing issue, Article III

25   standing issue, for certain claims.  But the very next

1  sentence she makes clear that that defendant's motion to

2  dismiss also raises a preemption argument that would get rid

3  of the entire complaint.

4       We don't have any argument in this case, in HP's

5  motion to dismiss, that will get rid of our entire complaint

6  without at least having the option to amend.

7       THE COURT:  But you would concede, though, that I

8  would sill have the discretion to either fully or partially

9  stay discovery if I felt that the motion to dismiss maybe

10 wouldn't get rid of the entire case but would get rid of a

11 substantial piece of it, in, as I've said, a threshold-type of

12 manner.  You would agree with me that much; wouldn't you?

13      MR. KRTAUSCH:  Well, Judge, I think that goes into

14 the merits of their motion to dismiss, and I think that's

15 inappropriate at this stage based off of, I believe it's *New*

16 *England Carpenter*, where Judge Rowland discussed that.

17      THE COURT:  Okay.

18      MR. KRTAUSCH:  But --

19      THE COURT:  Yeah, she didn't want to do that.  I

20 remember that.

21      MR. KRTAUSCH:  But with our factual allegations --

22      THE COURT:  That wasn't quite what I was asking, but

23 go ahead.

24      MR. KRTAUSCH:  Our discovery request and the scope of

25 our discovery will not be different no matter if half the

1   complaint or some of the state law issues -- state antitrust

2   counts are dismissed or all of them stay.

3           THE COURT:  Okay.  Anything else?

4           MR. KRTAUSCH:  Not at this time, your Honor.  Thank

5   you.

6           THE COURT:  Okay.  Very good.

7           So Ms. Spears, reply as you wish.  A couple things I

8   hope you can address, though, would be counsel's, I thought,

9   very helpful discussion of some of the precedent.  So he

10  sought to distinguish *Calderon*.  He sought to rely heavily on

11  *Freeman* and say really *Freeman* ought to pretty much, you know,

12  give a roadmap to this Court as to how to decide your stay

13  motion.

14          And then the other thing he did was to say, even if

15  you were right in your motion to dismiss as to the standing

16  question as you've described it, ability to sue in the 42

17  states, that the same kind of factual issues would still have

18  to get litigated as to other plaintiffs, so why should all of

19  that factual discovery be stayed now?

20          Those were I thought, you know, some of the most

21  salient things counsel said, and I hope you can address those.

22  But reply in any way you wish.

23          MS. SPEARS:  Sure.  Thank you, your Honor.  I'll

24  start with the state standing issue.  I think off the bat, and

25  perhaps I'll borrow what plaintiffs' counsel just said, on a

1    motion to stay, this Court need not weigh into the merits of

2    the motion to dismiss.  And that's precisely what plaintiffs

3    are asking when they are calling into question the standing

4    issue that HP has raised.

5         Yes, certain courts in this district have, on a

6    motion to dismiss, held that they see this more as a class

7    certification issue than a motion-to-dismiss issue.  HP

8    maintains that this very much is a standing issue to be

9    addressed on motion to dismiss, and there are plenty of courts

10   in this district that agree with HP's position, as cited in

11   HP's briefing in the motion to dismiss.  To imply that that is

12   an unsupported position I think is improper.  So I think --

13   and -- and secondly --

14        THE COURT:  Improper, strong word.  Do you mean

15   incorrect?

16        MS. SPEARS:  Sure.  Thank you, your Honor.

17        THE COURT:  Okay.

18        MS. SPEARS:  Secondly, to my point that the merits

19   not be weighed into, the courts merely discuss on a motion to

20   stay, has a threshold standing issued been raised.  Here we

21   have.  We have brought a motion to dismiss as to standing.

22   And I think that's where the analysis can stop in terms of the

23   stay motion.

