IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RENEE ROBINSON, et al.,          ) Case No. 24 C 164
                                 )
                Plaintiffs,      )
          v.                     )
                                 )
HP, INC.,                        ) Chicago, Illinois
                                 ) January 23, 2025
                Defendant.       ) 10:20 a.m.

TRANSCRIPT OF PROCEEDINGS - MOTION
BEFORE THE HONORABLE MARTHA M. PACOLD

APPEARANCES:

For the Plaintiffs:    MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN
                       BY:  MR. JIMMY W. MINTZ
                       201 Sevilla Avenue, 2nd Floor
                       Coral Gables, Florida 33134

                       MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN,
                       PLLC
                       BY:  MR. STEPHEN J. RAAB
                       227 W. Monroe Street, Suite 2100
                       Chicago, Illinois  60606

For the Defendant:     EIMER STAHL LLP
                       BY:  MR. JOHN K. ADAMS
                       224 S. Michigan Avenue, Suite 1100
                       Chicago, Illinois  60604

                       GIBSON, DUNN & CRUTCHER LLP
                       BY:  MS. RACHEL S. BRASS
                            MR. SEAN HOWELL
                       One Embarcadero Center, Suite 2600
                       San Francisco, California 94111-3715

                       GIBSON, DUNN & CRUTCHER LLP
                       BY:  MR. SAMUEL G. LIVERSIDGE
                            MS. ILISSA S. SAMPLIN
                       333 South Grand Avenue
                       Los Angeles, California 90071

Court Reporter:          KATHLEEN M. FENNELL, CSR, RMR, FCRR
                         Official Court Reporter
                         219 South Dearborn Street, Room 2328A
                         Chicago, Illinois  60604
                         Telephone:  (312) 435-5569
                         Kathleen_Fennell@ilnd.uscourts.gov

                    *    *    *    *    *

              PROCEEDINGS REPORTED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

(Call to order.)

THE CLERK: 24 C 164, Robinson v. HP.

If you can state your names for the record, we'll start with plaintiffs' counsel.

MR. MINTZ: Jimmy Mintz for the plaintiffs.

MR. RAAB: Jarret Raab for the plaintiffs.

MR. LIVERSIDGE: Good morning, Your Honor. Sam Liversidge for defendant HP.

MR. HOWELL: Good morning. Sean Howell for defendant HP.

MS. BRASS: Good morning. Rachel Brass for defendant HP.

MS. SAMPLIN: Good morning. Ilissa Samplin for defendant HP.

MR. ADAMS: Good morning. John Adams for defendant HP.

THE COURT: Good morning, everyone. Feel free to have a seat.

We're here for the argument on the motion to dismiss. And first of all, apologies for the delay in starting the hearing this morning.

Are the parties ready to proceed with the argument?

MR. MINTZ: Yes, Your Honor.

MR. LIVERSIDGE: Yes, Your Honor.

THE COURT: Okay. Typically I would just track the order of the briefs, so we would start with the defense, then go to the plaintiffs for the response, then come back to the defense for reply, so just mirroring the briefs.

And I set 30 minutes. I'm not sure, does that time frame approximately work for you? If you anticipate something vastly different from that, just let me know, but I set that sort of as just a rough guideline.

MR. LIVERSIDGE: That's fine for us, Your Honor.

THE COURT: Okay.

MR. MINTZ: Same for us, Your Honor.

THE COURT: All right. Well, whenever you're ready.

MR. LIVERSIDGE: Okay. Should I argue from up --

THE COURT: Feel free, whichever is easier for you. If you'd like to come up here, that works great.

MR. LIVERSIDGE: Okay. Thank you, Your Honor.

Good morning again, Your Honor. Sam Liversidge for defendant HP.

I'd like to start with the relevant market, if that's okay. The plaintiffs in this case contend that the relevant market in support of their antitrust claims is an aftermarket for replacement cartridges that work with HP printers. In other words, they are alleging a single-brand aftermarket, and single-brand aftermarkets are exceedingly rare. They're typically rejected as a matter of law, and as we've discussed

at length in our brief, the case law sets out the elements that have to be established in order to proceed with antitrust claims based on a single-brand market.

And the courts approach these elements a bit differently, but essentially what is required is for the plaintiffs to establish that the challenged aftermarket restrictions are not generally known at the time consumers buy the original product, here the printer.

They also have to establish that there are significant information costs that prevent accurate life-cycle pricing and that the defendant took steps to increase those costs.

They have to allege that there are significant monetary switching costs that would lock in consumers to a particular product.

And they also have to establish that general market definition principles don't undermine the alleged market.

We don't believe the plaintiffs have alleged these elements, Your Honor. We don't actually think it's close. There's almost nothing in the complaint on many of these elements, and I'd like to walk through it quickly.

To begin with, they don't plausibly allege that these aftermarket restrictions were not generally known by consumers. They don't make that allegation. The starting point in these aftermarket cases is an allegation that the defendant failed to disclose its policies, that the defendant got consumers to buy

their product without disclosing to them its policy about these restrictions. There's no allegation to that effect in the complaint, and we don't believe they can make such an allegation.

They also have not plausibly alleged that HP's actions prevented them from calculating the cost of owning an HP printer. There's no allegation to that effect in the complaint. The courts in the Seventh Circuit in particular are focused on situations where the defendant changed its policy after the purchase, essentially a bait-and-switch situation.

There's no allegation in this case that HP did that. We've got one what I would call cryptic allegation in the complaint at paragraph 23 that in late 2022, HP reinstated a feature that had the same functionality as its Dynamic Security features in many of its printer models. That's it. That's the allegation about a change in policy. There's no indication of what this feature is, what it does, what printers it was implemented in.

If plaintiffs were going to allege a claim based on a change in policy, the allegation would be that HP sold printers under a stated policy that you could use these third-party clone cartridges with the printers and then subsequently changed its position on that policy after people had made the original purchase. There's nothing like that in the complaint.

Plaintiffs also have not plausibly alleged that

consumers face significant costs to switch to a different printer. The allegation is essentially that printers in general cost between 100 and $200, and it would be difficult for people to switch. There's no attempt to grapple with what is the cost of cartridges versus the cost of printers for these printers at issue or how that might lock in consumers to a particular printer.

And finally there's no attempt to deal with cross-elasticity of demand at all. Essentially they allege that every cartridge that works with an HP printer is somehow interchangeable with every other cartridge. No attempt to deal with which cartridges actually work with the printers at issue, what third-party cartridges are available or not available, no attempt to deal with the printer market and what competition looks like in that market.

So, Your Honor, at the end of the day, we have a complaint here where there is no allegation that the aftermarket restrictions were not generally known, no meaningful allegation that HP ever changed its policy, no meaningful discussion of switching costs, no attempt to deal with cross-elasticity of demand at all.

We think the allegations in this case fall woefully short of what's required under the case law to move forward with a single-brand aftermarket in support of these antitrust claims, and we think all of their antitrust claims fail as a

result of this failure to plead these essential elements.

I'm going to pivot to additional arguments and move off the relevant market.

In addition to our arguments about the relevant market, we think their antitrust claims fail for additional independent reasons. It appears that the only theory that plaintiffs have put forward in support of their Section 1 and Section 2 claims is a tying theory.

