## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| RENEE ROBINSON, RICHARD MYERS, ANNETTE FIRST, CASEY GADDY, STEVEN GOUISIE, ROBERT PLUNKETT, FRANCOIS STEIGER, JAMES ULRICH, GABRIEL VOILES, JOHN WAUDBY, and LAKESHA WELLS, on behalf of themselves and all others similarly situated, | Case No. 24-cv-00164 |
| Plaintiffs, | Judge Martha M. Pacold |
| v. | |
| HP, INC., a Delaware corporation, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs filed this class action lawsuit against defendant, HP, Inc. ("HP"), asserting violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1–2, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, various state consumer protection, unfair and deceptive practices, and antitrust laws, and a claim for unjust enrichment. Plaintiffs bring this suit on behalf of themselves and two putative classes of individuals who purchased HP-branded and non-HP-branded replacement ink cartridges for various HP printer models between September 2022 and the present. HP moves to dismiss plaintiffs' complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [24].[1] For the reasons below, HP's motion is granted. Plaintiffs' complaint is dismissed without prejudice and with leave to amend.

## BACKGROUND

For purposes of HP's motion to dismiss, the court accepts as true the well-pleaded factual allegations in plaintiffs' complaint, [1], and draws all reasonable inferences in plaintiffs' favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). The court also considers documents that are critical to the complaint and referred to in it and additional facts set forth in plaintiffs' opposition to the motion to

---

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph citations. Page numbers refer to the CM/ECF page number.

dismiss, to the extent those facts are consistent with the pleadings. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (citation omitted).

## I.    The Firmware Update

HP is a Fortune 500 company and one of the world's largest manufacturers and sellers of computers. [1] ¶¶ 17, 24. In addition to selling computers, HP also sells printers. *Id.* ¶¶ 18–19, 24. According to the complaint, HP holds about 34.7% of the global market share for printers. *Id.* ¶ 19. "Based on information derived from sources no longer publicly available without a subscription, Plaintiffs allege that HP's share of the U.S. market for printers is roughly equivalent to its global market share." *Id.*

HP sells printer ink cartridges that are compatible with HP printers. *Id.* ¶¶ 18, 40–41. For many HP printer models, however, HP-branded ink cartridges cost nearly twice as much as those offered by other sellers. *Id.* ¶ 18. Color printers typically require four ink cartridges to function. *Id.* A full HP-branded set of replacement ink cartridges could cost a consumer up to $100. *Id.*[2]

According to the complaint: HP has a history of using software to prevent consumers from using competitors' ink cartridges in HP printers. *Id.* ¶ 20. From 2010 to 2015, HP launched a firmware update using a software called "Dynamic Security" that "functionally prevented" some consumers from using non-HP ink cartridges in many HP printer models. *Id.* In 2019, HP settled a class action lawsuit with aggrieved consumers and agreed not to issue the "Dynamic Security" firmware update to certain printer models in the future. *Id.*; Settlement Agreement, *In re HP Printer Firmware Update Litig.*, No. 5:16-CV-05820-EJD-SVK, Dkt. 110-2 at 10 (N.D. Cal. Sept. 18, 2018).[3]

According to the settlement agreement, which is incorporated by reference into the complaint, HP was required to "not at any time take any action to employ Dynamic Security for the Class Printers, including by releasing or otherwise making available firmware that enables Dynamic Security." [1] ¶ 20 n.4; Settlement Agreement, *supra*, Dkt. 110-2 at § 2.3. The "Class Printers" included a list of eighteen HP printers. There is no overlap between the models comprising the Class Printers in the settled case and the printer models at issue in this case. *Compare* [1] ¶ 44

---

[2] The complaint does not specify whether or not all the printers at issue in this case are color printers.

[3] The case docket, of which the court may take judicial notice on a motion to dismiss, indicates that the plaintiffs filed the settlement agreement as part of the joint motion for preliminary approval of class action settlement. *See In re HP Printer Firmware Update Litig.*, No. 5:16-CV-05820-EJD-SVK, Dkt. 110. In November 2018, the court granted the motion for preliminary approval. *Id.* Dkt. 114. The court granted final approval of the settlement in April 2019. *Id.* Dkts. 138, 139.

("Class Models" affected by the firmware update), *with* Settlement Agreement, *supra*, Dkt. 110-2 at 6 ("Class Printers" included in the settlement agreement).

At some point before 2022 (the complaint does not specify exactly when), HP discontinued use of the Dynamic Security firmware update for several of its printer models (the complaint does not specify which models). [1] ¶ 27 ("In 2022 and 2023, HP distributed updates to many of its registered customers that featured the functionality of 'Dynamic Security' previously discontinued . . . ."). But then in 2022 and 2023, HP again issued the firmware update to many of its printers. *Id.* ¶¶ 1, 27. The update disabled the printer if the consumer replaced an existing ink cartridge with a non-HP ink cartridge. *Id.* ¶¶ 1, 23–27.

## II. Plaintiffs Purchase HP Printers

Plaintiffs purchased HP printers at different times between 2016 and 2023. *Id.* ¶¶ 6–16. Included with each HP printer were marketing materials requesting that all purchasers register their devices online to receive printer software and firmware updates. *Id.* ¶ 25. According to HP's marketing materials, some of these updates were designed to enhance performance and correct security problems. *Id.* If a consumer registered his printer, there was no way the consumer could opt out of any specific software or firmware update; the printer would download the update automatically if it was connected to the internet. *Id.* ¶¶ 26–28.

According to the complaint, HP's printer manuals never indicated that "agreeing to accept software and firmware updates could damage any features of the printer." *Id.* ¶ 25. And the complaint alleges that "[n]one of the plaintiffs had received any warning at the time of the firmware update or at the time of the purchase of a printer, or at any other time, that by registering their printers to receive regular updates, [plaintiffs] might lose the ability to use non-HP replacement ink cartridges." *Id.* ¶ 31. When HP reinstated the firmware update in 2022 and 2023, plaintiffs allege that "[t]here was no notification of any kind . . . that might inform customers that the update would reduce the printer's functionality." *Id.* ¶ 27.

At the time plaintiffs filed this lawsuit, HP's Limited Warranty—available on its website—stated that "[t]he use of a non-HP or refilled cartridge does not affect either the HP Limited Warranty to the end-user customer or any HP support contract with the end-user customer for the printer." *Id.* ¶ 39.[4] The Limited Warranty did not

---

[4] Elsewhere in the complaint, plaintiffs allege that HP's End User License Agreement contains the same statement regarding the use of non-HP replacement ink cartridges. [1] ¶ 32. This allegation provides a link to a web page, which is incorporated into the complaint by reference. *Id.* ¶ 32 n.7. But the linked web page only shows the Limited Warranty, not the End User License Agreement. *See id.* Still elsewhere in the complaint, plaintiffs provide a link to the End User License Agreement. *Id.* ¶ 36 n.8; *End-User License Agreement*, https://support.hp.com/us-en/document/ish_4416646-4390016-16 (last visited

discuss the firmware update or the compatibility of non-HP ink cartridges. *Id.* ¶ 39 n.9; *HP Worldwide Limited Warranty and Technical Support*, hp.com, https://www.hp.com/us-en/privacy/limited_warranty.html (last visited September 29, 2025).

Each of the eleven named plaintiffs purchased non-HP ink cartridges between 2020 and 2023. [1] ¶¶ 6–16, 28. Plaintiffs attempted to print using the non-HP ink cartridges, presumably after the firmware update, although the complaint does not say when each attempted use occurred. When plaintiffs attempted to print using the non-HP ink cartridges, plaintiffs received an error message stating that the cartridges had been blocked:



*Id.* ¶ 28. Because plaintiffs had already opened their non-HP ink cartridges, plaintiffs could not return them. *Id.* ¶ 29. Plaintiffs could not print using the non-HP ink cartridges. *Id.* ¶¶ 6–16. When plaintiffs switched to HP-branded ink cartridges, their printers began working again. *Id.*

### III.   This Lawsuit

In January 2024, plaintiffs filed this class action lawsuit. Plaintiffs seek to represent two classes: (1) all persons who purchased an HP-branded replacement ink cartridge for use in any of the Class Models of HP printers between September 2022 and the present (the "HP Ink Purchaser Class"); and (2) all persons who purchased a non-HP ink cartridge for use in any of the Class Models of HP printers between September 2022 and the present, which they were unable to use because of the effects of the firmware update (the "Firmware Update Class"). *Id.* ¶ 44. The "Class Models" include thirty-nine different HP printer models. *Id.*

---

September 29, 2025). But the statement plaintiffs identify does not appear in the linked agreement.

