# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| RENEE ROBINSON, RICHARD MYERS, ANNETTE FIRST, CASEY GADDY, STEVEN GOUISIE, ROBERT PLUNKETT, FRANCOIS STEIGER, JAMES ULRICH, GABRIEL VOILES, JOHN WAUDBY, and LAKESHA WELLS, on behalf of themselves and all others similarly situated, | Case No.: 1:24-cv-00164 |
| | Hon. Martha M. Pacold |
| *Plaintiffs*, | Magistrate Judge Daniel P. McLaughlin |
| v. | **FIRST AMENDED** |
| HP, INC., a Delaware corporation, | **CLASS ACTION COMPLAINT** |
| *Defendant*. | |

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................. 3

PARTIES ................................................................................................................................. 4

FACTUAL ALLEGATIONS .................................................................................................. 7

    The Aftermarket for Ink Cartridges ................................................................................. 7

    2016: HP Blocks Third-Party Cartridges, Then Resumes Ordinary Competition .................... 11

    2018-2019: Cheaper Non-HP inks Place Downward Pressure on HP's Profits ....................... 13

    Late 2019 – 2023: HP Gradually Monopolizes The Aftermarket Using Firmware Updates.... 15

    HP Continues Selling Printers That Fail to Adequately Disclose its New Restrictions ........... 17

    Antitrust Allegations Arising From *Kodak* Single-Brand Aftermarket.................................... 27

    Antitrust Allegations Relating to Tying Aftermarkets for Services and Replacement Inks...... 28

    Warranty................................................................................................................................. 29

CLASS ACTION ALLEGATIONS ...................................................................................... 30

    Class Definition .................................................................................................................... 30

    Factual Allegations Supporting Class Treatment................................................................... 35

    Notice of Claims to HP Would be Futile and is Therefore Excused........................................ 37

COUNT I ............................................................................................................................... 37

COUNT II .............................................................................................................................. 39

COUNT III ............................................................................................................................. 42

COUNT IV ............................................................................................................................. 44

COUNT V .............................................................................................................................. 46

COUNT VI ............................................................................................................................. 49

COUNT VII............................................................................................................................ 50

COUNT VIII........................................................................................................................... 51

COUNT IX ............................................................................................................................. 52

COUNT X .............................................................................................................................. 52

COUNT XI ............................................................................................................................. 53

COUNT XII............................................................................................................................ 54

COUNT XIII........................................................................................................................... 55

COUNT XIV .......................................................................................................................... 56

COUNT XV ........................................................................................................................... 57

COUNT XVI ............................................................................................................. 57

COUNT XVII ............................................................................................................ 58

COUNT XVIII ........................................................................................................... 59

COUNT XIX .............................................................................................................. 60

COUNT XX ............................................................................................................... 61

COUNT XXI .............................................................................................................. 62

COUNT XXII ............................................................................................................ 63

COUNT XXIII ........................................................................................................... 64

COUNT XXIV ........................................................................................................... 65

COUNT XXV ............................................................................................................ 66

COUNT XXVI ........................................................................................................... 67

COUNT XXVII .......................................................................................................... 67

COUNT XXVIII ........................................................................................................ 69

COUNT XXIX ........................................................................................................... 69

COUNT XXX ............................................................................................................ 70

RELIEF DEMANDED .............................................................................................. 71

JURY TRIAL DEMANDED ...................................................................................... 72

Plaintiffs Renee Robinson, Richard Myers, Annette First, Casey Gaddy, Steven Gousie, Robert Plunkett, Francois Steiger, James Ulrich, Gabriel Voiles, John Waudby, and Lakesha Wells ("Plaintiffs"), acting on behalf of themselves and all other similarly situated persons ("Class Members"), bring this action for damages and equitable relief against HP, Inc., d/b/a HP Computing and Printing, Inc. ("HP").

## <u>INTRODUCTION</u>

1. This is a class action brought against HP for forcing consumers who purchased HP-branded printers to use only HP-branded replacement ink cartridges, rather than purchasing ink replacements from its competitors. HP accomplished this through the electronic distribution of restrictive and deceptive "firmware updates," to registered owners of the varied printer models at issue from 2020 through 2024. HP's restrictive firmware updates permanently disabled the at-issue printers from accepting competing certain non-HP replacement ink cartridges that previously worked in the printers.

2. The printers at issue are inkjet printers (specifically, OfficeJet, Deskjet, and DesignJet series) that HP sold from 2016 to at least early 2023. HP manufactured these with "Dynamic Security" firmware—a type of software permanently embedded in the printers' hardware—that allowed HP to remotely disable certain brands of previously functional non-HP ink through "firmware updates." HP sold these printers with a misleading disclaimer that mentioned the words "Dynamic Security" near the bottom of the printer box, without conspicuously defining that phrase, and misleading stated that non-HP ink "may not work" but without revealing HP's intent to remove the functionality of non-HP (the "May Not Work" Disclaimer). Collectively, these printers are referred to as the "Class Printers." The Class Printers do not include any printers that HP subsequently sold with a disclaimer that explicitly stated it would "block cartridges" containing non-HP ink (the "Block Cartridges" Disclaimer, discussed in

further detail below). All Class Printers were subject to firmware updates at least once during the years 2020, 2021, 2022, 2023, or 2024.

3.     HP packaged and sold the Class Printers with a misleading disclaimer that merely informed its customers that non-HP ink "may not work," and nowhere else disclosed HP's then-existing intent to permanently remove, at a future date, the printers' ability to use cheaper non-HP ink cartridges that were otherwise compatible and functional for use with HP printers. After selling these printers without a reasonable point-of-sale disclosure, HP later used remote "firmware updates" to permanently block the owners of these printers from using cheaper non-HP ink from various sources.

4.     Between the years 2020 and 2024, HP remotely reprogramed the Class Printer to produce an error message from HP that stated "Non-HP Chip," "Non-HP Chip Detected," "Cartridge Problem," or "Supply Problem." HP caused this message to appear through its remote transmission of a "firmware update" that rendered the printers inoperable if cheaper non-HP ink was used. HP transmitted the updates to different printer models in successive stages at different times, but the ultimate effect was uniform. After HP's firmware update, when the user inserted a cheaper non-HP replacement ink of a type that previously worked in the printer, HP caused the printer to reject the cheaper non-HP ink.

5.     In this way, HP misled individuals who bought the Class Printers in reliance on the prior decades in which non-HP ink functioned adequately in HP's printers.

6.     Indeed, during the very time period that the Class Printers were sold to HP's unsuspecting customers, HP already possessed the intent to transmit the disabling firmware updates at a future date. As of 2019, HP possessed detailed plans to lock-in millions of printer customers through this process but chose not to disclose these plans at the point of sale. It instead

merely alluded to a risk that non-HP ink "may not work." This "disclosure" effectively disclosed nothing, as HP had for many years conducted public marketing campaigns that conveyed a consistent message that non-HP ink was of shoddy quality and claimed it may not work. HP failed to inform purchasers of the Class Printers at the point of sale that it planned to *cause* these printers to reject non-HP ink cartridges.

7.    HP's subsequent firmware updates enabled it, over the course of four years, to dramatically reduce HP's share of so-called "unprofitable" printer customers who purchase cheaper non-HP ink cartridges. After locking in millions of customers who purchased the Class Printers, HP took advantage of consumers' sunk costs to raise ink prices several times. HP managed to exploit consumers' sunk costs to charge supracompetitive ink prices, as consumers were squeezed between a choice of buying excessively-priced ink or incurring significantly greater expenses to replace their printers.

<u>JURISDICTION AND VENUE</u>

8.    This Court has jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000.00 exclusive of interest and costs, and some of the members of the proposed class are citizens of states different from Defendant HP, Inc.

9.    This Court also has jurisdiction over this action under 28 U.S.C. § 1331, and 15 U.S.C. § 4, as this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, and 2. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1267 over the claims brought under state law.

10.    HP has sufficient minimum contacts with this District to be subject to this Court's personal jurisdiction. HP intentionally avails itself of the markets within this District and this state

through the promotion, sale, marketing, and distribution of their printers, software and software updates and replacement cartridges, which renders this Court's exercise of jurisdiction necessary and proper. It also has an office at 100 North Riverside Plaza, Suite 1525, Chicago IL 60606.

11.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this case occurred in this district. Plaintiffs Robinson and Myers reside and purchased HP printers in this District. Plaintiffs Robinson and Myers also both received firmware updates that were delivered electronically directly from HP to a printer located in Illinois. Thousands of other Class Members also reside in and received firmware and software updates in this District.

## **PARTIES**

12.     Plaintiff Renee Robinson is a citizen of Illinois residing in Chicago in this district. She purchased an HP Envy Inspire 7255 printer in 2021 that received firmware updates directly from HP. She recalls purchasing ink from a non-HP source in 2022, at which point the printer stopped working. When she switched to an HP-branded replacement ink cartridge, the printer functioned again.

13.     Plaintiff Richard Myers is a citizen of Illinois residing in Elgin in this district. He purchased an HP Office Jet Pro 6978 in March 2022 that received firmware updates directly from HP. He purchased non-HP branded replacement ink cartridge in late 2023, at which point the printer stopped working and showcased an error message due to use of non-HP ink. When he switched to an HP-branded replacement ink cartridge, the printer functioned again.

14.     Plaintiff Annette First is a citizen of Missouri residing in St. Louis. She purchased an OfficeJet 6500 series printer that received software and firmware updates directly from HP. Plaintiff First purchased non-HP ink in 2021, and 2022, with the most recent purchase occurring

4

in January 2022. The printer received a firmware update directly from HP. After that date, the printer no longer functioned and received an error message due to use of non-HP ink.

15.     Plaintiff Casey Gaddy is a citizen of Pennsylvania residing in Philadelphia. He purchased OfficeJet 6500 and OfficeJet 8022 Printers in 2021 and 2022 for use in his office that received firmware updates directly from HP. Plaintiff Gaddy purchased replacement ink cartridges for use in these printers in 2022. The printers no longer functioned until the ink cartridge was replaced with an otherwise identical cartridge branded by HP. Plaintiff Gaddy directly purchased his HP-branded ink from HP, through its Instant Ink Program, beginning in June 2021.

16.     Plaintiff Steven Gousie is a citizen of Massachusetts residing in Rehobeth. He purchased an OfficeJet Pro 8025e in April 2022 which received software and firmware updates directly from HP. Plaintiff Gousie recalls purchasing a replacement ink cartridge from a non-HP source for use in this printer in 2023. The printer worked normally for a few weeks but then stopped functioning with the replacement ink cartridge and showcased an error message due to use of non-HP ink. Plaintiff Gousie replaced it with an HP-branded replacement ink cartridge, and the printer worked.

17.     Plaintiff Robert Plunkett is a citizen of Michigan residing in Grand Ledge. Plaintiff Plunkett purchased an Office Jet Pro 6968 Printer in October 2021 that received firmware updates directly from HP. Plaintiff Plunkett purchased non-HP ink in 2021, 2022, and 2023, with the most recent purchase before this lawsuit occurring in April 2023. After receiving firmware updates, the printer ceased functioning and showcased an error message due to use of non-HP ink. While this lawsuit was pending, Plaintiff Plunkett again purchased non-HP ink but was unable to use it in his HP printer.

5

18.     Plaintiff Francois Steiger is a citizen of Massachusetts residing in Cambridge. He purchased an Office Jet Pro 8035 Printer in 2019. Plaintiff Steiger purchased ink from a non-HP source for use in this printer in 2022. The printer received software and firmware updates directly from HP. In late 2022, the printer no longer functioned until the ink cartridge was replaced with an otherwise identical cartridge branded by HP. Plaintiff Steiger purchased HP-branded ink directly from HP, through its Instant Ink program.

19.     Plaintiff James Ulrich is a citizen of New Jersey residing in Beach Haven. He purchased an Office Jet Pro 6978 Printer in July 2016. The printer received firmware updates directly from HP. Ulrich recalls purchasing a replacement ink cartridge from a non-HP source for use in this printer in 2020. After receiving firmware updates, the printer no longer functioned until the ink cartridge was replaced with HP ink cartridges. Plaintiff Ulrich has continued purchasing HP-branded inks due to the firmware updates preventing him from using cheaper non-HP ink cartridges.

