**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| RENEE ROBINSON, RICHARD MYERS, ANNETTE FIRST, CASEY GADDY, STEVEN GOUISIE, ROBERT PLUNKETT, FRANCOIS STEIGER, JAMES ULRICH, GABRIEL VOILES, JOHN WAUDBY, and LAKESHA WELLS, on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> HP INC., a Delaware corporation, <br><br> *Defendant*. | Case No. 1:24-cv-00164 <br><br> Judge Martha M. Pacold |

**HP'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**
**PLAINTIFFS' FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION .................................................................................................1

II.   BACKGROUND ...................................................................................................3

    A.    Plaintiffs Sue HP For Allegedly Making Its Printers Compatible Only With Ink Cartridges With Original HP Chips. ......................................................3

    B.    The Court Dismisses All 79 Of Plaintiffs' Claims. .............................................3

        1.    Plaintiffs' Tying Claim Did Not Allege That HP Conditioned The Purchase Of Ink Cartridges On The Purchase Of Printers Or Services. ...................................................................................................3

        2.    Plaintiffs' Monopolization Claim Did Not Allege A Refusal To Deal Or Aftermarket Power. .............................................................................4

        3.    Plaintiffs' Misrepresentation Claims Did Not Allege Any Deceptive Statement. .............................................................................................5

        4.    The Court Dismisses Plaintiffs' Remaining Claims. ...............................6

    C.    Plaintiffs Assert Similar Theories In An Amended Complaint And Allege That HP's On-Box Disclosure Was Deceptive. ........................................................6

        1.    Plaintiffs Base Their Misrepresentation Claim On HP's Thorough On-Box Disclosure About Dynamic Security. .........................................6

        2.    Plaintiffs Bring Claims Under The Same Antitrust Theories as Before. ....................................................................................................8

        3.    Plaintiffs Base Their Claims Of Unfair And Unconscionable Practices On Their Misrepresentation And Antitrust Theories. ................8

III.  LEGAL STANDARD ...........................................................................................9

IV.   ARGUMENT.........................................................................................................9

    A.    The Court Should Dismiss Plaintiffs' Misrepresentation Claims. .......................10

        1.    Plaintiffs Do Not Plausibly Allege That HP Had A Duty To Disclose Additional Facts About Its Printers' Compatibility With Non-HP Cartridges..........................................................................10

        2.    Plaintiffs Have Not Plausibly Alleged That Any Misrepresentation Caused Them Injury. .............................................................................17

    B.    The Court Should Dismiss Plaintiffs' Antitrust Claims For Failure To Plead An Unlawful Tie Or Exclusionary Conduct.............................................18

        1.    Plaintiffs Do Not Plausibly Allege Tying Under Section 1 Of The Sherman Act And Analogous State Statutes. .........................................19

2.      Plaintiffs Do Not Plausibly Allege Exclusionary Conduct Under Section 2 Of The Sherman Act And Analogous State Statutes. ...............24

C.      The Court Should Dismiss Plaintiffs' Antitrust Claims For Failure To Plead The Existence Of A Relevant Aftermarket. ..............................................26

1.      Single-Brand Aftermarkets Are Disfavored...........................................26

2.      Plaintiffs Have Not Plausibly Alleged A Relevant Aftermarket. .............29

D.      The Court Should Dismiss Plaintiffs' State Antitrust Claims For Additional Reasons.........................................................................................37

E.      The Court Should Dismiss Plaintiffs' Consumer-Protection Claims For Additional Reasons.........................................................................................38

F.      The Court Should Dismiss Plaintiffs' Amended Complaint With Prejudice. .......................................................................................................40

V.      CONCLUSION.......................................................................................................40

ii

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A.O. Smith Corp. v. Lewis, Overbeck & Furman,*
   979 F.2d 546 (7th Cir. 1992)..................................................................................................23

*Abbott Labs. v. Durrett,*
   746 So. 2d 316 (Ala. 1999).....................................................................................................37

*AliveCor, Inc. v. Apple Inc.,*
   __ F.4th __, 2026 WL 61304 (9th Cir. Jan. 8, 2026)............................................................26

*In re Aluminum Warehousing Antitrust Litig.,*
   2014 WL 4743425 (S.D.N.Y Sep. 15, 2014) .........................................................................39

*In re Asacol Antitrust Litig.,*
   2016 WL 4083333 (D. Mass. July 20, 2016) ...................................................................38, 40

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .................................................................................................................9

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties,*
   2020 WL 5642941 (N.D. Ill. Sept. 22, 2020).........................................................................27

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties,*
   15 F.4th 831 (7th Cir. 2021)...................................................................................................40

*Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins., Inc.,*
   784 F.2d 1325 (7th Cir. 1986).................................................................................................23

*Beardsall v. CVS Pharm., Inc.,*
   953 F.3d 969 (7th Cir. 2020)...................................................................................................12

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ..................................................................................................................9

*Boss v. Kraft Heinz Co.,*
   690 F. Supp. 3d 912 (N.D. Ill. 2023) ......................................................................................14

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962)..................................................................................................................22

*Cameron v. New Hanover Mem. Hosp., Inc.,*
   58 N.C. App. 414 (1982) .........................................................................................................38

*Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.,*
   758 F.2d 203 (7th Cir. 1985).......................................................................................19, 21, 22

*Casper v. SMG,*
   2006 WL 3111132 (D.N.J. Oct. 31, 2006)..............................................................................24

i

*Chung v. Pure Fishing, Inc.*,
　2022 WL 866769 (E.D.N.Y. Mar. 23, 2022) .......................................................................18

*Clarke v. DPWN Holdings (USA), Inc.*,
　2022 WL 2905734 (N.D. Ill. July 22, 2022) ......................................................................40

*Corbett v. Pharmacare U.S., Inc.*,
　544 F. Supp. 3d 996 (S.D. Cal. 2021)......................................................................... 12, 16

*Coronavirus Reporter v. Apple Inc.*,
　85 F.4th 948 (9th Cir. 2023)................................................................................................29

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
　313 F. Supp. 3d 931 (N.D. Ill. 2018)................................................................4, 25, 28, 31, 37

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*,
　73 F.3d 756 (7th Cir. 1996)............................................................................................31, 32

*DSM Desotech Inc. v. 3D Sys. Corp.*,
　749 F.3d 1332 (Fed. Cir. 2014)...........................................................................................34

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
　504 U.S. 451 (1992) ....................................................... 19, 25, 28, 29, 31, 34

*In re Effexor Antitrust Litig.*,
　357 F. Supp. 3d 363 (D.N.J. 2018)................................................................................38, 40

*Epic Games, Inc. v. Apple, Inc.*,
　67 F.4th 946 (9th Cir. 2023)................................................................................28, 29, 34, 35

*Fin. Fiduciaries, LLC v. Gannett Co., Inc.*,
　46 F.4th 654 (7th Cir. 2022)................................................................................................11

*Freeman Indus., LLC v. Eastman Chem. Co.*,
　172 S.W. 3d 512 (Tenn. 2005)............................................................................................38

*Gallagher v. Lactalis Am. Grp., Inc.*,
　2023 WL 6224881 (W.D.N.Y. Sep. 21, 2023)....................................................................12

*Garland v. Children's Place, Inc.*,
　2024 WL 1376353 (N.D. Ill. Apr. 1, 2024)........................................................................14

*Goldwasser v. Ameritech Corp.*,
　222 F.3d 390 (7th Cir. 2000)...............................................................................................25

*Gorran v. Atkins Nutritionals, Inc.*,
　464 F. Supp. 2d 315 (S.D.N.Y. 2006)................................................................................18

*Gray v. Amazon.com, Inc.*,
　653 F. Supp. 3d 847 (W.D. Wash. 2023)............................................................................12

*Guajardo v. Skechers USA, Inc.*,
　503 F. Supp. 3d 746 (C.D. Ill. 2020) ..............................................................................5, 10

*Gurrola v. Ford Motor Co.*,
  774 F. Supp. 3d 959 (N.D. Ill. 2025) ................................................................. 18

*In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*,
  151 F.4th 922 (7th Cir. 2025) ........................................... 2, 11, 28, 29, 30, 31

*Haywood v. Massage Envy Franchising, LLC*,
  887 F.3d 329 (7th Cir. 2018) .............................................................................. 12

*Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*,
  445 Mass. 790 (2006) ......................................................................................... 18

*Hodsdon v. Mars, Inc.*,
  891 F.3d 857 (9th Cir. 2018) ................................................................................ 6

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ............................................................................................ 24

*Larkin v. Fin. Sys. of Green Bay, Inc.*,
  982 F.3d 1060 (7th Cir. 2020) ............................................................................ 18

*Lima v. Post Consumer Brands, LLC*,
  2019 WL 3802885 (D. Mass. Aug. 13, 2019) .................................................... 12

*Little Caesar Enters., Inc. v. Smith*,
  34 F. Supp. 2d 459 (E.D. Mich. 1998) ............................................................... 30

*Lorenzo v. Qualcomm Inc.*,
  603 F. Supp. 2d 1291 (S.D. Cal. 2009) .............................................................. 38

*Menzies v. Seyfarth Shaw LLP*,
  943 F.3d 328 (7th Cir. 2019) .......................................................................... 9, 16

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
  641 F.3d 834 (7th Cir. 2011) .............................................................................. 25

*Mich. Division-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
  524 F.3d 726 (6th Cir. 2008) .............................................................................. 29

*In re Microsoft Corp. Antitrust Litig.*,
  2003 WL 22070561 (D. Md. Aug. 22, 2003) ..................................................... 37

*Negron v. Ascension Health*,
  2025 WL 2710014 (E.D. Mo. Sep. 23, 2025) .................................................... 18

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ............................................................................ 28

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) .......................................................................... 24

*Nucap Indus., Inc. v. Robert Bosch LLC*,
  273 F. Supp. 3d 986 (N.D. Ill. 2017) ................................................................. 27

iii

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018) ...........................................................................................................26

*Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*,
  866 F.2d 228 (7th Cir. 1988) ...........................................................................................34

*Parziale v. HP, Inc. (Parziale I)*,
  445 F. Supp. 3d 435 (N.D. Cal. 2020) .................................................................. 13, 31

*Parziale v. HP, Inc. (Parziale II)*,
  2020 WL 5798274 (N.D. Cal. Sept. 29, 2020) ................................................ 13, 15, 31

*Photovest Corp. v. Fotomat Corp.*,
  606 F.2d 704 (7th Cir. 1979) ...........................................................................................19

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
  104 F.3d 811 (6th Cir. 1997) ...................................................................................30, 31

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
  615 F.3d 412 (5th Cir. 2010) ....................................................................................27, 28

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) ................................................................... 27, 28, 32

*Quitno v. Gen. Motors, LLC*,
  2020 WL 777273 (N.D. Ill. Feb. 18, 2020) ....................................................................39

*Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*,
  87 F. Supp. 3d 874 (N.D. Ill. 2015) ................................................................................27

*Rilley v. MoneyMutual, LLC*,
  2017 WL 3822727 (D. Minn. Aug. 30, 2017) .................................................................18

*Robey v. SPARC Group LLC*,
  256 N.J. 541 (N.J. 2024) ..................................................................................................18

*Robinson-Bock Distrib. Co., Inc. v. Pioneer/Eclipse Corp.*,
  1993 WL 326365 (7th Cir. Aug. 25, 1993) .....................................................................27