24        As to whether the discovery will be the same, whether

25   or not HP's motion is granted, I disagree as well with

1　plaintiffs' counsel.  There may be certain discovery that does

2　remain the same and certain facts that will need to be proved,

3　despite what state law claims are made in the case, if the

4　case is to proceed after HP's motion to dismiss.

5　　　　　But there is a lot of information that is highly

6　different, even state to state.  For one, plaintiffs concede

7　in their motion to dismiss briefing that certain of their

8　state law claims are brought because they allege that HP's

9　conduct is unfair.  Certain of their state law claims are

10　brought because they allege that HP's conduct is -- amounts to

11　a misrepresentation.  Certain of their claims are brought

12　because they allege that HP's conduct is unconscionable.  This

13　is different types of conduct that they're alleging across

14　these different state law claims.

15　　　　　Second, as I'm sure you know, your Honor, these

16　antitrust cases are heavily driven by the data.  And what --

17　what state law claims are in this case is going to have a very

18　large impact on the data, the purchase and sale data, the

19　printer data, when they're sold, from state to state.  If

20　we're talking about 20 percent of the states or -- or the full

21　thing, it's going to be vastly different.  So I think it is --

22　it is going to be a huge difference whether or not these other

23　state law claims are made in the case.

24　　　　　Second, plaintiffs' counsel's entire argument did not

25　take into the fact the standing issue as to the printer

1　models, which even more so I think highlights the difference

2　in discovery because these printer models receive -- are

3　different of themselves.  They receive different updates.  The

4　strategies for these printer models may be different.  And so

5　I think that those will show an even more difference that the

6　discovery will not be the same as to all the printer models.

7　So that's kind of I hope addressed the questions you may have

8　as to standing.

9　　　　　And I think your Honor probably agrees with us here,

10　but in terms of the burden, and plaintiffs said they don't

11　have requests, numerous courts in this district have found

12　that even less discussion than we've had here as to burden is

13　enough to find that a stay is warranted.  And plaintiffs'

14　counsel alluded to the fact that we know where the documents

15　are so we can get them.  And as I'm sure you know and don't

16　miss that the issue -- the burden of discovery is not in

17　knowing where the documents are, it's the collection, review,

18　and production of those documents.  And that's the burden that

19　we should not have to get into at this time.

20　　　　　THE COURT:  It might be different if you received an

21　extensive subpoena from the Department of Justice Antitrust

22　Division and already had to find them and produce them.  But

23　it sounds like that didn't happen here.

24　　　　　MS. SPEARS:  Correct, your Honor, that did not

25　happen.  And, you know, to the extent plaintiffs, you know,

1    call on the underlying cases, or, I'm sorry, I apologize, the

2    previous cases in which HP is a defendant in the Northern

3    District of California, the *Mobile Emergency Housing* and the

4    *So* cases.

5         THE COURT:  Yeah, they were very concerned about the

6    fact that you had already gone through discovery on those

7    cases, if I read it correctly?

8         MS. SPEARS:  No documents have been produced in the

9    *So* case.

10        THE COURT:  Okay.

11        MS. SPEARS:  And the *Mobile Emergency Housing* case

12   involves four printer models that are laser jet printers that

13   were not purchased by any of the named plaintiffs in this

14   case.  Moreover, the production of documents in that case span

15   the time period of December 2016 to January of 2023.

16   Plaintiffs' class in this case begins in September of 2022.

17   So we're talking about a four-month overlap.

18        THE COURT:  Okay.  I mean, just so that you know, I

19   guess I'm not really persuaded by any of this because all

20   discovery can be burdensome.  The discovery you're going to

21   have to undertake in the case is going to entail some burdens.

22   And I guess I'm not really very persuaded either way by

23   whether it's burdensome or not.  I'm more concerned about

24   whether this is a case where discovery should proceed.

25        Let's say that I granted the stay but that I wanted

1    to put some kind of boundary around what discovery could take

2    place.  How practically would I do that?  It strikes me it

3    might be very difficult.  How would I say you can have this

4    type of document, not this one, based on it relating to a

5    threshold standing issue that was raised in the motion?  How

6    would I do that, if you think I even can?