A tying arrangement is an arrangement where a seller offers to sell a product to one part -- to a party on the condition that they agree to also buy a second product. An essential component of a tying claim is an allegation that the defendant has market power.

There's nothing wrong with selling products together, selling components together. The question is does the defendant have economic power such that it can force a consumer to do something they don't want to do. The Supreme Court's decision in *Jefferson Parish* discusses at length what's required to show this type of market power, the forcing element of a tying claim, and it talks about how the evils of a tying claim are in forcing a customer to do something it doesn't want to do. It does not want the tied product, but it has no choice.

We think their tying claim fails for two principal reasons. One, we don't think they've adequately alleged that

HP has market power in the U.S. printer market, which is the tying product market. They have one sentence in their complaint that says HP currently holds about 34.7 percent of the global market share for printers.

There's no allegation about even what the market share is in the U.S. at all, no indication of exactly what this source is, and nothing else about how HP is able to exercise market power in what is a very competitive printer market in the United States. There's nothing more.

Now, *Jefferson Parish* and the *Digital Equipment Corporation* case in the Seventh Circuit talk about how a 30 percent market share is pretty underwhelming in terms of a claim of market power, and there have to be additional allegations that there are high barriers to entry that make it such that a defendant with a 30 percent market share could actually exercise economic power.

In addition to the failure to plead market power, the plaintiffs have not alleged the essential element of conditioning or coercion. There has to be an allegation that HP would not sell a printer unless somebody agreed to buy the cartridge.

Now, plaintiffs say that the alleged tying agreement was not the original purchase agreement. In fact, they say, their contention is they didn't know about the requirement to use HP original cartridges.

And the case law is clear that you can't have a tying claim where the customer says it was unaware of the arrangement. You don't have a coercion element where somebody's not even aware that they're being forced to buy a second product.

The plaintiffs have taken the position in their briefing that the agreement here occurred when plaintiffs, finding their printers disabled by the firmware update, agreed to purchase HP-branded ink. But that's not a tying arrangement. The printer has already been purchased.

I don't know whether that's another claim based on another theory, but that is not a tying arrangement under the law.

So, Your Honor, we believe that the conditioning element is missing from the complaint. They've taken the position now that it's not the original purchase that involves this conditioning and that it's some other action that occurred later in time.

We're not aware of a case that has allowed a tying claim where these purchases are at different points in time and there's no link between the two of them that's alleged.

We also -- and we've made this point in our briefing and argue at some length that we don't think that the type of tying that's alleged here is subject to per se treatment. I mean, it's a bit unclear what the theory of tying is, but if

the theory is some kind of technological tie, we think the case law is pretty clear that that does not support a per se tying claim under the antitrust laws.

We think for many of the same reasons, Your Honor, the Section 2 claim fails. It seems to be based on the same tying theory. We don't think there's sufficient allegations of market power in the tying product market allegations. We don't think there's a relevant market to begin with in support of the monopolization claim. We also don't think that they've adequately alleged that HP has monopoly power in this alleged aftermarket. I don't think there's an attempt to do that.

So we think the Section 2 claims fail for all of the same reasons and perhaps additional reasons as well, given the requirement that there be monopoly power.

I'm going to pivot, Your Honor, off the antitrust claims and just talk briefly about the Consumer Fraud and Abuse Act claim which we think fails for a number of reasons. As a starting point, it appears that the only section of the statute that is now at issue is Section 1030(a)(2).

In the complaint, they allege claims under (a)(2) and (a)(4). We've moved to dismiss both, and there's no response to our arguments for the dismissal of the claim under Section (a)(4). Instead in the briefing, plaintiffs now say that they are putting forward the claim under (a)(5), but that doesn't appear in their complaint. We don't think it's appropriate to

inject that at this point, although we think the claim fails for a lot of the same reasons as the claim under (a)(2).

So I won't belabor this. We have briefed it at some length, but in a nutshell, we believe that the claim under the Consumer Fraud and Abuse Act fails for essentially three reasons. One is we think it's clear and I don't think they're contesting that HP had authorization to provide these firmware updates. It's like an update you would get on your phone. People signed up for these updates.

What they're essentially contending is that they don't like some of the results of the update, and that's -- that is not a hacking claim. This is a hacking statute designed to prevent hacking, and I think the case law is clear that if you have authorization, you can't state a claim based on saying I don't like what this particular update did. They have argued, although not alleged, that they think HP went beyond its authorized scope by accessing ink cartridges in addition to printers.

That's not in the complaint, but I'm also not exactly sure what that means. We -- HP provided firmware updates that some people downloaded and installed on their systems.

The second point is they don't allege that HP actually obtained any information from the plaintiffs. What information did HP take from anybody as a result of this claimed hacking? There's no indication of what the information is. And that's

an independent reason for dismissal.

And, finally, we don't think they've met the $5,000 loss. We don't think that that loss can be aggregated across absent class members. There's some cases admittedly going both ways on that issue. We think we've got the better of that argument, but there are definitely cases going in the other direction on that element.

We make a number of arguments, Your Honor, in addition for dismissal based on standing grounds. I'm not going to repeat all of that, but I'm happy to answer any questions that the Court has.

And, finally, Your Honor, we obviously feel that we've got a complaint with 75 different state statutes, and it's largely a rote cut-and-paste of the exact same allegations under all of those statutes. We think the antitrust claims fail for all the same reasons that the federal antitrust claims fail. We think if they're based on misrepresentation claims, we think those claims fail.

But if they're based on something else, if there's some kind of additional theory of unconscionability or unfairness, we think we're entitled to know what that theory is so that we have the opportunity to challenge it.

We have not had that opportunity. We don't think they've stated an additional basis for those claims. We think all of those claims should be dismissed, but at a minimum, they

should be required to tell us what the theory is and what the specific part of the statute, these different state statutes they're proceeding under. We think that is required under the pleading standards. They haven't done it, and it puts us in a situation where we're not even sure what theories they're asserting in support of their claims.

Your Honor, I will -- I will stop there, unless there are questions, and wait for additional argument on rebuttal.

THE COURT: Okay. Maybe -- I might have just one or two questions now.

Just on the -- and this is not really in any particular order. I guess maybe just trying to track the order in which you addressed the points.

On the relevant market arguments, you mentioned -- your argument is there's not sufficient allegations or there's no allegations in some instances on these different elements or requirements for that to allege a relevant market, and I think you were pointing to paragraph 23 of the complaint, where it says, "Nonetheless, in late 2022, HP reinstated a feature that had the same functionality," but then, you know, later on, I think in the context of the tying argument, it sounds in a way like the factual allegations on the conditioning or coercion aspect of tying, do those come -- do the allegations in paragraph 23 of the complaint and then on the conditioning or coercion, don't they both get at this issue of what were the

plaintiffs allegedly aware of at the time they bought the printers?

So why wouldn't we just look at, I guess, the firmware update allegations in analyzing the -- the disclosure, whether a disclosure occurred for purposes of the relevant market, as well as for the conditioning argument on the tying?  Or does that -- I don't know if that question makes any sense.

MR. LIVERSIDGE:  I think it does.

You know, one point I would make is so the requirement is that consumers are generally unaware of the restrictions at the time of the original purchase.  So the question is did you make a significant expenditure up front without knowing what the policies are, and then if these other elements are part of it, were you locked into that purchase such that you couldn't easily transition.