Members of the HP Ink Purchaser Class allege that the firmware update forced them to pay higher prices for replacement ink cartridges. *Id.* ¶¶ 35, 44. Around the same time that HP distributed its firmware update, it raised the prices on all its replacement ink cartridges. *Id.* ¶¶ 33–35. Class members were forced to purchase HP-branded ink cartridges, even though non-HP ink cartridges may have cost half as much as HP-branded ink cartridges. *Id.* ¶¶ 18, 40–42. For the HP Ink Purchaser Class, the alleged injury is the higher prices they paid for ink cartridges because of the firmware update. *Id.* ¶ 48.

Members of the Firmware Update Class allege the same injury plus the sunk costs of purchasing non-HP ink cartridges without knowledge of the firmware update. *Id.* ¶¶ 6–16, 29, 44. Like the named plaintiffs, members of the Firmware Update Class purchased and attempted to use non-HP ink cartridges, only to discover that "they were unable to use [the cartridges] because of" the firmware update. *Id.* ¶¶ 29, 44. For the Firmware Update Class, the alleged injury is both the higher prices they paid for HP ink cartridges and the sunk costs of the purchase of non-HP ink cartridges that were "rendered useless" by HP's firmware update. *Id.* ¶ 29.

Plaintiffs bring seventy-nine causes of action for violation of the Sherman Act, 15 U.S.C. §§ 1 & 2, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the consumer protection, unfair and deceptive trade practices, and antitrust laws of all fifty states and the District of Columbia.[5] Plaintiffs also bring a claim for unjust enrichment, although the complaint does not specify under which law plaintiffs bring this claim. [1] ¶¶ 82–87. Plaintiffs seek damages and declaratory and injunctive relief.

HP moves to dismiss the complaint under Federal Rule of Civil Procedure Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. [24]. HP explains that its Rule 12(b)(6) motion applies to all claims, whereas the 12(b)(1) motion applies only to the state law claims asserted under the laws of states to which plaintiffs have no connection and for printers the named plaintiffs did not individually purchase. *See* [25] at 38–43.

## LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Ord. of Police Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). When reviewing a motion to dismiss under Rule 12(b)(6), the court "accept[s] as true all factual allegations in the complaint and draw[s] all permissible inferences in plaintiffs' favor." *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). A complaint "must contain sufficient factual matter, accepted as

---

[5] The counts in the complaint number 1–80. However, the complaint skips Count LXVII, jumping from LXVI to LXVIII. *See* [1] ¶¶ 547–61.

true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'[N]aked assertion[s]' devoid of 'further factual enhancement'" are insufficient. *Id.* (quoting *Twombly*, 550 U.S. at 557).

## DISCUSSION

Plaintiffs' claims fall into three categories: (1) the Sherman Act claims, (2) the Computer Fraud and Abuse Act claim, and (3) the state law claims. The court addresses each set of claims below.

## I.     Sherman Act Claims (Counts II and III)

### A.     Tying Under Section 1 (Count III)

Section 1 of the Sherman Act, 15 U.S.C. § 1, provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.[6] To state a claim under Section 1, the complaint must plausibly allege: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (alteration in original) (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)).

Count III asserts that HP's firmware update creates an illegal tying arrangement in violation of Section 1. [1] ¶¶ 71–74. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958); *see also Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 592 (7th Cir. 2008). For example, "[a] supermarket that will sell flour to consumers only if they will also buy sugar is engaged in tying. Flour is referred to as the tying product, sugar as the tied product." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 33 (1984) (O'Connor, J., concurring) (emphasis omitted), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

A tying arrangement constitutes a per se violation of Section 1 if "the seller has appreciable economic power in the tying product market and if the arrangement

---

[6] Sections 4 and 16 of the Clayton Act provide private rights of action for damages and injunctive relief, respectively, for cases asserting violations of Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 15, 26; *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109–10 (1986).

affects a substantial volume of commerce in the tied market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62 (1992) (internal quotation marks omitted). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Par.*, 466 U.S. at 12.

From an antitrust perspective, tying arrangements are problematic because they allow a competitor to leverage power in one market to unfairly gain power in another. *See N. Pac. Ry. Co.*, 356 U.S. at 11 ("[T]he vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another. . . ."). Tying arrangements unreasonably restrain trade in the market for the tied product. *Holleb & Co. v. Produce Terminal Cold Storage Co.*, 532 F.2d 29, 32 (7th Cir. 1976) ("The evil of a tying agreement is the restraint of competition in the tied product."). "[I]f the seller of the tying product is a monopolist, the tie-in will force anyone who wants the monopolized product to buy the tied product from him as well, and the result will be a second monopoly." *Sheridan*, 530 F.3d at 592.

Here, the complaint does not identify a cognizable tying arrangement. According to the complaint, the "relevant market," *Agnew*, 683 F.3d at 335, is the "aftermarket for Replacement Ink cartridges that will work in HP Printers in the United States." [1] ¶ 40. Count III asserts that HP imposed an unreasonable restraint of trade on this market by creating an unlawful tying arrangement. *Id.* ¶ 73. The complaint identifies two "separate and distinct products"—HP printers and replacement ink cartridges—as the subjects of the tying arrangement. *Id.* ¶¶ 73, 75. Plaintiffs' theory is that the tying "agreement" occurred when plaintiffs, "finding their printers disabled by the firmware update, agreed to purchase HP-branded ink because HP altered their printers so they would not accept cheaper ink from competitors." [34] at 22 (citing [1] ¶¶ 28–30).

But this does not constitute a tying arrangement. Plaintiffs do not allege that HP "condition[ed] the sale" of printers, the tying product, on an agreement to purchase HP-branded ink cartridges, the tied product. *Sheridan*, 530 F.3d at 592. Plaintiffs were not required to purchase HP-branded ink cartridges as a condition of purchasing their printers. In fact, the complaint alleges that at the time plaintiffs purchased their printers, they were not even aware of the firmware update. [1] ¶¶ 27, 31. By the time the firmware update occurred in 2022 and 2023, plaintiffs had already bought their printers, and several of the named plaintiffs had owned the printers for several years. *See* [1] ¶¶ 13–14 (plaintiffs Voiles and Ulrich purchased their HP printers in 2016). Thus, there was no conditioning of the sale of the tying product on any agreement to purchase the tied product.

Plaintiffs argue that their theory "tracks" the tie-in recognized in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). [34] at 22. The court

sees it differently. *Eastman Kodak* concerned a tying claim brought under Sections 1 and 2 of the Sherman Act. 504 U.S. at 455. Eastman Kodak, the defendant, was a competitor in the market for photocopier machines, which required servicing and replacement parts throughout the machine's lifetime. *Id.* at 457. For years, Kodak permitted other companies, known as independent service organizations ("ISOs"), to service and repair its photocopiers. *Id.* at 457–58. Kodak and other independent original-equipment manufacturers ("OEMs") also produced replacement parts for Kodak's photocopiers. *Id.* at 457. ISOs regularly purchased replacement parts from Kodak and OEMs to service the machines. *Id.*

After years of allowing the ISOs to service Kodak equipment, Kodak changed its policy. Kodak "implemented a policy of selling replacement parts for micrographic and copying machines only to buyers of Kodak equipment who use Kodak service or repair their own machines." *Id.* at 458. In other words, Kodak conditioned the sale of replacement parts on the buyer's use of Kodak's repair services. *Id.* at 458, 463. In furtherance of the same policy, Kodak pressured other parts distributors into refusing to sell parts to the ISOs and agreed with the OEMs to stop selling parts to the ISOs. *Id.* "Kodak would sell parts to third parties only if they agreed not to buy service from ISO's." *Id.* at 463. This policy effectively cut off the ISOs' access to Kodak photocopier machine replacement parts, forcing many of the ISOs out of business. *Id.* at 458. Based on these facts, the Court concluded that there was a genuine issue of fact as to whether Kodak engaged in an illegal tying arrangement under Sections 1 and 2 of the Sherman Act. *Id.* at 479–80.