20.     Plaintiff Gabriel Voiles is a citizen of New York residing in the Bronx. He purchased an HP Desk Jet 8250 All-In-One Printer in July 2016. The printer received firmware updates directly from HP. Plaintiff Voiles recalls purchasing a replacement ink cartridge from a non-HP source for use in this printer in April or May 2023. After receiving a firmware update, the printer ceased functioning and showcased an error message due to use of non-HP ink. The printer no longer functioned until the ink cartridge was replaced with otherwise identical cartridges branded by HP, which Voiles has continued to purchase due to HP's firmware updates.

21.     Plaintiff John Waudby is a citizen of Nevada residing in Las Vegas. He purchased an Office Jet 7740 Printer in December 2022. The printer received a firmware update directly from HP. Plaintiff Waudby purchased a replacement ink cartridge from a non-HP source for use in this

printer, most recently around June 2023. The printer no longer functioned until the ink cartridge was replaced with an otherwise identical cartridge branded by HP.

22.     Plaintiff Lakesha Wells is a citizen of Tennessee residing in Memphis. She purchased an Office Jet Pro 8028 Printer in 2020 that received firmware updates directly from HP. Plaintiff Wells recalls purchasing an ink cartridge from a non-HP source for use in this printer in 2022. The printer stopped functioning until the ink cartridge was replaced with an otherwise identical cartridge branded by HP.

23.     Defendant HP is a global Fortune 500 company and one of the world's largest manufacturers and sellers of computers. It is incorporated in the State of Delaware and its principal place of business is located at 1501 Page Mill Road in Palo Alto, California 94304.

## FACTUAL ALLEGATIONS

### The Aftermarket for Ink Cartridges

24.     HP derives substantial profits from the sale of HP printer ink cartridges. Color printers typically require four cartridges, and a full HP-branded replacement set may cost of $100 or more  for many models, while competitors' cartridges may cost half as much.[1] The costs of ink for the  Class Printers is not trivial or fleeting as "[t]he industry figured out years ago that once people buy a printer they are committed to it, so you can sell the printer at or below cost knowing they will buy the cartridges."[2]

_____

[1] https://www.amazon.com/HP-N9K27AN-140-Original-Cartridges/dp/B01AV8PPOQ/?_encoding=UTF8&pd_rd_w=OSWeS&content-id=amzn1.sym.35cab78c-35e3-4fc1-aab0-27eaa6c86063%3Aamzn1.symc.e5c80209-769f-4ade-a325-2eaec14b8e0e&pf_rd_p=35cab78c-35e3-4fc1-aab0-27eaa6c86063&pf_rd_r=CA3HMVH9WGSJYNP5WVC1&pd_rd_wg=M9Fgt&pd_rd_r=f39cbae9-8498-4388-a7c8-849c17e1a42f&ref_=pd_gw_ci_mcx_mr_hp_atf_m&th=1 (last visited Nov. 7, 2025).

[2] Charles LeCompte as quoted in Printer ink: Tired of feeding the cash cow?, Lamont Wood, COMPUTERWORLD      (Mar      28,      2012      6:00      am      PST),

25.     As of 2023, HP currently holds about 34.7% of the global market share for printers.[3] Based on information derived from sources no longer publicly available without a subscription, Plaintiffs allege that HP's share of the U.S. market for printers is roughly equivalent to its global market share.

26.     Historically, HP's most profitable business segment is its aftermarket for replacement ink cartridges following the initial purchase of a printer.

27.     Typically, HP's original cartridges are marketed to work with an entire "series" of HP printers. An example is the HP Office Jet Pro "6900" series. A single HP cartridge set will be marketed to work with the various printer models within this series, including the "HP OfficeJet 6954, 6958, 6962, HP OfficeJet Pro 6968, 6975, [and] 6978."[4] Similarly, HP's "OfficeJet Pro 8030 Series" includes all OfficeJet Pro printer models demarcated by the same first two digits, such as the OfficeJet Pro 8035. In such situations, HP will sell a single type of ink cartridge that is compatible with all printers in the same series.

28.     The same is true of non-HP ink cartridges marketed as "compatible" with the Class Printers. Non-HP ink cartridges are almost always be marketed as compatible with various HP

---

https://www.computerworld.com/article/2503134/printer-ink--tired-of-feeding-the-cash-cow-.html (last visited Nov. 7, 2025).

[3]     https://www.statista.com/statistics/269057/global-hardcopy-peripherals-market-share-since-2009-by-vendor/#:~:text=In%20the%20fourth%20quarter%20of,the%20fourth%20quarter%20of%20202 2 (last visited Nov. 11, 2023).

[4]     https://www.staples.com/hp-902xl-902-black-high-yield-and-cyan-magenta-yellow-standard-yield-ink-cartridge-4-pack-t0a39an-140/product_2145184?cid=ps:gs:co:nb:pla:hp_ink&gad_source=1&gad_campaignid=22178527 136&gbraid=0AAAAAD-acde3ZL_rhP3g8TFJO8bZIY7X_&gclid=Cj0KCQjwmYzIBhC6ARIsAHA3IkQjaeXIG0rBCGg Cql-ZkETAJSquCGjeN5tPnp-tCi8EJ6yd4grcAGUaAqIfEALw_wcB (last visited Oct. 30, 2025).

printer models sharing the same "Jet" name and the same first two digits, e.g., the OfficeJet 6954, 6958, 6962, and OfficeJet Pro 6968, 6975, and 6978.

29.     Since before 2010, companies providing HP-"compatible" third-party cartridges have sold their cartridges online and through physical stores such as Best Buy or Staples.

30.     The HP Replacement Ink Market is the aftermarket for Replacement Ink cartridges that will work in the Class Printers. Because replacement ink cartridges are available from numerous online sources, there is effectively a single nationwide market.

31.     In the decades leading up to 2020, HP outwardly signaled to its customers that competition in the HP Replacement Ink Market was legitimate and expected. Although HP preferred for its customers to purchase HP original ink, it repeatedly framed the issue as a question of choice and free competition.

32.     To win in HP Replacement Ink Market, HP undertook an "Inkology" ad campaign in the early to mid-2010s. Through this campaign, HP aim to persuade its inkjet, deskjet, and other printer customers they should still choose HP's "original" replacement ink cartridges.

33.     HP's big selling point was the supposedly superior quality of its ink cartridges and the inferior design of cheaper alternatives.

34.     HP regularly claimed that these cheaper alternatives were of lower quality and, as a result, might not work or would not work as well. For example, in a 2012 video upload entitled "Debunking Refill," HP asserted, "[a]lthough refill ink may seem like it costs less upfront, there are many hidden costs to using refill ink, including leaks, streaks and print failures. When you use Original HP ink you can count on your ink and HP printer to provide reliable, quality prints every

9

time - then you'll see the real value of Original HP ink."[5] In a January 6, 2016 video upload, HP touted a study claiming that "Original HP Ink Prints Twice as Many Pages."[6]

35.    A 2012 article explained HP's "Inkology" campaign as its effort to win over customers who had already purchased an HP printer but who were now opting to purchase lower priced third-party replacement inks: "Sales of ink cartridges are a key driver of HP's profitability, but due to economic pressures, customers are sensitive to the cost of ink, causing them to rail against HP through social media. As a result, . . . [HP] embarked on a campaign drive a perception shift by creating educational videos . . . . [HP's] team hosted head-to-head comparison programs for customers to compare HP supplies to third-party alternatives . . . and conducted proactive outreach to bloggers, media and analysts to generate interest and coverage of HP supplies."[7] HP even paid some online reviewers who it asked to compare HP's replacement ink cartridges to third-party competitors.[8]

36.    Throughout this years-long campaign, HP presented its arguments as a question of consumer choice. HP framed the issue as a choice between dependable, high-quality original HP ink cartridges and cheaper alternatives of unknown quality and workability.

37.    In the 2010s, HP's marketing campaigns indicated that customers were free to choose whichever ink they prefer, but claimed that many third-party manufacturers' inks may not work due to shoddy quality. For instance, in a January 2016 video, HP claimed "[o]riginal HP Ink

---

[5] https://www.youtube.com/watch?v=gaotHtIG_0s (last visited Oct. 27, 2025).

[6] https://www.youtube.com/watch?v=Vj8hMs2HbkY (last visited Oct. 27, 2025).

[7]  https://www.prnewsonline.com/2012-digital-pr-awards-digital-marketing-campaign-500k/ (last visited Oct. 27, 2025).

[8] Sept. 27, 2012 FTC Letter, "*Re: HP Inkology*," FTC. File No. 122-3087," *available online at*: https://www.ftc.gov/sites/default/files/documents/closing_letters/hp-inkology/120927hpinkologycltr.pdf (last visited Oct. 27, 2025).

prints more accurately and works better than refill inks, which often fail. 37% of tested refilled ink cartridges failed during use or right out of the box. Original HP ink cartridges worked every time."[9]

38.     Throughout these and many other marketing materials, HP gave millions of customers the impression that they were free to choose non-HP ink without interference from HP. Still, HP sought to persuade these customers that non-HP ink either did not work or did not work as well as HP ink. At all times, HP portrayed the suspect reliability of non-HP ink as being attributable solely to its competitors' inferior manufacturing quality, not to any action by HP itself to restrict consumers' choices in the HP Replacement Ink Market.

39.     At the point of sale, then, customers buying the Class Printers had no reason to suspect that HP would later sabotage their printers' ability to accept non-HP ink cartridges. The ability to use non-HP ink cartridges was so well-known and regular that it became central to the function of the printers and an expected feature of any purchase.

### 2016: HP Blocks Third-Party Cartridges, Then Resumes Ordinary Competition

40.     In 2016, HP briefly began experimenting with blocking non-HP ink cartridges in some printer models, using a new technology called "Dynamic Security" and employing "firmware updates." HP essentially transmitted computer code to some customers' printers, causing the printers to reject non-HP ink.

41.     However, HP was swiftly sued for this practice. "Approximately a week after the lawsuit was filed, HP issued a modified apology on its website to add an offer of a remedial 'patch' that HP claimed would restore printer functionality." *In re: HP Printer Firmware Update Litigation*, Case No. 5:16-cv-05820, 2019 WL 2716287, Dkt. 119, at *1 (N.D. Cal. June 28, 2019).

---

[9] https://www.youtube.com/watch?v=qARBxqmiNxY (last visited Oct. 27, 2025).

11

42.     Ultimately, the matter settled in a manner that gave the market the impression that HP had agreed to restore free competition in the aftermarket going forward. In a 2019 order, the court noted that "HP disabled the Dynamic Security technology in October 2016, long before the settlement was reached" and "HP had no intention of reactivating the Dynamic Security technology on the class printers because of the dwindling effectiveness of the technology and the end of-life status of the class printers." *Id*. at *4.

43.      In the 2019 settlement, HP paid $1.5 million for roughly two months of disrupting the printers of a class of over 2 million aggrieved consumers, while stating it had no intention to use "Dynamic Security" in their printer models in the future.[10]

44.     Shortly after the 2019 settlement in the United States, HP settled similar claims for its practices in Europe. European authorities noted that HP promoted "Dynamic Security" as a sort of upgrade but failed to disclose its intent to block the consumers' choice of replacement cartridges: "The problem stems from the introduction of a system called 'Dynamic Security,' which HP promoted to its customers as a way to upgrade their experience and maintain the integrity of its printing systems."[11] The Italian Competition Authority found that "HP has failed to adequately inform consumers - at the time of purchase - about the presence of this relevant and significant limitation [Dynamic Security], leading them to believe that they need replacing non-original ink/toner cartridges due to shortages or defects thereof and hence to use only original HP

---

[10] Settlement Agreement, *In re HP Printer Firmware Update Litig.*, N.D. Cal. 5:16-cv-05820-EJD-SVK, Dkt. No. 110-2, filed Sept. 18, 2018, at § 2.3 ("HP has released firmware that disables Dynamic Security for the Class Printers. HP will not at any time take any action to employ Dynamic Security on the Class Printers, including by releasing or otherwise making available firmware that enables Dynamic Security.").