*Rouse v. H.B.*,
  2024 WL 4528872 (D. Minn. Oct. 18, 2024) ..................................................................18

*In re Rust-Oleum Restore Mktg., Sales Pracs. & Prods. Liab. Litig.*,
  155 F. Supp. 3d 772 (N.D. Ill. 2016) ..............................................................................39

*Scott v. Amazon.com, Inc.*,
  33 Wash. App. 2d 44 (2024) ............................................................................................18

*See Rodriguez v. It's Just Lunch, Int'l*,
  2010 WL 685009 (S.D.N.Y. Feb. 23, 2010) ....................................................................16

*Sharif Pharm., Inc. v. Prime Therapeutics, LLC*,
  950 F.3d 911 (7th Cir. 2020) ......................................................................21, 22, 26, 36

iv

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
    737 F. Supp. 2d 380 (E.D. Pa. 2010)......................................................................37

*Smith v. Adidas Am., Inc.*,
    691 F. Supp. 3d 564 (N.D.N.Y. 2023)....................................................................12

*Smith-Brown v. Ulta Beauty, Inc.*,
    2019 WL 932022 (N.D. Ill. Feb. 26, 2019).............................................................39

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
    188 F.3d 11 (1st Cir. 1999)........................................................................ 27, 28, 34

*Spivey v. Evig LLC*,
    2025 WL 1638453 (N.D. Ill. June 9, 2025) .................................................... 12, 16

*Stuve v. Kraft Heinz Co.*,
    2023 WL 184235 (N.D. Ill. Jan. 12, 2023) .............................................................11

*Supreme Auto Transport LLC v. Arcelor Mittal*,
    238 F. Supp. 3d 1032 (N.D. Ill. 2017) ...................................................................18

*In re Tamoxifen Citrate Antitrust Litig.*,
    277 F. Supp. 2d 121 (E.D.N.Y. 2003) ...................................................................39

*Toulon v. Cont'l Cas. Co.*,
    877 F.3d 725 (7th Cir. 2017)...................................................................................14

*U.S. Gypsum Co. v. Ind. Gas Co., Inc.*,
    350 F.3d 623 (7th Cir. 2003)...................................................................................24

*United States Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*,
    390 F. Supp. 3d 892 (N.D. Ill. 2019).....................................................................27

*In re Urethane Antitrust Litig.*,
    663 F. Supp. 2d 1067 (D. Kan. 2009).....................................................................38

*Verizon Comms. Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ........................................................................................... 4, 25

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020)................................................................................ 4, 24

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001).....................................................................................24

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
    495 F. Supp. 3d 622 (N.D. Ill. 2020)..................................................................... 9, 16

*Wertymer v. Walmart, Inc.*,
    142 F.4th 491 (7th Cir. 2025)...................................................................................9

*Will v. Comprehensive Acct. Corp.*,
    776 F.2d 665 (7th Cir. 1985)...................................................................................22

v

*Wright v. Assoc. Ins. Cos. Inc.*,
  29 F.3d 1244 (7th Cir. 1994)................................................................................. 11, 33

*Xerox Corp. v. Media Scis., Inc.*,
  660 F. Supp. 2d 535 (S.D.N.Y. 2009)...........................................................................34

## Statutes

Ala. Code 1975 § 8-19-10(e) ........................................................................................39

Colo. Rev. Stat. § 6-4-116 ............................................................................................38

Haw. Rev. Stat. § 480-13.3(1), (5)(c)...........................................................................38

Mass. Gen. Laws. ch. 93A, § 9(3).................................................................................39

Nev. Rev. Stat. § 598A.210(3)......................................................................................38

Utah Code Ann. § 76-10-3111(9) ................................................................................38

## Other Authorities

*Hardcopy peripherals vendor market share worldwide from 2009 to 2025, by
  quarter*, Statista (Nov. 27, 2025), http://tinyurl.com/29y9sa74...........................................23

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
  Principles and Their Applications* (2025).......................................... 20, 29, 30, 33, 34

## Rules

Fed. R. Evid. 201(b)(2) ................................................................................................11

## I.     INTRODUCTION

The few changes made to Plaintiffs' amended complaint do not cure the deficiencies the Court identified when it previously dismissed all 79 of Plaintiffs' original claims. The main change is to allege that the disclosure on HP's printer boxes about its dynamic-security features was misleading because it failed to "disclose HP's existing intent to block non-HP ink cartridges" in the "future." Dkt. 100 ("FAC") ¶¶ 64, 74. But that *is* exactly what HP disclosed. HP informed users that their printers were "dynamic security enabled," that they were "[o]nly intended to be used with cartridges using an HP original chip," that "[c]artridges using a non-HP chip may not work," and that cartridges "that work today may not work in the future." Remarkably, Plaintiffs studiously avoid quoting this disclosure language in their amended complaint. Instead, they quote a small portion of language and add a blurred-out photo of the full disclosure, trying to turn the snippet into something misleading (which it is not). This is not a valid approach to pleading a claim and the Court should again dismiss all of Plaintiffs' claims.

***Plaintiffs have not plausibly alleged misrepresentation.*** Plaintiffs have not plausibly alleged misrepresentation claims because, in the on-box disclosure Plaintiffs reference in the amended complaint, HP disclosed what Plaintiffs say HP omitted. Plaintiffs also do not allege they reviewed or relied on HP's on-box disclosure, or any other HP disclosure—which independently defeats their misrepresentation claims.

***Plaintiffs have not plausibly alleged an antitrust claim.*** Plaintiffs have not plausibly alleged an antitrust claim for two independent reasons. *First*, they have not pleaded unlawful tying. In their claim under Section 1 of the Sherman Act, they continue to advance the already rejected theory that HP tied either printers or some type of undefined services to ink cartridges— but still do not allege that they were required to purchase HP ink cartridges to obtain HP printers or services. To the contrary, they allege that printers and services could be purchased without ink

1

cartridges; that they "had no reason to suspect" at the point of sale that HP would later limit the use of third-party cartridges in their printers; and that HP only effectuated the alleged tie via firmware update *after* Plaintiffs bought their printers and established some undefined service relationship with HP.  FAC ¶¶ 39, 104, 115, 174–76.  Plaintiffs also have not alleged that HP has power in a relevant printer or services market.  And they still have not plausibly alleged any exclusionary conduct in violation of Section 2.  Their Section 2 monopolization theory appears to be that HP unlawfully refused to deal with rival cartridge manufacturers by refusing to make its printers compatible with certain third-party cartridges, but they have pleaded no facts suggesting that HP had any duty to deal with those third-party manufacturers.

*Second*, Plaintiffs have not plausibly alleged a relevant single-brand aftermarket for cartridges compatible with the at-issue printer models.  A plaintiff "cannot plausibly allege a lock-in claim when the [relevant disclosure] was available to him at the time he purchased" the product at issue.  *In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*, 151 F.4th 922, 936 (7th Cir. 2025).  Here, Plaintiffs allege that HP disclosed its policy regarding the compatibility of its printers with non-HP cartridges on its printer boxes—which defeats both their Section 1 and 2 claims.

**Plaintiffs have not plausibly alleged unfairness and unconscionability claims.**  These claims cannot survive Rule 12(b)(6) scrutiny because they are predicated on the same implausible theories as Plaintiffs' misrepresentation and antitrust claims.

In dismissing Plaintiffs' complaint, the Court issued a detailed roadmap for amendment. Plaintiffs were unable to allege the additional facts this Court told them were necessary to state a claim—because those facts simply do not exist.  Plaintiffs had ample opportunity to try and make out a claim.  The Court should again dismiss Plaintiffs' claims, this time with prejudice.

## II.     BACKGROUND

A.     **Plaintiffs Sue HP For Allegedly Making Its Printers Compatible Only With Ink Cartridges With Original HP Chips.**

The 11 Plaintiffs in this case initially brought 79 claims against HP for "requiring consumers" to use "only HP-branded replacement ink cartridges, rather than purchasing ink replacements from its competitors." Dkt. 1 ¶ 1. They alleged that "HP accomplished this through firmware updates it distributed electronically to all registered owners of the printers at issue in this case in late 2022 and early 2023, which effectively disabled the printer if the user installed a replacement ink cartridge that was not HP-branded." *Id.* They alleged that this conduct violated federal and state antitrust laws, the Computer Fraud and Abuse Act ("CFAA"), a bevy of state consumer-protection statutes, and the law of unjust enrichment.

B.     **The Court Dismisses All 79 Of Plaintiffs' Claims.**

This Court dismissed all of Plaintiffs' claims on September 30, 2025. Dkt. 96.

1.     **Plaintiffs' Tying Claim Did Not Allege That HP Conditioned The Purchase Of Ink Cartridges On The Purchase Of Printers Or Services.**

The Court rejected Plaintiffs' claim that HP's alleged conduct constituted unlawful tying in violation of Section 1 of the Sherman Act and analogous state statutes because Plaintiffs did "not allege that HP 'condition[ed] the sale' of printers, the tying product, on an agreement to purchase HP-branded ink cartridges, the tied product." Dkt. 96 at 7. That is, "Plaintiffs were not required to purchase HP-branded ink cartridges as a condition of purchasing their printers." *Id.* "In fact," the Court continued, "the complaint alleges that at the time plaintiffs purchased their printers, they were not even aware of the firmware update." *Id.*

The Court rejected Plaintiffs' "alternative tying theory" that "HP conditions access to printer updates," which Plaintiffs refer to as "ongoing printer support services," "on an agreement to purchase HP ink cartridges." Dkt. 96 at 9–10. This theory did not work, the Court reasoned,

3

because "the complaint does not allege that HP conditioned access to printer updates on any agreement by the plaintiffs to purchase only HP ink cartridges," and because "[t]he complaint does not allege that consumers purchase the updates, nor does it allege that there is a market for 'ongoing printer support services.'" *Id.* at 10. The Court also held that the fact that "plaintiffs were not required as a condition of purchasing their printers to accept the firmware update or agree to purchase only HP-branded ink cartridges" doomed their implied-tying theory. *Id.* at 11.

> **2. Plaintiffs' Monopolization Claim Did Not Allege A Refusal To Deal Or Aftermarket Power.**

The Court also dismissed Plaintiffs' monopolization claim under Section 2 of the Sherman Act and analogous state laws on the ground that Plaintiffs had not plausibly alleged that HP had "refus[ed] to deal with competitors." Dkt. 96 at 12. The Court noted that "'[t]he law . . . generally permits unilateral refusals to deal by monopolists under Section 2'" because "'[c]ompelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law.'" Dkt. 96 at 12 (first quoting *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 955 (N.D. Ill. 2018); then quoting *Verizon Comms. Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407–08 (2004)). The Court explained that there is a "narrow exception" to the rule that monopolists are allowed to make unilateral decisions not to deal with competitors where the defendant engaged in a "prior course of voluntary conduct" in dealing with a rival, "sacrifice[d] . . . short-term profits," and "refus[ed] to sell to rivals on the same terms as other potential buyers." Dkt. 96 at 12–13 (quoting *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 463 (7th Cir. 2020)). But "Plaintiffs' complaint [did] not plausibly identify any of" these factors. Dkt. 96 at 13. To the contrary, "[t]he complaint alleges that 'HP had a long history of using software to prevent owners of its printers from using competitors' ink cartridges,'" and that, "from 2010 to 2015, HP used the 'Dynamic Security' software" to "prevent consumers from using non-

4

HP ink cartridges." *Id.* The Court also held that Plaintiffs did not plausibly allege technological tying. *Id.* at 13–15.