7         MS. SPEARS:  In terms of limiting discovery or

8    allowing discovery in part, you know, so as not to bring this

9    case to a complete halt, I think there are numerous things

10   that the parties can do now and that HP was willing to do

11   months ago when we first, you know, had this discussion with

12   plaintiffs.  As you know, we will need to negotiate an ESI

13   protocol, a protective order.  We can begin discussions on

14   custodians.  Those are sorts of high-level things that, you

15   know, need to have happen in every case.  And in a case like

16   this that is complex, it is going to take a while to have

17   those discussions.  And HP remains willing to engage in those

18   things.

19        THE COURT:  Okay.  What else did you want to add?

20        MS. SPEARS:  Just one last point on standing.

21   Plaintiffs' counsel suggested that we don't contest the

22   named-plaintiff standing, but we absolutely do contest the

23   named-plaintiff standing.  We contest that named plaintiffs do

24   not have standing to bring the claims in the states that they

25   don't have connection to.  So I just wanted to clarify that

1    one point.

2          And I think that is -- that is probably all I have.

3    Unless you have any other questions, your Honor.

4          THE COURT:  No, I don't.  So I want to just start out

5    or finish by saying, Mr. Krtausch and Ms. Spears, thank you.

6    And you get -- you get rave reviews.  I appreciate the parties

7    in the case and the counsel, more senior counsel in the case,

8    providing both of you with an opportunity to actually say

9    something in court, actually argue substantive points to

10   respond to questions.  Because I really believe that it's very

11   difficult to become good at that kind of thing unless you do

12   it with some regularity.  And I'm glad your firms are allowing

13   you to do that.  I hope they do that in this and other cases.

14   Maybe there's other mechanisms firms might use to get their

15   attorneys in front of courts, juries, what have you.  They

16   should do that.  I think that's good.  It's good for the

17   profession.  And it is not an interference with the

18   attorney-client relationship for this Court to make a polite

19   suggestion or request that that be done because that request,

20   of course, could be refused.  And, you know, I think clients

21   benefit.  It's none of my business, it's the client's business

22   to decide who gets to argue.  But I think clients benefit from

23   a professional development if younger members, pardon me,

24   less-experienced members of teams because they get better

25   lawyers, they get a better legal team, they inherit the case

1    as more senior people move on in their careers.  This is a

2    good thing.  So I've said enough.

3             As for what we're going to do next, so, because the

4    argument was so good and it raised a number of points that I

5    think are nuanced, I'm not comfortable just ruling right now

6    orally.  I want to think a little bit more, take a little bit

7    more time.  I don't think we'll need more briefing.  I don't

8    think we'll need another hearing or argument.  But I think we

9    might need a day, or a few days.  I've got a commitment this

10   afternoon, evening, I have to do.  We have an all-day

11   settlement conference tomorrow.  So it's likely you might not

12   get an order until perhaps next week.  If it happens sooner,

13   wonderful.  But I'd like to move quickly.  You'd like to know

14   whether discovery will be stayed or not.  And that's not the

15   motion -- not the kind of motion that should sit around.

16            So that's my goal, but it will be by ECF, then.  And

17   I just don't feel comfortable -- I haven't really decided yet

18   what I'm doing.  I want to think about it because you both

19   made such good points.

20            So thank you everyone, once again, and we're

21   adjourned.  Thank you.

22       (Which were all the proceedings heard.)

23

24

25

1          CERTIFICATE

2     I certify that the foregoing is a correct transcript from

3 the digital recording of proceedings in the above-entitled

4 matter to the best of my ability, given the limitations of

5 using a digital-recording system.

6

7 */s/Sandra M. Tennis*          May 11, 2024

8 _____     _____

 Sandra M. Tennis          Date
9 Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25