So I think the question on knowledge, yes, they allege that these plaintiffs didn't know about the restrictions, but I don't think that's the question.  I think the question is was the policy disclosed?  Were people generally aware?  Probably did the policy change?  And we don't have any of those elements.

And the reality is that this -- I'm going beyond the complaint here, but this all was heavily disclosed, including on the printer box.  And so they've taken the position of not dealing with that and instead saying, well, these people didn't

know.

And I think we're dealing with an objective standard here:  Was it disclosed; were people put on notice?  I think HP very much wants to put people on notice that this is the design of these printers.  If you buy these printers, these are the cartridges that will or will not work with the machine.

So I don't know that you can -- I don't think you can point to a subsequent event to address that question, the initial question of whether there was awareness of these restrictions.

I don't know -- I don't know if I answered the question.  I think -- the tying piece of it becomes relevant because they're saying that we didn't -- we didn't know at the time of the purchase, and so our point is there's no -- there's no conditioning or coercion.  They're saying that occurred later.  But it's unclear when that conditioning element comes in.  What is the agreement that they're challenging here?

And how can we have a tying claim if they're not challenging the conditioning of the original printer purchase on the purchase of a second product, which is the foundation of a tying claim.

I may have said a lot of things that don't get at the point you're raising.

THE COURT:  No, I mean it was a poorly framed question, but, I mean -- I guess just trying to boil it down,

are they basically saying we bought printers not knowing that we would be only able to use HP -- when we bought the printers, we thought we could use a range of cartridges. Later on, there was a firmware update from HP which caused us to have to use HP cartridges only. I mean, that's sort of the basic, like, very boiled down probably missing a lot of nuances and very layperson just boiled down version of the allegations, I think.

MR. LIVERSIDGE: I think I would agree that that's the basic contention.

THE COURT: So, I mean, then it's, okay, well, when the question -- so for the relevant market issues, among the different points is whether they were, like, somehow -- well, were they aware of any -- was there a policy up front that they were not aware of that -- were they -- basically, was there a policy up front that was not disclosed that they would only be able to use the HP cartridges? I mean, that's basically -- I think that's how that fits into that relevant market analysis.

And they'll say up front we thought the policy was we could -- when we bought the printers, we thought we could use all these different cartridges. Then later on, through the firmware update, we found out that we couldn't I think is what their argument would be, at least in the relevant market argument.

But then when it comes to conditioning, I mean, I guess they would say -- well, I guess your point on

conditioning would be how can -- you can't really have it both ways. Either they didn't know about it up front, thereby satisfying the relevant market, but also, you know, failing the conditioning because if they didn't know, how can your purchase be conditioned on a condition that you weren't aware of? Now I'm --

MR. LIVERSIDGE: No, it's -- I will admit that it's a bit hard to conceptualize what's happening here and what the allegations are, but I think you've stated it correctly. They can't have it both ways unless we don't understand what the theory is.

If we understand the theory based on what they said in their opposition brief, they can't -- they can't have it both ways. If they said they didn't know, then what's the conditioning, what's the tie?

But I would say on the relevant market point, I also don't think it's enough -- I agree they can't have it both ways, but I also don't think it's enough to say I didn't know. I think when you look at the cases, pretty robust allegations are required to set up one of these markets, and there are detailed allegations about obfuscation, you know, duping customers into signing up for a significant purchase and then changing the policies, and even some of the cases that the plaintiffs cite, some of which are in the Northern District, I think it's *In re Dealer Management* and the *In re Deere* case, I

mean dramatically different allegations. You're talking about buying a tractor for up to a million dollars, where the allegation is that the defendant told everyone that they would have access to repair tools and things like that, and then after those purchases changed the policy and tried to enforce that change in policy.

And the court talks about how there are I forget if it says pages and paragraphs and paragraphs of allegations about this obfuscation that would allow you to conclude at least there's an issue about whether people are locked in.

And I -- here, we have a sentence that says there's an aftermarket for replacement cartridges, and then some very vague allegations about switching costs, and I don't -- I think the case law suggests that something much more is required.

So I do agree they can't have it both ways, but I also think that just saying I didn't know is not enough to set up one of these markets.

THE COURT: Okay. Now switching to the issue about the market power. So the allegation is that HP currently holds about 34.7 percent of the global market share for printers. I think -- I mean, any comments on the -- I know you mentioned *Jefferson Parish* and the *Digital Equipment Corporation* case, and your argument there is that you need something beyond 30 percent market share. You need further allegations to sustain a market power allegation.

20

But I think or I -- I'm sure they'll address this in response, but, I guess, what about the *Eastman Kodak* case, where I think you could make arguments about did that -- does that have any effect on this, on what's required?

MR. LIVERSIDGE: Yeah, I mean, it's a great question and one that I think there's a lot of debate about exactly what did *Kodak* hold and how does that play out. I think they are different issues.

The *Kodak* holding was essentially that even if you have a competitive initial product market, a competitive foremarket. In that case, it was copiers. Even if that's the case, there's not an absolute rule that you couldn't have a situation where -- in aftermarkets, given the structure of the markets where the defendant is able to take advantage of some economic power in those markets.

But I think that's a little bit of a different issue from the tying claim, because when you allege tying, you have to have this element of forcing through the use of economic power, and all of the cases, even in these single-brand aftermarkets that talk about this issue talk about how, yes, you can have lock-in that may allow for some exercise of economic power, but when you're alleging tying, you have to show market power in this tying product market.

*Kodak* does that. They go on at length about market power in the parts market, parts aftermarket, and how it was an

exercise -- a potential exercise of market power in the parts market, where they had almost a hundred percent of the market that could be linked to the service market and where they could force people to get parts from *Kodak* if they wanted the service.

And so -- and the same is true of the cases in the Northern District of Illinois. I talked about before the *Deere* case, *In re Dealer Management*, and, you know, *Digital Equipment*. They talk about in the tying context, yes, there is this question about a Kodak aftermarket, but you have to show market power in this tying product market.

The *Deere* court, after going through the analysis of the aftermarket, then goes for pages talking about but what is the market power, is there market power in this tying product market? *Jefferson Parish*, the same thing.

And I think *Jefferson Parish* basically says you can't state a tying claim without showing that there is economic power in the tying product market. So I think those are slightly different points.

It is a bit nuanced. I think the *Deere* court, if I'm remembering correctly, tried to kind of deal with the *Kodak* versus *Jefferson Parish* and how to reconcile those and suggested that *Jefferson Parish* said you could have some form of economic power where there's an absence of information, but that's a different type of economic power that's required for

tying, where you're forcing somebody to do what they don't want to do.

And so I'm not aware of any case that has suggested that you don't have to prove market power in a tying claim just because you're alleging a single-brand aftermarket.

THE COURT: Okay. Thank you.

MR. LIVERSIDGE: Thank you, Your Honor.

THE COURT: Whenever you're ready.

MR. MINTZ: Good morning, Your Honor. Jimmy Mintz for the plaintiffs.

I was going to address the general antitrust theory and CFAA, Computer Fraud and Abuse Act portions, and I believe my colleague was going to address some of our state law issues to the extent you want to get into that.

THE COURT: Okay.

MR. MINTZ: I apologize. I'm going to be a little bit married to my computer. I had my own printing issue this morning.

THE COURT: No problem. If you want -- I mean, if you want to bring it up here, feel free, or if it's easier, just feel free to stay there.