Unlike HP, Kodak conditioned the sale of its product on an agreement to only purchase repair services from Kodak. *Id.* at 458–59. Not so here. Plaintiffs do not allege that HP conditioned the sale of its printers on an agreement to purchase only HP ink cartridges. Nor does the complaint allege that plaintiffs were forced to accept the firmware update as a condition of purchasing their printers.[7]

Put differently, unlike in *Eastman Kodak*, HP did not leverage its power in the tying product market to restrict competition in the tied product market. "[T]he vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another . . . ." *N. Pac. Ry. Co.*, 356 U.S. at 11; *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1423 (9th Cir. 1995). "Only if [buyers] are forced to purchase [the tied] services as a result of the [seller's] market power would the arrangement have anticompetitive consequences" sufficient to support a claim for tying. *Jefferson Par.*, 466 U.S. at 25; *cf.* Phillip E. Areeda & Herbert Hovenkamp,

---

[7] The complaint alleges that in HP's marketing materials, HP "request[ed]" that plaintiffs register their printers online to receive software and firmware updates that may enhance performance. [1] ¶ 25. But nothing in the complaint suggests that consumers were *required* to register their printers for firmware updates, either at the time of purchase or at any time thereafter, as a condition of purchasing the printer.

*Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1752e (Supp. 2025) ("[G]eneral threats inducing purchase of [the tying product] do not prove tying unless the threats took the form of refusing to sell the tying product to those who would not take the defendant's tied product.").

In *Eastman Kodak*, because Kodak had economic power in the replacement parts market, including the power to restrict access to parts, it could force users to purchase Kodak's services as a condition of purchasing Kodak's replacement parts. *See* 504 U.S. at 464–65. Here, however, HP's customers did not purchase HP ink cartridges as a condition of purchasing anything else from HP. Rather, the customers had *previously* purchased printers from HP, and it was this fact—along with the customers' having registered their printers for firmware updates—that gave HP leverage. *See* [1] ¶ 75 ("HP leverages the fact that its customers have previously purchased HP printers at substantial cost, and have received the firmware update . . . , to force Plaintiffs and the proposed Class into purchasing HP ink cartridges.").

Put differently, while HP certainly had leverage to compel plaintiffs to purchase HP ink cartridges, that leverage did not come from HP's position in the printer market. It came instead from plaintiffs' earlier decisions to make HP their printer brand of choice. Thus, HP's conduct "is not the type of economic coercion or forcing that constitutes a tie under antitrust law." *See In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs., & Antitrust Litig.*, No. 23-MD-3064, 2024 WL 2846349, at *8 (E.D. Wis. June 5, 2024) (plaintiff did not allege cognizable tying arrangement where motorcycle seller threatened to revoke warranty on motorcycle unless plaintiff purchased only defendant's replacement parts); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1179 (9th Cir. 2016) (rejecting theory of "de facto" tying claim because there was "no tie, *i.e.*, no evidence that Honeywell explicitly or implicitly ties or conditions the *sale*" of the tying product "on a requirement that the owners" accept defendant's services).

At oral argument, plaintiffs proposed an additional, alternative tying theory. Plaintiffs suggested that in addition to printers being the tying product, "ongoing printer support services" were the tying product. *See* [77] at 36:1–12, 56:2–7. The basis for this theory is not entirely clear. In their complaint, plaintiffs recount that HP requests that all users register their printers online to receive software updates. [1] ¶ 25. HP's marketing materials explained that these updates might help performance and enhance security. As explained at oral argument, registration for firmware updates is marketed as being useful for "maintain[ing] printer integrity" and providing "various benefits." [77] at 35:5–23. In asking consumers to register their printers, HP contemplates an "ongoing service relationship" between consumers and HP. *Id.* at 35:6. Per the complaint, once consumers register their printers for updates, however, consumers "do not have a choice to opt out of specific software or firmware updates." [1] ¶ 26. According to plaintiffs, by registering their printers,

consumers are forced to accept HP's firmware updates, including updates that prevent consumers from using non-HP-branded ink. As best the court can tell, plaintiffs' alternative theory is that HP conditions access to printer updates on an agreement to purchase HP ink cartridges.

But this theory suffers from a similar flaw as plaintiffs' first theory: The complaint does not allege that HP conditioned access to printer updates on any agreement by the plaintiffs to purchase only HP ink cartridges. While the named plaintiffs each purchased their printers sometime before the firmware update occurred in 2022 and 2023, the complaint does not detail when they registered their printers. *See* [1] ¶¶ 6–16. To demonstrate a conditional purchase, plaintiffs would at the very least have to show that at the time they registered their devices—the moment they "purchased" device support from HP—a condition already existed limiting them to purchasing only HP ink cartridges. That is because, as discussed, "the vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another." *N. Pac. Ry. Co.*, 356 U.S. at 11. If plaintiffs registered their printers at one time and only later were subjected to an "HP-ink-only" requirement, HP's leverage to impose the requirement would come not from its "power in [the HP printer support market]" but rather from its customers' earlier decisions to register their devices.[8]

Plaintiffs' alternative theory fails for another reason: Tying requires a plaintiff to link "two distinct markets for products that [are] distinguishable in the eyes of buyers." *Jefferson Par.*, 466 U.S. at 21 ("[A] tying arrangement cannot exist unless two separate product markets have been linked."). But the theory does not identify a distinct tying product market. The complaint alleges that consumers receive updates to their printers by registering the printers online. [1] ¶ 25. The complaint does not allege that consumers purchase the updates, nor does it allege that there is a market for "ongoing printer support services." Plaintiffs concede that HP does not charge consumers for its printer updates. [77] at 35:19–22. Thus, to the extent plaintiffs' tying claim is premised on a tie of printer updates to HP-branded ink cartridges, the claim is not plausible.

Finally, plaintiffs point out that a tying arrangement may exist when "a defendant adopts a policy that makes it unreasonably difficult or costly to buy the tying product (over which the defendant has market power) without buying the tied product from the defendant." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 471

---

[8] The Supreme Court stated in *Eastman Kodak* that "[a] tying arrangement is 'an *agreement* by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least *agrees* that he will not purchase that product from any other supplier.'" 405 U.S. at 461 (emphasis added) (quoting *N. Pac. Ry. Co.*, 356 U.S. at 5–6). The Court's emphasis on the need for an "agreement" suggests that the condition in a tying arrangement must exist at the time the consumer purchases the tying product or service. That is because the consumer cannot "agree" to a condition that is not yet in existence.

(7th Cir. 2020) (quoting *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272 (6th Cir. 2015)). For example, in *Collins Inkjet*, the Sixth Circuit recognized a tying claim arising from a differential pricing arrangement. 781 F.3d at 267. Eastman Kodak adopted a pricing policy that raised the cost of replacing certain printheads, but only for customers who refused to purchase Kodak ink. *Id.* The district court found that the additional cost of the printheads for these customers was so great that "all rational buyers" of the competitors' ink would switch to Kodak's ink. *Id.* at 269. This was sufficient to give rise to a claim for a "non-explicit" tie. *Id.*

But in *Collins Inkjet*, it was Kodak's use of its power in the market for the tying product, printheads, that gave rise to a cognizable tying claim. Because Kodak possessed a "one-hundred-percent share of the refurbished printhead market," it could use a "threatened printhead price increase to 'force' buyers to buy its ink." *Id.* at 277. By contrast, here, plaintiffs do not allege that HP used its power in the printer market to force consumers to purchase HP ink cartridges. There is no allegation that HP adopted a "policy that ma[de] it unreasonably difficult or costly to buy the tying product," printers, "without buying the tied product," HP-branded ink cartridges. *Id.* at 272. As explained above, plaintiffs were not required as a condition of purchasing their printers to accept the firmware update or agree to purchase only HP-branded ink cartridges. Nor is there any allegation that HP adopted a differential pricing policy that raised the price of the printer unless the consumer agreed to purchase only HP-branded ink cartridges. Thus, unlike in *Collins Inkjet*, plaintiffs do not plausibly allege that HP used its market power in the printer market to condition sale of its printers on an agreement to purchase HP ink cartridges.

Because the complaint does not allege a cognizable tying arrangement, plaintiffs' Section 1 tying claim cannot proceed. The court need not reach HP's remaining arguments that plaintiffs fail to plead a relevant market, that HP lacks power in the tying product market for printers, or that plaintiffs lack antitrust standing. Count III is dismissed without prejudice.

### B. Exclusionary Conduct Under Section 2 (Count II)

Count II asserts a claim under Section 2 of the Sherman Act. Section 2 provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2. Persons "injured . . . by reason anything forbidden in" Section 2 may bring a civil action for damages. *Id.* § 15(a).

Count II, plaintiffs' Section 2 claim, alleges that "[t]he anticompetitive conduct, of implementing a firmware update to prevent owners of HP printers from using any competitor's replacement ink cartridges, has unreasonably restrained and threatens to continue [to] unreasonably restrain[] competition in the HP replacement ink cartridge aftermarket." [1] ¶ 66.

11

HP contends that the court should dismiss plaintiffs' Section 2 claim for the same reason as plaintiffs' Section 1 claim—plaintiffs have not plausibly alleged a tying arrangement. [25] at 33. To the extent plaintiffs base their Section 2 claim on the standard required to prove a violation under Section 1, the court agrees.