[11] https://www.bleepingcomputer.com/news/hardware/hp-will-pay-customers-for-blocking-non-hp-ink-cartridges-in-eu/ (last visited Nov. 11, 2023).

cartridges. . . . The Authority also found that, without informing consumers, HP records the consumption data relating to the cartridges employed, either original or not, through the firmware present on many printers: these data are then used both to create a database useful for formulating its commercial strategies and to deny assistance to printers that have used non-original cartridges, thus hindering the provision of the legal guarantee of conformity."[12]

### 2018-2019: Cheaper Non-HP inks Place Downward Pressure on HP's Profits

45.     As stated above, in October 2016—shortly after initiating its first experiment with blocking non-HP chips—HP had discontinued the practice and issued a public apology to consumers. HP then resumed ordinary competition in the ink cartridge aftermarket.

46.     Just as in the decade before, HP emphasized a marketing campaign that portrayed HP-branded ink cartridges as higher quality than its competitors. And as before, HP gave customers the impression they were free to choose non-HP ink without interference.

47.     During the decade of the 2010s, third-party website, such as Amazon and Best Buy, hosted a myriad of brands selling ink cartridges labeled "compatible" with a series of HP printer model series. Consumers were learning from experience that despite HP's statements to the contrary, cheaper third-party brands generally worked in HP printer models for which those brands were marketed as "compatible."

48.     By late 2018, competition was fierce and HP faced substantial downward pricing pressure from non-HP ink cartridge manufacturers. Due to this market competition and the

---

[12] Autorità Garante della Concorrenza e del Mercato (Italian Competition Authority), Press Release: "PS11444 – ICA: HP fined 10 million Euros for misleading and aggressive commercial practices," *available online at*: https://en.agcm.it/en/media/press-releases/2020/12/PS11144 (last visited Nov. 11, 2023).

resulting pricing pressures, HP estimated that a 10% increase in the price of its supplies would result in a 6-7% loss in its aftermarket share.

49.     HP saw this competition as a major threat to the outsized profits it had long enjoyed in printing. "In the quarter ending July 31, 2019, [HP's] personal systems" division—computer sales—"had an operating margin of 5.6%," but "[p]rinting, with a 15.6% margin, brings in the big profits. And almost 65% of the printing division revenue in those nine months ending July 31, 2019 came from 'supplies.' That's ink." [13] "These [ink sale profits] are the profits that subsidize so much elsewhere in the company." *Id*. But as of 2019, "the ink market ha[d] been changing for years" and "the purchase of replacement ink cartridges by commercial accounts' . . . . [was] the big problem, [according to] Jim Kelleher, director of research and senior technology analyst for Argus Research." *Id*.

50.     In the last quarter of 2019, HP admitted to investors it was facing "increased competition" from "imitation, refill or remanufactured alternatives" for "some of [its] LaserJet toner and InkJet cartridges." HP, Inc. 10-Q Statement to Securities Exchange Commission, filed Aug. 31, 2019, at 54.14. HP informed the investing public that it "expect[ed] this competition [would] continue":

> Customers are increasingly using online and omnichannel resellers and distributors to purchase our products. These resellers and distributors often sell our products alongside competing products, including non-original supplies, or they may highlight the availability of lower cost non-original supplies. We expect this competition will continue, and it may negatively impact our financial performance, particularly if large commercial customers purchase competing products instead of HP products.

---

[13] https://fortune.com/2019/10/07/hp-printers-ink-investors/amp/ (last visited Oct. 14, 2025).
[14]     *Available      online      at*:      https://investor.hp.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=13619268 (last visited Nov. 5, 2025).

HP's words thus show there was a thriving market for non-HP ink, and competition was placing downward pressure on ink prices.

51.     Because many customers chose non-HP ink, HP now estimated that 25% of its printer customers were "unprofitable customers" who did not buy HP replacement ink cartridges. In an investor presentation, HP stated: "25% of customers are not profitable; they don't by HP supplies or they use imitation supplies."

52.     While estimating that 25% of its total printer customers were "unprofitable," HP tagged an even higher percentage for customers who purchased inkjet printers. HP concluded, "30% of the ink customers were unprofitable" and "[l]aser was less."

53.     By late 2019, then, HP faced a highly competitive aftermarket for replacement ink cartridges and toners—the HP Replacement Ink Market. HP had spent years inviting this aftermarket competition, while seeking to persuade consumers to choose HP's "original" ink over supposedly less reliable imitations. By this point, however, the market had spoken and at least 30% of HP's inkjet printer customers no longer bought this message.

54.     Even so, HP assured investors it had a plan to counter this increased competition without losing market share or being forced to compete on price. In early 2020, HP told its investors it planned to "reduce mix of unprofitable customers by 3 points over 10 years."

**Late 2019 – 2023: HP Gradually Monopolizes The Aftermarket Using Firmware Updates**

55.     To reverse this trend without cutting prices, HP decided it could no longer rely on ordinary aftermarket competition. Instead, HP secretly chose to take more coercive action to prevent customers from using cheaper non-HP ink cartridges, thereby "reducing" the mix of so-called "unprofitable customers."

56.     One of HP's strategies for "reducing unprofitable customers" was to use "technologies . . . to protect HP's supplies aftermarket." These "technologies" included HP's system of "Dynamic Security" or "Authentication." Authentication." Essentially, HP planned to gradually re-implement firmware updates across different printer models at different times. These updates allowed HP to spy on its users' ink purchases, study the cartridges inserted, and design the future firmware codes it needed to block customers from using the same cheaper non-HP inks in the future.

57.     From 2020-2024, HP rolled out these firmware updates across different printer models at different times. By doing this rollout in waves across different models, HP minimized the public outrage and media attention that would have occurred had it monopolized the entire aftermarket for all printer models at a single point in time.

58.     While the printer models and dates differed, the same pattern of behavior remained constant. After spying on users' printers and identifying non-HP ink cartridges they used, HP began surreptitiously transmitting computer code—called "firmware updates"—to block their printers from accepting non-HP inks that they had already purchased, and that previously worked in the same printer models.

59.     In 2020, 2021, 2022, 2023, and 2024, HP gradually distributed these updates to different printer models registered by its customers, touting that the updates would enhance users' experience and security. Instead, these updates disabled the printer if the customer replaced the existing cartridge with a non-HP cartridge.

60.     Unaware of this, many of the Plaintiffs purchased replacement cartridges that were not HP-branded after they received the firmware update. When they attempted to print, the printer did not work. Each received the following error message (or an equivalent message):

16



61.     Since the non-HP branded replacement ink cartridges had been opened, they generally could not be returned, even though they were rendered useless by HP's firmware updates.

62.     Further, the HP printers were left with permanently reduced functionality and value. Due to HP's actions, these printers could no longer print with the cheaper non-HP ink cartridges that would have been compatible with the printer, but for HP's firmware updates.

63.     Faced with non-functional printers, several of the Plaintiffs were forced to purchase HP-branded ink that they would not otherwise have purchased.

**HP Continues Selling Printers That Fail to Adequately Disclose its New Restrictions**

64.     From 2016 to at least late 2022, HP did not disclose its plan to restrict aftermarket access to the customers who continued buying its printers. During this timeframe, HP continued

selling printers in packaging that was deeply misleading and that did not disclose HP's existing intent to block non-HP ink cartridges.

65.     From at least late 2019 onward, HP had made a decision to re-implement Dynamic Security in order to monopolize the aftermarkets for ink cartridges in OfficeJet, DeskJet, and DesignJet printers. But it chose to continue selling printers that did not disclose, at the point of sale, this new plan and HP's resulting change in policy as it relates to digital firmware updates.

66.     At the time HP sold these printers These packages uniformly failed to disclose HP's intend to send post-purchase firmware updates that would permanently remove customers' ability to use many (or most) non-HP ink cartridges.

67.     Specifically, from 2016 through late 2022—and for some models, even later— HP sold all Dynamic Security-enabled with disclosures that started with "Dynamic Security Enabled," then merely stated non-HP ink "may not work" or "may not function" (collectively, the "'May Not Work' Disclaimer"). The "May Not Work" Disclaimer appeared in small font on the bottom front portion of the printer boxes, as shown in the images below:



68.     The "May Not Work" Disclaimer did not disclose that HP intended to employ computer code to remotely disable the printers' ability to use cheaper, non-HP ink.

69.     In fact, the "May Not Work" Disclaimer effectively imparted no new information. By merely stating that other ink "may not work" or "may not function," HP did little more than paraphrase the same quality-related arguments HP had used in its marketing since the early 2010s. For years, HP had claimed that over 30% of non-HP ink cartridges were so shoddily-made that they would fail to print from the moment customers opened the packages.

70.     As explained above, customers had extensive, successful experiences with non-HP inks despite HP's decade-long campaign of warnings about product quality.

19

71.     By 2019, HP internally admitted that customers no longer bought its message that non-HP ink would not work due to its lower quality. According to HP, its customers concluded that non-HP ink allowed them to "get good quality and save money," and so "[c]ustomers [were] increasingly asking for/ open to non HP [ink cartridges]."

72.     Thus, the market had reasonably come to believe that non-HP ink would usually work as intended in HP printers. It was only HP's post-purchase sabotage of the Class Printers that removed this functionality.

73.     By merely telling printer customers at the point of sale that non-HP ink "may not work," HP concealed its intent to *cause* such ink cartridges to cease working.

74.     HP's statement that non-HP ink "may not work" or "may not function" was objectively misleading, and was part of the packaging on each Class Printer at the point of sale. An average consumer "would not understand the word 'may' to mean 'will.'" *Dunbar v. Kohn L. Firm, S.C.*, 896 F.3d 762, 765 (7th Cir. 2018). When HP sold each Class Printer, its true intent was to ensure at a future date that ink cartridges containing HP chips *would not* work. By merely repeating its old mantra that non-original ink "*may not*" work, HP deceived Plaintiffs and Class Members at the point of sale.

75.     Through this deceptive language, HP implied that the workability of non-original ink was largely a function of its own inherent quality rather than a result of HP's future actions.

76.     In fact, when impacted customers called HP in 2020 to complain about cartridges being blocked, HP's official "top message" talking point for verbal discussion was to first deny that HP prevented non-HP ink from working in HP's printers and to claim that HP supported free competition. Any revelations about the role of Dynamic Security in blocking some non-HP cartridges were relegated to the sixth bullet point in HP's guide and were substantially de-

emphasized compared to its bold, prominent talking point—that HP supported competition and did not prevent customers from choosing non-HP ink.

77. Had HP disclosed its true intent to block non-HP cartridges at the point of sale, Plaintiffs and the Class Members would not have purchased the Class Printers or they would have paid less.

78. Due to the vagueness of the May Not Work Disclaimer, HP was able to continue selling printers as before without an appreciable drop in sales or reduction in the price of printers sold. Reasonable customers simply did not understand this vague "may not work" language to mean that HP intended, at a future date, to remotely employ computer code that would restrict its customers' choice of third-party aftermarket ink cartridges.

79. In sum, HP had always inundated its customers with claims that non-HP ink "may not work" due to its poor quality. The market, however, proved customers no longer accepted this message. That is why, in early 2020, HP faced a situation in which it estimated that 30% of its Inkjet printer customers bought non-HP ink and were "unprofitable." And that is why HP implemented post-sale restrictions on the printers' ability to accept non-HP inks.

80. Because it was not generally known that HP would change its policy as to non-HP ink after customers purchased their printers, HP faced major customer backlash and complaints by customers impacted by successive waves of firmware updates in select models. Eventually, this backlash led HP to tacitly admit the "May Not Work" Disclaimer had misled consumers.