In addition, the Court held that Plaintiffs did not plausibly allege HP had power in an aftermarket for ink cartridges compatible with HP printers because "Plaintiffs' complaint contains no allegations of HP's share in the market for HP-compatible ink cartridges" and Plaintiffs did not allege that HP could exercise "control over all its printers." Dkt. 96 at 15–16. And the Court cast doubt on Plaintiffs' allegation that there is a relevant aftermarket for ink cartridges compatible with HP printers, noting that "[t]he complaint [did] not limit [the purported aftermarket] to certain models or types of printers" and that Plaintiffs did not "explain why the court should limit the market to certain printer models." *Id.* at 15.

### 3. Plaintiffs' Misrepresentation Claims Did Not Allege Any Deceptive Statement.

Plaintiffs based their state-law misrepresentation claims on a "fraudulent omission" theory, alleging that "HP purposefully misled [Plaintiffs] by failing to disclose that its 'Dynamic Security' firmware updates would disable HP printers that were fitted with replacement ink cartridges." Dkt. 96 at 22. Plaintiffs alleged that HP provided "no notification of any kind . . . that might inform consumers that the update would reduce the printer's functionality." *Id.* Applying Illinois law and evaluating Plaintiffs' claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Court noted that a plaintiff "must allege an omission from a communication, not a general failure to disclose." *Id.* at 24 (quoting *Guajardo v. Skechers USA, Inc.*, 503 F. Supp. 3d 746, 754 (C.D. Ill. 2020)). It concluded that the only statement Plaintiff identified—that "'[t]he use of a non-HP or refilled cartridge does not affect' HP's warranty"—"did not imply that HP's subsequent firmware updates would continue to support the use of non-HP cartridges." *Id.* Plaintiffs accordingly "ha[d] not alleged a plausible ICFA claim arising from any deceptive

statement by HP." *Id.* The Court also rejected the argument that HP had a duty to disclose information about its firmware updates on the ground that those updates "affected a feature 'central to the printer's function,'" reasoning that "the firmware update did not 'render the printers incapable of use by any consumer.'" Dkt. 96 at 25–26 (quoting *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 863–64 (9th Cir. 2018)) (alterations omitted).

### 4. The Court Dismisses Plaintiffs' Remaining Claims.

The Court dismissed Plaintiffs' claims for unfair conduct because they appeared to be predicated on the same alleged conduct as their misrepresentation and antitrust claims. Dkt. 96 at 22, 26. The Court dismissed Plaintiffs' unjust enrichment claim because Plaintiffs conceded dismissal was warranted. *Id.* at 27. And the Court dismissed Plaintiffs' CFAA claim on the ground that Plaintiffs did not plausibly allege that they had each lost $5,000 as a result of HP's alleged firmware updates. *Id.* at 16–18.

## C. Plaintiffs Assert Similar Theories In An Amended Complaint And Allege That HP's On-Box Disclosure Was Deceptive.

Plaintiffs filed an amended complaint on November 10, 2025. Plaintiffs did not replead their unjust enrichment or CFAA claims. They also narrowed the list of state laws under which they are bringing claims, pleading consumer-protection claims under the laws of 11 states and antitrust claims under the laws of 23 states. *See* FAC at Counts I, II, V. They expanded their list of "class printers"—defined as printers sold from 2016 to 2023 or later that featured dynamic security—to include over 150 printer models, including both commercial and consumer printers, and both print-only models and three-in-one printers/copiers/scanners. *Id.* ¶¶ 2, 119–20.

### 1. Plaintiffs Base Their Misrepresentation Claim On HP's Thorough On-Box Disclosure About Dynamic Security.

In support of their misrepresentation claims, Plaintiffs allege that they were "harmed by HP's failure to disclose, at the point in which HP sold the Class Printers, its present and existing

6

intent to remove [Plaintiffs'] ability to use cheaper non-HP ink." FAC ¶ 149. This is effectively identical to their previous allegation that HP "did not inform them of its intent to use firmware updates to disable third-party ink cartridges," Dkt. 1 ¶ 90, but they now emphasize that their claim "focuses exclusively on HP's point of sale disclosures" and on HP's intent "to *cause* such ink cartridges to cease working." FAC ¶¶ 73, 149. Plaintiffs also allege that unspecific disclosures HP made over the past 15 years could have led consumers to misread the on-box disclosure to mean that non-HP cartridges are merely of poor quality. *Id.* ¶¶ 6, 32, 34–38.

Plaintiffs purport to provide HP's on-box, point-of-sale disclosure to the Court so that the Court can assess their claim that HP failed to disclose pertinent information at the point of sale. But they provide a blurry photo (below) of that disclosure and never quote it in full, instead referring to it obliquely (36 times) as the "may not work" disclosure. FAC ¶ 73; *see also, e.g., id.* ¶¶ 2–3, 6, 67, 74, 78, 85–87, 93, 134–35, 139.



*Id.* ¶ 67. HP has submitted a declaration with a clear photo of an OfficeJet Pro 6978 printer box, which always featured the same disclosure about dynamic security. Sutherland Decl. ¶ 4. As

7

shown below, the full text reads: "Dynamic security enabled printer. Only intended to be used with cartridges using an HP original chip. Cartridges using a non-HP chip may not work, and those that work today may not work in the future." Sutherland Decl. ¶ 4 & Ex. A. The disclosure is circled in red, as it is in Plaintiffs' photo.



### 2. Plaintiffs Bring Claims Under The Same Antitrust Theories as Before.

Plaintiffs' antitrust theories have not changed. They allege that HP violated Section 1 of the Sherman Act by (1) tying printers to HP-branded cartridges via firmware updates that were issued long after Plaintiffs purchased their printers, and (2) using HP's End User License Agreement to tie a "service relationship" to HP-branded cartridges. FAC ¶¶ 174–76, 180. And they appear to allege that HP violated Section 2 of the Sherman Act by refusing to deal with manufacturers of cartridges with non-HP chips. *Id.* ¶¶ 169, 171. They do not allege a technological-tying theory or any other theory of exclusionary conduct under Section 2. *See id.*

### 3. Plaintiffs Base Their Claims Of Unfair And Unconscionable Practices On Their Misrepresentation And Antitrust Theories.

All but one of Plaintiffs' claims of unfair or unconscionable conduct are expressly predicated on their claims that HP violated federal antitrust law. *See* FAC ¶¶ 123, 198–99, 201,

8

208, 216, 222, 228, 234, 239, 245, 252, 259, 266, 273, 280, 286, 292, 300, 307, 315, 322, 327, 332, 339, 347, 354, 360. Their remaining claim for unfair conduct, brought under Illinois law, is predicated on the same alleged conduct as Plaintiffs' misrepresentation claims. *Id.* ¶ 139.

## III.    LEGAL STANDARD

A complaint is subject to dismissal under Rule 12(b)(6) if it lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a facially plausible claim need not provide "detailed factual allegations," it must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Claims of fraudulent or deceptive practices are subject to the heightened pleading requirements of Rule 9(b). *See Wertymer v. Walmart, Inc.*, 142 F.4th 491, 495 (7th Cir. 2025) (applying Rule 9(b) to claims under ICFA). Rule 9(b) requires plaintiffs to allege the "'who, what, when, where, and how' of the fraud." *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 634 (N.D. Ill. 2020), *aff'd*, 2022 WL 1449184 (7th Cir. May 9, 2022) (quoting *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019)). "Each instance of fraud must be alleged with 'precision and some measure of substantiation.'" *Id.* (quoting *Menzies*, 943 F.3d at 338).

## IV.    ARGUMENT

The Court should dismiss Plaintiffs' misrepresentation claims because HP disclosed the material Plaintiffs say it omitted, and because Plaintiffs did not rely on any alleged misrepresentation. The Court should dismiss Plaintiffs' federal and state antitrust claims because

(1) Plaintiffs have not plausibly alleged tying or exclusionary conduct; (2) Plaintiffs have not plausibly alleged that HP changed its policy as to cartridges with non-HP chips or otherwise locked consumers in to using only cartridges with HP chips; and (3) Plaintiffs have not plausibly alleged several additional essential elements of their state antitrust claims. Finally, the Court should dismiss Plaintiffs' unfairness and unconscionability claims for the same reasons.

## A. The Court Should Dismiss Plaintiffs' Misrepresentation Claims.

Plaintiffs' allegation that HP violated state misrepresentation laws by failing to disclose its printers' potential lack of compatibility with non-HP ink cartridges is implausible because HP *did* disclose what Plaintiffs say HP omitted. Plaintiffs also have not alleged that they relied on any statements or omissions by HP, or that the alleged misrepresentations otherwise caused them harm. The Court should dismiss Plaintiffs' misrepresentation claims with prejudice.

### 1. Plaintiffs Do Not Plausibly Allege That HP Had A Duty To Disclose Additional Facts About Its Printers' Compatibility With Non-HP Cartridges.

The Court should dismiss Plaintiffs' misrepresentation claim because HP disclosed what Plaintiffs say they omitted. Plaintiffs' allegations of earlier statements HP made about the quality of non-HP cartridges are too vague to support their claim and contradict their theory in any event.

#### a. HP disclosed what Plaintiffs say it should have disclosed.

The Court previously held that, to state a misrepresentation-by-omission claim, a plaintiff "must allege an omission from a communication, not a general failure to disclose." Dkt. 96 at 24 (quoting *Guajardo*, 503 F. Supp. 3d at 754). Plaintiffs now allege that HP failed to disclose on its printer boxes "HP's intent to remove the functionality of cartridges with non-HP chips." FAC ¶ 2. But HP disclosed, on the same printer boxes Plaintiffs reference, precisely what Plaintiffs say it should have: that its printers were "dynamic security enabled," that they were "[o]nly intended to be used with cartridges using an HP original chip," and that "[c]artridges using a non-HP chip may

10

not work, and those that work today may not work in the future." Sutherland Decl. ¶ 4 & Ex. A. Plaintiffs' misrepresentation claim should be dismissed because the purported missing information on which the claim is based was not omitted at all.

Although Plaintiffs do not quote HP's on-box disclosure in full, they refer to it dozens of times throughout the amended complaint and included a photo of it with the disclosure circled. *See* FAC ¶¶ 2–3, 6, 67–69, 73–74, 78–81, 85–89, 93, 119, 126–27, 134–35, 139. Because the disclosure is "referred to in the [Plaintiffs'] complaint and [is] central to [their] claim," it is incorporated into the pleading by reference, and the Court can consider it in deciding HP's motion to dismiss. *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994). The incorporation-by-reference doctrine "prevents a plaintiff from avoiding dismissal by omitting facts or documents that undermine his case," *Fin. Fiduciaries, LLC v. Gannett Co., Inc.*, 46 F.4th 654, 663 (7th Cir. 2022), and courts routinely consider the full text of similar disclosures when resolving motions to dismiss. For instance, the Seventh Circuit considered a warranty that was "referred to in the complaint and central to the plaintiffs' claims" in a recent aftermarkets case, even though the plaintiff had not attached the warranty to its complaint. *Harley-Davidson*, 151 F.4th at 926. Another court determined that product packaging was incorporated by reference where the plaintiffs "refer[red] to the labeling . . . throughout their complaint and premise[d] their claims on alleged omissions on the labeling." *Stuve v. Kraft Heinz Co.*, 2023 WL 184235, at *1 n.2 (N.D. Ill. Jan. 12, 2023). Pursuant to this doctrine, the Court should consider the clear photo of the full at-issue disclosure HP has submitted with this Motion. *See* Sutherland Decl. Ex. A.