MR. MINTZ: All right. Well, the basic issue we have here is that when customers bought their HP printers, what we're alleging is that HP did not disclose that it would use a firmware update to remotely prevent their printers from working

with third-party inks. And so we are alleging that it was not generally known that HP would block third-party ink. And if we want to get into specific paragraphs of the complaint, you know, in paragraph 25, we talk about, you know, the marketing materials contained in the boxes and, you know, talk about a number of statements HP makes, and we state, you know, there's no indication that agreeing to accept software and firmware updates could damage any features of the printer.

And, you know, paragraph 31, we mention that none of the plaintiffs received any warning at the time of the firmware update or at the time of the purchase of the printer that by registering their printers to receive regular updates, they might lose the ability to use non-HP replacement ink cartridges.

So, I mean, we do make those allegations. I believe, in fact, the allegation early on where we describe what Dynamic Security is, we quote from an article.

Pardon me, I'm sorry. We actually -- I'm trying to find the particular allegation because we're going into specific paragraphs, but we do have an allegation. It's actually paragraph 21. The problem stems from the introduction of a system called Dynamic Security, which HP promoted to customers as a way to upgrade their experience and maintain the integrity of its printing systems.

And we also allege -- we make similar allegations in

paragraphs 25, 26, 31. Paragraph 32 we mention how HP's End User License Agreement suggests that consumers will be able to use third-party ink.

So I do agree with what my colleague said that, you know -- he said that, you know, HP told consumers at the time of purchase that third-party ink will not work. We don't agree that that's what they actually did. We do agree that if they had actually done that, if that disclosure was made in those terms and was reasonably conspicuous, we'd have no claim.

But that is not what the disclaimer actually says. We get into this in the briefing, but what their disclaimer said was simply third-party ink may not work. And as we argued in our briefs, there's really a world of difference between "may not work" and "will not work." In fact, we didn't cite this case in our brief, but there is a Seventh Circuit decision, *Dunbar v. Kohn Law Firm, S.C.* It's a 2018 case, the citation is 896 F.3d 762, and the quote from the Seventh Circuit in a different context is, "An unsophisticated consumer would not understand the word 'may' to mean 'will.'"

And that is really our point here. Of course, you know, HP cannot vouch for third-party ink. You know, I've bought a car before that said please only use this one particular brand of coolant.

And I think, you know, your average consumer, at least a substantial number of consumers, would understand third-party

ink may not work to mean exactly that. We cannot vouch for the quality of third-party ink. You're, you know, taking a risk. You might try this ink at your own peril. We can't vouch for its quality.

But what HP did not disclose on the printer box at the time of purchase in the relevant time frame was that HP was going to transmit a computer code to the printers for the purpose of disabling their ability to accept third-party ink.

I would also note that we do allege that at the time the plaintiffs and consumers generally purchased their printers, the printers were capable of accepting third-party ink. In fact, you know, in our papers, we provide a quote from HP to investors through an SEC filing in 2019 where HP specifically stated that there was a thriving aftermarket. They were facing, you know, increasing competition from lower-cost third-party suppliers, and they expected that competition to continue.

And that is really our basic point, our argument, that most consumers, including these plaintiffs, because there was a thriving aftermarket for third-party ink, they expected to be able to use third-party ink, and in many cases they were able to use third-party ink prior to the firmware update.

Now, I think we all agree this is about an *Eastman Kodak*-style claim, a single-brand aftermarket. My colleague said these types of cases are exceedingly rare. I would

actually argue they're not quite as rare these days, you know, based on cases in this district, such as, you know, *In re Deere* and *Dealer Management Systems*. But my colleague I think said that we must allege that there was a change in policy and that the policy wasn't generally known and that defendants intentionally increased the switching costs, in other words, the cost of basically just buying a new printer from a competitor.

I don't really think that's correct. We've quoted in our brief from the *In re Deere* case. It's really you can allege either/or. Either the policy isn't generally known at the time of purchase, or there's a change in policy. And I do believe we allege both.

Basically at the time of the purchase, HP did not disclose the specific fact that it intended to transmit a firmware update to disable the printer's ability to use third-party ink.

Now, my colleague also said that with regard to the tying theory that we need to allege that the consumers effectively agreed that they would only use -- or that they would buy HP ink. We did make a discussion about the decision to purchase HP ink later being the relevant agreement in our briefing.

I would point out though that we've also adequately alleged -- excuse me -- we've adequately alleged a negative

tie, and *Eastman Kodak* itself approves of the negative tying theory. One of the quotes from *Eastman Kodak v. Image Technical Services, Inc.*, this is 504 U.S. at 461 to 462, the Supreme Court states, "A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different or tied product, or at least agrees that he will not purchase that product from any other supplier."

And in the *Eastman Kodak* case, you know, what occurred was Kodak, in the aftermarkets, people were buying -- I believe it was the copier market. People were buying aftermarket replacement parts, and Kodak wanted to condition that on only using its aftermarket services, and it essentially, you know, took action to ensure that consumers couldn't buy the aftermarket part from a third party.

And that was also the case in another *Kodak* case involving *Kodak* in the Sixth Circuit that we cited in our brief, *Collins Inkjet Corporation v. Eastman Kodak*, and, you know, in these cases, you're essentially dealing with a negative tie, with the defendant doing something to cause consumers to be unable to purchase a replacement part from a third party after they've already bought their -- the equipment in the primary market.

And the really important point is simply that, yeah, at the time of the sale of the equipment, they don't disclose

that they are going to do something after the purchase to make the consumer unable to buy a replacement part from a third party.

I would also say one other thing. My colleague mentioned that we only allege tying. That's not really correct. We also have a count for aftermarket monopolization, and I think that is also supported by *Kodak*.

Now, with regard to defining what the market is, I think my colleague mentioned, you know, cross-elasticity, basically that we need to allege, you know, which inks worked in which printers or were marketed to work in which printers.

In paragraph 44, we do provide a list of the printer models for which, based on our investigation what we've read, that were essentially hit by these firmware updates, and, you know, consumers who were previously able to use third-party ink, they tried to use a third-party ink and they got this error message from HP saying we're blocking you from using third-party ink.

So we don't necessarily disagree that discovery might reveal that, you know, if a particular type of ink is only useful in a certain series of printers, maybe, you know, ten different models rather than all models, that in that case, you might have a series of submarkets. You know, you might have a Series 9000 market, aftermarket for inks that are marketed as compatible with, say, Series 9000 printers, and you might have

a separate aftermarket for, you know, ink advertised as compatible with let's say Series 2000 printers.

But I think at this stage, what we're alleging based on, you know, HP's own comments, its own public comments generally treating third-party suppliers as kind of a single aftermarket, I think we're just alleging it as a single nationwide market.

And we don't have this in the complaint right now, but we would simply add that as of last year in late 2023, there is a public statement from HP to investors stating that since 2019, they've been able to reduce what they call unprofitable customers from -- you know, meaning customers who buy a lot of non-HP ink, from 15 percent of all printer customers down to -- sorry, from 25 percent of all printer customers down to 15 percent.

If we need to amend to add that allegation, you know, we're happy to, but we think what we've stated, the claim that we stated at present is sufficient.