But plaintiffs appear to base their Section 2 claim on a different theory. [77] at 28:4–7. In their response to the motion to dismiss, plaintiffs argue that "[t]he firmware update was a change in existing practice that had the result of eliminating competition in the ink cartridge market" under Section 2. *See* [34] at 24. Plaintiffs cite *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), and *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), as support for this argument. Both cases involved monopolization claims arising from a defendant's refusal to deal with competitors. *See Aspen Skiing Co.*, 472 U.S. at 599; *Viamedia*, 951 F.3d at 463. Likewise, here, plaintiffs could assert a refusal-to-deal theory arising from HP's refusal to support the compatibility of third-party ink cartridges with its printers. To the extent plaintiffs assert a refusal-to-deal theory, HP argues that HP has no duty to aid competitors absent the "unilateral termination of a voluntary (and thus presumably profitable) course of dealing." [25] at 33 (quoting *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004)).

The court agrees with HP. "The law . . . generally permits unilateral refusals to deal by monopolists under Section 2." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 955 (N.D. Ill. 2018); *see also Trinko*, 540 U.S. at 411. This is because "[c]ompelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Trinko*, 540 U.S. at 407–08.

However, the Supreme Court carved out a narrow exception to this rule in *Aspen Skiing Co.* That case concerned three competing ski mountain companies—plaintiff, defendant, and a third company—who for several years offered customers a multi-area pass to ski on their respective mountains. 472 U.S. at 588–92. The multi-area pass gave visitors the flexibility to choose on the day of their visit which of the three mountains to ski on without having to decide in advance. *Id.* at 589. The companies would divide the pass revenues based on the number of visitors who chose to frequent their mountain on a given day. *Id.* at 591. After years of cooperation, however, the defendant, which by that time had bought the third company's mountain and opened a fourth mountain, stopped offering the multi-area pass with plaintiff, instead selling a pass that allowed one to ski on all three of defendant's mountains. *Id.* at 591–94.

The Court held that defendant's refusal to deal with plaintiff violated Section 2 because it effected "an important change in the character of the market." *Id.* at 604. The "monopolist made a deliberate effort to discourage its customers from doing

business with its smaller rival," and harmed consumers by depriving them of the superior ski pass deal. *See id.* at 607–08, 610.

*Aspen Skiing* represents an antitrust violation "at or near the outer boundary" of Section 2 liability. *Trinko*, 540 U.S. at 409. Since *Aspen Skiing*, the Seventh Circuit has held that a unilateral refusal to deal may result in Section 2 liability under the "limited circumstances" of *Aspen Skiing*, intimating that conduct must fall "within *Aspen's Skiing*'s bounds" to fall under Section 2 on a refusal to deal theory. *Viamedia*, 951 F.3d at 455. These characteristics include a "prior course of voluntary conduct, sacrifice of short-term profits, and refusal to sell to rivals on the same terms as other potential buyers." *Id.* at 463. f"[N]o factor is always decisive by itself," and at the motion to dismiss stage, "it is enough to allege plausibly that the refusal to deal has some of the key anticompetitive characteristics identified in *Aspen Skiing*." *Id.* at 457, 462; *see also Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*, No. 22-CV-1648, 2024 WL 2785142, at *14 (N.D. Ill. May 30, 2024) (applying the *Viamedia* framework).

Plaintiffs' complaint does not plausibly identify any of the anticompetitive characteristics discussed in *Aspen Skiing*. There is no allegation of past cooperation between HP and other ink cartridge sellers; the complaint suggests the opposite. The complaint alleges that "HP had a long history of using software to prevent owners of its printers from using competitors' ink cartridges." [1] ¶ 20. According to the complaint, from 2010 to 2015, HP used the "Dynamic Security" software to prevent consumers from using non-HP ink cartridges. *Id.* Moreover, plaintiffs do not allege any sacrifice of short-term profits or refusal to sell to rivals on the same terms as other potential buyers. Plaintiffs otherwise do not point to any parallels between this case and *Aspen Skiing*. Thus, their refusal-to-deal theory fails.

HP also argues that plaintiffs are attempting to bring a claim for a "technological tie" arising out of a unilateral design change. *See* Areeda & Hovenkamp, *supra*, ¶ 1757a. A technological tie occurs when a defendant designs a product such that the "technological interdependence" between a primary product and a complementary product has "the practical effect of foreclosing rivals in the complementary market." *Id.* "For example, someone who owns an inkjet printer may be required to purchase future inkjet cartridges from that manufacturer as well, because the cartridges made for one printer are incompatible with those made for a different printer." *Id.*

Such a unilateral design change does not "establish the coercion essential to a *per se* unlawful tying arrangement." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 542, 542 (9th Cir. 1983); *accord* Areeda & Hovenkamp, *supra*, ¶ 1757a (for technological ties, "no tying agreement or conditioned sale should be found for purposes of the per se rule"). And because it is a unilateral act, a redesign "does not satisfy Sherman § 1 or Clayton § 3's requirement of an agreement." Areeda & Hovenkamp, *supra*, ¶ 1757a.

But some courts have held that a unilateral design change may support liability under Section 2 if the defendant redesigns the product to render it incompatible with third-party aftermarket products. *See, e.g.*, *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010); *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 378 (S.D.N.Y. 2007).

Plaintiffs argue that a change to a primary product that renders it "impossible for third parties" to compete in an existing aftermarket is cognizable under antitrust law. [34] at 23. As support, plaintiffs cite *AliveCor, Inc. v. Apple Inc.*, 592 F. Supp. 3d 904 (N.D. Cal. 2022), a case that involved a unilateral design change claim under Section 2. *Id.* at 918–19.

But even under the technological tie theory, plaintiffs do not state a plausible Section 2 claim. To state a claim under Section 2, the plaintiff must allege that the defendant possesses "monopoly power in the relevant market." *Viamedia*, 951 F.3d at 451 (quoting *Trinko*, 540 U.S. at 407). Alternatively, to state a Section 2 attempted monopolization claim, the plaintiff must allege "a dangerous probability that the attempt at monopolization will succeed." *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011). To show a "dangerous probability" of acquiring monopoly power requires that the defendant had "sufficient market power to have been reasonably able to create a monopoly." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 270 (7th Cir. 1981). Whether bringing a monopolization or an attempted monopolization claim, "to survive a motion to dismiss, plaintiffs . . . must set forth facts sufficient to create an inference that defendant had enough market power to create a monopoly." *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000).

The market power requirement applies no less to cases where the Section 2 claim arises from a unilateral design change affecting a complementary product aftermarket. For example, in *Xerox*, the court denied a motion to dismiss a Section 2 unilateral redesign claim when the plaintiff alleged that the defendant's ownership of the market for replacement solid ink sticks compatible with Xerox machines "exceed[ed] 90%." 511 F. Supp. 2d at 385.

Market share is not the only way to establish market power sufficient to create a monopoly. In *AliveCor*, the defendant, Apple, possessed "complete control over both watchOS and distribution for watchOS apps." 592 F. Supp. 3d at 917. This control effectively gave Apple "one hundred percent" ownership of the market for "heart rate analysis apps on watchOS devices." *Id.* Apple's complete control over the distribution of apps plausibly established monopoly power. *Id.* When Apple, among other things, changed the design of its watchOS devices to create technical problems for competitors' heart rate analysis apps, the court held that Apple's conduct gave rise to a cognizable Section 2 claim. *Id.* at 911.

14

Here, to the extent plaintiffs attempt to assert their claim under a similar unilateral redesign theory, the claim is not plausible. Plaintiffs do not allege that HP possessed monopoly power or that HP possessed sufficient market power to create a monopoly. Plaintiffs' purported market is defined as "the aftermarket for Replacement Ink cartridges that will work in HP Printers in the United States." [1] ¶ 40. The complaint does not limit this alleged market to certain models or types of printers. Nor do plaintiffs explain why the court should limit the market to certain printer models. *Cf. In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901–02 (N.D. Ill. 2011) (courts may dismiss antitrust claims when a plaintiff "fail[s] even to attempt a plausible explanation as to why a market should be limited in a particular way" (alteration in original) (quoting *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 142 (E.D.N.Y. 2010)).

But even assuming for the sake of argument that the market identified in the complaint is a relevant market, plaintiffs have not alleged that HP possessed sufficient power in it to create a monopoly. *See 42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 405–06 (7th Cir. 2002) (assuming that plaintiff alleged a relevant market, dismissal of antitrust claim was still appropriate because the plaintiff did not plausibly allege that defendant possessed sufficient power in that market).