81. In June 2021, in response to backlash from consumers who had purchased impacted printer models, HP was forced to "update[e] the dynamic security message to improve customer awareness . . . to avoid consumer confusion, general customer dissatisfaction and increased product returns." In another presentation, HP also attributed the decision to update its disclaimer to

"customer misunderstandings" that occurred when it sold printers with the "May Not Work" Disclaimer.

82.     HP acknowledged that to avoid misleading consumers, it needed to switch to a "Dynamic Security" message that would be "prominent, visible, and meaningful to . . . to allow them to make an informed purchase decision." Therefore, HP switched to a new disclaimer that explicitly revealed its intent to "block cartridges" using non-HP chips (the "'Block Cartridges' Disclaimer").

83.     In one of the presentations in which it made these admissions, HP informed recipients to "PLEASE DELETE THIS SLIDE BEFORE PRESENTING."

84.     HP internally admitted that to be effective, its new "Block Cartridges" Disclaimer must "be included as part of the product selling features in each point of sale, including online and in-store across the channels."

85.     In addition to the consumer backlash as to impacted printer models, HP also faced external pressure from foreign regulatory authorities over its misleading "May Not Work" Disclaimer. According to a summary of sealed filings in another lawsuit, the Italian Competition Authority found HP's "May Not Work" Disclaimer misleading and ordered HP to provide a more conspicuous disclaimer to consumers in Italy.[15]

86.     HP thus knew that to avoid misleading customers who bought the Class Printers, HP needed to inform them at the point of sale of its ultimate intent to "block cartridges" containing non-HP chips. HP knew it was not enough to vaguely hint—in small font near the bottom of the printer box—that non-HP ink "may not work" or "may not function."

---

[15] *See Mobile Housing Emergency Corp. v. HP, Inc.*, 5:20-cv-09157, ECF No. 117, at 19 (N.D. Cal. July 6, 2023) (citing sealed deposition of HP employee Jesse Sutherland).

87.     However, after making these admissions in mid-2021, HP continued selling printers with the misleading "May Not Work" Disclaimer for more than a year and, in some models, to the present date. As explained above, the "May Not Work" Disclaimer was ambiguously worded and failed to disclose HP's intent to block non-HP ink cartridges.

88.     Across most printer models, HP did not switch from the misleading "May Not Work" Disclaimer to the more explicit "Block Cartridges" Disclaimer until the third or fourth quarters of 2022. For some printer models, HP only switched to the "Block Cartridges" Disclaimer in 2023 or later (if at all).

89.     To illustrate, the chart below shows a sample of printer models and when HP's records indicate it switched its labeling from the misleading "May Not Work" Disclaimer to the corrective "Block Cartridges" Disclaimer.

| Printer Model | "May Not Work" Disclaimer – Start Date | Date Switched to "Block Cartridges" Disclaimer |
|---|---|---|
| HP OfficeJet Pro 6968 | 11/12/2018 | N/A |
| HP OfficeJet Pro 6978 All-in-One Printer | 11/12/2018 | N/A |
| HP OfficeJet Pro 7740 Wide Format All-in-One Printer | 6/3/2016 | 2/12/2023 |
| HP OfficeJet 8022e Printer | 1/11/2021 | 9/16/2022 |

| HP OfficeJet 8025 All-in-One Printer | 4/29/2019 | N/A |
|---|---|---|
| HP OfficeJet Pro 8025e All-in-One Printer | 8/31/2020 | 12/9/2022 |
| HP OfficeJet Pro 8028 All-in-One Printer | 5/6/2019 | N/A |

The Class Printers do not include any printers sold with the "Block Cartridges" disclaimer. For example, for the HP OfficeJet Pro 7740, printers sold between June 3, 2016 and February 11, 2023 are included in the Class Printers. However, OfficeJet Pro 7740 printers sold on or after February 12, 2023 are not included in the Class Printers.

90.     At all relevant times, HP knew it was misleading consumers by failing to explicitly disclose its intent to "block [non-HP] cartridges" at the printers' point of sale.

91.     At the point of sale, HP could have asked its customers to agree not to purchase non-HP ink. It chose not to do so.

92.     At the point of sale of the printer, HP could have informed customers of its present intent to block cartridges from cheaper third-party sources. HP did not do this either.

93.     Instead, HP chose to continue selling printers in packaging that did not disclose its intent to block non-HP ink cartridges. From at least June 2021 onwards, HP chose to continue selling printers with the "May Not Work" Disclaimer, despite HP's own realization that it was hoodwinking consumers by concealing its true intent at the point of sale.

94.     By selling printers with this deceptive labeling, HP managed to continue locking in millions of printer customers who were unaware that HP intended to digitally restrict their

24

aftermarket choices. Once HP switched its policy and blocked non-HP ink through firmware updates, these customers were faced with the choice to incur the higher cost of purchasing a new printer or the lower cost of buying HP's replacement ink at supracompetitive prices.

95. By October 2023, HP's deceptive lock-in strategy yielded results. HP concluded that it had "successfully reduced the number of unprofitable customers from 25% in 2019 to 15% today, and will work to lower this number to less than 10%."

96. By May 6, 2024, HP stated it had reached this "less than 10%" goal: "25% of the customers were unprofitable- Goal was to reduce by 10 PT to < 15% unprofitable customers. Now we are less than 10%."

97. HP attributed this reduction in "unprofitable customers," in part, to its use of Dynamic Security—"DS"—to remove users' ability to use non-HP cartridges in their printers. Internally, HP candidly summarized the effect of its actions on the aftermarket: "DS more effective leading to fewer unprofitable customers."

98. Since the firmware updates, consumers who own the affected HP printers have no viable substitute for HP replacement ink cartridges. Since printers cost several hundred dollars, while replacement ink cartridges cost a fraction of that amount, it is not practical or economically rational to purchase a new printer in order to avoid purchasing HP replacement ink cartridges. Therefore, once consumers purchase their printers, the Dynamic Security firmware updates lock them into purchasing HP-branded ink. The existence of independent sellers of ink cartridges would promote competition and lead to lower prices.

99. Absent the conduct complained of, the HP Replacement Ink Market would include a greater selection of usable ink cartridges sold by independent third parties. Having created a

monopoly for itself through the firmware update, HP is able to charge supracompetitive prices for replacement ink cartridges.

100.    As of 2023, HP internal records related to several printer models confirm that HP's share of the ink cartridge aftermarket hovered between 87% and 95% of the market.[16]

101.    By forcing millions of HP printer users to purchase only ink with HP's computer chips, HP exploited the leverage of their sunk costs. This leverage allowed HP to effectively monopolize the aftermarket for replacement ink cartridges and charge supracompetitive prices, implementing price increases that would have caused it to lose market share in a competitive aftermarket.

102.    In the same time period, HP also increased the price for its "Instant Ink" subscription program.

103.    Plaintiffs and Class Members suffered monetary losses from the firmware update in several ways.

104.    First, they purchased printers without being informed at the point of sale of HP's present, existing intent to transmit digital firmware updates that would permanently reduce their printers' ability to accept many cheaper non-HP ink cartridges. If HP had conspicuously disclosed this intent at the point of sale, Plaintiffs and Class Members either would not have purchased their printers or would have paid less for their printers (the "Multi-State Consumer Fraud Printer Purchase Class").

105.    Second, Plaintiffs and class members lost the value of the non-HP branded replacement ink cartridges they had purchased and which could no longer be used (the "Non-HP Ink Purchaser Class").

---

[16] This allegation is based on a preliminary review of data. Further discovery is needed.

106.     Third, HP coerced some Plaintiffs and class members into buying HP-branded ink cartridges (the "HP Ink Purchaser Class").

**Antitrust Allegations Arising From *Kodak* Single-Brand Aftermarket**

107.     Through these actions, HP monopolized the Replacement Ink Cartridge Market in a manner that unreasonably restrained trade in this single-brand aftermarket. *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992) (outlining elements for stating a Section 2 claim in the context of a single-brand aftermarket).

108.     First, HP engaged in a switch in policy as to each Class Printer when it disabled the printers' functionality through firmware updates.

109.     Second, millions of HP's printer customers, the Class Members, were unaware at the point of sale that HP would engaged in this switch after they purchased the Class Printers. These customers represent an appreciable share of HP's total customers for OfficeJet, DeskJet, and DesignJet printers as of 2019-2020. By HP's own internal estimates, about 25% of its total printer customers and 30% of its InkJet customers were so-called "unprofitable customers" who did not purchase HP's replacement ink or chose to purchase cheaper non-HP ink.

110.     Third, these customers could not accurately estimate the lifecycle costs of replacement ink in the Class Printers at the point of sale. According to HP's own internal studies, inkjet customers were often surprised at how quickly their need to replace ink cartridges led to large costs. This is one reason why consumers were increasingly choosing to purchase non-HP ink cartridges prior to HP's actions that precluded them from doing so.

111.     Fourth, after HP implemented the firmware updates, an appreciable share of ordinary consumers were locked in by the relatively high cost of purchasing new printers, as

compared to the lower cost of buying HP's replacement ink. This was true even at the supracompetitive price point HP charged for its replacement ink cartridges.

112.     Fifth, HP's post-sale firmware update allowed it to exert market power by raising ink cartridge prices, even as it reduce total "unprofitable customers" from 25% of all printer customers to less than 10%. For inkjet printer customers specifically, HP's post-sale firmware updates allowed it to reduce total "unprofitable customers" from 30% of all printer customers to less than 10%.

113.     In short, HP pulled a bait-and-switch on Plaintiffs and Class Members. HP made misleading statements at the point of sale when it sold the Class Printers, then exploited Class Members' sunk costs by using remotely-issued digital "updates" to permanently remove the printers' ability to accept many, if not most, non-HP ink cartridges.

**Antitrust Allegations Relating to Tying Aftermarkets for Services and Replacement Inks**

114.     To engage in its aftermarket monopolization scheme, HP designed its Dynamic Security-enabled printers with "firmware," a type of software that is permanently embedded in the Class Printers' circuitry. This firmware creates a permanent service relationship between HP and the Class Members.

115.     At the point of sale, the Class Printers were capable of accepting and using cheaper non-HP ink. However, after HP's firmware updates, HP illegally tied its continued support services for each Class Printer to the use of only inks containing HP's chips.

116.     According to HP, its ongoing service relationship with Class Members is governed by its End User License Agreement ("EULA"), a purported contract of adhesion it imposes for all HP software and firmware provided to owners of HP's products. This effectively creates an ongoing service market, albeit one based not on ongoing sales but a purported license that HP

28

provides to Class Members who wish to continue receiving technical support and ongoing functionality in their printers. The EULA states:

> 1. GRANT OF LICENSE. HP grants you the following rights provided you comply with all terms and conditions of this EULA:
>
> a. Use. You may use the Software Product on a single HP Product. If the Software Product is provided to you via the internet and was originally licensed for use on more than one HP Product, you may install and use the Software Product only on those HP Products. You may not separate component parts of the Software Product for use on more than one HP Product. You do not have the right to distribute the Software Product. You may load the Software Product into your HP Product's temporary memory (RAM) for purposes of using the Software Product.
>
> b. Storage. You may copy the Software Product into the local memory or storage device of the HP Product.
>
> c. Copying. You may make archival or back-up copies of the Software Product, provided the copy contains all of the original Software Product's proprietary notices and that it is used only for back-up purposes.
>
> d. Reservation of Rights. To the maximum extent permitted by applicable law, HP and its suppliers reserve all rights not expressly granted to you in this EULA.[17]

### Warranty

117.     HP also purports to provide a warranty for end users of all HP products, including the Class Printers. This warranty, available online, states that the use of non-HP replacement cartridges does not affect the warranty on the printer, unless the replacement cartridge itself causes damage:

> The use of a non-HP or refilled cartridge does not affect either the HP Limited Warranty to the end-user customer or any HP support contract with the end-user customer for the printer. However, if printer or print head failure or damage is attributable to the use of a non-HP or refilled cartridge, HP will charge its standard time and materials charges to service the printer for the particular failure or damage or for the cost to replace the print head.[18]

---

[17] https://support.hp.com/us-en/document/ish_4416646-4390016-16

[18] https://www.hp.com/us-en/privacy/limited_warranty.html

118.    After the Class Printers receive firmware updates, however, HP effectively ties the continued availability of its "support contracts," such as the EULA governing firmware, to the exclusive use of ink cartridges containing HP's chips.