Alternatively, the Court may take judicial notice of HP's on-box disclosure, because the text of the disclosure "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2)—namely, from the box itself, *see*

11

Sutherland Decl. ¶¶ 3, 4.  And if the Court declines to consider the full disclosure for any reason, it should dismiss Plaintiffs' misrepresentation claims entirely, because Rule 9(b) requires plaintiffs to allege the specific statement they claim was misleading.  As the Seventh Circuit has explained, "failure to cite a specific deceptive representation . . . is particularly problematic in light of Rule 9(b)'s heightened standard," and prevents a plaintiff from establishing that the defendant's alleged deception was the but-for cause of any injury.  *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 334–35 (7th Cir. 2018) (dismissing misrepresentation claim where the plaintiffs "fail[ed] to cite a specific representation" that deceived them and did not allege "what, if anything, [they] saw or did not see" that deceived them); *see also Spivey v. Evig LLC*, 2025 WL 1638453, at *5–6 (N.D. Ill. June 9, 2025) (dismissing misrepresentation claim where the plaintiff alleged that the "'overarching' theme or message of the advertisement" was misleading, but did not identify the specific ad he viewed); *Corbett v. Pharmacare U.S., Inc.*, 544 F. Supp. 3d 996, 1008 (S.D. Cal. 2021) (dismissing misrepresentation claim where plaintiffs alleged that the "specific misrepresentations they relied on . . . were just examples").

With the disclosure out in the open, it becomes clear why Plaintiffs so assiduously avoid mentioning it: it is not remotely misleading and a reasonable consumer would not be deceived into thinking that HP would "continue to support the use of non-HP cartridges."  Dkt. 96 at 24.[1]

A district court rejected the argument that a substantially similar disclosure was misleading

---

[1] All 11 states under whose laws Plaintiffs bring consumer-protection claims apply the reasonable-consumer standard in determining whether an alleged statement or omission is misleading.  *See Beardsall v. CVS Pharm., Inc.*, 953 F.3d 969, 972 & n.2 (7th Cir. 2020) (Florida, Illinois, Michigan, Missouri, New Jersey, New York); *Lima v. Post Consumer Brands, LLC*, 2019 WL 3802885, at *9 (D. Mass. Aug. 13, 2019) (Massachusetts, Minnesota); *Gallagher v. Lactalis Am. Grp., Inc.*, 2023 WL 6224881, at *4 (W.D.N.Y. Sep. 21, 2023) (Alabama); *Gray v. Amazon.com, Inc.*, 653 F. Supp. 3d 847, 858 (W.D. Wash. 2023), *aff'd*, 2024 WL 2206454 (9th Cir. May 16, 2024) (Washington); *Smith v. Adidas Am., Inc.*, 691 F. Supp. 3d 564, 579 (N.D.N.Y. 2023) (Idaho).

12

in *Parziale v. HP, Inc.* (*Parziale II*), 2020 WL 5798274, at *5–6 (N.D. Cal. Sept. 29, 2020). The disclosure at issue there, which appeared on HP's website, read: "Dynamic security enabled printer. This Firmware includes dynamic security measures, which may prevent supplies with non-HP chips or circuitry from working now or in the future." *Id.* at *5. The court held as a matter of law that the disclosure would not deceive a reasonable consumer and granted HP's motion to dismiss the plaintiff's misrepresentation claim. *Id.* at *6. The court concluded that HP's disclosure put consumers "on notice that . . . dynamic security might render certain non-HP cartridges incompatible with the printer in the future," *id.*, and reasoned that it "defies common sense to suggest that a reasonable customer would understand [HP's disclosure] . . . to mean that non-HP cartridges would continue to work in perpetuity," *Parziale v. HP, Inc. (Parziale I)*, 445 F. Supp. 3d 435, 445 (N.D. Cal. 2020).

The same is true of the on-box disclosure at issue here. There is nothing that suggests "HP's subsequent firmware updates would continue to support the use of non-HP cartridges," as this Court previously held with respect to different alleged disclosures on which Plaintiffs focused in the original complaint. Dkt. 96 at 24. Nor does the on-box disclosure suggest that HP "intended" to support the use of non-HP cartridges in its printers. The statement says the opposite—that the printer is "[o]nly *intended* to be used with cartridges using an HP original chip." Sutherland Decl. ¶ 4 & Ex. A (emphasis added). Plaintiffs argue that the statement "did not disclose HP's existing intent to block non-HP ink cartridges," FAC ¶ 64, but that's merely a rephrasing of the words on the printer box. That a printer is only intended to be used with cartridges containing an HP original chip means that the printer is not intended to be used with cartridges containing a non-HP chip. Plaintiffs suggest there is a temporal aspect to the alleged misrepresentation—that HP concealed its intent regarding its "future actions." *Id.* ¶ 75. But HP clearly disclosed in its on-box disclosure

13

that cartridges "that work today may not work in the future." Sutherland Decl. ¶ 4 & Ex. A. Nor is the portion of the disclosure that Plaintiffs excerpt—that cartridges with non-HP chips "may not work" in dynamic security-enabled printers—misleading, even if viewed in isolation. The disclosure was entirely true, and it implied nothing about the "quality" of cartridges with non-HP chips because it said nothing about that topic.

HP's disclosure of certain information about the compatibility of its printers with cartridges containing a non-HP chip did not create some legal obligation on HP to disclose everything about the topic. "[T]hat [a defendant] could have provided 'more detailed' or 'more specific' information . . . is insufficient" to state a claim for misrepresentation by omission. *Garland v. Children's Place, Inc.*, 2024 WL 1376353, at *7 (N.D. Ill. Apr. 1, 2024) (quoting *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 740 (7th Cir. 2017)). A party is required to make additional disclosures only if necessary to correct a misleading disclosure. For instance, one court held that a product label was not deceptive under the ICFA where the label stated that the product at issue contained "natural flavor with other natural flavors," but did not disclose that the product also contained artificial flavors. *Boss v. Kraft Heinz Co.*, 690 F. Supp. 3d 912, 914 (N.D. Ill. 2023). The court held that "[a]n omission is not actionable fraud if it gives rise to an 'incomplete' as opposed to an affirmatively 'false impression,'" and the disclosure at issue did not represent that the product was "free from artificial ingredients." *Id.* at 914–15.

To the extent Plaintiffs are saying HP should have explained to consumers *why* cartridges with non-HP chips may not work in their printers, HP was not required to disclose that information, because its on-box disclosure said nothing about the reason non-HP cartridges may not work in HP printers. That information also would not be material to a reasonable consumer, because it would not influence his or her purchasing decision. As the court in *Parziale II* explained,

14

reasonable consumers would review the on-box disclosure and "anticipate any impending harm caused by a printer becoming incompatible with non-HP cartridges." 2020 WL 5798274, at *5. And they would be able to "avoid any impending injury, either by buying a different printer in the first instance, or by not buying non-HP cartridges that might be rendered incompatible in the future." *Id.* The fact of the incompatibility is what would be material to a reasonable consumer—not *why* HP decided to make its printer incompatible with cartridges containing a non-HP chip.

HP's on-box disclosure was not misleading, nor did it give rise to an indefinite obligation for HP to disclose any facts about its printers' interoperability with third-party cartridges that a consumer might wish to know. Plaintiffs have not stated a plausible misrepresentation claim.

**b.** **Plaintiffs' vague references to earlier disclosures do not support their allegation that HP's on-box disclosure was misleading.**

The unspecified, more than 10-year-old disclosures Plaintiffs added to their amended complaint did not create an affirmative obligation on HP to disclose additional facts about its printers' interoperability with third-party cartridges either. Plaintiffs allege that, in disclosures HP purportedly made "in the early to mid-2010s," HP gave consumers the impression that non-HP cartridges were of poor quality, and that consumers therefore would have interpreted the "may not work" disclosure on its printer boxes to mean that "non-HP ink was of shoddy quality." FAC ¶¶ 6, 37. In other words, Plaintiffs allege a consumer might interpret HP's on-box disclosure in an unreasonable way in light of other disclosures HP allegedly made over 10 years ago—and that HP was required to make further disclosures to correct their unreasonable interpretation. There are three fundamental problems with these allegations: (1) they are fatally imprecise, (2) they contradict Plaintiffs' repeated assertions that they are only challenging HP's disclosures at the point of sale, and (3) the earlier disclosures Plaintiffs discuss are not in tension with HP's on-box disclosure and do not somehow render that disclosure misleading.

15

*First*, although Plaintiffs allege years of representations by HP about third-party cartridges, they do not cite any specific representations. They allege vaguely that HP "inundated customers with claims that non-HP ink 'may not work' due to its poor quality," FAC ¶ 79, and used quality messaging to cover up its intention to "remotely disable the printers' ability to use cheaper, non-HP ink," *id.* ¶ 68, without citing a single statement made by HP. Rule 9(b) requires a plaintiff to allege the "'who, what, when, where, and how' of the fraud." *W. Palm Beach*, 495 F. Supp. 3d at 634 (quoting *Menzies*, 943 F.3d at 338). "Each instance of fraud must be alleged with 'precision and some measure of substantiation.'" *Id.* (quoting *Menzies*, 943 F.3d at 338). Vague allegations of an overarching marketing scheme, like Plaintiffs' allegations here, don't cut it. *See Rodriguez v. It's Just Lunch, Int'l*, 2010 WL 685009, at *5 (S.D.N.Y. Feb. 23, 2010) ("Simply averring that certain misrepresentations have been made, through a Web site and a 'nationwide marketing campaign,' since 1993, does not provide the requisite specificity to satisfy Rule 9(b)"). Courts routinely dismiss misrepresentation claims where plaintiffs do not identify the specific statement on which they base misrepresentation claims. *E.g.*, *Spivey*, 2025 WL 1638453, at *5–6; *Corbett*, 544 F. Supp. 3d at 1008. This Court should do the same.

*Second*, Plaintiffs' allegations about disclosures HP purportedly made over 10 years ago are inconsistent with Plaintiffs' own misrepresentation theory. Plaintiffs repeatedly assert that "HP deceived Plaintiffs and Class Members at the *point of sale*." FAC ¶ 74 (emphasis added); *see also id.* ¶ 113 ("HP made misleading statements at the point of sale"). Plaintiffs could not be clearer about this. They state that, "[f]or maximum clarity," their state-law misrepresentation claims "focus[] exclusively on HP's point of sale disclosures, not statements made *after* the point of sale or in places that consumers would not see at the point of sale (e.g., statements made on portions of HP's website that it has invoked in other litigation)." *Id.* ¶ 149. They cannot limit

16

their claim to disclosures made at the point of sale while simultaneously asserting that the claim is based on over 10 years' worth of additional (unidentified) disclosures.