One last thing with regard to switching costs. We believe paragraphs 18, 25 through 30 and 41 do allege that the upfront costs of the printer means it's not economically rational to buy a brand new printer, you know, once the plaintiff gets hit with a firmware update and realizes they can no longer buy the lower cost ink. In other words, the cost of the new printer is still greater than the cost of HP's higher

priced replacement ink.

I did want to make one correction to our brief. I think HP cited this *Xerox* case, and it was decided on summary judgment. We noted that in the *Xerox* case, that they cited it for the proposition that I believe a $3,000 upfront color printer cost was insufficient kind of as a matter of law to lock in customers.

You know, we made the point that that was a different type of customer, and it was decided on summary judgment, and the ultimate issue was lack of real-world evidence of consumers actually buying replacement ink sticks being coerced as a result of the policy. But I would note that in that very case, *Xerox v. Media*, it's 511 F.Supp. 2d 372, it was actually a 2007 earlier decision in the same case, but the court denied the motion to dismiss and basically said it was a question of fact whether, you know, given the particular market, what level of upfront costs will be enough to lock in the type of customer at issue.

And we have alleged here that these particular plaintiffs and consumers for these models actually did buy HP ink they otherwise wouldn't have purchased because of the costs of replacing their printer once they got hit with these firmware updates.

Just one quick thing, just to pivot to the Computer Fraud and Abuse Act. As we argue in our brief, we do believe

we've stated a claim under Section (a)(5)(A). My colleague mentioned that we didn't plead a claim under that subsection, but if you look at our complaint, I mean, we are -- our Count I is a claim under the Computer Fraud and Abuse Act generally. And in paragraph 61, we do allege facts that -- we allege, you know, damage to the computer from the code that HP transmitted down to the printer rather, and we believe that factual allegation does constitute a violation of Section (a)(5).

We don't, you know, spell out every subsection of the CFAA, that's true, but if you -- but I think as we also mentioned in our brief, failure to cite the proper subsection of a statute doesn't defeat the claim when the factual allegation states a cause of action. And, for example, in *Quinn-Hunt v. Bennett Enterprises*, that case held precisely that.

And, lastly, my colleague mentioned that there are decisions stating that HP's policy of blocking third-party ink was generally known, but, you know, as stated in our brief, we don't believe that's correct. In the *Parziale* decision, there's language in which the court actually acknowledged, you know, what we allege in our complaint, that there are statements on HP's website and in various places that suggest you can use third-party ink with HP printers. But the plaintiff in the *Parziale* decision just had an overbroad theory that HP needed to disclose that it was possible that

third-party ink could eventually stop working or would not work, and based on that overbroad theory, the court dismissed the case because HP's disclaimer says third-party ink may not work.

The real issue was addressed in the other decisions, the later decisions, *So* and *Mobile Emergency Housing Corp.* The real omission here is that at the time of purchase, HP simply says third-party ink may not work. It does not say we are going to use a firmware update to remotely disable your printer if you use third-party ink.

Again, I think it's the same difference between, you know, my car example earlier. I might have a car that says we want you to only use 87 octane fuel, a reasonable consumer would not understand that disclaimer or even if it said, you know, your car may not work. If you don't use 87 octane fuel or 93 octane fuel, a reasonable consumer would not understand that to mean if you use a different fuel, we are going to remotely transmit a code to cause your car to shut off.

And, I mean, I think that's really the crux of our case here. I would just note one more thing. HP actually has, subsequent to when our plaintiffs bought their printers, this does go beyond the complaint, but our understanding is they, as of 2024, they do include a more specific disclaimer that says we will block you if you use third-party ink.

But our argument is that prior to that explicit

disclaimer, people purchasing HP's printers simply would not anticipate, would not know simply by HP saying third-party ink may not work, they would not understand that HP is going to affirmatively take action to remotely block their printers if they use third-party ink. And that class of consumers was, by and large, locked in, and, you know, HP took away their choice in the aftermarket for ink.

THE COURT: Okay. Thank you.

I guess one, you know, one question about the conditioning or coercion aspect of a tying claim, so what -- can you just walk through that again? You likely covered this, but what's the basic argument, given that your basic -- it sounds like the basic allegations are: We bought the printers; at the time we thought -- the disclaimer didn't clearly say that this malware was coming or -- I guess that's another issue when you get to the Computer Fraud and Abuse Act, like, can you characterize a firmware update as actual malware? Normally when you hear malware, you think virus, you think, you know, hacking.

So that's another topic maybe we can talk about a little bit, but your basic point on the tying is, okay, we bought printers, didn't ever get any disclosure that there was going to be this firmware update and we would be blocked from using third-party ink. But at least the classic kind of tying claim is -- it has to be the coercion happens, at least as I

understand it, the coercion has to happen when you make the initial purchase.

So here, you know, even if there was some -- just take for the sake of argument that there was some coercion later on -- not making a ruling on that or forecasting, I'm just trying to ask questions to understand -- how does that, just walk through again, like, how is that a tying claim if it's a delayed -- if the firmware happened after the purchase, not at the time of the purchase?

MR. MINTZ: That's a good question, Your Honor.

I -- I would just go back to the *Eastman Kodak* decision. I mean, the basis for that decision was the change in policy that occurred after customers bought their copiers.

I would agree that one distinction between how we've alleged it and I think you could say *Eastman Kodak* as well as, you know, one of the other related cases involving *Kodak* printers, the *Collins Inkjet Corp. v. Eastman Kodak* in the Sixth Circuit, those are cases where, you know, after the initial purchase of the printer or copier, the primary market piece of equipment, there were basically two distinct aftermarkets -- yeah, two distinct aftermarkets. And so there was a service aftermarket and a parts aftermarket.

My personal reading of *Kodak* is -- and again this -- we also are alleging aftermarket monopolization, but the *Eastman Kodak* decision is precisely talking about a change in

policy after the equipment is purchased. I do agree that we are -- one distinction is that you could at least read the way we've alleged it is that the printer and the ink are what are being tied together.

However, we do point out that the -- there is essentially an ongoing service relationship between HP and its customers as well with their printers. You know, we allege that, look, this Dynamic Security thing is often marketed as, you know, being to, you know, maintain printer integrity to have these various benefits. And in paragraph 32, we talk about how HP just generally on its website talks about both its warranty and its, you know, just general support contract. It talks about use of non-HP ink will not affect the HP limited warranty or any HP support contract, and HP is purporting to apply this End User License Agreement to everyone is our understanding.

So I think, one, it is a correct distinction between our case and some of the others is the support, the printer support, the firmware/software support that is involved, our understanding is HP isn't necessarily charging people for it and saying, you know, if you want online service support for your printer, come buy it from us, but you have to go -- you know, you can't use someone else's ink.

This case would be directly analogous, like, factually almost indistinguishable from *Eastman Kodak* or *Collins Inkjet*

if that were the case. We just don't -- to the extent we need to, we would plead the ongoing service relationship as essentially the second aftermarket. In fact, that is how their -- it is that relationship that they're using to block people from buying third-party ink.

So I would just say that to the extent that we need a -- for a tying claim, you could argue that you need a secondary market after the initial printer purchase, I think we would have that here in the sense that, you know, HP is providing ongoing printer support services, but it's conditioning this ongoing printer support on only using their ink.