The complaint suggests that HP was one of several competitors in the market for ink cartridges compatible with HP printers. [1] ¶¶ 18, 40, 42. But unlike in *Xerox*, where the defendant's share of the aftermarket exceeded 90%, 511 F. Supp. 2d at 385, plaintiffs' complaint contains no allegations of HP's share in the market for HP-compatible ink cartridges. *See Hon Hai Precision Indus. Co. v. Molex, Inc.*, No. 08-CV-5582, 2009 WL 310890, at *3 (N.D. Ill. Feb. 9, 2009) ("The Complaint makes no other allegations, such as the extent of Molex's worldwide share in the relevant market, that would allow the Court to infer that Molex threatens or even has the capacity to obtain monopoly power.").

The complaint does not otherwise offer a plausible basis to infer HP possesses sufficient market power. In *AliveCor*, the complaint alleged that the defendant possessed complete control of the aftermarket for watchOS heart rate analysis apps because it held "complete control over both watchOS and distribution for watchOS apps" to its Apple Watches. 592 F. Supp. 3d at 917. By contrast, the complaint here does not allege that HP could exercise similar control over all its printers. To begin with, it is not clear what proportion of HP printer models in the market were affected by the firmware update. The complaint alleges that "many," not all, of HP's printer models were affected by the firmware update. [1] ¶ 23. Even for consumers who owned these models, however, to receive an update, a consumer had to register his printer. *Id.* ¶ 27. Moreover, for at least eighteen HP printer models, HP's 2018 settlement agreement obligated HP not to "at any time take any action to employ Dynamic Security . . . including by releasing or otherwise making available firmware that enables Dynamic Security," that is, the firmware update that "may prevent [HP] printers from operating with" ink cartridges "that contain a non-HP security chip."

15

Settlement Agreement, *supra*, Dkt. 110-2 at 6, 10; [1] ¶ 20. The complaint does not suggest that HP could send the firmware update to these printer models. Thus, unlike in *AliveCor*, there is no allegation that HP retained control over all its printers such that it was capable of sending the firmware update to all its printers to acquire a monopoly in the market for ink cartridges compatible with HP printers.

Considering these allegations, the complaint does not plausibly allege that HP possessed sufficient market power to create a monopoly in the aftermarket identified in the complaint. *See Hennessy Indus. Inc. v. FMC Corp.*, 779 F.2d 402, 405 (7th Cir. 1985) (affirming dismissal of Section 2 attempted monopolization claim because the complaint did "not set forth any facts from which we can infer that defendants had sufficient market power to have been able to create a monopoly"). For this reason, plaintiffs do not plausibly allege a Section 2 unilateral redesign claim.

For these reasons, plaintiffs' Section 2 claim cannot proceed. Count II is dismissed.

## II. Computer Fraud and Abuse Act

Count I asserts a claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Section 1030(a)(2)(C) imposes liability on whoever "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." Section 1030(a)(4) imposes liability on whoever "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value." Section 1030(g) creates a private right of action for "[a]ny person who suffers damage or loss by reason of a violation of this section." As will be discussed more below, Section 1030(g) is qualified by a loss threshold of $5,000.

Plaintiffs contend that by sending the firmware update, HP intentionally accessed plaintiffs' printers "without authorization or exceed[ed] authorized access[,] . . . and thereby obtain[ed] . . . information" from the printers. *See* [1] ¶ 60 (third alteration in original) (quoting 18 U.S.C. § 1030(a)(2)(C)). In their response brief, plaintiffs add that "[a]lthough the subsection is not explicitly cited in the Complaint, the Complaint also contains all elements of a violation of § [1030](a)(5)(A)." [34] at 27. Section 1030(a)(5)(A) imposes liability on whoever "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer."

HP offers three arguments in favor of dismissal. The court agrees with HP's third argument—that plaintiffs have not plausibly satisfied the CFAA's $5,000 loss threshold. As was described above, Section 1030(g) creates a private right of action for "[a]ny person who suffers damage or loss by reason of a violation of this section."

16

18 U.S.C. § 1030(g). A civil action may be brought "only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." *Id.* Section 1030(c)(4)(A)(i)(I) states:

> *loss to 1 or more persons during any 1-year period* (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) *aggregating at least $5,000 in value[.]*

(Emphases added.) "Loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11). So, putting it all together: A plaintiff may bring a CFAA claim if he can plausibly claim that a violation of the CFAA—that is, damaging or gaining information from a protected computer—caused a loss of at least $5,000 to one or more persons.

Plaintiffs do not allege that they each individually suffered a $5,000 loss from the firmware update; no plaintiff quantifies his or her loss. [1] ¶¶ 6–16, 61. Rather, plaintiffs argue that the statute's use of the term "aggregating at least $5,000" "expressly directs that claims may be aggregated to reach the $5,000 threshold." [34] at 29–30. According to plaintiffs, if the court aggregates the losses of all the named plaintiffs with the losses of the absent members of the class, whose individual injuries may be "as little as $30 to each recipient," the collective "loss" exceeds $5,000. *Id.*

Plaintiffs' argument fails. On their theory, this court should aggregate the harm caused by software downloads on dozens and dozens of computers. But that request runs headfirst into statutory text. The "loss" entitling a plaintiff to damages must arise from "a violation" of the CFAA. *See* 18 U.S.C. § 1030(g). Under § 1030(a)(5)(A)–(C), a person violates the statute if he "accesses" or "causes damage" to "*a* protected computer." *Id.* § 1030(a)(5)(A)–(C) (emphasis added). Section 1030(a)(2) likewise imposes liability on whoever "intentionally accesses *a* computer." (Emphasis added.) The use of the singular "*a* violation" and "*a* protected computer" suggests that the $5,000 aggregated loss must arise from a single act of prohibited intrusion into a single computer. That is, each intrusion is its own offense.

Were there any doubt, Congress has set a different standard for cases brought by the United States. In "proceeding[s] brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers" may be aggregated. § 1030(c)(4)(A)(i)(I) (emphasis added). Congress has specified when more than one computer is at play in other places as well. *See* § 1030(c)(4)(A)(i)(VI) ("10 or more protected computers"). That variation is meaningful.

17

Plaintiffs have not stated a plausible claim. They ask the court to aggregate the harm caused by dozens of separate offenses. But while some types of aggregation are contemplated by the CFAA, aggregating the harm caused by separate offenses is not one of them. *See Mount v. PulsePoint, Inc.*, No. 13 Civ. 6592 (NRB), 2016 WL 5080131, at *9 n.4 (S.D.N.Y. Aug. 17, 2016). Thus, Count I is dismissed.

## III.    State Law Claims (Counts IV–LXXX)

Plaintiffs' remaining claims assert violations of the consumer protection, unfair and deceptive practices, and antitrust laws of all fifty states. Plaintiffs also bring an unjust enrichment claim without specifying the applicable state law.

HP asserts two primary grounds (among several others) for dismissing these claims: First, the named plaintiffs lack standing to bring claims under the laws of states to which they have no connection and for printer models they did not purchase. Second, plaintiffs fail to state a claim for relief under the various states' consumer protection, unfair and deceptive practices, antitrust, and unjust enrichment laws and doctrines. The court addresses each argument below.

### A.    Standing

According to the complaint, the named plaintiffs are citizens of Illinois, Missouri, Pennsylvania, Massachusetts, Michigan, New Jersey, New York, Nevada, and Tennessee. [1] ¶¶ 6–16. Plaintiffs bring claims under the laws of all fifty states. *See id.* ¶¶ 88–648. Sixty-three of the seventy-nine causes of action arise under the laws of states where the named plaintiffs do not reside and suffered no alleged injury. Thus, HP contends that plaintiffs lack Article III standing to sue under these states' laws. [25] at 38–40.

Plaintiffs bring their state law claims on behalf of a multi-state class. Per the complaint, "[c]laims based on state law are applicable only to Class Members who reside in, or received firmware updates in, the specified state." [1] ¶ 45. For example, the Illinois Consumer Fraud Act ("ICFA") claim is brought on behalf of the "Illinois Class Members." *See id.* ¶¶ 88–96. The question is whether the named plaintiffs have standing to bring a suit on behalf of class members residing in states and under the laws of states to which the named plaintiffs have no connection.

"To have standing to sue as a class representative it is essential that a plaintiff must be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974). "[A] person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action." *Payton v. Cnty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002).