## CLASS ACTION ALLEGATIONS

### Class Definition

119.    This action involves the Class Printer—inkjet printers (OfficeJet, Deskjet, and DesignJet series) that HP sold from 2016 to the present that were Dynamic Security enabled and packaged with the misleading "May Not Work" Disclaimer. The Class Printers do not include any printers that HP sold at the point of sale with the subsequent "Block Cartridges" Disclaimer. All Class Printers were subject to firmware updates at least once during the years 2020, 2021, 2022, 2023, or 2024.

120.    Based on Plaintiffs' investigation of the fact, the Class Printers as defined in the previous paragraph include at least the following inkjet models:

**OfficeJet Models**

- HP OfficeJet Pro 6230
- HP OfficeJet Pro 6320
- HP OfficeJet Pro 6830
- HP OfficeJet Pro 6835
- HP OfficeJet Pro 6960
- HP OfficeJet Pro 6961
- HP OfficeJet Pro 6963
- HP OfficeJet Pro 6964
- HP OfficeJet Pro 6965
- HP OfficeJet Pro 6966
- HP OfficeJet Pro 6968
- HP OfficeJet Pro 6970
- HP OfficeJet Pro 6971
- HP OfficeJet Pro 6974
- HP OfficeJet Pro 6975
- HP OfficeJet Pro 6976
- HP OfficeJet Pro 6978

- HP OfficeJet Pro 6979
- HP OfficeJet Pro 7720
- HP OfficeJet Pro 7730
- HP OfficeJet Pro 7740
- HP OfficeJet Pro 7745
- HP OfficeJet Pro 8020 All-in-One Printer
- HP OfficeJet Pro 8021 All-in-One Printer
- HP OfficeJet Pro 8022 All-in-One Printer
- HP OfficeJet Pro 8023 All-in-One Printer
- HP OfficeJet Pro 8024 All-in-One Printer
- HP OfficeJet Pro 8025 All-in-One Printer
- HP OfficeJet Pro 8026 All-in-One Printer
- HP OfficeJet Pro 8027 All-in-One Printer
- HP OfficeJet Pro 8028 All-in-One Printer
- HP OfficeJet Pro 8029 All-in-One Printer
- HP OfficeJet Pro 8030 All-in-One Printer
- HP OfficeJet Pro 8031 All-in-One Printer
- HP OfficeJet Pro 8032 All-in-One Printer
- HP OfficeJet Pro 8033 All-in-One Printer
- HP OfficeJet Pro 8034 All-in-One Printer
- HP OfficeJet Pro 8035 All-in-One Printer
- HP OfficeJet Pro 8036 All-in-One Printer
- HP OfficeJet Pro 8037 All-in-One Printer
- HP OfficeJet Pro 8038 All-in-One Printer
- HP OfficeJet Pro 8039 All-in-One Printer
- HP OfficeJet Pro 8210
- HP OfficeJet Pro 8211
- HP OfficeJet Pro 8216
- HP OfficeJet Pro 8218
- HP OfficeJet Pro 8610
- HP OfficeJet Pro 8615
- HP OfficeJet Pro 8616
- HP OfficeJet Pro 8640
- HP OfficeJet Pro 8620
- HP OfficeJet Pro 8625
- HP OfficeJet Pro 8660
- HP OfficeJet Pro 8630
- HP OfficeJet Pro 8610
- HP OfficeJet Pro 8710
- HP OfficeJet Pro 8712
- HP OfficeJet Pro 8714
- HP OfficeJet Pro 8715
- HP OfficeJet Pro 8716
- HP OfficeJet Pro 8717

31

- HP OfficeJet Pro 8718
- HP OfficeJet Pro 8719
- HP OfficeJet Pro 8720
- HP OfficeJet Pro 8725
- HP OfficeJet Pro 8727
- HP OfficeJet Pro 8728
- HP OfficeJet Pro 8730
- HP OfficeJet Pro 8740
- HP OfficeJet Pro 8743
- HP OfficeJet Pro 8744
- HP OfficeJet Pro 8745
- HP OfficeJet Pro 8746
- HP OfficeJet Pro 8747
- HP OfficeJet Pro 9010 All-in-One Printer
- HP OfficeJet Pro 9011 All-in-One Printer
- HP OfficeJet Pro 9012 All-in-One Printer
- HP OfficeJet Pro 9013 All-in-One Printer
- HP OfficeJet Pro 9014 All-in-One Printer
- HP OfficeJet Pro 9015 All-in-One Printer
- HP OfficeJet Pro 9016 All-in-One Printer
- HP OfficeJet Pro 9017 All-in-One Printer
- HP OfficeJet Pro 9018 All-in-One Printer
- HP OfficeJet Pro 9019 Premier All-in-One Printer
- HP OfficeJet Pro 9020 All-in-One Printer
- HP OfficeJet Pro 9021 All-in-One Printer
- HP OfficeJet Pro 9022 All-in-One Printer
- HP OfficeJet Pro 9023 All-in-One Printer
- HP OfficeJet Pro 9024 All-in-One Printer
- HP OfficeJet Pro 9025 All-in-One Printer
- HP OfficeJet Pro 9026 All-in-One Printer
- HP OfficeJet Pro 9027 All-in-One Printer
- HP OfficeJet Pro 9028 All-in-One Printer
- HP OfficeJet Pro 9029 All-in-One Printer
- HP OfficeJet Pro X451
- HP OfficeJet Pro X551
- HP OfficeJet Pro X476 MFP
- HP OfficeJet Pro X576 MFP

**DeskJet Models**

- HP DeskJet 1210 Printer
- HP DeskJet 1211 Printer
- HP DeskJet 1213 Printer
- HP DeskJet 1255 Printer

- HP DeskJet 2300 Printer
- HP DeskJet 2600
- HP DeskJet 2620
- HP DeskJet 2630
- HP DeskJet 2650
- HP DeskJet Ink Advantage 2600
- HP DeskJet Ink Advantage 2632
- HP DeskJet Ink Advantage 2675
- HP DeskJet Ink Advantage 2676
- HP DeskJet Ink Advantage 2677
- HP DeskJet Ink Advantage 2678
- HP DeskJet 2710 All-in-One Printer
- HP DeskJet 2720 All-in-One Printer
- HP DeskJet 2721 All-in-One Printer
- HP DeskJet 2722 All-in-One Printer
- HP DeskJet 2723 All-in-One Printer
- HP DeskJet 2724 All-in-One Printer
- HP DeskJet 2730 All-in-One Printer
- HP DeskJet 2732 All-in-One Printer
- HP DeskJet 2752 All-in-One Printer
- HP DeskJet 2755 All-in-One Printer
- HP DeskJet Plus 4110 All-in-One Printer
- HP DeskJet Plus 4120 All-in-One Printer
- HP DeskJet Plus 4121 All-in-One Printer
- HP DeskJet Plus 4122 All-in-One Printer
- HP DeskJet Plus 4130 All-in-One Printer
- HP DeskJet Plus 4134 All-in-One Printer
- HP DeskJet Plus 4140 All-in-One Printer
- HP DeskJet Plus 4152 All-in-One Printer
- HP DeskJet Plus 4155 All-in-One Printer
- HP DeskJet Plus 4158 All-in-One Printer
- HP DeskJet Ink Advantage 5075
- HP DeskJet Ink Advantage 5076
- HP DeskJet Ink Advantage 5078
- HP DeskJet Ink Advantage 5085
- HP DeskJet Ink Advantage 5088
- HP DeskJet Ink Advantage 5275
- HP DeskJet Ink Advantage 5276
- HP DeskJet Ink Advantage 5278
- HP DeskJet Ink Advantage 5285

**DesignJet Models**

- HP DesignJet T730
- HP DesignJet T830
- HP DesignJet T1600
- HP DesignJet T1600dr
- HP DesignJet T1700
- HP DesignJet T2600
- HP DesignJet T2600dr
- HP DesignJet XL 3600
- HP DesignJet Z6 Postscript
- HP DesignJet Z9+ Postscript

121.     Plaintiffs bring the first two counts of this Amended Complaint on behalf of themselves and the members of the following class:

> **Consumer Fraud Multi-State Printer Purchase Class:** All persons in the States of Illinois, New York, Florida, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, Idaho, Alabama, and Washington who purchased the Class Printers from 2016 through date of class certification, and received an error message stating "Non-HP Chip," "Non-HP Chip Detected," "Cartridge Problem," or "Supply Problem," due to HP's transmission of a firmware update  (the "Consumer Fraud Multi-State Printer Purchase Class").[19]

122.     Next, Plaintiffs bring several count in this action on behalf of members of the Firmware Update Class, pursuant to HP's violation of federal antitrust laws:

> **Antitrust Firmware Update Class**. All persons who purchased a non HP-branded replacement ink cartridge for use in any of the Class Models of HP Printers between September 2022 and the present, which they were unable to use because of the effects of the series of firmware update.

---

[19] The States in the Consumer Fraud Multi-State Class are limited to those States with similar consumer fraud laws under the facts of this case: Illinois  (815 Ill. Comp. Stat. 505/1, *et seq.*); New York (N.Y. Gen. Bus. Law § 349, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich.  Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); Idaho (I.C. § 48-603); Alabama (Ala. Code § 8–19–10, *et seq.*); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*). As the case proceeds, Plaintiffs may seek to expand this class to include California (Cal. Bus. & Prof. Code § 17200, *et seq.*).

123.     Lastly, Plaintiffs also bring a count in this action on behalf of the HP Ink Purchase

Class, pursuant to HP's violation of state antitrust and unfair competition laws and the resulting

overcharge in ink sold to consumers. Plaintiffs bring this cause of action under state law statutes

that permit violations of federal antitrust law to serve as predicate violations of state law, but

provide standing to indirect purchasers:

> **Antitrust HP Ink Purchaser Class**. All persons who purchased an HP-branded
> replacement ink cartridge for use in any of the Class Printers from 2021 to the
> present.

124.     Plaintiffs reserve the right to amend the Class definitions as necessary.

**Factual Allegations Supporting Class Treatment**

125.     <u>Numerosity</u>: Although the exact number of Class Members is uncertain and can

only be ascertained through appropriate discovery, the number is great enough such that joinder is

impracticable. Although the precise number of impacted users is not yet clear, tens of millions of

printers are sold each year, HP is the market leader, the Class Printers number over 100 models,

and HP's 2019 settlement included over 2 million class members.

126.     <u>Typicality</u>: The claims of the representative Plaintiffs are typical in that Plaintiffs,

like all Class Members, purchased a printer that contained the same misleading "May Not Work"

Disclaimer. and later received a Firmware update that rendered their printers unable to function

with non-HP ink cartridges.  For the Antitrust HP Ink Purchaser Class, all class members were

forced to pay higher prices for HP-branded cartridges if they wished to continue using their

printers.

127.     <u>Commonality</u>: There are numerous questions of law and fact common to Plaintiffs

and Class Members that predominate over any individual questions. These common legal and

factual issues include the following:

35

a) Whether the firmware update prevented HP printers from functioning with non- HP - branded replacement ink cartridges;

b) Whether the "May Not Work" disclaimer was objectively misleading at the point of sale of the Class Printers;

c) Whether disabling printers from functioning with non-HP branded replacement ink cartridges reduced competition in the replacement ink cartridge aftermarket;

d) Whether the firmware update created an effective monopoly in the aftermarket for replacement ink cartridges;

e) Whether disabling printers from functioning with non-HP branded replacement ink cartridges permitted HP to charge supracompetitive prices for replacement ink cartridges;

f) Whether HP adequately informed consumers, before they bought their printers, that HP be distributing s firmware update that had the effect of preventing the use of non-HP branded replacement ink cartridges;

g) Whether the firmware update damaged consumers who owned the specified HP printer models;

h) Whether HP was unjustly enriched by the actions listed above; and

i) Whether HP should be required to make restitution, disgorge profits, reimburse losses, pay damages, and pay treble damages as a result of the above-described practices.