*Third*, Plaintiffs do not allege that any consumers interpreted the on-box disclosure to mean that cartridges using a non-HP chip may not work because they are of poor quality. The disclosure says nothing about the quality of cartridges with non-HP chips, focusing instead on the requirements of the printer—which is "[d]ynamic security enabled" and "[o]nly intended to be used with cartridges using an HP original chip"—and emphasizing that even cartridges that "work today may not work in the future." Sutherland Decl. ¶ 4 & Ex. A. Because a reasonable consumer would not interpret the on-box disclosure as a statement about the quality of cartridges with non-HP chips, earlier statements by HP about cartridge quality have no bearing on whether the disclosure was misleading.

The Court should dismiss Plaintiffs' misrepresentation claims because Plaintiffs have not plausibly alleged that a reasonable consumer would interpret HP's on-box disclosure to mean that its printers would continue to work with cartridges containing non-HP chips in perpetuity.

> **2.      Plaintiffs Have Not Plausibly Alleged That Any Misrepresentation Caused Them Injury.**

The Court should dismiss Plaintiffs' misrepresentation claims for the independent reason that Plaintiffs have not alleged any causal link between HP's alleged misrepresentation and Plaintiffs' decision to buy an HP printer. As HP pointed out in its previous motion to dismiss, Plaintiffs never allege they viewed any purported disclosures or omissions by HP, much less that any misrepresentation by HP caused them to buy an HP printer. *See* Dkt. 25 at 37–38. Plaintiffs have not added any allegations to their amended complaint to address this deficiency. Instead, Plaintiffs say they addressed this problem by narrowing the state laws under which they bring their misrepresentation claims to those that "do not require consumers to show individualized proof of

17

reliance on a misleading statement or omission." Dkt. 100 ¶ 148. Plaintiffs are wrong. Each of the statutes under which they bring misrepresentation claims requires a showing of causation.[2] And in the false advertising context, to establish that a misrepresentation caused her harm, a plaintiff must allege that she viewed the alleged statement or omission and purchased the at-issue product in reliance on that statement or omission. For instance, a court in this District recently dismissed a false-advertising claim under the ICFA on causation grounds because the complaint "[did] not allege that the [plaintiffs] ever saw the advertisement" at issue. *Gurrola v. Ford Motor Co.*, 774 F. Supp. 3d 959, 981 (N.D. Ill. 2025). "If deception happened in a forest, and no one heard it, it doesn't sound like a claim." *Id.* Plaintiffs have not alleged that they viewed and were deceived by HP's on-box disclosure, so they have not plausibly alleged that the disclosure caused them harm. This also means they lack Article III standing to maintain their claims. *See Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060, 1066–67 (7th Cir. 2020) (plaintiffs lacked Article III standing where they alleged a misrepresentation but did not allege that the misrepresentation harmed them). Plaintiffs' failure to allege causation is fatal to their misrepresentation claims.

The Court should dismiss Plaintiffs' misrepresentation claims, this time with prejudice.

**B.    The Court Should Dismiss Plaintiffs' Antitrust Claims For Failure To Plead An Unlawful Tie Or Exclusionary Conduct.**

Plaintiffs' tying claim remains implausible because they still do not allege that HP required

---

[2] *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 328 (S.D.N.Y. 2006) (Florida); *Gurrola v. Ford Motor Co.*, 774 F. Supp. 3d 959, 981 (N.D. Ill. 2025) (Illinois); *Chung v. Pure Fishing, Inc.*, 2022 WL 866769, at *2 (E.D.N.Y. Mar. 23, 2022) (New York); *Rilley v. MoneyMutual, LLC*, 2017 WL 3822727, at *9 (D. Minn. Aug. 30, 2017) (Minnesota); *Supreme Auto Transport LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1041–42 & 1041 n.6 (N.D. Ill. 2017) (Michigan); *Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*, 445 Mass. 790, 802 (2006) (Massachusetts); *Negron v. Ascension Health*, 2025 WL 2710014, at *14 (E.D. Mo. Sep. 23, 2025) (Missouri); *Robey v. SPARC Group LLC*, 256 N.J. 541, 555 (N.J. 2024) (New Jersey); *Rouse v. H.B.*, 2024 WL 4528872, at *4 (D. Minn. Oct. 18, 2024) (Idaho); Al. St. § 8-19-10 (Alabama); *Scott v. Amazon.com, Inc.*, 33 Wash. App. 2d 44, 72 (2024) (Washington).

consumers to purchase ink cartridges in order to purchase printers or printer services. *See* Dkt. 96 at 6–11. As for Plaintiffs' monopolization claim, they still do not allege any plausible theory of exclusionary conduct, and do not allege any additional facts to support the refusal-to-deal theory this Court previously held was implausible. *Id.* at 12–13. The Court should again dismiss Plaintiffs' antitrust claims, this time with prejudice.

> **1.      Plaintiffs Do Not Plausibly Allege Tying Under Section 1 Of The Sherman Act And Analogous State Statutes.**

This Court previously dismissed HP's Section 1 tying claim because Plaintiffs did not allege that HP conditioned the purchase of printers or printer services on an agreement to purchase HP ink cartridges, and did not allege a distinct market for printer services. Plaintiffs have not fixed these problems. They also have not plausibly defined a market for printers or cartridges in which HP has power and have not alleged damages resulting from antitrust injury. All are fatal defects.

> **a.      Plaintiffs do not plausibly allege conditioning.**

Plaintiffs still do not allege HP conditioned the purchase of the tying product (printers or printer services) on an agreement to purchase HP ink. Dkt. 96 at 7, 10. As this Court held, tying requires "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Id.* at 10 n.8 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992)); *see also Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 207 (7th Cir. 1985) (similar). "[T]he condition in a tying arrangement must exist at the time the consumer purchases the tying product or service." Dkt. 96 at 10 n.8. A plaintiff cannot "prove[] that it was coerced" if it is "totally unaware that the tying product was conditioned on" taking the tied product. *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 724 n.29 (7th Cir. 1979).

Here, however, Plaintiffs pleaded neither that they were "required to purchase HP-branded

19

ink cartridges as a condition of purchasing their printers," nor that they were "forced to accept the firmware update as a condition of purchasing their printers." Dkt. 96 at 7–8. To the contrary, Plaintiffs alleged that, "at the time [P]laintiffs purchased their printers, they were not even aware of the firmware update[s]." *Id.* at 7. The Court rejected Plaintiffs' alternative "ongoing printer support services" theory for a similar reason: they did not allege "that at the time [Plaintiffs] registered their devices—the moment they 'purchased' device support from HP—a condition already existed limiting them to purchasing only HP ink cartridges." *Id.* at 10.

Plaintiffs have not fixed these problems; their tying theory has not changed. *Compare* Dkt. 1 ¶¶ 71–81, *with* FAC ¶¶ 172–84. They continue to allege that the "tie" arose not at the time of purchase, but rather when printer users accepted firmware updates. FAC ¶ 180. Far from alleging that they were required to purchase HP ink cartridges to obtain HP printers, Plaintiffs acknowledge that their printers could be purchased without HP ink cartridges, and that those printers initially worked with third-party cartridges. *Id.* ¶ 115; *see also id.* ¶¶ 12–22 (allegations about Plaintiffs' specific printers). Contrary to a viable tying theory, they expressly allege that, at the point of sale, consumers "had no reason to suspect" that HP would later limit the use of third-party cartridges in their printers. *Id.* ¶¶ 39, 104. And they amended their complaint to add allegations that HP effectuated the alleged tie via firmware update *after* the alleged service relationship was created. *Id.* ¶¶ 115, 174–75. Plaintiffs have not stated an express tying claim.

Plaintiffs have also not alleged an implied tying claim. An implied tie exists where a company "lead[s] reasonable buyers to understand that they cannot get product A unless they also take . . . product B." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Applications* ¶ 1754c (2025). Plaintiffs previously argued that HP tied printers to cartridges by making it "unreasonably difficult or costly" to use non-HP cartridges,

but the Court rejected this theory because Plaintiffs did not "plausibly allege" that they were "required as a condition of purchasing their printers to accept the firmware update or agree to purchase only HP-branded ink cartridges." Dkt. 96 at 10–11. Nor did Plaintiffs allege "that HP adopted a differential pricing policy that raised the price of the printer unless the consumer agreed to purchase only HP-branded ink cartridges." *Id.* at 11. Plaintiffs have alleged no new facts in support of their implied-tying theory.

Because Plaintiffs have not alleged either an express or implied tie, dismissal is warranted.

### b. Plaintiffs do not allege the existence of a relevant services market.

Plaintiffs have not plausibly alleged a "services" tying claim for the additional, independent reason that they still do not allege that printer services constitute "a distinct tying product market." Dkt. 96 at 10. Plaintiffs' tying claim requires them to show that HP has power in a relevant market for the tying product, *Sandburg*, 758 F.2d at 207, so they must allege a relevant market for "ongoing printer support services," Dkt. 96 at 10. Plaintiffs now allege that HP's firmware updates and End User License Agreement "create[d] a permanent service relationship between HP and the Class Members." FAC ¶ 114. But they still do not allege that the "ongoing service market" is a relevant antitrust product market, or that HP has power in that undefined market. *See id.* ¶¶ 116, 174; *Sandburg*, 758 F.2d at 207 (plaintiff must allege a tie between "two distinct products or services" and that the defendant has market power in the tying product). They have not alleged what actual services are in this purported market, what the geographic dimensions of the market are, or why other services are not reasonable substitutes. *See Sharif Pharm., Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020) (setting out requirements for defining market). Moreover, Plaintiffs still do not allege that they purchased anything as part of this relationship, further undercutting their tying claim. *See* Dkt. 96 at 10. To the contrary, they admit that HP's End User License Agreement is "not [based] on ongoing sales," FAC ¶ 116, and do not

21

otherwise allege that consumers purchased device support or firmware updates from HP. Plaintiffs' supposed services market remains fatally vague.

### c. Plaintiffs do not allege a relevant printer market in which HP has power.

Plaintiffs still do not allege a relevant market for printers in which HP has power, and this represents an independent ground on which the Court may dismiss the amended complaint.

Courts dismiss tying claims where the plaintiff does not "plead[] facts sufficient to support an inference that defendants have the requisite market power within a viable product market." *Sharif*, 950 F.3d at 918. A well-defined product market encompasses the relevant product and all reasonably interchangeable substitutes for that product. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325–26 (1962). Plaintiffs allege the existence of a relevant "U.S. market for printers," FAC ¶ 25, but they do not plead that the printers in this purported market are "reasonably interchangeable by consumers for the same purposes." *Sharif*, 950 F.3d at 916. It defies logic that commercial and consumer printers, or standalone printers and printers with copiers and scanners, to take two pairs of examples, are reasonably interchangeable. So they have not plausibly alleged a relevant market for all U.S. printers.

Plaintiffs also have not plausibly alleged that HP has power in their purported U.S. printer market. To state a tying claim, a plaintiff must allege that the defendant "has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product." *Sandburg*, 758 F.2d at 207. Plaintiffs' sole allegation on this score is that HP had "about 34.7%" of the global market share for printers in 2023. FAC ¶ 25. This bare allegation of share does not plausibly establish market power. Where a defendant has "a market share of 30%," the plaintiff "must establish more than just a substantial share of all sales" in tying product market. *Will v. Comprehensive Acct. Corp.*, 776 F.2d 665, 672 (7th Cir. 1985). "[T]oday's sales do not

22

always indicate power over sales and price tomorrow," and a defendant lacks market power if barriers to entry are low, allowing rivals to compete effectively. *Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1336–37 (7th Cir. 1986). The FAC is devoid of any allegations about barriers to entry.