THE COURT: Ongoing printer support services in the sense of, you know, like, providing a help line or providing customer service and support generally, or in the sense of sending firmware updates? Like, you know, I only -- okay, you can accept -- you can decline the firmware update and just not have an updated software, but in exchange for that, you -- or you can only have the latest updated software on your printer if you also agree to only buy HP ink?

Like, which one of those, when you say ongoing service, what's that referring to?

MR. MINTZ: Well, we allege in paragraph 21, you know, this is based on what has been reported publicly is the Dynamic Security System is something HP is promoting to its customers

as a way to upgrade their experience and maintain the integrity of the printing systems. So they have online connectivity. They're encouraged to register their printers, you know, online with HP, and this Dynamic Security thing is kind of marketed as a form of printer support.

And, again, I would agree that one distinction between our case and let's say *Eastman Kodak* is they're not selling the Dynamic Security as, like, a package. It's essentially a support service, think of it as a market, but it is not necessarily being sold at a profit.

I don't think that distinction really makes or breaks the tying claim, at least how I read *Eastman Kodak* or *Collins Inkjet*. I don't think that if you have the elements that we're talking about, the high switching costs, the lack of information at the time of purchase of the primary market equipment, that the defendant is going to do something to limit aftermarket choices after the purchase, I don't believe if you have, you know, these sort of elements here, which we believe we have properly alleged, that the case simply goes away if the service side of the equation is essentially something they're providing for free rather than selling.

The point is that you still have an aftermarket monopolization, and it's something that consumers didn't agree to upfront when they purchased their printer, it's based on something HP did after the fact.

THE COURT: Is the Dynamic Security something that automatically occurs when someone buys an HP printer, or is it -- is it, you know, like a unique -- is it something that a consumer has to separately agree to, you know, separate from when they buy the printer?

MR. MINTZ: My understanding is that consumers have to register their computer online. I think that's what we allege in paragraph 25, and the Dynamic Security kind of comes along for the ride when they register their computer as part of the sort of online service relationship.

My understanding is that it's mostly done automatically. There might be exceptions to that, but our understanding is that, in general, it's done automatically.

So in other words, yeah, HP -- yeah, paragraph 25, we allege HP encourages people to register their printer online. So in that sense, there is an ongoing sort of online support relationship.

There is, again, there is one distinction between this and some of the other copier or printer cases involving derivative aftermarkets where, you know, again, our understanding is they're not selling in general the service of, you know, allowing people to register their printers and have online support, but it effectively functions the same way that the aftermarket services market did in those cases.

THE COURT: So just looking at paragraph 25, in

marketing materials contained in the boxes in which printers are sold, HP requests that all purchasers of its printers register their computers online so that they can receive any software updates, is that a typo?  Is it register their printers online, or is it registered -- like, lots of consumer products have a little thing saying, yeah, go register -- please register.

But then, you have -- so I take it this would be like that, like, okay, you buy a printer and you have an option, there might be a little slip saying okay you can go register this printer online, and -- but so that's up to -- I mean, that's a separate and additional step that the consumer would need to take, right?  Like, if you don't feel like registering your printer online, you don't have to.  You can just either do it or not, either go register online or not?

MR. MINTZ:  Yes, Your Honor.  Our understanding is that is correct that, you know, that was a typo, I believe, the register printers online, and, you know, as stated in paragraph 25 and elsewhere, you know, HP is essentially stating that updates may enhance performance, correct security problems, and, you know, they promote registration of the printer online, and our understanding is they have a general sort of website statement that, you know, you're in this ongoing End User License Agreement with them for these sort of support services, the online support services, once you've

registered a computer.

But, yes, it is our understanding that it's possible for someone to simply never register their computer -- or, sorry, their printer online and, you know, in that sense perhaps avoid the firmware update if they knew at the time of purchase that, you know, that's what was going to occur.

THE COURT: Okay.

Going just to the market power issue, what's your -- and I know it's in the briefs, but any comments on the -- do you need to allege something more than the 30 percent market share? And which market share, is it in the printers? Do you need to allege market share in the so-called tied products, so like the ink? In either instance, do you need to allege something more than just the 30 percent number?

And I guess, I mean, the defense also made this point that, you know, which -- is an allegation of global market share enough to get you to the United States market?

MR. MINTZ: Your Honor, I -- so in paragraph 19, we do allege that HP's share of the U.S. market is roughly equivalent.

I would say that that, as we did allege though, that was based on information from sources that are no longer publicly available without a subscription. We did find a source that is now behind a paywall as I recall, you know, to try to locate HP's U.S. market share, and I recall it being

roughly equivalent when we were able to access it.

We do know that, you know, in -- but, yeah, I mean, I believe that is a fair inference is that its global market share and its U.S. market share as a U.S. company are going to be relatively similar, but I do think we have more beyond just that market share.

We do actually in our brief cite a case stating that -- and this was *Sea-Land Services v. Atlantic Pacific International, Incorporated*. It was a District of Hawaii 1999 case. We cite it on page 13 of our brief. But, you know, a court held at the motion-to-dismiss stage that -- actually, I think that might have been the summary-judgment stage, an undisputed 33 percent market share coupled with other unique factors can make market power a question of material fact.

So, I mean, 33 percent is enough with, when combined with other factors, to create market power in the tying market, which in this case would be the printer market, but I've actually not -- I'm not aware of a post-*Kodak* decision regarding a single-brand aftermarket monopoly where a case failed on the basis that there wasn't sufficient market share alleged in the equipment market.

I mean, my reading of *Kodak* personally is that if you have what we've alleged here, which is essentially a post-purchase change in policy, in this case the firmware update, and if at the time of purchase, consumers -- it was not

generally known to consumers that the firmware update was coming and that it was going to disable their ability to purchase third-party ink, if you have those things and you have the high switching costs, you know, as we've alleged, it would not be economically rational to go buy a brand new printer, and many consumers, you know, wouldn't be able to afford it, buying a brand new printer when they need to print rather than going and eating the cost of HP's replacement ink.

If you have those factors, my reading of *Kodak* is that those are effectively plus factors that can sort of independently create market power in the tying market separate from the traditional market share way of looking at market power.

THE COURT: Okay. And just quickly on the Computer Fraud Abuse Act, any comments on that issue of is that, you know, a fair reading of that statute to include firmware updates as opposed to, you know, some sort of hacking type of event?

MR. MINTZ: Yes, Your Honor. I would say that under, in particular, Section (a)(5)(A) of the CFAA, it includes liability for anyone who knowingly causes the transmission of a program, information, code, or command and as a result of such conduct intentionally causes damage without authorization to a protected computer.

We believe the firmware update, you know, fits within

the definition of a program, information, code, or command, and that removing the ability to use third-party ink that previously existed, you know, that functionality used to exist and now it doesn't, the removal of that functionality is a form of damage.

So we believe that these facts do certainly fit Section (a)(5)(A) of the CFAA. Interestingly, the text doesn't require explicitly, you know, virus or malware or anything. It just says a code, command, program, or information and it has to be one that causes damage.

THE COURT: Okay. I think that's all my questions. Thank you.

MR. RAAB: Jarret Raab, Your Honor.

THE COURT: Good morning.

MR. RAAB: How are you?

HP in large part in their oral argument really did not address the state law claims, nor do they really get into standing. So as they did, we'll just defer to the briefing on those issues.