18

Although Seventh Circuit caselaw does not dictate either conclusion, HP notes that several courts in this district have held that a named plaintiff (or plaintiffs) cannot share the same interest or injury as members of the class when the plaintiff sues under the laws of a state to which the plaintiff has no connection. *See, e.g., Brown v. Auto-Owners Ins. Co.*, No. 1:21-CV-02597, 2022 WL 2442548, at *2 (N.D. Ill. June 1, 2022); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09-CV-3690, 2013 WL 4506000, at *8 (N.D. Ill. Aug. 23, 2013).

But "[t]he prevailing view . . . is that the issue is best framed through the class-certification lens, not standing." *Slowinski v. BlueTriton Brands, Inc.*, 744 F. Supp. 3d 867, 880 (N.D. Ill. 2024) (quoting *Clark v. Blue Diamond Growers*, No. 22-CV-1591, 2023 WL 4351464, at *6 (N.D. Ill. July 5, 2023)); *Clark*, 2023 WL 4351464, at *6 (collecting cases). In other words, whether plaintiffs may bring a class action lawsuit asserting claims arising under the laws of different states turns on whether class certification is proper, not whether the named plaintiffs have Article III standing.

This view appears more consistent with Seventh Circuit caselaw. The Seventh Circuit has held that "the question of who is authorized to bring an action under a statute is one of statutory interpretation; it does not implicate Article III standing or jurisdiction." *Woodman's Food Market, Inc. v. Clorox Co.*, 833 F.3d 743, 750 (7th Cir. 2016). The Seventh Circuit has also held that if the state "law does not apply because events were centered" in another state, "then plaintiffs must rely on some other state's law; this application of choice-of-law principles has nothing to do with *standing*, though it may affect whether a class should be certified—for a class action arising under the consumer-fraud laws of all 50 states may not be manageable, even though an action under one state's law could be." *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) (citation omitted).

Here, the named plaintiffs have Article III standing. Plaintiffs allege that they suffered injury-in-fact arising from the firmware update, which forced them to "pay higher prices" and "los[e] the value" of the non-HP ink they had purchased. [1] ¶ 35. The injury is fairly traceable to the actions of HP, that is, the firmware update, and redressable by this court. Because the named plaintiffs have Article III standing, the court need not decide now whether plaintiffs may bring their class claims under the laws of states to which the plaintiffs have no connection.

HP makes a similar standing argument as to the claims plaintiffs bring for printers they did not individually purchase or own. The named plaintiffs purchased several different HP printer models, such as the HP Envy Inspire 7255 and HP Office Jet Pro 6978. [1] ¶¶ 6–16. But the Class Models include thirty-six other printer

models that the named plaintiffs neither owned nor purchased.[9] HP contends that plaintiffs lack standing to bring claims related to these models.

But many courts have held that this too creates a class certification issue, not a standing issue. *See Tex. Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, 522 F. Supp. 3d 402, 408–09 (N.D. Ill. 2021); *Thomas v. Walmart Inc.*, 720 F. Supp. 3d 650, 658 (N.D. Ill. 2024); *Friend v. FGF Brands (USA) Inc.*, No. 18-CV-7644, 2019 WL 2482728, at *3 (N.D. Ill. June 12, 2019). "[W]hether the named plaintiffs 'may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions.'" *Thomas*, 720 F. Supp. 3d at 658 (quoting *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 722 (N.D. Ill. 2016)). So long as the named plaintiffs have standing to sue for their own injuries, "[t]his is not a case where the named plaintiff[s] [are] trying to piggy-back on the injuries of the unnamed class members." *Id.* (alterations in original) (quoting *Payton*, 308 F.3d at 682). Because the named plaintiffs have Article III standing, the court need not decide now whether plaintiffs may assert class claims for updates to printers that the named plaintiffs did not purchase.

## B.     Failure to State a Claim

HP argues that the named plaintiffs fail to state a claim for violations of the various states' consumer protection, unfair and deceptive practices, and antitrust laws. HP also argues that plaintiffs do not allege a plausible unjust enrichment claim.

To begin with, if the named plaintiffs fail to state a claim, then the court may dismiss plaintiffs' class claims as well. A named plaintiff's "failure to adequately plead" a claim "renders her unable to represent . . . a multi-state class under the laws of various other states." *Craw v. Clorox Co.*, 692 F. Supp. 3d 854, 864 (C.D. Ill. 2023); *see Van Zeeland v. Rand McNally*, 532 F. Supp. 3d 557, 571–72 (N.D. Ill. 2021); *Halperin*, 123 F. Supp. 3d at 1009 (collecting cases). This is because "if the court determines that the named plaintiffs' claims lack merit, such a decision ordinarily, though not invariably, . . . disqualifies the named plaintiffs as proper class representatives, thus resolving the issue of class certification." *Chavez v. Ill. State Police*, 251 F.3d 612, 630 (7th Cir. 2001) (quoting *Cowen v. Bank United of Tex.*, 70 F.3d 937, 941 (7th Cir. 1995)). Thus, if the court determines that the named plaintiffs do not state a claim, the court may dismiss plaintiffs' class claims.

---

[9] According to the complaint, the Class Models "include[]" all the printers listed in paragraph 44 of the complaint. *See* [1] ¶ 44. The named plaintiffs purchased several models that are not listed, however, including the Inkjet 6500. *Id.* ¶ 8. As best the court can tell, the Class Models comprise the list of printers provided in paragraph 44 of the complaint plus any printers purchased by the named plaintiffs and not specifically listed in paragraph 44.

Plaintiffs' state law claims fall into three categories: (1) state consumer protection and unfair and deceptive practices, (2) state antitrust, and (3) unjust enrichment. The court addresses each category of claims below.

### 1. State Consumer Protection and Unfair and Deceptive Practices Laws

Plaintiffs bring claims under the consumer protection and unfair and deceptive practices laws of every state. Each count follows the same general pattern: First, plaintiffs allege that HP violated the relevant statute through its "unfair," "deceptive," and/or "illegal" acts or practices. *E.g.*, [1] ¶¶ 106, 119, 123, 126, 159, 380, 541, 603. Second, plaintiffs allege that HP's actions caused the following effects:

> (1) replacement ink cartridge price competition was restrained, suppressed, and eliminated throughout [the state]; (2) replacement ink cartridge prices were raised, fixed, maintained, and stabilized at artificially high levels throughout [the state]; (3) members of the Class were deprived of free and open competition; (4) members of the Class unfairly lost the value of non-HP replacement ink cartridges they purchased and which would have been compatible with their printers but for HP's firmware updates; (5) members of the Class bought HP's printers without being informed of HP's intent to reduce or eliminate the printers' ability to use third-party ink cartridges; (6) members of the Class were coerced into paying supracompetitive, artificially inflated prices for HP's replacement ink cartridges.

*See, e.g.*, *id.* ¶¶ 93, 99, 106, 113, 119.

Based on the complaint and plaintiffs' arguments in their response brief, plaintiffs appear to assert two theories of liability under the various state consumer protection and unfair and deceptive trade practices laws: (a) an antitrust theory and (b) a fraud theory.

### a. The Antitrust Theory

Plaintiffs assert violations of various states' consumer protection and unfair and deceptive practices acts based on HP's alleged antitrust violations. The complaint's allegations regarding the "effects" of HP's actions, including its allegations that consumers were charged "supracompetitive, artificially inflated prices" and "deprived of free and open competition," *e.g.*, *id.* ¶ 93, suggest that plaintiffs' state antitrust trust theory mimics their federal antitrust theory.

In their response brief, plaintiffs do not argue that their consumer protection and unfair and deceptive practices law claims are based on an antitrust theory different from their federal antitrust theory. Rather, plaintiffs argue that "to the

extent Plaintiffs' claims are dependent upon their federal antitrust claims, the state law claims are valid." [34] at 42.

The court has dismissed plaintiffs' federal antitrust claims. Thus, to the extent plaintiffs' state antitrust theory is "predicated on defendant['s] having engaged in anticompetitive behavior," the consumer protection and unfair and deceptive practices claims are dismissed for the same reasons as the federal antitrust claims. *See In re Aluminum Warehousing Antitrust Litig.*, No. 13–md–2481 (KBF), 2014 WL 4743425, at *2 (S.D.N.Y. Sept. 15, 2014) (after court dismissed federal antitrust claims, it dismissed state consumer protection and unfair competition claims when the claims were "predicated on defendants' having engaged in anticompetitive behavior that caused plaintiffs to pay supra-competitive prices"); *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003) (dismissing state unfair competition and consumer protection claims when the claims "track[ed] entirely the allegations underlying the antitrust claims," which the court already dismissed).

### b.   The Fraud Theory

Plaintiffs' other theory is fraudulent omission. According to plaintiffs, "HP purposefully misled them by failing to disclose that its 'Dynamic Security' firmware updates would disable HP printers that were fitted with replacement ink cartridges." [34] at 39.