128. <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained attorneys experienced in the prosecution of consumer and antitrust class actions, and intend to prosecute this action vigorously.

129.    <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of HP's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for HP's misconduct. Absent a class action, Class Members will continue to incur damages, and HP's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

130.    Further, HP has acted on grounds generally applicable to the Classes, thereby making appropriate final relief with respect to the Classes as a whole.

### Notice of Claims to HP Would be<br>Futile and is Therefore Excused

131.    As to any claims where Notice to HP may be required, Notice is excused as futile. HP has been put on notice of the legal issues associated with its Limited Warranties by media reports, prior lawsuits discussed above, and numerous comments and requests to HP helplines. HP has not offered restitution or any other remedy to its customers who were adversely affected in the past by having paid supracompetitive prices for branded replacement ink.

### COUNT I<br>ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT<br>(815 ILCS 505/1, ET SEQ.)<br>(ON BEHALF OF ILLINOIS MEMBERS OF<br>MULTI-STATE CONSUMER FRAUD PRINTER PURCHASE CLASS)

132.    The allegations in paragraphs 1-106 and 119-131 are incorporated as if fully stated.

133.   HP has engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of 815 ILCS §§ 505/1, *et seq.*, with respect to the sale of Class Printers to consumers in Illinois, including Plaintiffs Robinson and Myers, along with the Illinois-based Class Members.

134.   HP sold their Class Printers in boxes containing the misleading "May Not Work" Disclaimer. This disclaimer failed to disclose HP's present, existing intent to use firmware to block cheaper non-HP ink cartridges at a future date.

135.   HP's statement that non-HP ink "may not work" or "may not function" was objectively misleading, and was part of the packaging on each Class Printer at the point of sale. When HP sold each Class Printer, its true intent was to ensure at a future date that ink cartridges containing HP chips *would not* work. By merely repeating its old mantra that non-original ink "may" or may not work, HP deceived Plaintiffs Robinson and Myers, along with the other Illinois Class Members, at the point of sale.

136.   HP intended for consumers to rely on its silence as to its true intent.

137.   HP's failure to conspicuously disclose its intent to block cartridges was deceptive.

138.   If HP had disclosed its true intent at the point of sale, the Illinois Plaintiffs and Class Members would not have purchased the Class Printers or would have paid less for them.

139.   In addition to the deception theory pled in paragraphs 136-138, Plaintiffs separately allege that HP's conduct was unfair. Because the "May Not Work" Disclaimer was objectively misleading to reasonable consumers, it allowed HP to sell the Class Printers at higher prices than would have existed but for its unfair failure to make full disclosure printer customers, generally, at the point of sale. Essentially, HP gained an unfair advantage in the market by making misleading statements to the market as a while.

140.    If HP had disclosed its true intent at the point of sale, it would have faced reduced sales and downward pricing pressure on the Class Printers. Thus, Illinois Plaintiffs and Class Members would not have purchased the Class Printers or would have paid less for them.

141.    HP's conduct had a substantial effect on Illinois commerce.

142.    As a direct and proximate result of HP's unlawful conduct, members of the Illinois Class have been injured in their business and property and are threatened with further injury.

143.    Accordingly, Plaintiffs and the Class seek all forms of relief, including all damages available under the statute, as well as reasonable attorneys' fees, costs, and injunctive relief available.

### COUNT II
### VIOLATION OF UNFAIR AND DECEPTIVE TRADE PRACTICE ACTS
### (ON BEHALF OF PLAINTIFFS AND CLASS MEMBERS IN
### MULTI-STATE CONSUMER FRAUD PRINTER PURCHASE CLASS)

144.    The allegations in paragraphs 1-106 and 119-131 are incorporated as if fully stated.

145.    This count is brought on behalf of the Consumer Fraud Multi-State Printer Purchase Class, whose members are defined below, and all named Plaintiffs who are citizens of the specified states.

> **Consumer Fraud Multi-State Printer Purchase Class:** All persons in the States of New York, Florida, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, Idaho, Alabama, and Washington who purchased the Class Printers from 2016 through date of class certification, and received an error message stating "Non-HP Chip," "Non-HP Chip Detected," "Cartridge Problem," or "Supply Problem," due to HP's transmission of a firmware update  (the "Consumer Fraud Multi-State Printer Purchase Class").[20]

---

[20] The States in the Consumer Fraud Multi-State Class are limited to those States with similar consumer fraud laws under the facts of this case: Illinois  (815 Ill. Comp. Stat. 505/1, *et seq.*); New York (N.Y. Gen. Bus. Law § 349, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J.

146.    The Multi-State Consumer Fraud Printer Purchase Class includes Plaintiffs Gousie (New York), Steiger (Massachusetts), Ulrich (New Jersey), Waudby (Michigan), First (Missouri), and Wells (Tennessee). These Plaintiffs are typical and adequate class representatives.

147.    The States in the Consumer Fraud Multi-State Printer Purchase Class are limited to those States with similar consumer fraud laws under the facts of this case: New York (N.Y. Gen. Bus. Law § 349, *et seq.*);  Florida (Fla. Stat. § 501.201, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); Idaho (I.C. § 48-603); Alabama (Ala. Code § 8–19–10, *et seq.*); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

148.    The common thread linking these state statutes is that they do not require consumers to show individualized proof of reliance on a misleading statement or omission. Each of these states' consumer fraud statutes provide a cause of action so long as the defendant sells a product with (1) objectively deceptive labeling, (2) upon which it intends for consumers to rely, and (3) the deceptive statement or omission results in loss to class members.

149.    Here, Members of Multi-State Consumer Fraud Printer Purchase Class were harmed by HP's failure to disclose, at the point in which HP sold the Class Printers, its present and existing intent to remove their ability to use cheaper non-HP ink. For maximum clarity, this count focuses exclusively on HP's point of sale disclosures, not statements made *after* the point of sale or in places that consumers would not see at the point of sale (e.g., statements made on portions of HP's website that it has invoked in other litigation).

---

Stat. § 56:8-1, *et seq.*); Idaho (I.C. § 48-603); Alabama (Ala. Code § 8–19–10, *et seq.*); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

150. If HP had disclosed this scheme on the Class Printers' labeling at the point of sale, Class Members would not have purchased the Class Printers or would have paid less for them.

151. Based on HP's own internal analysis, it knew that disclosure of this limitation would reduce HP's sales of the Class Printers or would force HP to cut prices, either by reducing the price of the Class Printers or reducing the price of its "original" ink cartridges.

152. Plaintiffs and Class Members were thereby damaged in an amount equal to the reduced value of the Class Printers, following HP's intentional removal of their ability to function with cheaper non-HP ink.

153. Plaintiffs and Class Members also seek all damages multiplier and statutory damages available under the consumer protection statutes of their respective states.

154. Plaintiff Gousie and New York-based Class Members are entitled to all statutory damages available under New York law (N.Y. Gen. Bus. Law § 349, *et seq.*; N.Y. Gen. Bus. Law § 350, *et seq.*).

155. Plaintiff Steiger and Massachusetts-based Class Members are entitled to all statutory damages available under Massachusetts law (Mass. Gen. Laws Ch. 93A, *et seq.*).

156. These state-specific differences in statutory damages, however, provide no reason to avoid class certification. HP's own records will reveal how many individuals bought the Class Printers in each state, making it simple to calculate state-specific statutory damages.

157. WHEREFORE, Plaintiffs and Class Members seek all actual and statutory damages arising from HP's sale of the Class Printers.

## COUNT III
### SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### MONOPOLIZATION OF THE AFTERMARKET FOR
### REPLACEMENT INK CARTRIDGE FOR HP PRINTERS
### (ON BEHALF OF HP INK PURCHASER CLASS MEMBERS)

158. The allegations in paragraphs 1-131 are incorporated as if fully stated.

159. This cause of action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

160. HP monopolized the Replacement Ink Cartridge Market in a manner that unreasonably restrained trade in this aftermarket. *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992) (outlining elements for stating a Section 2 claim in the context of a single-brand aftermarket).

161. First, HP engaged in a switch in policy as to each Class Printer when it disabled the printers' functionality through firmware updates.

162. Second, millions of HP's printer customers, the Class Members, were unaware at the point of sale that HP had engaged in this switch, and also remained unaware after the point of sale, having purchased the Class Printers. These customers represent an appreciable share of HP's total customers for inkjet (e.g., OfficeJet, DeskJet, and DesignJet) printers as of 2019-2020. By HP's own internal estimates, about 25% of its total printer customers and 30% of its inkjet customers were so-called "unprofitable customers" who did not purchase HP's replacement ink or chose to purchase cheaper non-HP ink.

163. Third, these customers could not accurately estimate the lifecycle costs of replacement ink in the Class Printers at the point of sale. According to HP's own internal studies, inkjet customers were often surprised at how quickly their need to replace ink cartridges led to

large costs. This is one reason why consumers were increasingly choosing to purchase non-HP ink cartridges prior to HP's actions that precluded them from doing so.

164.    Fourth, after HP implemented the firmware updates, an appreciable share of ordinary consumers were locked in by the relatively high cost of purchasing new printers, as compared to the lower cost of buying HP's replacement ink. This was true even at the supracompetitive price point HP charged for its replacement ink cartridges.

165.    Fifth, HP's post-sale firmware update allowed it to exert market power by raising ink cartridge prices, even as it reduce total "unprofitable customers" from 25% of all printer customers to less than 10%. For inkjet printer customers specifically, HP's post-sale firmware updates allowed it to reduce total "unprofitable customers" from 30% of all printer customers to less than 10%.

166.    In short, HP pulled a bait and switch on the Class Members. HP made misleading statements at the point of sale when it sold the Class Printers, then exploited Class Members' sunk costs by using remotely-issued digital "updates" to permanently remove the printers' ability to accept many non-HP inks.

167.    HP has monopoly power in the HP Replacement Ink Cartridge aftermarket for all registered users after the firmware, including the ability to control prices and exclude competition in those aftermarkets.

168.    HP willfully and intentionally engaged in predatory, exclusionary, and anticompetitive conduct with the purpose, and effect of unlawfully creating and maintaining a monopoly in the HP replacement ink cartridge aftermarket.

169.    The anticompetitive conduct, of implementing a firmware update to prevent owners of HP printers from using any competitor's replacement ink cartridges, has unreasonably restrained

43

and threatens to continue unreasonably restraining competition in the HP replacement ink cartridge aftermarket.

170.    As a direct and proximate result of HP's anticompetitive and monopolistic conduct, Plaintiffs and the proposed Class have suffered, and will continue to suffer, injuries of the type the antitrust laws were intended to prevent, including, among other things, the lost value of non-HP ink cartridges.

171.    All Plaintiffs seek injunctive relief to prevent HP from continuing to engage in this aftermarket monopolization scheme, which uses firmware updates to retroactively impair the ability of printers to accept third-party replacement ink cartridges.

**COUNT IV**
**SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**UNLAWFUL TYING**
**(ON BEHALF OF ALL HP INK PURCHASER CLASS MEMBERS)**

172.    The allegations in paragraphs 1-131 are incorporated as if fully stated.

173.    An unlawful tying arrangement exists, and constitutes a per se violation of Section 1 of the Sherman Act, where a seller conditions the sale of a good or service in one market in which the seller has market power (the "tying" product) upon the buyer's agreement to (a) buy a second good or service (the "tied" product) from the seller or (b) refrain from buying that same good or service from a competing seller. In the absence of an explicit agreement, a tying arrangement may be based on the seller's coercion.

174.    HP's Class Printers and replacement ink cartridges are separate and distinct products. However, HP manufactured the Class Printers so that they are dependent on an ongoing digital service relationship between the user and HP's remote servers, embodied in HP's EULA that it asserts applies to all registered users.