Plaintiffs' allegation that HP has "about 34.7%" of the U.S. printer market is entirely conclusory in any event. Plaintiffs rely on a source that provides *global* data, rather than U.S.-only data, and does not purport to provide data on a market for all printers. For instance, copiers are included in the share calculation. *Hardcopy peripherals vendor market share worldwide from 2009 to 2025, by quarter*, Statista (Nov. 27, 2025), http://tinyurl.com/29y9sa74 (cited at FAC ¶ 25 n.4). Plaintiffs allege that this global figure approximates HP's share of the U.S. printer market based only on counsel's recollection of unidentified "sources no longer publicly available without a subscription." FAC ¶ 25. This is not a plausible allegation of market power.

### d. Plaintiffs do not allege a relevant market for ink cartridges in which HP has power.

"[M]arket power in the tied product market" is also "an essential element in an antitrust claim of tying" under Section 1. *A.O. Smith Corp. v. Lewis, Overbeck & Furman*, 979 F.2d 546, 549 (7th Cir. 1992). But Plaintiffs do not plausibly allege that there is a "substantial danger" that HP will acquire market power in the "tied product market" for "ink cartridges with HP chips," FAC ¶ 176, because that is not a cognizable market for the reasons described in Part IV.C.2 below.

The Court should again dismiss Plaintiffs' tying claim under both federal and state laws.

### e. Plaintiffs cannot recover losses attributable to the purchase of non-HP ink cartridges under the antitrust laws.

Finally, Plaintiffs have not alleged a viable theory of damages under the antitrust laws in connection with their tying theory. In their original complaint, Plaintiffs claimed damages from two sources: (1) alleged overcharges for HP ink cartridges, and (2) alleged losses from the purchase

23

of non-HP cartridges that they say they were unable to use due to HP's firmware updates. Dkt. 1 ¶ 35. Plaintiffs' amended complaint abandons their claim for overcharge damages connected with their antitrust claims, presumably because they recognize that, as indirect purchasers, they cannot recover such damages under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). *See* FAC ¶¶ 122, 171, 183–84. But Plaintiffs cannot recover alleged losses from the use of non-HP cartridges, either, because those alleged losses do not stem from an antitrust injury.

Antitrust injury is caused by "those things that make the practice unlawful, such as reduced output and higher prices." *U.S. Gypsum Co. v. Ind. Gas Co., Inc.*, 350 F.3d 623, 626–27 (7th Cir. 2003). A tie injures consumers by "foreclosing consumer choice" and forcing them to buy a product they do not want. *Casper v. SMG*, 2006 WL 3111132, at *4–5 (D.N.J. Oct. 31, 2006), *aff'd sub nom.*, *Atl. Exposition Servs. Inc. v. SMG*, 262 F. App'x 449 (3d Cir. 2008). Damages are awarded "only to the extent that the plaintiff overpaid for the combination of the tied and tying products." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 143 (2d Cir. 2001) (emphasis omitted). Here, any lost value of ink cartridges with non-HP chips or decreased value of Plaintiffs' printers was caused by HP's alleged failure to disclose that those cartridges were not compatible with its printers—not by the alleged tie. Plaintiffs are foreclosed from pursuing their damages theory.

**2. Plaintiffs Do Not Plausibly Allege Exclusionary Conduct Under Section 2 Of The Sherman Act And Analogous State Statutes.**

Plaintiffs have also done nothing to fix the problems the Court identified with their monopolization claim. Courts have "develop[ed] . . . specific rules for common forms of alleged misconduct" under Section 2 of the Sherman Act. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.); *see also Viamedia*, 951 F.3d at 452–53 ("Courts recognize various types of conduct that have the potential to harm competition."). Plaintiffs still do not allege

any type of recognized exclusionary conduct. They continue to suggest that "single brand aftermarket claims" constitute a standalone basis for Section 2 liability, FAC ¶ 107, but that is incorrect. The analysis of whether plaintiffs have pleaded a single-brand aftermarket turns on whether they have adequately defined a market in which the defendant has monopoly power—an essential element of all Section 2 claims. *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011). But even in aftermarket cases, a plaintiff must allege the defendant engaged in the "willful acquisition or maintenance of that power" through exclusionary conduct. *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 396–97 (7th Cir. 2000) (quoting *Kodak*, 504 U.S. at 481).

The Court previously analyzed Plaintiffs' monopolization claim primarily under a refusal-to-deal theory. Dkt. 96 at 12–16. (The Court also held that Plaintiffs had not stated a claim for tying, *id.* at 13–14, but Plaintiffs do not allege tying as a Section 2 theory in their amended complaint, *see* FAC ¶¶ 169, 171.) The Court concluded that Plaintiffs had not plausibly alleged an anticompetitive refusal to deal because "[t]he law . . . generally permits unilateral refusals to deal by monopolists under Section 2," and Plaintiffs did not allege that HP's conduct fell into one of the narrow exceptions to that rule. Dkt. 96 at 12–13 (quoting *Dealer Mgmt. Sys.*, 313 F. Supp. 3d at 955). Plaintiffs have not added any allegations on that score, so the Court should again dismiss the Section 2 claim. HP has "no duty to aid [its] competitors," at least absent the "unilateral termination of a voluntary (and thus presumably profitable) course of dealing," *Verizon*, 540 U.S. at 409–11 (2004) (emphasis omitted), and Plaintiffs allege no such course of dealing. They don't allege "past cooperation between HP and other ink cartridge sellers," much less a sacrifice of short-term profits or a refusal to sell to rivals on the same terms as other potential buyers. Dkt. 96 at 13.

To the extent Plaintiffs argue that HP's firmware updates constituted an exclusionary

25

unilateral design change, they have not plausibly alleged that theory, either. Such a claim requires a duty on HP's part to make its printers compatible with rival manufacturers' cartridges, and Plaintiffs have not plausibly alleged any such duty. *See AliveCor, Inc. v. Apple Inc.*, __ F.4th __, 2026 WL 61304, at *6–7 (9th Cir. Jan. 8, 2026) (suggesting that design-change claims are a variety of refusal-to-deal claims). Nor does HP's use of post-sale firmware updates to "prevent owners of HP printers from using any competitor's replacement ink cartridges," FAC ¶¶ 166, 169, qualify as a design change. HP disclosed at the point of sale that its printers were "dynamic security enabled," that they were "[o]nly intended to be used with cartridges using an HP original chip," and that "[c]artridges using a non-HP chip may not work, and those that work today may not work in the future." Sutherland Decl. ¶ 4 & Ex. A; *see also* FAC ¶¶ 6, 67, 89. That is, HP's printers were designed only to be used with cartridges with HP chips when they came off the assembly line— and HP informed Plaintiffs and other consumers so. There is no cognizable claim here.

### C. The Court Should Dismiss Plaintiffs' Antitrust Claims For Failure To Plead The Existence Of A Relevant Aftermarket.

Plaintiffs also fail to allege a cognizable relevant antitrust market. Market definition is an essential predicate to an antitrust claim, because "without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (alterations omitted). Plaintiffs' antitrust claims hinge on the existence of a relevant aftermarket for "Replacement Ink cartridges that will work in the Class Printers." FAC ¶ 30. But Plaintiffs still have not alleged such an aftermarket, and that failure is an independent reason their antitrust claims should be dismissed.

### 1. Single-Brand Aftermarkets Are Disfavored.

A relevant market "is comprised of the 'commodities reasonably interchangeable by consumers for the same purposes.'" *Sharif*, 950 F.3d at 916–17. Although market definition is "a

deeply fact-intensive inquiry," "failure to offer a plausible relevant market is a proper ground for dismissing an antitrust claim" on the pleadings. *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1011–12 (N.D. Ill. 2017); *see also Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 2020 WL 5642941, at *6–7 (N.D. Ill. Sep. 22, 2020) (Pacold, J.), *aff'd*, 15 F.4th 831 (7th Cir. 2021) (dismissing antitrust claim where plaintiff failed to plead a relevant market that "plausibly correspond[ed] to . . . commercial realities"). Where the plaintiff "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products," the market "is legally insufficient and a motion to dismiss may be granted." *United States Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 908 (N.D. Ill. 2019) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).

According to Plaintiffs, the relevant market HP monopolized and in which it allegedly restrained trade is the "aftermarket for Replacement Ink cartridges that will work in the Class Printers." FAC ¶ 30. That is, Plaintiffs allege that HP has an "aftermarket for its own brand." *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 17 (1st Cir. 1999). But it is only in "rare circumstances" not present here that "a single brand of a product or service can constitute a relevant market for antitrust purposes." *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 887 (N.D. Ill. 2015) (quoting *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010)). Such markets are generally "without merit as a matter of law." *Robinson-Bock Distrib. Co., Inc. v. Pioneer/Eclipse Corp.*, 1993 WL 326365, at *4 (7th Cir. Aug. 25, 1993).

A single-brand market is cognizable only in "situations in which consumers are 'locked in'

27

to a specific brand by the nature of the product." *Leegin*, 615 F.3d at 418; *see also Dealer Mgmt. Sys.*, 313 F. Supp. 3d at 963 (discussing lock-in issues). This "lock in" can occur when a manufacturer changes a policy regarding secondary (or "aftermarket") products after selling the primary (or "foremarket") product. *SMS*, 188 F.3d at *19–20. But if "competition in the primary market" is sufficient to "discipline anti-competitive conduct in the aftermarket," then there is no customer lock-in, and no relevant antitrust aftermarket. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1047 (9th Cir. 2008) (citing *Queen City Pizza*, 124 F.3d at 440).

Courts have developed a stringent test to determine whether competition in the primary market can check anticompetitive conduct in a purported aftermarket—and thus whether there is a relevant aftermarket at all for antitrust purposes. The plaintiff must show that "(1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist [in the foremarket]; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023) (quoting *Kodak*, 504 U.S. at 475, 477 n.24); *see also Dealer Mgmt. Sys.*, 313 F. Supp. 3d at 962 (adopting similar construction of *Kodak*).

Courts apply this standard to the pleadings—and frequently dismiss antitrust claims where the plaintiff fails to plausibly allege the existence of a relevant aftermarket. For example, in *Harley-Davidson*, the Seventh Circuit affirmed dismissal of a state-law antitrust claim premised on a purported aftermarket for replacement Harley-Davidson motorcycle parts, finding that the plaintiff "cannot plausibly allege a lock-in claim when the [relevant policy] was available to him at the time he purchased his motorcycle." 151 F.4th at 936. The Court also affirmed dismissal

28

because the plaintiff did not allege that consumers were unable to calculate life-cycle costs or that there were substantial switching costs. *Id.* And in *Coronavirus Reporter v. Apple Inc.*, 85 F.4th 948 (9th Cir. 2023), the Ninth Circuit affirmed dismissal of antitrust claims based on a purported iPhone App Store aftermarket where the plaintiffs did not allege either that iPhone customers "lacked awareness" of the alleged constraints or that significant switching costs were present. *Id.* at 956–57. The Sixth Circuit similarly held that dismissal of aftermarket claims was appropriate where the plaintiff made no "factual allegations . . . that the defendant either changed its rules after the initial sale was made or concealed its rules from its customers." *Mich. Division-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 737 (6th Cir. 2008).