The one argument that I heard counsel make that I did want to address, as done in the briefing, HP is criticizing the plaintiffs for making formulaic general allegations in the various state court counts that are effectively similar to one another. That is -- it's not a valid criticism.

The key issue, particularly on a motion to dismiss

where you're looking at the facts and the reasonable inferences drawn from facts, are are there specific factual allegations in the complaint that would give rise to a valid cause of action? And all of the consumer protection statutes are -- they're not identical, but they're substantially the same. And so the conduct that gives rise to a claim under, let's say, Illinois's consumer protection statutes would likewise give rise to claims under every of the other ones that we cited.

Similarly, with respect to the state antitrust claims, the same conduct that gives rise to a Sherman Act claim would likewise give rise to a claim under the state -- the state causes of action.

Simply attacking the complaint without actually identifying a single count that is deficient or allegedly defective is -- is not sufficient. It does not suffice.

The approach taken by HP here is identical to the approach taken by the defendants in the *Jones v. Varsity Brands* case and the *Staley/Gilead Sciences* case, for instance. You can't attack a complaint and seek to have specific counts thrown out without discussing what's wrong with the specific counts.

They make these broad, general arguments, but they don't specifically address a single state court count and explain why it's deficient. They simply say that we, the plaintiffs, have not adequately articulated a cause of action,

so therefore it should be thrown out, but they don't actually go in and specify what specifically is wrong. And as the movant, the onus is on the defendant if it believes that any particular count is deficient, they have to explain why that particular count is sufficient.

It's almost ironic that the criticism of a broad-based, generalized allegation is being made in a broad-based, generalized critique, and that just is not the appropriate way to do it in a motion to dismiss.

If HP believes a specific or particular count is deficient, it needs to identify that specific count and articulate why that specific count is deficient.

That's all I have, Your Honor.

THE COURT: Okay. Thank you.

I mean, is it a -- basically a Rule 8(a) notice-type argument? In other words, if there's -- a complaint needs to spell out enough to put the defendants on notice, or defendant on notice of what the claim is?

MR. RAAB: Yes, Your Honor. I would argue it's clearly sufficient under Rule 8, and I would argue that to the extent a heightened pleading standard is required under Rule 9 for any of the deceptive practices claims, those have also been met.

I mean, it's very clear when you look at the complaint what -- what the case is about. We've gone over it. I think

46

Your Honor understands that in a nutshell, the consumers purchased printers with the understanding that they could use third-party ink and, in fact, at the time of the purchase, they could use third-party ink; and then unbeknownst to them, they were hit with a firmware update that disabled their printer and that, the conduct that HP undertook, was not disclosed. It would constitute essentially a fraudulent or an omission.

But if you look at paragraphs 25, 27, 31, 32, 38 through 39, that lays out the allegations. And then, as Mr. Mintz had mentioned, there are more detailed allegations regarding the deceptive or unfair nature of the claims in paragraphs 20 through 23, again, 25 through 31. It's all in here.

There's no way that HP with a straight face can argue that it doesn't understand what this case is about. They may argue that the -- the facts don't align with the law, we don't agree with that, but to say that they have no way of understanding what claims are being made against them because there's nothing in the complaint I don't think is a fair reading of the complaint.

THE COURT: And on -- okay. So do you agree that some claims are subject to 9(b), so to the extent there's --

MR. RAAB: It is arguable, and, again, HP would need to explain which counts they're even talking about, but there are a line of cases, federal and state court, that say if

you're alleging a consumer-fraud-type claim, that the allegations do need to meet the fraud standard, and we have here.

But to make the statement that, you know, oh, the complaint's deficient because they haven't alleged with specificity the essential elements or enough facts, what -- which count are they talking about? Again, this is going back to what I was saying earlier, but if you're going to attack the consumer fraud statute in Wyoming, then you need to discuss it. Or if you think that the Illinois claim is deficient, then you need to explain that and articulate that.

You can't just broad base say they're all deficient, you haven't met Rule 9, you haven't met Rule 8. That's not an appropriate way to attack a complaint. So at least at this stage of the litigation, the complaint is adequate as is and should be allowed to go forward.

If they're at summary judgment there are particular issues with whether we can prove that in connection with any particular claim, then they can address it at that point. But I think that the broad-based argument that's being asserted or being raised is just not enough to warrant having the complaint thrown out.

THE COURT: Okay.

MR. RAAB: Your Honor, I would add, and I apologize, there are a line of cases that say that conduct that

constitutes an antitrust violation is by its very nature deceptive, which would trigger a cause of action under each -- under each of these state court claims.

THE COURT: Okay. If Rule 9(b) applies to some of the claims, then, I mean, I take your point that basically you've just got to go look at the factual allegations and, you know, just go back to the paragraphs you were mentioning and make an assessment, does this adequately plead with specificity under 9(b) the -- if there's an allegedly deceptive statement, if there's -- so I guess --

MR. RAAB: The argument can be made, Your Honor. It just wasn't. I'm not saying it's a valid argument or meritorious argument, but they would need to go claim by claim and allegation by allegation and say this allegation is insufficient for this particular cause of action.

Again, looking at the allegations of the complaint, and certainly if you take the reasonable inferences and construe those in the favor of the plaintiff, which you must do in a Rule 12(b) motion to dismiss, we have laid out the fraud. We've laid out the unfair conduct. That's all that's needed at this stage.

THE COURT: Okay. Thanks.

All right. So coming back to the defense.

MR. LIVERSIDGE: Thank you, Your Honor.

Just quickly here, I guess I'll start back with the

49

antitrust claims.

Counsel made the argument that it's alleged that the aftermarket restrictions are not generally known here. I just don't think that's correct. That language is not in the complaint. They don't allege that.

If they're prepared to allege it based on the facts they know, they should allege it. If their allegation is that these policies were not generally known by consumers, they should allege it and should allege the basis for it. They have not said that.

They have pointed to materials that they've come up with where, you know, these restrictions do not appear in those materials, but that is not -- that is not the test, and it's fairly straightforward. If they're prepared to make the allegation, they should make it. They say this case is based on a change in policy. They made that argument.

If that's the case, they should allege it. What was the policy under which these printers were sold, and how did it change? There wasn't a change in policy on these printers. They were sold as Dynamic Security-enabled printers designed to work with cartridges that have HP original chips. That's the stated policy. If they think the facts are different, they should have to allege that to state a claim.

There were a lot of statements and arguments about things that don't appear in the complaint. There's -- now

counsel made a challenge to the adequacy of the disclosure. If they don't think the disclosure was adequate, which courts have already found that it was, they should make that contention. They should make that allegation and say that the disclosure was not adequate. They haven't -- they haven't done that. They've stayed away from the disclosure entirely.

They've also just omitted facts that allow them to argue what they want to argue. As we pointed out in our papers, there are third-party cartridges that work with these printers, but they're not designed to work with cartridges that reverse engineer HP's chip. A lot of those cartridges are counterfeit. Some are not. But the printers are not designed to work with those cartridges, and that's what HP makes clear.

So there's a lot left out for purposes of making the allegations they want to make, and there are straightforward allegations that they should have to make if they're truly trying to establish a single-brand aftermarket.