Claims sounding in fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). That rule requires a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "That includes the 'who, what, when, where, and how' of the fraud." *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 634 (N.D. Ill. 2020) (quoting *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019)). "Each instance of fraud must be alleged with 'precision and some measure of substantiation.'" *Id.* (quoting *Menzies*, 943 F.3d at 338).

Plaintiffs argue that HP purposefully misled them by failing to disclose the effects of the firmware update. According to the complaint, HP never indicated in its printer manuals that "agreeing to accept software and firmware updates could damage any features of the printer." [1] ¶ 25. Additionally, the complaint alleges that "[n]one of the plaintiffs had received any warning at the time of the firmware update or at the time of the purchase of a printer, or at any other time, that by registering their printers to receive regular updates, [plaintiffs] might lose the ability to use non-HP replacement ink cartridges." *Id.* ¶ 31. When HP reinstated the firmware update in 2022 and 2023, plaintiffs allege, "[t]here was no notification of any kind . . . that might inform customers that the update would reduce the printer's functionality." *Id.* ¶ 27. Plaintiffs thus contend that HP misled them by failing to disclose the effects of the firmware update. [34] at 39.

To begin with, while the named plaintiffs are citizens of Illinois, Missouri, Pennsylvania, Massachusetts, Michigan, New Jersey, New York, Nevada, and Tennessee, [1] ¶¶ 6–16, it is not clear that the named plaintiffs seek to bring their individual claims under those states' laws. While plaintiffs assert *class action* claims under the laws of all fifty states, plaintiffs do not identify what substantive law applies to their *individual* claims. This presents a choice of law issue, meaning that the court must resort to Illinois choice-of-law rules to determine how to assess the named plaintiffs' individual claims. *See Al Haj v. Pfizer Inc.*, 338 F. Supp. 3d 741, 753 (N.D. Ill. 2018) (case involving a class-action complaint asserting violations of all fifty states' consumer protection laws, court applied Illinois choice-of-law rules to determine what law governed the named plaintiff's individual claims); *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) ("Federal courts hearing state law claims under diversity or supplemental jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law.").

But critically, neither party argues that the result would be different under the law of any particular state. *See Coexist Found., Inc. v. Fehrenbacher*, No. 11-cv-6279, 2016 WL 4091623, at *4 n.2 (N.D. Ill. Aug. 2, 2016) ("The Court need not decide which state's law applies as the outcome is the same under both."). Plaintiffs do not argue that they have asserted a claim under any particular state's laws. Rather, plaintiffs cite several cases applying California, Florida, Texas, Washington, New Jersey, and Illinois law to argue that the complaint states a viable consumer fraud claim. [34] at 31–33. HP likewise does not focus its argument on a particular state's laws but instead argues that plaintiffs' claims are implausible "under the laws of a number of states because they do not allege that HP had any duty to disclose" or that plaintiffs relied on HP's omissions. [25] at 49–51.

Because neither party argues that applying a different state's law produces a different outcome, the court applies Illinois law. *See S. Ill. Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co.*, 302 F.3d 667, 672 (7th Cir. 2002) (when "neither party contends that Illinois's choice of law rules require us to apply the substantive law of another state and there is a reasonable relation between the dispute and the forum whose law has been selected, we will apply Illinois law in this case" (internal quotation marks and citations omitted)).

Plaintiffs bring a claim under the ICFA, which prohibits "unfair or deceptive acts or practices, including . . . deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce." 815 Ill. Comp. Stat. 505/2. Pleading fraud under ICFA requires "(1) a deceptive act or practice by the defendant; (2) the defendant intended that the plaintiff rely on the deception; (3) the deceptive act occurred in a course of conduct involving trade or commerce; and (4) actual

damage to the plaintiff; (5) proximately caused by the deceptive act." *Phila. Indem. Ins. Co. v. Chi. Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014) (citing *De Bouse v. Bayer AG*, 922 N.E.2d 309, 313 (Ill. 2009)).

"[T]he plaintiff must actually be deceived by a statement or omission. If there has been no communication with the plaintiff, there have been no statements and no omissions." *De Bouse*, 922 N.E.2d at 316. "[A] plaintiff must allege an omission from a communication, not a general failure to disclose." *Guajardo v. Skechers USA, Inc.*, 503 F. Supp. 3d 746, 754 (C.D. Ill. 2020).

Plaintiffs contend that language in the End User License Agreement and Limited Warranty suggested that HP printers would function properly with non-HP replacement cartridges. [34] at 40. Thus, plaintiffs contend, HP's failure to disclose the existence of the firmware update constituted a fraudulent omission.

This argument is not persuasive. According to the complaint, the Limited Warranty and End User License Agreement state that "[t]he use of a non-HP or refilled cartridge does not affect" HP's warranty. [1] ¶¶ 32, 39. At most, this could have suggested at the time of purchase that it was possible to use non-HP ink cartridges. But the statement did not imply that HP's subsequent firmware updates would continue to support the use of non-HP cartridges. *See Parziale v. HP, Inc.*, 445 F. Supp. 3d 435, 443–44 (N.D. Cal. 2020) (rejecting argument that statements like "[p]lease use genuine HP ink cartridges for best results" plausibly gave rise to a state law consumer fraud claim because the statements did not imply that the printers "would *always* be compatible with [non-HP] cartridges" or that "those cartridges will continue to work in the future"). Thus, plaintiffs have not alleged a plausible ICFA claim arising from any deceptive statement by HP.

Plaintiffs cite several out-of-circuit cases involving allegations like those in plaintiffs' complaint. But several of these cases are distinguishable. In *San Miguel v. HP Inc.*, 317 F. Supp. 3d 1075 (N.D. Cal. 2018), the plaintiffs asserted a fraudulent omission theory arising from an error message on the plaintiffs' printers. *Id.* at 1080–81. When plaintiffs attempted to use third-party ink, their printer displayed an error message stating that the ink cartridges were "missing or damaged." *Id.* In reality, the defendant had issued a firmware update preventing consumers from using third-party ink. *Id.* at 1082. Similarly, in *Mobile Emergency Hous. Corp. v. HP, Inc.*, No. 20-CV-09157-SVK, 2021 WL 9867952 (N.D. Cal. Oct. 15, 2021), the plaintiffs asserted a fraudulent omission theory arising from the printers' error message. *Id.* at *10–11. When the plaintiffs attempted to use third-party ink, the printer displayed a "supply problem" error message even though "there was no supply problem." *Id.* at *11. In reality, the only problem was that the defendant's firmware update inhibited the compatibility of third-party ink. *Id.*

In both cases, plaintiffs stated a plausible fraudulent omission claim because "[t]he alleged omission, that [the defendant] intentionally used a firmware update to disable printers that were using [third-party] ink cartridges, [was] arguably contrary to the explanations for the printer failure stated in the error messages." *Id.* (quoting *San Miguel*, 317 F. Supp. 3d at 1090); *San Miguel*, 317 F. Supp. 3d at 1090. There are no similar allegations here. Plaintiffs do not argue that HP's omission was "arguably contrary to the explanations for the printer failure stated in the error messages." *Id.* The complaint alleges that the error messages displayed to plaintiffs plainly stated that "[t]he indicated cartridges have been blocked by the printer firmware because they contain a non-HP chip. This printer is intended to work only with new or reused cartridges that have a new or reused HP chip." [1] ¶ 28. Unlike in *San Miguel* and *Mobile Emergency*, there was nothing misleading about the error messages displayed to plaintiffs when they attempted to use a non-HP ink cartridge.

Plaintiffs also cite *So v. HP, Inc.*, No. 22-CV-02337-BLF, 2023 WL 4596778 (N.D. Cal. July 17, 2023), another unpublished district court decision involving allegations like those in plaintiffs' complaint. *Id.* at *1–2. The court in *So* held that the plaintiffs plausibly alleged that HP had a duty to disclose the firmware update's impact because it affected a feature "central to the printer's function." *Id.* at *8. The court relied on the "central function" approach, which is rooted in the Ninth Circuit's interpretations of California law. *See id.* (citing *Oddo v. United Techs. Corp.*, No. 8:15-CV-01985-CAS(Ex), 2022 WL 577663 (C.D. Cal. Jan. 3, 2022)). *See generally Hodson v. Mars, Inc.*, 891 F.3d 857, 863 (9th Cir. 2018) (interpreting California case law to hold that "manufacturers have a duty to disclose a defect when it affects the central functionality of a product"). Plaintiffs argue that because *So* involved allegations similar to those here, plaintiffs have plausibly alleged a fraudulent omission.