44

175.     Prior to implementing the firmware updates, HP did not its continued electronic service relationship with printer customers to their exclusive purchase of HP-branded ink.

176.     After implementing the firmware updates, however, HP tied the continued use of the Class Printers and the EULA service relationship to Class Members' use of only ink cartridges with HP chips.

177.     The firmware update gives HP monopoly power in the aftermarket for replacement ink cartridges.

178.     By virtue of the anticompetitive conduct consisting of the firmware update alleged herein, HP has engaged in tying arrangements.

179.     HP leverages the fact that its customers have previously purchased HP printers at substantial cost, and have received the firmware update so that they cannot use any other brand of replacement ink cartridge, to force Plaintiffs and the proposed Class into purchasing HP ink cartridges. This scheme restrains competition in the aftermarket for replacement ink cartridges by excluding other sellers of the tied products and services.

180.     HP implemented these firmware updates through its direct relationship with printer owners, who were subject to HP's end user license agreement. HP exploited this purported contractual relationship to send the updates. In this way, HP used the end user license agreement to unreasonably restrain consumers' choices in the aftermarket for ink cartridges.

181.     This tying arrangement affected a substantial amount of interstate commerce, and HP has a substantial economic interest in sales of replacement ink cartridges.

182.     There are no legitimate procompetitive business justifications for HP's unlawful tying arrangement.

183. All Plaintiffs bring this count on behalf of the Firmware Update Class, and seek damages stemming from the lost value of non-HP ink due to HP's illegal tying scheme, as well as consequential damages to printers caused by HP's firmware updates.

184. All Plaintiffs seek injunctive relief to prevent HP from continuing to engage in its illegal tying scheme, which uses firmware updates to retroactively impair the ability of printers to accept third-party replacement ink cartridges.

**COUNT V**
**VIOLATION OF STATE ANTITRUST AND UNFAIR COMPETITION LAW**
**(ON BEHALF OF ALL HP INK PURCHASER**
**CLASS MEMBERS IN INDIRECT PURCHASER STATES)**

185. The allegations in paragraphs 1-131 are incorporated as if fully stated.

186. Plaintiffs bring this action on behalf of the HP Ink Purchaser Class.

**Antitrust Ink Purchaser Class**. All persons who purchased an HP-branded replacement ink cartridge for use in any of the Class Printers from 2021 to the present in the states of Alabama, California, Colorado, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Maine, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Tennessee, Vermont, West Virginia, and Wisconsin.

187. Several Plaintiffs, but not all, are members of the Antitrust Ink Purchaser Class and were damaged by being forced to pay supracompetitive prices for HP's replacement ink cartridges.

188. This Class is limited to states that permit recovery of antitrust damages, either through their state antitrust or unfair competition statues, by indirect purchasers of items sold at supracompetitive prices due to illegal monopolization. These states are known as Indirect Purchaser States.

189. The Indirect Purchaser States and the respective statutes permitting recovery are Alabama (Ala. Code §§ 8–10–1 *et seq*., § 6-5-60), California (Cal. Bus. & Prof. Code §§ 16700, *et seq.*), Colorado (Colo. Rev. Stat. §§ 6-4-101 *et seq.*), Florida (Fla. Stat. §§ 501.201(2) *et seq.*),

Hawaii (Haw. Rev. Stat. §§ 480-1 *et. seq.*), Illinois (740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*), Iowa (Iowa Code §§ 553.1 *et seq.)*, Kansas (Kan. Stat. Ann. §§ 50-101 *et seq.*), Maine (Me. Rev. Stat. Tit. 10, § 1101 *et seq.*), Massachusetts (Mass. Gen. Laws Chapter 93A), Michigan (Mich. Comp. Laws Ann. §§ 445.771, e*t seq.*), Maine (Minn. Stat. §§ 325d.49, *et seq.*), Mississippi (Miss. Code Ann. §§ 75-21-1 *et seq.*), Nebraska (Neb. Rev. Stat. §§59-801 *et seq.*), Nevada (Nevada Rev. Stat. §§598A.010 *et seq.*), New Hampshire (N.H. Rev. Stat. Ann. §§358-A:1 *et seq.*), New Mexico (N.M. Stat. Ann. §§57-1-1 *et seq.*), New York (N.Y. Gen. Bus. Law §§ 340 et seq.), North Carolina (N.C. Gen. Stat. Ann. §§75-1 *et seq.*)., Oregon (Oregon Rev. Stat. §§646.705 *et seq.*), Tennessee (Tenn. Code Ann. §§47-25-101 *et seq.*), Utah (Utah Code Ann. §§76-10-3101 *et seq.*), Vermont (9 V.S.A. §§2451 *et seq***.),** West Virginia (W. Va. Code §§47-18-1 & W. Va. Csr §§142-9-1, 2 *et seq.*), and Wisconsin (Wisconsin Stat. §§133.01 *et seq.*).

190.     In order to achieve the supracompetitive prices alleged herein, HP monopolized the Replacement Ink Cartridge Market in a manner that unreasonably restrained trade in this aftermarket. In doing so, HP violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

191.     First, HP engaged in a switch in policy as to each Class Printer when it disabled the printers' functionality through firmware updates.

192.     Second, millions of HP's printer customers, the Class Members, were unaware at the point of sale that HP would engaged in this switch after they purchased the Class Printers. These customers represent an appreciable share of HP's total customers for inkjet (OfficeJet, DeskJet, and DesignJet) printers as of 2019-2020. By HP's own internal estimates, about 25% of

its total printer customers and 30% of its inkjet customers were so-called "unprofitable customers" who did not purchase HP's replacement ink or chose to purchase cheaper non-HP ink.

193.   Third, these customers could not accurately estimate the lifecycle costs of replacement ink in the Class Printers at the point of sale. According to HP's own internal studies, inkjet customers were often surprised at how quickly their need to replace ink cartridges led to large costs. This is one reason why consumers were increasingly choosing to purchase non-HP ink cartridges prior to HP's actions that precluded them from doing so.

194.   Fourth, after HP implemented the firmware updates, an appreciable share of ordinary consumers were locked in by the relatively high cost of purchasing new printers, as compared to the lower cost of buying HP's replacement ink. This was true even at the supracompetitve price point HP charged for its replacement ink cartridges.

195.   Fifth, HP's post-sale firmware update allowed it to exert market power by raising ink cartridge prices, even as it reduce total "unprofitable customers" from 25% of all printer customers to less than 10%. For inkjet printer customers specifically, HP's post-sale firmware updates allowed it to reduce total "unprofitable customers" from 30% of all printer customers to less than 10%.

196.   In short, HP pulled a bait-and-switch on the Class Members. HP made misleading statements at the point of sale when it sold the Class Printers, then exploited Class Members' sunk costs by using remotely-issued digital "updates" to permanently remove the printers' ability to accept many non-HP inks.

197.   HP thus achieved monopoly power in the HP Replacement Ink Cartridge aftermarket for all registered users after the firmware, including the ability to control prices and exclude competition in those aftermarkets.

198.     This federal antitrust violation serves as a predicate violation of all state antitrust and unfair competition laws alleged herein. The state laws invoked in this count do not meaningfully differ in treating Sherman Act violations as predicate violations of their state laws.

199.     Class certification is appropriate because in each of these states, violation of federal antitrust law is automatically a predicate violation of either the state antitrust statute or the state unfair competition statute.

200.     Class Members seek to recover antitrust damages under the laws of the Indirect Purchaser States, calculated as the difference between the actual price HP charged for replacement ink cartridges and the price that would have prevailed in a competitive market.

### COUNT VI
### ALABAMA CODE §§ 8–10–1, *ET SEQ.*, § 6-5-60
### (ON BEHALF OF ALABAMA CLASS MEMBERS)

201.     The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

202.     This count incorporates the same theory as Count V, and is pled in the alternative as an Alabama-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

203.     Sections 8–10–1 through § 8–10–3 of the Alabama Code prohibits unreasonable restraints in trade or commerce. In turn, Section 6-5-60 of the Alabama Code provides a private cause of action to enforce the Alabama antitrust laws.

204.     As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, members of the Alabama Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

49

205.     But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

206.     Plaintiffs and the Alabama Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## COUNT VII
## CALIFORNIA'S CARTWRIGHT ACT
## CAL. BUS. & PROF. CODE §§ 16700, *ET SEQ.*
## (ON BEHALF OF CALIFORNIA CLASS MEMBERS)

207.     The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

208.     This count incorporates the same theory as Count V, and is pled in the alternative as a California-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

209.     The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

210.     California public policy provides that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

211.     Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. Cal. Bus. & Prof. Code § 16750(a).

212.     As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, California members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

213. But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

214. Plaintiffs and California members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**COUNT VIII**
**COLORADO ANTITRUST ACT**
**COLO. REV. STAT. §§ 6-4-101, *ET SEQ.***
**(ON BEHALF OF COLORADO CLASS MEMBERS)**

215. The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

216. This count incorporates the same theory as Count V, and is pled in the alternative as a California-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

217. HP's acts violate the Colorado State Antitrust Act of 2023 ("ADTPA"). Colo. Rev. Stat. §§ 6-4-101-120.

218. As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, California members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

219. But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

220. Plaintiffs and California members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## COUNT IX
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
## FLA. STAT. §§ 501.201(2), *ET SEQ.*
## (ON BEHALF OF FLORIDA CLASS MEMBERS)

221.     The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

222.     This count incorporates the same theory as Count V, and is pled in the alternative as a Florida-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

223.     The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

224.     As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Florida members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

225.     But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

226.     Plaintiffs and Florida members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## COUNT X
## HAWAII ANTITRUST ACT
## HAW. REV. STAT. §§ 480-1, *ET SEQ.*
## (ON BEHALF OF HAWAII CLASS MEMBERS)

227.     The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

228.    This count incorporates the same liability theory as Count V, and is pled in the alternative as a Hawaii-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

229.    HP has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

230.    As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Hawaii members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

231.    But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

232.    Plaintiffs and Hawaii members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

<div align="center">

**COUNT XI**
**ILLINOIS ANTITRUST ACT**
**740 ILL. COMP. STAT. ANN. 10/3(1), *ET SEQ*.**
**(ON BEHALF OF THE ILLINOIS CLASS)**

</div>

233.    The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

234.    This count incorporates the same theory as Count V, and is pled in the alternative as an Illinois-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

235.    As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Illinois-based members of the Antitrust Ink Purchaser

<div align="center">53</div>

Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

236. But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

237. Plaintiffs and Illinois members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**COUNT XII**
**IOWA COMPETITION LAW**
**IOWA CODE §§ 553.1, *ET SEQ.***
**(ON BEHALF OF IOWA CLASS MEMBERS)**

238. The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

239. This count incorporates the same liability theory as Count V, and is pled in the alternative as an Iowa-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

240. The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

241. As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Iowa members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

242. But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

243.    Plaintiffs and Iowa members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**COUNT XIII**
**KANSAS RESTRAINT OF TRADE ACT**
**KAN. STAT. ANN. §§ 50-101, *ET SEQ.***
**(ON BEHALF OF KANSAS CLASS MEMBERS)**

244.    The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

245.    This count incorporates the same liability theory as Count V, and is pled in the alternative as a Kansas-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

246.    The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

247.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

248.    As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Kansas members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

249.    But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

250.    Plaintiffs and Kansas members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## COUNT XIV
## MAINE MONOPOLIES AND PROFITEERING LAW
## ME. REV. STAT. TIT. 10, § 1101, *ET SEQ.*
## (ON BEHALF OF MAINE CLASS MEMBERS)

251. The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

252. This count incorporates the same liability theory as Count V, and is pled in the alternative as an Maine-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

253. Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.

254. Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

255. As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Maine members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

256. But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

257. Plaintiffs and Maine members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

### COUNT XV
### MASSACHUSETTS CONSUMER PROTECTION LAW
### MASS. GEN. LAWS CHAPTER 93A
### (ON BEHALF OF MASSACHUSETTS CLASS MEMBERS)

258.    The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

259.    This count incorporates the same liability theory as Count V, and is pled in the alternative as a Massachusetts-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

260.     Massachusetts members of the HP Ink Purchaser Class are "persons" under the Massachusetts Regulation of Business Practice and Consumer Protection Act. M.G.L.A. 93A, § 1(a).