> **2.      Plaintiffs Have Not Plausibly Alleged A Relevant Aftermarket.**

Plaintiffs have not alleged that *any* of the four factors courts require to establish lock-in are present here. Accordingly, they have not plausibly alleged the existence of a relevant aftermarket.

> **a.      Plaintiffs have not plausibly alleged that HP's practices and policies regarding the compatibility of its printers with cartridges with non-HP chips were "not generally known."**

Plaintiffs do not plausibly allege that it was not "generally known" that the printers subject to the claims here were designed to be incompatible with cartridges with non-HP chips. The requirement that a policy not be generally known places "the burden on a plaintiff to rebut the economic presumption that consumers make a knowing choice to restrict their aftermarket options." *Epic*, 67 F.4th at 979 (cleaned up); *see also Harley-Davidson*, 151 F.4th at 936 (plaintiff "cannot plausibly allege a lock-in claim" when information about policy was available at point of sale). The standard is an "objective" one. Areeda & Hovenkamp, *supra*, ¶ 1740d3 (citing *Kodak*, 504 U.S. 451). Courts analyze whether customers could "reasonably anticipate later 'exploitation' when they bought the machine," *id.*, because antitrust laws protect competition by "considering what the reasonable consumer would know, or could know if it made economic sense to do more

29

research," *Little Caesar Enters., Inc. v. Smith*, 34 F. Supp. 2d 459, 485 (E.D. Mich. 1998) (citing *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997)).

Plaintiffs allege a lack of subjective knowledge that cartridges with non-HP chips may not work in their printers. *See* FAC ¶¶ 39, 110. But they do not plausibly allege that the "objective 'reasonable buyer'" did not know about HP's approach to cartridges without HP chips, perhaps because such an allegation is wholly implausible. Areeda & Hovenkamp, *supra*, ¶ 1740d3. In the text contained (if blurred out) in Plaintiffs' amended complaint, HP disclosed the following on the boxes of at-issue printers: "Dynamic security enabled printer. ***Only intended to be used with cartridges using an HP original chip***. ***Cartridges using a non-HP chip may not work, and those that work today may not work in the future***." Sutherland Decl. ¶ 4 & Ex. A (emphasis added); *see also* FAC ¶¶ 6, 67, 89. As the Seventh Circuit has explained, a point-of-sale disclosure like HP's negates the possibility that a consumer could be locked in within the meaning of *Kodak* because it gives the plaintiffs the opportunity to "factor[] the costs" of the alleged aftermarket restriction into their purchase decision. *Harley-Davidson*, 151 F.4th at 936. A "reasonable consumer" would have been aware that cartridges with non-HP chips may not work in HP printers enabled with dynamic security.

Plaintiffs allege that HP "did not disclose that [it] intended to employ computer code to remotely disable [Plaintiffs'] printers' ability to use cheaper, non-HP ink." FAC ¶ 68. But the relevant question is whether it was generally known that HP did not support the use of cartridges with non-HP chips—not whether Plaintiffs were familiar with every mechanism by which HP might ensure that only cartridges with HP chips will function in their printers. As this Court previously held, nothing about the disclosures alleged in the original complaint suggests that "HP's subsequent firmware updates would continue to support the use of non-HP cartridges." Dkt. 96 at

24. And as the court in *Parziale* held with respect to a substantially similar disclosure, HP's on-box disclosure is "sufficient to allow a reasonable consumer to anticipate any impending harm caused by a printer with limited compatibility with non-HP cartridges." *Parziale I*, 445 F. Supp. 3d at 447. "[A] reasonable consumer [reading HP's disclosure] could have anticipated that any cartridges with non-HP chips, including refilled cartridges, might become incompatible with the printer in the future." *Parziale II*, 2020 WL 5798274, at \*6. Under the objective governing standard and based on Plaintiffs' own allegations, the challenged cartridge practices are generally known, foreclosing the existence of a relevant aftermarket.

**b.    Plaintiffs have not plausibly alleged that HP's actions prevented them from calculating the cost of owning an HP printer.**

Plaintiffs also do not plausibly allege that there are "significant" information costs that prevent consumers from accurately calculating the life-cycle costs of purchasing a printer and cartridges from HP. *See Dealer Mgmt. Sys.*, 313 F. Supp. 3d at 962 (citing *Kodak*, 504 U.S. at 473). Significant information costs exist only when the defendant's "own actions" serve to "increase[] its customers' information costs." *PSI*, 104 F.3d at 820. The paradigmatic example of conduct that increases information costs is a manufacturer's decision to change its policy regarding aftermarket parts after selling its product. *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 762–63 (7th Cir. 1996) (summarizing facts of *Kodak*, 504 U.S. 451). Accordingly, courts are concerned with affirmative policy changes where a defendant reverses a policy that it previously "publicly and loudly took." *See Dealer Mgmt. Sys.*, 313 F. Supp. 3d at 963.

There are no such facts alleged here. As the Supreme Court explained in *Kodak*, a policy change must be assessed as of "the time [the plaintiffs] bought their" machines. *PSI*, 104 F.3d at 820. A Plaintiff "cannot plausibly allege a lock-in claim when" the relevant disclosure "was available to him ***at the time he purchased***" the product at issue. *Harley-Davidson*, 151 F.4th at

31

936 (emphasis added); *see also Queen City Pizza*, 124 F.3d at 440–41 (similar). Plaintiffs allege that they bought their printers between 2016 and 2022, FAC ¶¶ 12–22, and that HP sold all of its dynamic security-enabled printers during that time period "with disclosures that started with the phrase 'Dynamic Security Enabled,'" then informed customers that "non-HP ink 'may not work' or 'may not function,'" *id.* ¶ 67. HP also disclosed on the printer box that its printers were "[o]nly intended to be used with cartridges using an HP original chip," and that "[c]artridges using a non-HP chip" that "work today may not work in the future." Sutherland Decl. ¶ 4 & Ex. A. While Plaintiffs allege that this disclosure did not specifically say that HP would later use firmware updates in an attempt to continue to ensure that only cartridges with HP chips would work in its printers, FAC ¶ 58, this is not a policy change within the meaning of *Kodak*.

In that case, Kodak enabled the plaintiffs to "hire independent service organizations (ISOs)" to repair their copiers when Kodak sold the copiers, but later "changed its policy and refused to sell parts to ISOs," which prevented the plaintiffs from using ISOs. *Digital Equip. Corp.*, 73 F.3d at 762. Plaintiffs allege no such change in policy here. When Plaintiffs bought their printers, they were specifically informed that those printers were only intended to be used with cartridges with HP chips and may not work with cartridges with non-HP chips. Issuing firmware updates to maintain that functionality is entirely consistent with that policy. As the Court previously observed, HP did not tell consumers that "subsequent firmware updates would continue to support the use of non-HP cartridges." Dkt. 96 at 24. Instead, its on-box disclosure gave consumers the information they needed to "shop[] around for competitive life-cycle prices," which means that they "could not be exploited." *Digital Equip. Corp.*, 73 F.3d at 762–63.

And Plaintiffs do not allege that HP *ever* had an express policy of allowing cartridges with non-HP chips to connect with its printers. To the contrary, they allege that HP engaged in a "years-

32

long campaign" to tell consumers that they should not use cartridges with non-HP chips in their printers. FAC ¶ 36. Previously, they alleged that HP used dynamic security to "prevent[] the use of any non-HP replacement ink cartridges in some printer models" from 2010 through 2015. Dkt. 1 ¶ 20. Plaintiffs now allege that HP used firmware updates more in some years than in others to ensure that their printers continued to work only with cartridges that had HP chips, *see* FAC ¶¶ 40–63, but this is entirely consistent with the disclosure that Plaintiffs' printers "may not work" with cartridges that do not have HP chips. In short, if there was a change in policy, Plaintiffs do not identify it. And in any event, Plaintiffs' allegation that HP began issuing firmware updates that blocked cartridges with non-HP chips in 2020 after not doing so for many years, *see id.* ¶¶ 45, 79, is inconsistent with a press release cited in their complaint stating that HP had been "introducing significant limitations to the use of non-original" cartridges "*for some years*" as of 2020. Liversidge Decl. Ex. B at 1 (cited at FAC ¶ 44 n.13) (emphasis added); *see also Wright*, 29 F.3d at 1248 (courts can consider documents incorporated by reference into the complaint in deciding a motion to dismiss).

In sum, because HP consistently disclosed that its printers may not work with non-HP cartridges and never reversed any prior policy permitting their use, Plaintiffs fail to plausibly allege significant information costs that prevented consumers from accurately calculating the life-cycle costs of purchasing HP printers and cartridges.

### c. Plaintiffs have not plausibly alleged that consumers face significant costs to switch to a different printer brand.

Plaintiffs also do not plausibly allege significant switching costs. "Switching costs" refer to "unrecoverable investments that would be lost when shifting to an alternative supplier." Areeda & Hovenkamp, *supra*, ¶ 1740c8. These costs must be "substantial" for "a significant share of the defendant's customers" to be "substantially locked in." *Id.* Otherwise, an increase in the cost of

parts would cause reasonable consumers to buy a competitor's machine in the foremarket and use the competitor's parts instead. *Id.*

Plaintiffs' conclusory allegation that it is "not practical or economically rational to purchase a new printer in order to avoid purchasing HP replacement ink cartridges," FAC ¶ 98, is not a plausible allegation that switching costs are "significant," *Epic*, 67 F.4th at 977. Plaintiffs allege that "printers cost several hundred dollars," and that "a full HP-branded replacement set may cost . . . $100." FAC ¶¶ 24, 98. But they do not allege which of the nearly 150 printer models at issue here these estimates relate to, and they do not state how many times over the course of a printer's life a cartridge must be replaced. *See id.* ¶ 120. One court has held that switching costs of $3,000 over the "three-year useful life" of a printer were not sufficiently high to lock customers into a printer brand. *Xerox Corp. v. Media Scis., Inc.*, 660 F. Supp. 2d 535, 548 (S.D.N.Y. 2009). Plaintiffs do not allege that the costs of switching from any given HP printer to another printer brand come anywhere close.

Plaintiffs also do not allege that a substantial number of customers are already "locked in" to HP's firmware updates, such that HP would be able to "significant[ly] exploit[] . . . customers" by concealing the life-cycle costs of owning an HP printer. Areeda & Hovenkamp, *supra*, ¶ 1740c8. A "*substantial* number of preexisting customers" must be "locked in" for a party to be able to exert market power in an aftermarket. *SMS*, 188 F.3d at 21 (emphasis added); *see also DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346–47 (Fed. Cir. 2014) (same). This means that "the number of locked-in customers [is] high relative to the number of new purchasers." *Kodak*, 504 U.S. at 476. Otherwise, "defections from the manufacturer's installed base, coupled with losses in the foremarket, in all probability will sabotage any effort to exploit the aftermarket." *SMS*, 188 F.3d at 21; *see also Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 236

34

(7th Cir. 1988) (Posner, J., dissenting) (customers who have not purchased the product would simply buy a competitor's machine "as soon as word [gets] out" about the policy).