On the tying claim, counsel said, well, this may be a negative tie, but that doesn't change the requirement of conditioning. We have to have conditioning to have a tying claim. And there was a contention that, well, in *Kodak*, some of the conduct occurred after the original purchase. Correct. There was a change in policy where *Kodak*, the allegation was, started tying the purchase of parts to the purchase of service. If you want the parts, you have to agree to get your service

from *Kodak*. That was the tie that started occurring. That was the conditioning.

There was an indication that, well, we also have an aftermarket monopolization claim, but I don't know what that claim is based on besides the tying theory. What is the theory of anticompetitive conduct that they're asserting? Is it a refusal to deal? It's hard to determine what that is. They have not stated a refusal to deal claim, and HP doesn't have a duty to deal with all these competitors. It does not have a duty to design printers that make them accessible to all competitors out there.

And if they want to get into the disclosures and put all those forward, we would be -- we would be happy to do that. HP does disclose, it has for years, that firmware updates include Dynamic Security measures, but they've stayed away from that fight entirely.

On the CFAA, it seems that plaintiffs are now pivoting to this (a)(5)(A) section that was not alleged in their complaint. I don't think it's appropriate to say what we're really complaining about is (a)(5)(A) and not (a)(2) and (a)(4), which were the ones alleged. We obviously should be given an opportunity to respond.

We don't think damage, we don't think a firmware update that offers all kinds of different benefits to consumers is damage to the machine. We don't think that qualifies, but

we also don't think that claim has been put forward here.

I guess I would just -- not to get too hung up on these state law claims, but I would say, Your Honor, that I do think we -- we were at pains to try to identify the different claims and statutes that we were moving on. You know, for example, in our footnote 5, which is one of the longer footnotes in history, and I apologize for that, but we tried to list out all the state law claims that would need to be dismissed if the federal antitrust claims are dismissed.

We also made the arguments that they haven't adequately alleged fraud and misrepresentation. We identified in footnote 9 all the law that supports the need to plead reliance in support of these consumer protection statutes.

We have attempted to identify all of the statutes that would need to be dismissed if they have not adequately alleged a fraud and misrepresentation claim, which we don't think they have. We don't think there's any fraudulent statement that's been put forward.

The thing that we are complaining about beyond the way that they pled these claims is that we don't know what else there is. We don't think they've stated antitrust claims. We think those should be dismissed. We don't think they've stated fraud and misrepresentation claims. We think those should be dismissed. But if they're contending that they've got some other claim under an unfair prong of a statute, I think we're

entitled to know what that theory is so we can say that's not a claim either.

So I think we have moved on those claims and tried our best in the space we had to identify all the statutes that need to be -- the claims under the statutes that need to be dismissed. But if there's a contention that, well, but you didn't address this other aspect of our claim, I think we're entitled to know what that is. We're not aware of what their theory is beyond antitrust, this Consumer Fraud and Abuse Act, and claims of fraud and misrepresentation.

So I will stop there, Your Honor, unless there are other questions.

THE COURT: Just on the conditioning aspect of the tying claim, is there a claim -- are they making a claim that it's not the sale that's conditioned on the use of HP ink but continued use of the product, and is that -- if that's the claim, is that a valid tying claim?

MR. LIVERSIDGE: I'm not sure I fully follow the theory. I -- Your Honor, I guess I would start with the point that if that is the theory, they should lay that out in some way in the complaint that allows us to respond to it.

If they're contending that we tied -- we somehow tied ongoing support to the need to buy HP cartridges, I'm not sure if that's the theory, but if that is, I don't believe that is a valid theory, but I think we should have the opportunity to

respond to it.

That's suggesting that the tying product almost is Dynamic Security and that people want Dynamic Security, but in order to get it, we're making them buy cartridges. I don't know if that's what the theory is that's being put forward, but I think they should articulate it if they've got something different so that we can respond to it.

THE COURT: Okay. I guess other than -- so if -- I suppose one theory could be that the tying product is Dynamic Security.

Is there any theory that it's not particular -- or it's not Dynamic Security, it's just the continued ability to use the product? I mean, I don't even know if that could be -- I just don't know if that could be a tying product because continued ability or continued use, I just -- I'm not sure whether that's something that's recognized in the case law as a tying product because a tying claim, at least the class of tying claim seemed to be about either a product or, I mean, I suppose it could be the services, like tying the services to the cost of the replacement parts. I mean, I guess that's -- service, services are -- I mean, that is a product sometimes in the cases, but I don't know about continued use.

I mean, if that were the claim, yeah, I just don't know whether that would be --

MR. LIVERSIDGE: Yeah, I mean, it's an interesting

question. I'm not -- I'm not aware of -- I mean, the case law talks about the tying claim in terms of you selling -- selling one product conditioned on the purchase of another. I'm not aware of a sort of an ongoing use kind of a claim that fits within the tying rubric.

The *Digital Equipment* case from the Seventh Circuit talks about a claim of tying where the defendant had packaged I think it's mid-range computers with an operating system, and the court -- so to use those computers, you had to use the operating system that they picked, and the claim was that that was tying, and the court sort of said, come on, that's not tying. Everyone gets to kind of pick the components that they want to sell a product with, and you can buy that product with those components and use it or not.

And so I'm not -- I'm not aware of one that really frames it up in terms of continued use, I would have to say.

But I also don't know -- I don't think that's a viable theory. I also don't think that's been alleged here if that's their theory.

I don't know if that's helpful. I'm just not aware of that theory being put forward under a tying claim.

THE COURT: Okay. Thank you.

MR. LIVERSIDGE: Thank you.

THE COURT: So, ordinarily, we would end there. I just -- I guess I just asked that last question, wanted to ask

the plaintiffs if you have anything further?

MR. MINTZ: Yeah, I would just say I think there's two real types of tying here, it really would be, like, both the sale of the printer at the outset. We -- based on our reading of *Eastman Kodak*, and also, yes, the continued service in the sense at least for printers that are registered on the Internet.

There's essentially online services, online connectivity, things that HP advertises are beneficial to, you know, having your computer registered and having that online connection.

I mean, I would say that I do think that some of the other cases that we've cited, I mean, I think *AliveCor v. Apple* is also a fairly similar claim of aftermarket monopolization. And, again, my reading of *Kodak* is that you have a valid -- you have a general valid claim for aftermarket monopolization in addition to tying as a separate count if you do have the change of policy after the purchase of the equipment and then you start basically preventing consumers from being able to use the aftermarket parts, replacement parts that they want.

As long as you have the switching costs, the change in policy or lack of information about the policy change up front, you have a valid claim for aftermarket monopolization under our reading, and we believe we have alleged that here with regard to the firmware updates because we have alleged that the

printers could accept third-party ink at the time they were purchased, and they lost that functionality.

And if the Court does not agree on any of these points, we would request leave to amend to add additional allegations if the Court believes they're necessary.

THE COURT: Okay. Thank you.

And I guess I meant to give the defense the last word because of the order of the briefs. I just asked you some more questions, so anything further at this point?

MR. LIVERSIDGE: No, Your Honor.

THE COURT: All right. Thank you all very much for the time and attention that you've given this and both in the briefs and in the arguments today, and I will -- I'll just take it under advisement and get you a ruling.

MR. RAAB: Thank you, Your Honor.

MR. LIVERSIDGE: Thank you.

THE COURT: Thank you, everybody.

(Concluded at 11:58 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kathleen M. Fennell*          *January 29, 2025*
Kathleen M. Fennell              Date
Official Court Reporter