This argument is not persuasive. Even applying the "central function" approach, plaintiffs' theory is not plausible. "[T]he central functionality of the product is not based on subjective preferences about a product." *Hodsdon*, 891 F.3d at 864. Rather, "the question is: does the alleged defect prevent the product from performing a critical or integral function, or render the product incapable of use for all users?" *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1086 (N.D. Cal. 2022) (internal quotation marks omitted) (collecting cases). For example, in *Collins v. eMachines, Inc.*, 134 Cal. Rptr. 3d 588 (Cal. Ct. App. 2011), an undisclosed defect with a floppy disk caused data corruption of a computer's hard drive, thereby affecting its central functionality—"storage, access, and transport of accurate computer data." *Id.* at 253, 258; *see also Hodsdon*, 891 F.3d at 864 (summarizing *Collins* as holding that a "computer chip that corrupts the hard drive, or a laptop screen that goes dark, renders those products incapable of use by any consumer").

Here, the complaint does not plausibly allege that the firmware update caused a defect that "prevent[ed] the product from performing a critical or integral function" or rendered it "incapable of use by any consumer." *Hammerling*, 615 F. Supp. 3d

at 1086 (internal quotation marks omitted). Every printer requires an ink cartridge to function. All the firmware update changed was the type of ink cartridge the printer accepted. Plaintiffs do not allege that use of third-party ink caused permanent damage to their printers. The complaint alleges that the printers functioned normally again when the plaintiffs used an HP-branded ink cartridge. [1] ¶¶ 6–16. Unlike the defects at issue in *Collins*, which involved the "critical data corruption of the hard drive," *Hodsdon*, 891 F.3d at 862, the firmware update did not "render[] [the] product[] incapable of use by any consumer." *Id.* at 864.

The complaint does not otherwise plausibly allege that the firmware update "prevent[ed] the product from performing a critical or integral function." *Hammerling*, 615 F. Supp. 3d at 1086; *see In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1103–04 (N.D. Cal. 2021) (lower-than-advertised fuel tank capacity was not a central functionality defect because "allegations that the fuel tank does not fill to its advertised capacity, but still can achieve 330–480 miles on a single tank of [gas], do not plead a defect rendering the Vehicles incapable of use in any meaningful sense" (internal quotation marks omitted) (alteration in original)); *C.W. v. Epic Games, Inc.*, No. 19-CV-03629-YGR, 2020 WL 5257572, at *5 (N.D. Cal. Sept. 3, 2020) (video game's allegedly undisclosed nonrefundability terms did not affect its central function). The complaint does not plausibly allege that HP failed to disclose any central function defect.

Finally, plaintiffs cite a Northern District of Illinois case where the court held that the alleged failure to disclose a transfer restriction policy on a note was sufficient to state a claim under the ICFA. *ABN AMRO, Inc. v. Cap. Int'l Ltd.*, 595 F. Supp. 2d 805 (N.D. Ill. 2008). But in that case the fraudulent omission claim arose from a series of note-related documents provided to the plaintiff that contemplated transactions involving the note. *Id.* at 817. The documents suggested that only certain restrictions would apply to the note without disclosing the existence of any absolute restrictions on the note's sale, costing the plaintiff millions of dollars. *Id.* at 817, 836–37. Plaintiffs do not identify any comparable partial disclosures by HP.

To the extent plaintiffs' state law consumer protection and unfair and deceptive trade practices act claims are based on a fraudulent omission theory, the claims cannot proceed. Plaintiffs' claims under various states' consumer protection and unfair and deceptive practices acts are dismissed.

### 2. State Antitrust Laws

Plaintiffs bring claims under the antitrust laws of various states. Both parties agree that because state antitrust law applies the same standards as federal antitrust law under the Sherman Act, plaintiffs' state law claims rise or fall with their federal antitrust claims. *See* [25] at 44–45; [34] at 35–36; [77] at 44:9–12.

Because the court has dismissed plaintiffs' federal antitrust claims, plaintiffs' state antitrust claims are also dismissed.

### 3.    Unjust Enrichment

Count IV asserts a claim for unjust enrichment, but it does not specify under which state's laws plaintiffs bring the claim. *See* [1] ¶¶ 82–87. In its memorandum in support of the motion to dismiss, HP points out that the law of unjust enrichment has "varying interpretations even by courts within the same state, let alone amongst the fifty states." [25] at 42 (quoting *In re Sears, Roebuck & Co.*, Nos. 05-cv-4742 & 05-cv-2623, 2006 WL 3754823, at *1 n.3 (N.D. Ill. Dec. 18, 2006)).

Plaintiffs argue that the facts alleged are sufficient to state unjust enrichment claims under the laws of every state. [34] at 35. But plaintiffs concede that the failure to link the claim to a particular state's unjust enrichment law may lead to confusion. *Id.* Plaintiffs request "leave to amend and add additional counts as may be necessary." *Id.*

The court grants plaintiffs' request and will reserve a decision on the plausibility of plaintiffs' unjust enrichment claim until plaintiffs replead it. Count IV is dismissed.

## C.    Dismissal of the Class Claims

The court has dismissed the named plaintiffs' individual claims. As explained above, the named plaintiffs' failure to plausibly state a claim renders them unable to represent a multi-state class asserting claims under the laws of various other states. *E.g.*, *Craw*, 692 F. Supp. 3d at 864. Plaintiffs' remaining class claims asserted under the laws of various states are therefore dismissed without prejudice.

# IV.    Amendment

"Generally, if a district court dismisses for failure to state a claim, the court should give the party one opportunity to try to cure the problem . . . ." *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010). "Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi.*, 786 F.3d 510, 519–20 (7th Cir. 2015) (quoting *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004)).

Plaintiffs request that if the court dismisses their claims the court also grant leave to amend. [34] at 46. HP argues that amendment is futile with respect to plaintiffs' claims hinging on their allegation that HP fraudulently omitted or misrepresented the fact that third-party ink cartridges would not work in plaintiffs' printers—such as plaintiffs' fraud theory under their state-law consumer protection

claims. *See* [43] at 28–29 ("Plaintiffs [are] not . . . able to amend their complaint to state a claim for misrepresentation, deception, or fraudulent conduct."). HP maintains that the court in *Parziale v. HP* "found" that HP adequately disclosed "that non-HP cartridges may not be reliable." *Id.* at 12 (quoting *Parziale*, 445 F. Supp. 3d at 444); *see also id.* at 28–29.

HP's argument is unpersuasive. Like here, *Parziale* considered whether the plaintiffs adequately stated a consumer fraud claim based on HP's alleged failure to disclose the impact of its firmware update, which disabled the compatibility of non-HP ink cartridges. *Parziale*, 445 F. Supp. 3d at 443–44. But *unlike* here, *Parziale* relied in part on HP's online "Support Page" for the Officejet Pro 7740. *Id.* at 445. *Parziale* found that the Support Page was incorporated by reference into the complaint because the complaint quoted and referenced it several times. *Id.* at 440 n.1. On the Support Page, HP warned consumers that the firmware update would "include[] dynamic security measures, which may prevent supplies with non-HP chips or circuitry from working now or in the future." *Id.* at 440. Based on the Support Page, *Parziale* concluded that HP's warning was "sufficient to counter any potential misconception about the use of non-HP cartridges." *Id.* at 445.

Here, nothing in the complaint suggests that HP disclosed the possibility that third-party ink cartridges would not work in plaintiffs' printers. The complaint alleges that "[n]one of the plaintiffs had received any warning at the time of the firmware update or at the time of the purchase of a printer, or at any other time, that by registering their printers to receive regular updates, [plaintiffs] might lose the ability to use non-HP replacement ink cartridges." [1] ¶ 31. HP has not pointed to any disclosures that contradict plaintiffs' allegations. Nor does the complaint refer to a "support page" that could be considered incorporated by reference. Aside from that, *Parziale* was decided in 2020, and does not address HP's current disclosures.

Thus, it is not "certain from the face of the complaint that any amendment would be futile or otherwise unwarranted." *Runnion*, 786 F.3d at 519–20. Plaintiffs are granted leave to file an amended complaint if they can do so consistent with this opinion.

## CONCLUSION

Defendants' motion to dismiss, [24], is granted and the complaint, [1], is dismissed without prejudice. Since this is a first dismissal on the merits, plaintiffs are granted leave to amend if they can do so consistent with this opinion. Plaintiffs may file a second amended complaint by October 28, 2025. If no amended complaint is filed by that date, the court will enter final judgment and dismiss the case with prejudice.

Dated: September 30, 2025          /s/ Martha M. Pacold