261.    Under M.G.L.A. 93A, § 2(a), "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful."

262.    As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Massachusetts members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

263.    But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

264.    Massachusetts members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

### COUNT XVI
### MICHIGAN ANTITRUST REFORM ACT
### MICH. COMP. LAWS ANN. §§ 445.771, *ET SEQ.*
### (ON BEHALF OF MICHIGAN CLASS MEMBERS)

265. The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

266. This count incorporates the same liability theory as Count V, and is pled in the alternative as a Michigan-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

267. The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . to prohibit monopolies and attempts to monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

268. Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

269. As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Michigan members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

270. But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

271. Plaintiffs and Michigan members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## COUNT XVII
### MINNESOTA ANTITRUST LAW MINN. STAT. §§ 325D.49, *ET SEQ.*
### (ON BEHALF OF MINNESOTA CLASS MEMBERS)

272. The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

273.     This count incorporates the same liability theory as Count V, and is pled in the alternative as a Minnesota-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

274.     The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

275.     Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

276.     As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Minnesota members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

277.     But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

278.     Plaintiffs and Minnesota members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**COUNT XVIII**
**MISSISSIPPI ANTITRUST ACT**
**MISS. CODE ANN. §§ 75-21-1, *ET SEQ*.**
**(ON BEHALF OF MISSISSIPPI CLASS MEMBERS)**

279.     The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

280.    This count incorporates the same liability theory as Count V, and is pled in the alternative as an Mississippi-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

281.    Miss. Code. Ann. § 75-21-9 provides a cause of action for indirect purchasers.

282.    As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Mississippi members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

283.    But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

284.    Plaintiffs and Mississippi members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## COUNT XIX
## NEBRASKA JUNKIN ACT
## NEB. REV. STAT. §§59-801, *ET SEQ.*
## (ON BEHALF OF NEBRASKA CLASS MEMBERS)

285.    The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

286.    This count incorporates the same liability theory as Count V, and is pled in the alternative as a Nebraska-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

287.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

288.    As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Nebraska members of the Antitrust Ink Purchaser Class

have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

289.    But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

290.    Plaintiffs and Nebraska members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

<div align="center">

**COUNT XX**
**NEVADA UNFAIR TRADE PRACTICES ACT**
**NEVADA REV. STAT. §§598A.010, *ET SEQ.***
**(ON BEHALF OF NEVADA CLASS MEMBERS)**

</div>

291.    The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

292.    This count incorporates the same liability theory as Count V, and is pled in the alternative as an Iowa-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

293.    The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

294.    The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, inter alia, price fixing, division of markets, allocation of customers, tying arrangements, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060(1).

295.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. § 598A.210(2).

<div align="center">61</div>

296.     As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Nevada members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

297.     But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

298.     Plaintiffs and Nevada members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

### COUNT XXI
### NEW HAMPSHIRE CONSUMER PROTECTION ACT
### N.H. REV. STAT. ANN. §§358-A:1, *ET SEQ.*
### (ON BEHALF OF NEW HAMPSHIRE CLASS MEMBERS)

299.     The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

300.     This count incorporates the same liability theory as Count V, and is pled in the alternative as a New Hampshire-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

301.     The New Hampshire Consumer Protection Act ("NHCPA") deems it unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within the state. N.H. Rev. Stat. Ann. §358-A:2.

302.     The NHCPA provides a cause of action for indirect purchasers harmed by acts that violate federal antitrust law.

303.     As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, New Hampshire members of the Antitrust Ink Purchaser

Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

304.     But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

305.     Plaintiffs and New Hampshire members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

<div align="center">

**COUNT XXII**
**NEW MEXICO ANTITRUST ACT**
**N.M. STAT. ANN. §§57-1-1, *ET SEQ*.**
**(ON BEHALF OF NEW MEXICO CLASS MEMBERS)**

</div>

306.     The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

307.     This count incorporates the same liability theory as Count V, and is pled in the alternative as a New Mexico-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

308.     The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. § 57-1-15.

309.     Through their unlawful tying and aftermarket monopolization scheme, HP engaged acted to restrain, or to monopolize trade or commerce within New Mexico, for the purposes of excluding competition or controlling, fixing, or maintaining prices, in violation of N.M. Stat. Ann. § 57-1-1, *et seq*.

310.     HP's unlawful conduct substantially affected New Mexico's trade and commerce because the New Mexico Class members are located in New Mexico, purchased, repaired, and

owned motorcycles in New Mexico, and engaged in repair services in New Mexico, all of which are activities affected by Defendants' unlawful conduct.

311.    As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, New Mexico members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

312.    But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

313.    Plaintiffs and New Mexico members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## COUNT XXIII
## THE DONNELLY ACT
## N.Y. GEN. BUS. LAW §§ 340, *ET SEQ.*
## (ON BEHALF OF NEW YORK CLASS MEMBERS)

314.    The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

315.    This count incorporates the same liability theory as Count V, and is pled in the alternative as a New York-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

316.    Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

317.　Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

318.　As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, New York members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

319.　But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

320.　Plaintiffs and New York members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**COUNT XXIV**
**NORTH CAROLINA ANTITRUST ACT**
**N.C. GEN. STAT. ANN. §§75-1, *ET SEQ.***
**(ON BEHALF OF NORTH CAROLINA CLASS MEMBERS)**

321.　The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

322.　This count incorporates the same liability theory as Count V, and is pled in the alternative as a North Carolina-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

323.　By reason of the conduct alleged herein, HP has violated N.C. Gen. Stat. §§75-1, *et seq.*, which provides a cause of action for indirect purchaser harmed by acts that violate federal antitrust laws.

324.　As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, North Carolina members of the Antitrust Ink Purchaser

Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

325.    Plaintiffs and North Carolina members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## COUNT XXV
## OREGON ANTITRUST LAW
## OREGON REV. STAT. §§646.705, *ET SEQ.*
## (ON BEHALF OF OREGEON CLASS MEMBERS)

326.    The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

327.    This count incorporates the same liability theory as Count V, and is pled in the alternative as an Oregon-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

328.    Or. Rev. Stat. § 646.780(1)(a) allows indirect purchasers to seek damages for violations of antitrust law. Acts that violate federal antitrust law also violate Oregon law.

329.    As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Oregon members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

330.    But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

331.    Plaintiffs and Oregon members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**COUNT XXVI**
**TENNESSEE TRADE PRACTICES ACT**
**TENN. CODE ANN. §§47-25-101, *ET SEQ.***
**(ON BEHALF OF TENNESSEE CLASS MEMBERS)**

332.     The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated. This count incorporates the same liability theory as Count V, and is pled in the alternative as an Tennessee-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

333.     By reason of the conduct alleged herein, HP violated the Tennessee Trade Practices Act ("TTPA"), Tennessee Code Ann. §§ 47-25-101, *et seq*., which declares unlawful and against public policy "all arrangements or contracts" which "lessen full and free competition" and which tend to "advance" or "control" the price to the consumer of any product or article.

334.     The TTPA provides a cause of action for indirect purchasers. *Id*., § 47–25–106.

335.     As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Tennessee members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

336.     But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

337.     Plaintiffs and Tennessee members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**COUNT XXVII**
**UTAH ANTITRUST ACT**
**UTAH CODE ANN. §§76-10-3101, ET SEQ.**
**(ON BEHALF OF UTAH CLASS MEMBERS)**

338.     The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

339.     This count incorporates the same liability theory as Count V, and is pled in the alternative as a Utah-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

340.     The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." Utah Code Ann. § 76-10-3102.

341.     Utah Class members purchased HP-branded ink cartridges within the State of Utah during the Class Period. But for HP's conduct set forth herein, the price of these ink cartridges would have been lower.

342.     Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

343.     As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Utah members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

344.     But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

345.     Plaintiffs and Utah members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## COUNT XXVIII
## VERMONT CONSUMER PROTECTION ACT
## 9 V.S.A. §§ 2451, *ET SEQ.*
## (ON BEHALF OF VERMONT CLASS MEMBERS)

346.     The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

347.     This count incorporates the same liability theory as Count V, and is pled in the alternative as a Vermont-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

348.     By reason of the conduct alleged herein, HP violated the Vermont Statutes Annotated 9, §§ 2453, *et seq.*, which prohibits "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."

349.     Vermont Class members are expressly permitted to recover from HP, even where plaintiffs have "not dealt directly with the defendant" under 9 V.S.A. §§ 2465.

350.     As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Vermont members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

351.     But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

352.     Plaintiffs and Vermont members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## COUNT XXIX
## WEST VIRGINIA ANTITRUST ACT
## W. VA. CODE §§47-18-1 & W. VA. CSR §§142-9-1, 2, *ET SEQ.*
## (ON BEHALF OF WEST VIRGINIA CLASS MEMBERS)

353.    The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

354.    This count incorporates the same liability theory as Count V, and is pled in the alternative as a West Virginia-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

355.    The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code. Further, under W. Va. CSR § 142-9-1, indirect purchasers may sue for damages.

356.    As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, West Virginia members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

357.    But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

358.    Plaintiffs and |West Virginia members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**COUNT XXX**
**WISCONSIN ANTITRUST LAW**
**WISCONSIN STAT. §§133.01, *ET SEQ.***
**(ON BEHALF OF WISCONSIN CLASS MEMBERS)**

359.    The allegations in paragraphs 1-131 and 185-201 are incorporated as if fully stated.

360. This count incorporates the same liability theory as Count V, and is pled in the alternative as a Wisconsin-only count. HP's federal antitrust violation serves as a predicate violation of the state law under which this count arises.

361. The violations of federal antitrust law set forth above also constitute violations of Wisconsin state law. Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.

362. Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(a).

363. As a direct and proximate result of HP's unlawful monopolization of the Ink Cartridge Aftermarket and tying scheme, Wisconsin members of the Antitrust Ink Purchaser Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for HP-branded ink cartridges due to HP's unlawful conduct.

364. But for HP's conduct set forth herein, the price of HP's replacement ink cartridges would have been lower.

365. Plaintiffs and |Wisconsin members of the Antitrust Ink Purchaser Class are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## RELIEF DEMANDED

366. WHEREFORE, Plaintiffs, individually and on behalf of the Class of all others similarly situated, seeks a judgment against HP, as follows:

a.      For an order certifying the Classes described above under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class representatives and Plaintiffs' attorneys as Class Counsel;

b.      For an order declaring that HP's conduct violates the statutes referenced herein;

c.      For an injunction requiring HP to disable the firmware updates to the extent they precluded the use of non-HP branded replacement ink cartridges in HP printers;

d.      For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

e.      For compensatory, statutory, and punitive damages, as applicable, in amounts to be determined by the Court and/or jury;

f.      For prejudgment interest on all amounts awarded;

g.      For an order of restitution and all other forms of equitable monetary relief;

h.      For injunctive relief as pleaded or as the Court may deem proper; and

i.      For an order awarding Plaintiffs and the Class their reasonable attorneys' fees, expenses and costs incurred in bringing and prosecuting this lawsuit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.


Dated: November 7, 2025

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Peggy Wedgworth*
Peggy J. Wedgworth (*pro hac vice*)
Milberg Coleman Bryson Phillips
Grossman, PLLC
405 East 50th Street
New York, NY 10022
Tel: (212) 594-5300
pwedgworth@milberg.com

</div>

Melissa K. Sims
Milberg Coleman Bryson Phillips
Grossman, PLLC
Illinois Bar Number: 6231297
227 West Monroe Street
Suite 2100
Chicago, Illinois 60606
Tel.: (865) 247-0080
msims@milberg.com

Jimmy Mintz (*pro hac vice*)
Bryson Harris Suciu DeMay, PLLC
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL 33134
Tel.: (786) 879-8200
jmintz@brysonpllc.com

*Attorneys for Plaintiffs and the Proposed Class*