According to Plaintiffs, HP's firmware updates cause "an appreciable share of ordinary consumers" of HP printers to become "locked in by the relatively high cost of purchasing new printers." FAC ¶ 164. But the Court previously dismissed Plaintiffs' antitrust claims in part because they did not say in their original complaint "what proportion of HP printer models in the market were affected by the firmware update," or otherwise allege that HP could exercise "control over all its printers" Dkt. 96 at 15–16. Plaintiffs' amended complaint does not remedy this or otherwise plead that a substantial number of customers are "locked in." Far from alleging that HP retains control to issue firmware updates impacting substantially all printers and cartridges in the purported markets, Plaintiffs continue to allege that HP's End User License Agreement applies only to "registered users." FAC ¶ 174. And they still have not alleged what proportion of printers received the firmware updates at issue. *See* Dkt. 96 at 15. Nor do Plaintiffs allege that HP compels consumers to register their printers to accept firmware updates (it does not).

Because Plaintiffs allege neither the existence of high switching costs nor that a substantial number of owners of dynamic-security-enabled printers sign up for HP firmware updates, they have not plausibly alleged that consumers face significant costs to switch to a different printer brand.

> **d. Plaintiffs have not plausibly alleged that cartridges for dynamic-security-enabled HP printers are reasonably interchangeable.**

Plaintiffs fail to plausibly allege that "general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand" aftermarket. *Epic*, 67 F.4th 977. A plaintiff must establish that all products in a purported aftermarket are reasonably interchangeable. *See id.* at 975. That means Plaintiffs must plausibly allege all cartridges in the

35

purported market for "Replacement Ink cartridges that will work in the Class Printers," FAC ¶ 30, are "reasonably interchangeable [with each other] by consumers for the same purposes," and are not reasonably interchangeable with any cartridges outside of that market. *Sharif*, 950 F.3d at 916.

The Court previously noted that Plaintiffs made no such allegations: "The complaint [did] not limit [the purported aftermarket] to certain models or types of printers," and Plaintiffs did not "explain why the court should limit the market to certain printer models." Dkt. 96 at 15. Plaintiffs have now "limited" the aftermarket to "Replacement Ink cartridges that will work in" a list of over 150 printers. FAC ¶¶ 30, 120. But they do not explain what those printers have in common, aside from allegedly being enabled with dynamic security. This list of printers includes both consumer and commercial models and both print-only models and three-in-one printers/copiers/scanners. *Id.* ¶¶ 2, 120. Plaintiffs do not allege that cartridges in these printers are reasonably interchangeable with each other. Rather, they allege that HP sells a "single type of ink cartridge that is compatible with all printers in the same series." *Id.* ¶ 27; *see also id.* ¶ 120. For example, "a single HP cartridge set" is compatible with all printers in the HP Office Jet Pro "6900" series, and a different cartridge set is compatible with printers in the HP OfficeJet Pro "8000" series. *Id.* ¶ 27. A user who buys an HP printer cannot be "locked in" to using cartridges that are not compatible with that printer—but that is apparently Plaintiffs' theory here, given that ink cartridges across printer series are not reasonably interchangeable. Accordingly, general market-definition principles undermine Plaintiffs' proposed single-brand aftermarket theory.

\* \* \*

The Court should dismiss Plaintiffs' antitrust claims for failure to plead a relevant aftermarket for cartridges compatible with dynamic-security-enabled HP printers.

**D.** **The Court Should Dismiss Plaintiffs' State Antitrust Claims For Additional Reasons.**

The Court previously dismissed Plaintiffs' state-law antitrust claims because the parties agreed that "state antitrust law applies the same standards as federal antitrust law," and Plaintiffs did not plausibly state a claim under federal antitrust law. Dkt. 96 at 26. The Court should again dismiss those claims for the same reason, this time with prejudice. The state antitrust claims also fail for the following independent reasons.

*First*, the Court should dismiss Plaintiffs' claims under the antitrust laws of Alabama, Mississippi, North Carolina, Tennessee, and Wisconsin because each of these states' laws require allegations of intrastate conduct, and the alleged conduct that forms the basis of Plaintiffs' claims—HP's firmware updates—is *inter*state in nature. Alabama's antitrust law only applies to purely intrastate conduct—that is, conduct that occurs "within the geographic boundaries of [the] state." *Abbott Labs. v. Durrett*, 746 So. 2d 316, 339 (Ala. 1999); *see also Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 429 (E.D. Pa. 2010) (dismissing Alabama antitrust claim alleging "interstate, and not purely intrastate, conduct"). Similarly, Mississippi's antitrust statute applies only where plaintiffs plead that "at least some conduct" occurred "wholly intrastate." *In re Microsoft Corp. Antitrust Litig.*, 2003 WL 22070561, at *2 (D. Md. Aug. 22, 2003). Plaintiffs allege no wholly intrastate conduct, requiring dismissal.

Similarly, North Carolina, Tennessee, and Wisconsin require allegations that the defendant's conduct had a substantial effect on in-state commerce. North Carolina's antitrust law "reaches only conduct causing a 'substantial in-state injury,'" and "allegations that indirect purchasers paid inflated prices are not sufficient to establish a substantial, in-state injury." *Dealer Mgmt. Sys.*, 362 F. Supp. 3d at 549. Tennessee's antitrust statute similarly reaches only anticompetitive conduct that "affects Tennessee trade or commerce to a substantial degree."

37

*Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W. 3d 512, 523 (Tenn. 2005). And Wisconsin's antitrust law requires a plaintiff to "demonstrate a *substantial* effect on Wisconsin commerce generally." *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1084 (D. Kan. 2009). Plaintiffs have not alleged any such facts, requiring dismissal of these claims.

*Second*, the Court should dismiss Plaintiffs' Colorado, Hawaii, Nevada, and Utah antitrust claims because Plaintiffs have not alleged that they provided pre-suit notice to the states' Attorneys General. *See* Colo. Rev. Stat. § 6-4-116; Nev. Rev. Stat. § 598A.210(3); Haw. Rev. Stat. § 480-13.3(1), (5)(c); Utah Code Ann. § 76-10-3111(9). Courts regularly dismiss antitrust claims under those states' laws where plaintiffs do not comply with pre-suit notice requirements. *See, e.g.*, *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 388–90 (D.N.J. 2018) (Utah); *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *15 (D. Mass. July 20, 2016) (Hawaii, Nevada, and Utah).

*Third*, the Court should dismiss Plaintiffs' claims under the antitrust laws of California, Kansas, New York, North Carolina, and Tennessee because those states' laws do not impose liability for unilateral conduct. *See Effexor*, 357 F. Supp. 3d at 393–95 (Kansas, New York, and Tennessee); *Cameron v. New Hanover Mem. Hosp., Inc.*, 58 N.C. App. 414, 442 (1982) (North Carolina); *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1306 (S.D. Cal. 2009) (California).

### E. The Court Should Dismiss Plaintiffs' Consumer-Protection Claims For Additional Reasons.

The Court should dismiss Plaintiffs' unfairness and unconscionability claims as duplicative of their misrepresentation and antitrust claims. It should dismiss the Alabama and Massachusetts consumer-protection claims for the additional reason that Plaintiffs failed to provide required pre-suit notice.

***Duplicative theories.*** With the exception of Plaintiffs' claim under Illinois law, all their claims of unfair or unconscionable conduct are predicated on their claims that HP violated federal

38

antitrust law. *See* FAC ¶¶ 123, 198–99, 201, 208, 216, 222, 228, 234, 239, 245, 252, 259, 266, 273, 280, 286, 292, 300, 307, 315, 322, 327, 332, 339, 347, 354, 360. Courts widely hold that, where a plaintiff has failed to state an antitrust claim, it has necessarily also failed to state a claim for unfair conduct. *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4743425, at *1 (S.D.N.Y Sep. 15, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2006) (dismissing 29 consumer protection, unfair competition, and unfair trade practices claims that relied on same allegations as deficient antitrust claims); *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003), *aff'd*, 466 F.3d 187 (2d Cir. 2006) (similar). The Court should dismiss Plaintiffs' non-Illinois unfairness and unconscionability claims for that reason. And it should dismiss their Illinois unfairness and unconscionability claims because those claims are premised entirely on their allegation that HP engaged in deceptive practices. *See* FAC ¶¶ 132–43. "Plaintiffs cannot . . . use the 'unfair practices' prong of the ICFA to avoid meeting Rule 9(b)'s particularity requirements if the claim remains 'entirely grounded' in a fraud claim." *Quitno v. Gen. Motors, LLC*, 2020 WL 777273, at *4 (N.D. Ill. Feb. 18, 2020).

**Pre-suit notice.** Alabama and Massachusetts's consumer-protection statutes require plaintiffs to provide pre-suit notice to the defendant. Ala. Code 1975 § 8-19-10(e); Mass. Gen. Laws. ch. 93A, § 9(3). Plaintiffs concede that they have not done so, instead contending that "[n]otice is excused as futile." FAC ¶ 131. But these statutes require plaintiffs to provide notice regardless of whether Plaintiffs think doing so would be "futile." *See Smith-Brown v. Ulta Beauty, Inc.*, 2019 WL 932022, at *11 (N.D. Ill. Feb. 26, 2019) (dismissing Alabama consumer protection claim where plaintiffs provided 14 days' notice but statute required 15 days' notice); *In re Rust-Oleum Restore Mktg., Sales Pracs. & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 819 (N.D. Ill. 2016) (dismissing Massachusetts consumer-protection claim for failure to provide pre-suit notice);

39

*Effexor*, 357 F. Supp. 3d at 386–90 (same); *Asacol*, 2016 WL 4083333, at *15 (same). These claims should be dismissed.

### F. The Court Should Dismiss Plaintiffs' Amended Complaint With Prejudice.

Plaintiffs' amended complaint does not cure the pleading defects previously identified by this Court, *see* Dkt. 96 at 28, and offers "no [discernable] basis on which [Plaintiffs] could correct the deficiencies" if given yet another opportunity. *Clarke v. DPWN Holdings (USA), Inc.*, 2022 WL 2905734, at *3 (N.D. Ill. July 22, 2022) (Pacold, J.); *see also Physicians & Surgeons*, 15 F.4th at 835 (affirming dismissal of antitrust complaint with prejudice where plaintiff "had one opportunity to amend its complaint—to no avail"). The Court should dismiss Plaintiffs' claims with prejudice.

### V. CONCLUSION

The Court should dismiss the complaint in its entirety with prejudice.

40

Dated:   January 16, 2026

Respectfully submitted,

*/s/ Samuel Liversidge*

Samuel Liversidge, *pro hac vice*
Ilissa Samplin, *pro hac vice*
GIBSON DUNN & CRUTCHER LLP
330 S. Grand Ave.
Los Angeles, CA 90071-3197
Tel: (213) 229-7000
sliversidge@gibsondunn.com
isamplin@gibsondunn.com


Rachel S. Brass, *pro hac vice*
Sean F. Howell, *pro hac vice*
Logan Freeborn, *pro hac vice*
GIBSON DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Tel: (415) 393-8306
rbrass@gibsondunn.com
showell@gibsondunn.com
lfreeborn@gibsondunn.com

Vanessa G. Jacobsen
Brian Y. Chang
EIMER STAHL LLP
224 S. Michigan Ave, Suite 1100
Chicago, IL 60604
Tel: (312) 660-7600
vjacobsen@eimerstahl.com
bchang@eimerstahl.com

*Counsel for Defendant HP Inc.*

41