UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RENEE ROBINSON, RICHARD MYERS, ANNETTE FIRST, CASEY GADDY, STEVEN GOUISIE, ROBERT PLUNKETT, FRANCOIS STEIGER, James Ulrich, GABRIEL VOILES, JOHN WAUDBY, and LAKESHA WELLS, on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> HP, INC., a Delaware corporation, <br><br> *Defendant*. | Case No.: 1:24-cv-00164 (MMP) <br><br> Hon. Martha M. Pacold |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS CORRECTED FIRST AMENDED COMPLAINT**

**Table of Contents**

Introduction .................................................................................................................... 1

Argument ........................................................................................................................ 6

    I.     Plaintiffs Sufficiently Allege That HP Misled Consumers. ................................. 6

        A.   HP misled consumers by continuing to use the names of printers that historically could use non-HP ink without interference. ........................................................................ 6

        B.   HP's small-font disclaimer was misleading by HP's own admission. ............................ 8

        C.   Plaintiffs plausibly allege HP's duty to disclose. ........................................................ 11

        D.   Plaintiffs plead fraud with particularity under Rule 9(b). ............................................. 16

        E.   Plaintiffs plausibly allege causation. ............................................................................ 17

        F.   Pre-suit notice not required. ......................................................................................... 20

    II.    Plaintiffs' Antitrust Claims are Adequately Pled. .............................................. 20

        A.   Plaintiffs plausibly allege monopolization and exclusionary conduct in violation of Section 2 of the Sherman Act. ........................................................................................ 21

        B.   The FAC plausibly alleges an unlawful tie and exclusionary conduct under Section 1 of the Sherman Act. .......................................................................................................... 37

Conclusion ................................................................................................................... 40

i

## Table of Authorities

**Page(s)**

**Cases**

*AliveCor, Inc. v. Apple Inc.*,
592 F. Supp. 3d 904 (N.D. Cal. 2022) ....................................................................................... 31

*Avaya Inc., RP v. Telecom Labs, Inc.*,
838 F.3d 354 (3d Cir. 2016) ................................................................................................. 24, 25

*Benson v. Fannie May Confections Brands, Inc.*,
944 F.3d 639 (7th Cir. 2019) ..................................................................................................... 18

*Bixby's Food Sys., Inc. v. McKay*,
193 F. Supp. 2d 1053 (N.D. Ill. 2002) ...................................................................................... 18

*Buechin v. Ogden Chrysler-Plymouth, Inc.*,
511 N.E.2d 1330 (Ill. App. Ct. 1987) ............................................................................... 7, 9, 13

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016) ................................................................................................... 19

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
781 F.3d 264 (6th Cir. 2015) ..................................................................................................... 40

*Colpitts v. Blue Diamond Growers*,
527 F. Supp. 3d 562 (S.D.N.Y. 2021) ....................................................................................... 18

*Connick v. Suzuki Motor Co.*,
675 N.E.2d 584 (Ill. 1996) ......................................................................................................... 12

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
36 F.3d 1147 (1st Cir. 1994) ...................................................................................................... 40

*Droesser v. Ford Motor Co.*,
No. 19-CV-12365, 2023 WL 2746792 (E.D. Mich. Mar. 31, 2023) ......................................... 13

*DSM Desotech Inc. v. 3D Sys. Corp.*,
749 F.3d 1332 (Fed. Cir. 2014) ................................................................................................. 40

*Dunbar v. Kohn L. Firm, S.C.*,
896 F.3d 762 (7th Cir. 2018) .................................................................................................. 9, 13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) ............................................................................................................*Passim*

*Elias v. Ungar's Food Products, Inc.*,
252 F.R.D. 233 (D.N.J. 2008) .................................................................................................... 19

*Estate of Pilgrim v. Gen. Motors LLC*,
344 F.R.D. 381 (E.D. Mich. 2023) ............................................................................................ 19

*F.T.C. v. Willms*,
No. C11-828 MJP, 2011 WL 4103542 (W.D. Wash. Sept. 13, 2011) ................................. 11, 15

*Fraser Eng'g Co. v. Desmond*,
524 N.E.2d 110 (Mass. App. Ct. 1988) ..................................................................................... 18

*Golber v. BayBank Valley Tr. Co.*,
  704 N.E.2d 1191 (Mass. App. Ct. 1999) ................................................................. 10

*Goldwasser v. Ameritech Corp.*,
  222 F.3d 390 (7th Cir. 2000) ................................................................................... 23

*Hammerling v. Google LLC*,
  615 F. Supp. 3d 1069 (N.D. Cal. 2022) ................................................................. 12

*Heredia v. Cap. Mgmt. Servs., L.P.*,
  942 F.3d 811 (7th Cir. 2019) ............................................................................... 9, 13

*Herron v. Best Buy Co. Inc.*,
  924 F. Supp. 2d 1161 (E.D. Cal. 2013) ................................................................. 12

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ................................................................................ 36

*Illinois Cent. Gulf R. Co. v. Dep't of Loc. Gov't*,
  *Affs.*, 169 Ill. App. 3d 683, 523 N.E.2d 1048 (1988) ........................................... 12

*In re Aggrenox Antitrust Litig.*,
  94 F. Supp. 3d 224 (D. Conn. 2015) ...................................................................... 20

*In re Apple & AT & TM Antitrust Litig.*,
  596 F. Supp. 2d 1288 (N.D. Cal. 2008) ................................................................. 28

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  2023 WL 4305901 (N.D. Ill. June 29, 2023) ......................................................... 20

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
  No. 3:22-cv-50188, 2023 WL 8190256 (N.D. Ill. Nov. 27, 2023) ................... 22, 23, 24, 40

*In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*,
  151 F.4th 922 (7th Cir. 2025) ................................................................................ 34

*In re Restasis Antitrust Litig.*,
  355 F. Supp. 3d 145 (E.D.N.Y. 2018) .................................................................... 20

*In re Smitty's/Cam2 303 Tractor Hydraulic Fluid Mktg.*,
  No. 4:20-MD-02936, 2023 WL 9064606 (W.D. Mo. Dec. 13, 2023) ..................... 19

*JamSports & Ent., LLC v. Paradama Prods., Inc.*,
  2003 WL 1873563 (N.D. Ill. Apr. 15, 2003) ......................................................... 36

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ............................................................................................... 38, 39

*Kim v. Carter's Inc.*,
  598 F.3d 362 (7th Cir. 2010) .................................................................................. 18

*Koenig v. Boulder Brands, Inc.*,
  995 F. Supp. 2d 274 (S.D.N.Y. 2014) ...................................................................... 8

*Lazaroff v. Paraco Gas Corp.*,
  38 Misc. 3d 1217(A), 967 N.Y.S.2d 867 (Sup. Ct. 2011) .................................. 7, 17

*Mausner v. Marketbyte LLC*,
  No. 3:12-cv-2461, 2013 WL 12073832 (S.D. Cal. Jan. 4, 2013) ...................... 10, 11

*McDonough v. Toys "R" Us, Inc.*,
  638 F. Supp. 2d 461 (E.D. Pa. 2009) ..................................................................... 36

iii

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
  62 F.3d 967 (7th Cir. 1995) ................................................................. 35

*In re St. Jude Med., Inc.*,
  522 F.3d 836 (8th Cir. 2008) ................................................................ 19

*Mobile Emergency Hous. Corp. v. HP, Inc.*,
  No. 20-cv-09157-SVK, 2021 WL 9867952 (N.D. Cal. Oct. 15, 2021) ................... 14

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ................................................ 30, 31, 33, 36

*O'Neill v. Standard Homeopathic Co.*,
  346 F. Supp. 3d 511 (S.D.N.Y. 2018) ....................................................... 19

*Paladin Assocs., Inc. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ............................................................... 32

*Parziale v. HP, Inc.*,
  445 F. Supp. 3d 435 (N.D. Cal. 2020) ...................................................... 14

*Parziale v. HP, Inc.*,
  No. 5:19-cv-05363, 2020 WL 5798274 (N.D. Cal. Sept. 29, 2020) ..................... 14

*Prudential Sec. Inc. Ltd. P'ships Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996) ........................................................... 10

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
  104 F.3d 811 (6th Cir. 1997) ............................................................... 28

*Queen City Pizza v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) ................................................................ 34

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ............................................................... 32

*Richman v. Goldman Sachs Group, Inc.*,
  868 F. Supp.2d 261 (S.D.N.Y. 2012) ........................................................ 10

*Robinson v. Gen. Motors LLC*,
  No. 20-cv-663, 2021 WL 3036353 (D. Del. July 19, 2021) ............................. 19

*Rodriguez v. Hanesbrands Inc.*,
  No. 17-cv-1612, 2018 WL 2078116 (E.D.N.Y. Feb. 20, 2018) ....................... 11, 15

*Rohlfing v. Manor Care, Inc.*,
  172 F.R.D. 330 (N.D. Ill. 1997) ............................................................ 36

*Roost Project, LLC v. Andersen Constr. Co.*,
  437 F. Supp. 3d 808 (D. Idaho 2020) ....................................................... 20

*Schaff v. Travelers Home & Marine Ins. Co.*,
  2025 IL App (1st) 240276, 2025 WL 3249567 (Ill. App. Ct. 2025) ..................... 18

*Schor v. Abbott,*
  *Lab'ys*, 457 F.3d 608 (7th Cir. 2006) ................................... 21, 23, 26, 27

*Sec. & Exch. Comm'n v. DeFrancesco*,
  699 F. Supp. 3d 228 (S.D.N.Y. 2023) ................................................... 10, 14

*Sec. & Exch. Comm'n v. Gallagher*,
  No. 21-cv-8739, 2023 WL 6276688 (S.D.N.Y. Sept. 26, 2023) .......................... 10

iv

*Semegen v. Weidner*,
  780 F.2d 727 (9th Cir. 1985)..................................................................................... 16

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) ................................................................................................. 20

*Sheridan v. Marathon Petroleum Co. LLC*,
  530 F.3d 590 (7th Cir. 2008)..................................................................................... 38

*So v. HP, Inc.*,
  No. 22-cv-02327, 2022 WL 16925965 (N.D. Cal. Nov. 14, 2022) ........................... 15

*So v. HP, Inc.*,
  No. 22-cv-02327, 2023 WL 4596778 (N.D. Cal. July 17, 2023) ............................... 10, 14, 15

*Stoltz v. Fage Dairy Processing Indus., S.A.*,
  No. 14-cv-3826, 2015 WL 5579872 (E.D.N.Y. Sept. 22, 2015) .................................. 8

*Tershakovec v. Ford Motor Co., Inc.*,
  79 F.4th 1299 (11th Cir. 2023)................................................................................... 19

*Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*,
  815 F.2d 1407 (11th Cir. 1987)................................................................................... 40

*Tomassini v. FCA U.S. LLC*,
  No. 3:14-cv-1226, 2015 WL 3868343 (N.D.N.Y. June 23, 2015)............................... 12

*United States ex rel. Conteh v. IKON Office Sols., Inc.*,
  103 F. Supp. 3d 59 (D.D.C. 2015) .............................................................................. 16

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ................................................................................................... 21

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020)....................................................................................... 39

*Williams v. Tissier*,
  165 N.E.3d 885 (Ill. App. 2019)................................................................................... 8

*Verizon v. Trinko*,
  540 U.S. 398 (2004)..................................................................................................... 26

*Xerox Corp. v. Media Sciences, Inc.*,
  660 F. Supp. 2d 535 (S.D.N.Y. 2009) ......................................................................... 29, 30

*Xerox Corp. v. Media Scis. Int'l, Inc.*,
  511 F. Supp. 2d 372 (S.D.N.Y. 2007) ......................................................................... 30

*Zine v. Chrysler Corp.*,
  600 N.W.2d 384 (Mich. App. Ct. 1999) ...................................................................... 12

**Statutes**

15 U.S.C. 2............................................................................................................21, 22, 23, 24
Ala. Code § 8–19–10 ................................................................................................................ 6
Fla. Stat. § 501.201 .................................................................................................................. 6
Mass. Gen. Laws Ch. 93A ........................................................................................................ 6
Mich. Comp. Laws § 445.901.................................................................................................... 6

Minn. Stat. § 325F.67 .............................................................................................................. 6
Mo. Rev. Stat. § 407.010 .......................................................................................................... 6
N.J. Stat. § 56:8-1 ................................................................................................................... 6
New York (N.Y. Gen. Bus. Law § § 349-350 ...................................................................... 6, 7
Wash. Rev. Code § 19.86.010 ................................................................................................. 6

**Rules**

Federal Rule of Civil Procedure 9(b) ................................................................................ 16, 17

**Introduction**

For more than a decade, Defendant HP, Inc. ("HP") did something refreshingly simple. It sold printers and allowed its customers to decide what ink to use. The First Amended Complaint details that history at length. *See* Corrected First Amended Complaint ("FAC"), Dkt. 100, ¶¶ 5, 31-39. Consumers who purchased HP inkjet printers could install HP cartridges, third party cartridges, or any other compatible alternative. The choice belonged to the printer owner.

HP marketed and sold these machines to Plaintiffs and Class Members, both before and during the 2010s, under names that became fixtures in homes and offices across the country: OfficeJet, DeskJet, and DesignJet. *Id*. ¶¶ 2, 27-28, 109, 119-120. Those names were not merely decorative flourishes on a shipping carton. They meant something. After years of open compatibility, they came to denote a printer that not only functioned, but left the choice of ink where it belonged, with the purchaser. That understanding arose from HP's open invitations for customers to shop around and its head-to-head quality comparisons with competitors who marketed their ink as "compatible" with series of OfficeJet, DeskJet, and DesignJet printers. *Id*., ¶¶ 27-39. Consumers learned from repeated experience that they could use third-party ink without interference, and it became part of the bargain. *Id*. ¶ 39.

Then came the reversal.

Between 2020 and 2024, HP gradually deployed firmware updates to nearly every series and model of OfficeJet, DeskJet, and DesignJet printers sold after 2016 ("Class Printers"). *Id*. ¶¶ 2-7. Those updates did not improve the print experience or enhance "security," as HP claimed. They caused the printers to reject competitors' cartridges outright. *Id*. A machine that once accepted compatible ink now refused it. *Id*. Consumers who had purchased third party cartridges discovered that their printers would no longer function with them. *Id*. ¶ ¶¶ 2-7, 60-62, 105. Money spent became money wasted.

HP did not disclose, at the point of sale, that it intended to exercise this newfound veto power. *Id*. ¶¶ 2-3, 6, 44, 64-66, 90-93, 104. It sold the Class Printers under the very same names, OfficeJet, DeskJet, and DesignJet, that had become synonymous with open choice in the replacement ink market. *Id*. ¶¶ 65-66, 119-120. The branding gave no hint that the ground had shifted, but instead conveyed the comforting assurance that nothing had changed at all.

The law has a term for that maneuver. One offers a product with an established set of attributes, reaps the benefit of the reputation attached to those attributes, and then quietly strips them away after the sale. That is not innovation, but a classic bait and switch. The only novelty lies in the instrument. Instead of a deft sleight of hand executed at the cash register, HP surreptitiously used line of software code transmitted after purchase—the "firmware update"— all to tighten its grip on the ink cartridge aftermarket. *Id*. ¶¶ 2-7, 60-62, 105.

Contrary to HP's narrative, the FAC adds many factual allegations supporting this core argument. These detailed new allegations more than adequately show why the Court should deny HP's Motion to Dismiss ("Motion"), Dkt. 106. Plaintiffs respond below to HP's supporting Memorandum of Law ("Mem."), Dkt. 107, detailing the new material facts alleged.

To start, the FAC adds many new allegations about the aftermarket for replacement ink cartridges as it existed before HP's bait-and-switch. Before and during the 2010s, the FAC alleges a competitive nationwide aftermarket for ink cartridges. FAC, ¶¶ 29-30, 50 (highlighting prevalence of "online" sales). In fact, HP pushed out regular ads to the Class Members, inviting head-to-head comparisons and highlighting consumer choice over which ink to buy. *Id*. ¶¶ 27-39. Due to this history, "[t]he ability to use non-HP ink cartridges" without interference became "so well-known and regular that it became central to the function of the printers and an expected feature of any purchase." *Id*. ¶ 39.

2

Next, the FAC adds new material facts about the price competition HP faced before springing its trap on consumers. By 2019, HP estimated that 30% of those who bought the Class Printers were "unprofitable customers" whose chose non-HP replacement ink over HP's cartridges. *Id*. ¶¶ 51-52. While HP published ads claiming "[o]riginal HP Ink prints more accurately and works better than refill inks, which often fail," *id*. ¶ 37, customer experience showed that many non-HP supplies let them "get good quality and save money," so "[c]ustomers [were] increasingly asking for/ open to non HP [ink cartridges]." *Id*. ¶ 71. HP could no longer take for granted its historical 15.6% profit margins, *id*. ¶ 49, owning up to investors that it faced serious competition from "lower cost non-original supplies." *Id*. ¶ 50. HP studied the impact of this news, estimating that a 10% increase in its ink prices "would result in a 6-7% loss in its aftermarket share." *Id*. ¶ 48. This could not stand. So HP developed a plan to force down the percentage of "unprofitable customers" by 10% over the next three years. *Id*. ¶ 54.

HP's scheme depended on post-sale "firmware updates," in which HP remotely sent digital codes to block the Class Printers' ability to use non-HP ink cartridges. *Id*. ¶¶ 3-4, 7, 54. The firmware updates enacted a change in policy that removed competition. *Id*. ¶¶ 65, 80. The FAC alleges in detail that HP did not disclose this scheme to Class Members when they bought the Class Printers. *Id*. ¶¶ 65, 73-74, 77-78, 90-93.

Had HP disclosed its intent at the point of sale, Class Members would not have bought the Class Printers or would have paid less. *Id*. ¶¶ 77, 104, 138, 140, 150. This scheme allowed HP to gradually monopolize the ink cartridge aftermarket across the Class Printers. *Id*. ¶¶ 57-59. From 2020-2024, each new firmware update meant Class Members were unexpectedly "faced with the choice to incur the higher cost of purchasing a new printer or the lower cost of buying HP's replacement ink at supracompetitive prices." *Id*. ¶ 94.

3

In just a few years, HP's lock-in scheme yielded results. By October 2023, HP's actions had "'reduced the number of unprofitable customers . . . to 15%," and HP now pledged to "lower this number to less than 10%.'" *Id*. ¶ 95. By May 2024, HP marveled that it had zoomed past its original aftermarket monopolization goal: "'25% of the customers were unprofitable- Goal was to reduce by 10 PT to < 15% unprofitable customers. Now we are less than 10%.'" *Id*. ¶ 96. HP concluded that its "DS" (Dynamic Security) technology had become "more effective" at designing firmware updates, "leading to fewer unprofitable customers." *Id*. ¶ 97.

Thanks to these firmware updates, HP no longer had to worry about losing 6-7% of its aftermarket share if it raised ink prices by 10%. *Id*. ¶ 48. After locking in so many customers, HP raised its ink prices several times, all while squeezing out competitors. *Id*. ¶¶ 101-102. This is how HP exercised its newfound market power over the aftermarket.

Lastly, the FAC adds allegations to show HP knew it was misleading consumers. Before issuing its firmware updates, HP started adding a small font disclaimer near the bottom of the Class Printers' boxes, vaguely hinting that non-HP ink "may not work." *Id*. ¶ 67. But these boxes failed to disclose, at the point of sale, HP's intent to *cause* non-HP ink to stop working. *Id*. ¶¶ 68-69. In June 2021, HP observed that in impacted printer models, its current disclaimer led to "customer confusion, general customer dissatisfaction," and "customer misunderstandings." *Id*. ¶¶ 81-82. As a result, HP admitted that its printer boxes needed to disclose its intent to "block cartridges" containing non-HP chips. *Id*. ¶ 82. HP then dragged its feet, continuing for more than a year to sell Class Printers with the misleading "May Not Work" Disclaimer. *Id*. ¶¶ 87-93.

HP knew it was concealing its intent to "block cartridges." *Id*. HP knew it was misleading customers. *Id.* But for more than a year it kept repeating the same unfair and deceptive business practice. *Id*. Put simply, HP realized it was hoodwinking customers and chose to keep doing so.

HP now denies that it misled or locked in consumers, but it was right the first time. HP's "May Not Work" Disclaimer was objectively misleading for two reasons.

First, HP kept selling the Class Printers with the "OfficeJet," "DeskJet," and "DesignJet" names in large, prominent font. *Id*. ¶ 67 (see box image example). For these longstanding inkjet brands, the "[t]he ability to use non-HP ink cartridges" without interference had been established over years of experience and from HP's own statements, becoming "an expected feature of any purchase." *Id*. ¶ 39. Yet HP chose to keep selling the Class Printers under the same old OfficeJet, DeskJet, and DesignJet names that signified the consumer's ability to shop around for their ink of choice. *Id*. ¶¶ 65-66, 119-120. HP did this despite its intent to impose new restrictions that did not historically exist for these product lines. *Id*. ¶ 93. In contrast to the prominence of these old product names, HP relegated the new "May Not Work" Disclaimer to small, de-emphasized font near the bottom of the box. *Id*. ¶ 67.

Second, this "may not work" language was ripe for misunderstanding based on history. During the years when HP allowed free competition, it regularly claimed that non-HP ink may not work and "often fail." *Id*. ¶¶ 37, 69-74. But customers had conducted their due diligence as to quality, and 30% found non-HP ink to be sufficiently reliable. *Id*. ¶¶ 69-71.[1] Given this history, HP knew it was misleading to simply slap on a small-font disclaimer, recycling HP's old warnings that it could not vouch for competitors' products. What HP needed to disclose was its intent to "block cartridges" containing non-HP chips—and HP knew it. *Id*. ¶ 82. But when HP sold the Class Printers, it knowingly failed to disclose that intent at the point of sale. *Id*. ¶¶ 87-93.

---

[1] The printers at issue here are all inkjet product lines. FAC, ¶ 2. While HP estimating "that 25% of its total printer customers were 'unprofitable,'" it "flagged an even higher percentage for customers who purchased inkjet printers. HP concluded, '30% of the ink customers were unprofitable' and '[l]aser was less.'" *Id*. ¶ 52. Plaintiffs therefore refer to the 30% figure.

In sum, HP locked in a substantial portion of its customers by selling them printers under brand names that historically could use non-HP ink, but then remotely sabotaging their ability to do so. These actions allowed HP to unfairly monopolize the aftermarket for replacement ink cartridges in the Class Printers. Due to the high switching costs requires to buy new printers, HP was able to charge supracompetitive ink prices without losing aftermarket share. HP's actions violated a host of state laws and the Sherman Act. The Court should deny HP's Motion to Dismiss.

## Argument

I.    **Plaintiffs Sufficiently Allege That HP Misled Consumers.**

With these new allegations, there should be little doubt the FAC states a cause of action for deceptive and unfair business practices, as alleged in Counts I-II.[2] Even so, HP's Memorandum spends much time claiming its misstatements are not laid out in sufficient detail. HP is incorrect.

### A. HP misled consumers by continuing to use the names of printers that historically could use non-HP ink without interference.

The FAC alleges and shows, with an image, how the Class Printers' boxes displayed HP's historic brand names for inkjet printers: OfficeJet, DeskJet, and DesignJet. FAC, ¶ 67. HP displayed these names front and center, in large font. *Id*. The FAC further alleges that when HP sold the Class Printers, the ability to use non-HP ink without interference had become so well-known that it was an expected feature of any purchase. *Id*. ¶ 39. But when HP hatched its plan to add new restrictions, it did not create new product lines. It kept using the same printer brand names as before, when the restrictions did not exist. *Id*. ¶¶ 65-66, 119-120. These allegations are not

---

[2] Count I alleges claims under the Illinois Consumer Fraud Act. Count II alleges consumer protection claims under the laws of New York (N.Y. Gen. Bus. Law § § 349-350); Florida (Fla. Stat. § 501.201, *et seq*.); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.); Michigan (Mich. Comp. Laws § 445.901, *et seq*.); Minnesota (Minn. Stat. § 325F.67, *et seq*.); Missouri (Mo. Rev. Stat. § 407.010, *et seq*.); New Jersey (N.J. Stat. § 56:8-1, *et seq*.); Idaho (I.C. § 48-603); Alabama (Ala. Code § 8–19–10, *et seq*.); and Washington (Wash. Rev. Code § 19.86.010, *et seq*.).

vague historical grievances. Rather, they provide context for how reasonable consumers would interpret HP's packaging disclosures at the point of sale.

In deciding whether HP misled consumers, it is appropriate to consider whether the public had come to associate these product names, OfficeJet, DeskJet, and DesignJet, with free choice of replacement ink. *Cf. Buechin v. Ogden Chrysler-Plymouth, Inc.*, 511 N.E.2d 1330, 1336 (Ill. App. Ct. 1987) ("In our analysis of whether fraud had been committed, we do not focus on the number of miles on the car, but on whether [the custromer] got a 'new' car as she and the general public understand the ordinary meaning of that word, that is, a car which has not been previously owned."). Just as past experience with "new" cars impact the public understanding of what it means to buy a "new" car, so too would HP's past actions affect public understanding of the OfficeJet, DeskJet, and DesignJet printers' restrictions (or lack thereof).

Applying this "public understanding" principle, it is fraudulent for a company to reduce the function or quantity previously associated with a product, when this new reduction is not conspicuously disclosed on the package. *See Lazaroff v. Paraco Gas Corp.*, 38 Misc. 3d 1217(A), 967 N.Y.S.2d 867 (Sup. Ct. 2011) (denying motion to dismiss GBL 349 and 350 claims, because defendant "began reducing the weight of [a propane product's] cylinders from 17 to 15 pounds," and while the defendant disclosed the new weight, the conspicuousness of its disclosure was disputed); *aff'd*, 95 A.D.3d 1080, 1080-81 (2012) (affirming holding that "[t]he plaintiff alleged a valid cause of action to recover damages for violations of [GBL] §§ 349 and 350").

HP's "May Not Work" Disclaimer does not cure this problem, either. The first problem is its small font size and inconspicuous placement on the Class Printers' boxes. FAC alleges, with an image depicting an example, that HP displayed the OfficeJet, DesignJet, and DeskJet brand names at the center of each box in large font, FAC, ¶ 67, while HP's "May Not Work" Disclaimers appears

only in much smaller font near the bottom of the boxes. *Id*. ¶ 67. In each relevant state, "the significance of a disclaimer depends upon factors such as the font size and placement of the disclaimer as well as the relative emphasis placed on the disclaimer and the allegedly misleading statement." *Stoltz v. Fage Dairy Processing Indus., S.A.*, No. 14-cv-3826, 2015 WL 5579872, at *16 (E.D.N.Y. Sept. 22, 2015) (collecting cases); *see also Williams v. Tissier*, 165 N.E.3d 885, 899 (Ill. App. 2019) (holding that hospital could not avoid liability as a matter of law based on its disclaimer stating physician was an "independent contractor," because "the independent contractor disclosure . . . is printed entirely in a small font"); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014) ("[A] reasonable consumer might also focus on the more prominent portion of the product label that touts the product as 'Fat Free Milk and Omega–3s,' and overlook the smaller text that discloses the fat content . . . .").

For each state law, Plaintiffs state a cause of action by alleging that HP kept selling the Class Printers under their historic names without disclosing its new plan to reduce their functionality. HP's small-font, inconspicuously-placed disclaimers do not cure this issue.

**B. HP's small-font disclaimer was misleading by HP's own admission.**

In any case, HP's "May Not Work" Disclaimers disclosed only misleading half-truths. HP argues that its packaging disclosed the "printers' *potential* lack of compatibility with non-HP ink cartridges." Mem., at 10 (emphasis added). HP points to its small-font statements near the bottom of the boxes, stating that printers were "dynamic security enabled" (without defining that term), were "only intended to be used with cartridges using an HP original chip," and cartridges using non-HP chips "may not work" or "may not work in the future." *Id*. But HP's reliance on the supposed "*potential* lack of compatibility" underscores the point it misses.

The FAC does not dispute that HP said third-party cartridges "may not work." What HP failed to disclose was its then-existing plan to deploy firmware updates that would cause

8

previously-compatible cartridges to stop working. FAC ¶¶ 64–70, 73–78. By framing the issue as "potential" incompatibility, HP sidesteps Plaintiffs' central allegation: HP knew for certain that incompatibility would occur in impacted cartridges due to its own actions, but used only conditional language implying uncertainty as to competitors' inks.

HP's conditional language not only shrouded its true intent, but lulled consumers into complacency because it mirrored statements HP made during the years when it did nothing to block competitors' cartridges. FAC, ¶ 79 (alleging that during the time when HP invited competition, it still "inundated its customers with claims that non-HP ink 'may not work' due to its poor quality"); *id*. ¶ 37 (example of statement that "[o]riginal HP Ink prints more accurately and works better than refill inks, which often fail"). During the years when HP warned about competitors' inks but still invited competition, many customers shopped around and found they could "get good quality and save money" by "asking for . . . non HP [ink cartridges]." *Id*. ¶ 71. What they could not know was that, when HP sold the Class Printers, it planned to remove their ability to use previously-compatible cartridges. *Id*. ¶¶ 68-69.

HP's disclaimer misled consumers because, as the Seventh Circuit has observed, an average consumer "would not understand the word 'may' to mean 'will.'" *Dunbar v. Kohn L. Firm, S.C.*, 896 F.3d 762, 765 (7th Cir. 2018). It is misleading "to make a 'may' statement about something that is . . . impossible." *Heredia v. Cap. Mgmt. Servs., L.P.*, 942 F.3d 811, 816 (7th Cir. 2019). Thus, HP acted deceptively by saying non-HP cartridges "may not" work, even while it planned to take actions that would make it impossible for some cartridges to work.

By crafting a conditional "may not work" warning, HP masked its true intent. Such "a statement, although technically true, may nevertheless be fraudulent where it omits qualifying materials, for a half-truth is sometimes more misleading than an outright lie." *Buechin*, 511 N.E.2d

at 1336. "Fragmentary information may be as misleading . . as active misrepresentation, and half-truths may be as actionable as whole lies." *Golber v. BayBank Valley Tr. Co.*, 704 N.E.2d 1191, 1193 (Mass. App. Ct. 1999) (internal citation omitted).

It was misleading, then, for HP to warn of a risk while failing to disclose its plan to take actions that would cause that risk to transpire. "[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp.2d 261, 278 (S.D.N.Y. 2012) (internal citation omitted). "A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect" the risk's "probability," especially when "the risk has, in fact, materialized in the past and is virtually certain to materialize again." *Sec. & Exch. Comm'n v. DeFrancesco*, 699 F. Supp. 3d 228, 240–41 (S.D.N.Y. 2023) (internal citations omitted). Put simply, one may not "warn[ ] his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).

As alleged here, HP said competitors' ink "may not work" but omitted its fully-formed intent to ensure that result. HP's statements differ little from those of a hiker who warns of a possible ditch but decides not to mention the Grand Canyon just ahead. *Cf. Sec. & Exch. Comm'n v. Gallagher*, No. 21-cv-8739, 2023 WL 6276688, at *9 (S.D.N.Y. Sept. 26, 2023) (concluding "statements Gallagher made touting the Target Securities" were "materially misleading because they omitted Gallagher's fully-formed, present intent to sell his own shares of the very same stocks"); *So v. HP, Inc.*, No. 22-cv-02327, 2023 WL 4596778, at *7 (N.D. Cal. July 17, 2023) (denying motion to dismiss claim for fraudulent omission, when complaint alleged that HP "intended to send the firmware updates at the time of [the printer's] purchase" but failed to disclose

10

that intent); *Mausner v. Marketbyte LLC*, No. 3:12-cv-2461, 2013 WL 12073832, at *8 (S.D. Cal. Jan. 4, 2013) (fraud claim sufficiently alleged when disclaimers mentioned possible conflicts but failed to disclose defendants' intent to manipulate the market); *id.* at *11 ("The disclaimer suggested that conflicts of interest might exist, but did not disclose that Defendants were being paid for publishing reports.").

What is more, the FAC alleges that HP admitted it was misleading consumers. HP observed that, by failing to disclose its plan to "block cartridges," it had caused "customer confusion, general customer dissatisfaction," and "customer misunderstandings." FAC ¶¶ 81-82. HP's admissions came in reaction to complaints it received when each new impacted Class Printer received a firmware restriction and consumers lost the value of their non-HP ink purchases. *Id.* ¶ 80. These "[c]onsumer complaints are highly probative of whether a practice is deceptive." *F.T.C. v. Willms*, No. C11-828 MJP, 2011 WL 4103542, at *5 (W.D. Wash. Sept. 13, 2011); *accord Rodriguez v. Hanesbrands Inc.*, No. 17-cv-1612, 2018 WL 2078116, at *4 (E.D.N.Y. Feb. 20, 2018), *report and recommendation adopted*, 2018 WL 1686105 (E.D.N.Y. Mar. 30, 2018) ("[W]hether a reasonable consumer would be deceived into believing that the Products would last longer than non-run resistant hosiery is informed by anecdotal evidence of consumers' experience with the Products . . . ."). But for more than a year after its smoking-gun admission, HP kept selling Class Printers that did not correct the misleading language. FAC ¶¶ 87-93.

For these reasons, HP's "may not work" language was itself a misleading half-truth, actionable under all state laws alleged in Counts I-II.

### C. Plaintiffs plausibly allege HP's duty to disclose.

HP also seeks to shrug off responsibility, claiming it had no duty to disclose its intent. Mem., at 10. Plaintiffs disagree. Under each relevant state law, a duty to disclose arises where a defendant possesses exclusive knowledge of material facts not known to consumers or makes

11

partial representations that create a misleading impression while suppressing additional material facts. *See Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1085 (N.D. Cal. 2022); *Tomassini v. FCA U.S. LLC*, No. 3:14-cv-1226, 2015 WL 3868343, at \*5 (N.D.N.Y. June 23, 2015) (holding that under New York's GBL, "when a defendant exclusively possesses information that a reasonable consumer would want to know and could not discover without difficulty, failure to disclose can constitute a deceptive or misleading practice") (internal citation omitted and alteration deleted); *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 595 (Ill. 1996) (affirming appellate court's "reinstate[ment] [of] the count alleging that Suzuki committed consumer fraud by concealing material facts about the Samurai's safety risks"); *Illinois Cent. Gulf R. Co. v. Dep't of Loc. Gov't Affs.*, 169 Ill. App. 3d 683, 689–90, 523 N.E.2d 1048, 1052 (1988) (recognizing fraud when seller with superior knowledge of material facts fails to disclose those facts); *Zine v. Chrysler Corp.*, 600 N.W.2d 384, 398 (Mich. App. Ct. 1999) (same under Michigan law).

Plaintiffs plausibly allege both circumstances here. This is sufficient at the pleading stage under the law of each state at issue.

### 1. HP held exclusive knowledge of its planned firmware restrictions.

As for superior knowledge, Plaintiffs plausibly allege that HP possessed exclusive knowledge of planned firmware restrictions that would block certain non-HP cartridges. FAC ¶¶ 55-60, 68. None of HP's cited packaging disclosures revealed any internal plan to fire off firmware updates that would disable the printer's ability to use these cartridges. That nondisclosure is significant because exclusive knowledge exists if the defendant knew of the material issue while consumers did not and the nature of the issue made it difficult for consumers to discover. *See Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1175 (E.D. Cal. 2013).

The FAC alleges that that HP planned to roll out firmware restrictions but did not disclose its plan to consumers, and HP's plans were not reasonably discoverable by purchasers at the point

of sale. FAC ¶¶ 39, 55-60, 90, 92-94. Those allegations plausibly establish that the material facts were uniquely within HP's knowledge and support a duty to disclose at this stage. *See Droesser v. Ford Motor Co.*, No. 19-CV-12365, 2023 WL 2746792, at \*21 (E.D. Mich. Mar. 31, 2023) (denying motion to dismiss 52 counts alleging violation of consumer protection laws as to duty to disclose, holding: "At this stage of the case . . . , the Court finds that Plaintiffs adequately plead Ford's superior knowledge of the alleged defects, and plausibly establish a duty to disclose . . . .").

### 2. HP's packaging statements are partial representations or half-truths that trigger its duty to disclose the full truth.

As for half-truths, HP's packaging statements themselves constitute partial representations that triggered a duty to disclose additional material facts. To start, HP labeled each Class Printer as an OfficeJet, DeskJet, or DesignJet. And, due to HP's history of allowing aftermarket competition in these product lines, it was misleading for HP to keep using the same old names without clearly disclosing its plan to introduce new restrictions on replacement inks. *Cf. Buechin*, 511 N.E.2d at 1336 (observing that "a half-truth is sometimes more misleading than an outright lie," and holding that car buyer could have been misled by claim that care was "new" when it was previously owned, despite odometer reading being available to plaintiff).

HP points to disclosures including "Dynamic Security" labeling, statements that printers were "only intended to be used with cartridges using an HP original chip," and warnings that third-party cartridges "may not work" or "may not work in the future." Mem. at 10. None of those statements informed consumers that HP was planning to deploy firmware updates that would *cause* many non-HP inks not to work, which is precisely the omission Plaintiffs challenge. Most consumers "would not understand the word 'may' to mean 'will.'" *Dunbar.*, 896 F.3d at 765. Since HP planned to make the use of certain inks impossible, it owed consumers a duty not to "make a 'may' statement about something that [would be] . . . impossible." *Heredia.*, 942 F.3d at 816.

13

HP's "generic warning of a risk will not suffice when undisclosed facts" show "the risk . . . materialized in the past and is virtually certain to materialize again." *DeFrancesco*, 699 F. Supp. 3d at 240–41. Because HP's intent to block cartridges made it a virtual certainty that impacted cartridges would not work, it had a duty to disclose that intent.

For these reasons, HP's "may not work" language triggered its duty to disclose the full truth about its plan to block non-HP cartridges.

### 3.   HP's disclosure argument is not supported by past cases.

As explained above, HP's argument hinges on the sufficiency of its "may not work" language. Courts addressing similar allegations against HP have declined to treat such cautionary language as adequate disclosure. In *So* and *Mobile Emergency*, the consumer plaintiffs, as here, asserted claims for deceptive and unfair conduct under California's and Florida's consumer protection statutes based upon a fraudulent omission theory. *So*, 2023 WL 4596778, and *Mobile Emergency Hous. Corp. v. HP, Inc.*, No. 20-cv-09157-SVK, 2021 WL 9867952 (N.D. Cal. Oct. 15, 2021). HP's motions to dismiss were denied in each case. *Mobile Emergency*, 2021 WL 9867952 at *11–12.

To argue its blocking of third-party ink was not deceptive, HP cites a case that does not allege the material facts here and was brought under a materially different case theory, *Parziale v. HP, Inc.*, 445 F. Supp. 3d 435 (N.D. Cal. 2020) ("*Parziale I*"); *Parziale v. HP, Inc.*, No. 5:19-cv-05363, 2020 WL 5798274 (N.D. Cal. Sept. 29, 2020) ("*Parziale II*"). Mem., at 13, 31. In *Parziale*, the plaintiff focused on website statements. Mem., at 13. And "[t]he [c]ourt agree[d] that the statement [on HP's website] that HP ink produces 'best results' implie[d] that it [was] possible to use non-HP ink cartridges with the printer." *Parziale I*, 445 F. Supp. 3d at 444. So far, so good. The *Parziale* plaintiff went too far, though, by arguing this meant "the printer is compatible with *all* non-HP cartridges" or "would *always* be compatible with such cartridges." *Id.* (emphasis in

14

original). This overbroad theory is not the basis for Plaintiffs' claims. Nor does *Parziale* allege the facts or case theory at the heart of this case. It is simply not on point.

Unlike *Parziale*, Plaintiffs here allege that (1) the Class Printers become associated with the ability to use non-HP ink (FAC ¶ 39); (2) HP formed a plan to remove this ability before it sold the Class Printers (*id*. ¶¶ 64–70, 73–78); and (3) HP used only conditional "may not work" language, while concealing its plan to cause non-HP ink not to work (*id*.). *Parziale*, on the other hand, did not discuss any plan by HP to disrupt printers at the time it sold them.

Nor does *Parziale* discuss the disclaimers' small font and inconspicuous placement on boxes. This is unsurprising because, as HP admits, the *Parziale* court focused on a website the plaintiff allegedly viewed, rather than the printers' boxes. Mem., at 13. Here, Plaintiffs take aim at HP's printer boxes at the point of sale. ¶¶ ¶¶ 2-3, 6, 44, 64-66, 90-93, 104. This case, then, is more like *So*, where HP "intended to send the firmware updates at the time of [the printer's] purchase" but failed to disclose its intent. *So*, 2023 WL 4596778, at *7.[3] That court denied HP's motion to dismiss. So, too, should the Court here.

In any case, the FAC adds a new element not present in *Parziale* or *So*. The FAC alleges that HP itself admitted its packaging had caused "customer confusion, general customer dissatisfaction," and "customer misunderstandings." FAC ¶¶ 81-82. HP admitted that to stop deceiving customers, it must disclose its intent to "block cartridges." *Id*. ¶ 82. Because these admissions followed real-world consumer reactions, they are "highly probative" in showing HP's practice was deceptive." *Willms*, 2011 WL 4103542, at *5; *Rodriguez*, 2018 WL 2078116, at *4. These new allegations are more than sufficient to allege a deceptive practice.

---

[3] The *So* court focused on this allegation in a prior order, *So v. HP, Inc.*, No. 22-cv-02327, 2022 WL 16925965, at *4 (N.D. Cal. Nov. 14, 2022) ("Plaintiff must also allege facts showing that HP intended to send the firmware updates at the time of purchase.").

### D. Plaintiffs plead fraud with particularity under Rule 9(b).

HP separately argues that Plaintiffs' omission allegations fail to satisfy Federal Rule of Civil Procedure 9(b). That argument likewise fails. Federal Rule of Civil Procedure 9(b) requires that a plaintiff alleging fraud "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see United States ex rel. Conteh v. IKON Office Sols., Inc.*, 103 F. Supp. 3d 59, 64 (D.D.C. 2015). This standard does not demand exhaustive detail. Rather, allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

Plaintiffs satisfy Rule 9(b)'s particularity requirement. The FAC identifies the who (HP as the manufacturer and seller of the Class Printers), the what (HP's packaging statements, including use of brand names that historically could use non-HP ink, and misleading statement that third-party cartridges "may not work"), the when and where (those statements appeared on printer packaging at the point of sale when Plaintiffs purchased the printers), and the how (by omitting HP's then-existing plan to deploy firmware updates that would render certain third-party cartridges incompatible, thereby creating a misleading impression that compatibility issues were merely possible rather than effectively inevitable). FAC ¶¶ 64–70, 73–78.

The FAC also provides contextual allegations regarding HP's prior public treatment of third-party cartridges to explain how reasonable consumers would interpret those packaging statements, not as independent fraud allegations but as background bearing on consumer understanding. FAC ¶¶ 31–44.[4] These allegations show that HP failed to adequately disclose its decision to reduce the compatibility of OfficeJet, DeskJet, and DesignJet printers in a way that a

---

[4] For this reason, HP's references to cases involving "historic" fraudulent statements are not on point.

16

reasonable consumer would grasp. Such allegations mirror *Lazaroff*, where the defendant allegedly "reduc[ed] the weight of [the product's] cylinders from 17 to 15 pounds," but failed to conspicuously disclose this material change to a pre-existing product line. 38 Misc. 3d 1217(A), 967 N.Y.S.2d 867. These allegations give HP clear notice of the challenged statements, the alleged omission, and the basis for Plaintiffs' claims, satisfying Rule 9(b).

### E.  Plaintiffs plausibly allege causation.

HP asserts that the FAC does not properly allege a causal link between HP's alleged misrepresentations and Plaintiffs' harm. *See* Mem. at 17. HP renews its argument that Plaintiffs fail to allege they viewed any of HP's disclosures or omissions. *See* Dkt. 25 at 37–38; Mem. at 17. HP is mistaken. While Plaintiffs do not plead the magic words that they "saw" HP's misstatements, the FAC alleges that the deceptive statements appeared on the printer boxes of all Class Printers at the point of sale. FAC ¶¶ 67-68, 73-74.

The FAC also alleges a causal nexus here, stating that, but for HP's failure to disclose its existing intent to limit the printers' functionality, Plaintiffs either (1) would not have purchased the printers, (2) would have paid less for them, or (3) would not have spent money on third-party ink cartridges rendered unusable by HP's conduct. FAC ¶¶ 60, 63, 77, 95, 104. HP's internal estimates support this theory. Before its deceptive conduct, HP expected that a 10% rise in its prices would lead to a 6-7% drop in customers buying its aftermarket ink supplies. *Id*. ¶ 48. But after HP's scheme, it could raise prices freely without losing market share. *Id*. ¶¶ 101-102.

Through these allegations, Plaintiffs adequately plead that HP's omission caused them harm. Under each relevant state law, individual reliance is not required so long as the misrepresentation caused injury. Injury can occur when, as Plaintiffs allege here, the misstatements "deprives the plaintiff[s] of 'the benefit of [their] bargain' by causing [them] to pay 'more than the

actual value of the property.'" *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 647 (7th Cir. 2019) (quoting *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010)).

The "deceptive" prong of the Illinois CFA is the only state statute here in which individual reliance issues are arguably relevant. Still, Illinois courts continue to hold that "[u]nlike common law fraud, plaintiffs need not show actual reliance under the Consumer Fraud Act." *Schaff v. Travelers Home & Marine Ins. Co.*, 2025 IL App (1st) 240276, 2025 WL 3249567, ¶ 151 (Ill. App. Ct. 2025); *accord Bixby's Food Sys., Inc. v. McKay*, 193 F. Supp. 2d 1053, 1064 (N.D. Ill. 2002) (same). For Illinois, Plaintiffs allege deception at the point of sale and, separately, allege HP's scheme was unfair. FAC, ¶¶ 135-39. So even as to this prong, Plaintiffs state a cause of action.

As for the remaining state consumer protection statutes, the law is clear that no individual reliance is required. Courts applying the Massachusetts and New York statutes hold that individual reliance is not required, and the deception may cause harm by leading to a price premium or depriving the plaintiff of the benefit of the bargain. *See*; *Fraser Eng'g Co. v. Desmond*, 524 N.E.2d 110, 113 (Mass. App. Ct. 1988) ("Nor is proof of actual reliance on a misrepresentation required so long as the evidence warrants a finding of a causal relationship between the misrepresentation and the injury to the plaintiff.") (applying Massachusetts law); *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 576–77 (S.D.N.Y. 2021) ("An injury under §§ 349 and 350 therefore may be alleged under a price premium theory whereby a plaintiff claims to have paid more for the product than he or she would have if the defendant did not engage in allegedly deceptive practices."); *O'Neill v. Standard Homeopathic Co.*, 346 F. Supp. 3d 511, 529 (S.D.N.Y. 2018) ("[N]either Section 349 nor 350 require proof of reliance . . . ."). The same is true of the other state statutes under which Plaintiffs bring claims:

- **Alabama:** *Robinson v. Gen. Motors LLC*, No. 20-cv-663, 2021 WL 3036353, at *9 (D. Del. July 19, 2021), *report and recommendation adopted*, 2021 WL 7209365 (D. Del.

18

Nov. 30, 2021) ("As Plaintiffs argue, they 'need not plead reliance when they allege misrepresentations by concealment or omission' to state a claim under the Alabama DTPA.'") (internal citations omitted) (denying motion to dismiss on this basis).

- **Florida:** *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016) (holding mental state of each class member irrelevant because plaintiff asserting a FDUPTA claim need not show actual reliance on representation or omission).

- **Michigan:** *Estate of Pilgrim v. Gen. Motors LLC*, 344 F.R.D. 381, 408 (E.D. Mich. 2023) (reiterating that the Michigan Supreme Court held that members of a class need not individually prove reliance on the alleged misrepresentations).

- **Minnesota:** *In re St. Jude Med., Inc.*, 522 F.3d 836, 839 (8th Cir. 2008) (explaining Minnesota consumer protection statutes do not require proof of individual reliance).

- **Missouri**: *In re Smitty's/Cam2 303 Tractor Hydraulic Fluid Mktg.*, No. 4:20-MD-02936, 2023 WL 9064606, at *17 (W.D. Mo. Dec. 13, 2023) ("[T]he MMPA does not require individualized evidence as it pertains to reliance . . .").

- **New Jersey:** *Elias v. Ungar's Food Products, Inc.*, 252 F.R.D. 233, 239 (D.N.J. 2008) ("The NJCFA 'does not require proof that a consumer had actually relied on a prohibited act in order to recover.'").

- **Washington:** *Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299, 1311 (11th Cir. 2023) ("Washington courts have held that a plaintiff suing under the statute must prove 'a causal link between the act and the injury.' . . . But they have clarified that reliance is merely one way to establish causation—reliance is not itself a necessary element.").

- **Idaho:** *Roost Project, LLC v. Andersen Constr. Co.*, 437 F. Supp. 3d 808, 827 (D. Idaho 2020) ("It is not necessary to prove actual intent to deceive or actual deception on behalf of the defendant, as long as a tendency or capacity to mislead consumers has been established.").

Plaintiffs, therefore, plausibly allege causation at the pleading stage. HP's argument provides no basis for dismissal of the FAC.

19

#### F. Pre-suit notice not required.

HP's argument, Mem. at 39, that the failure to allege compliance with state law pre-suit notice requirements in Alabama and Massachusetts dooms Plaintiffs' consumer protection claims in those states runs directly counter to *Shady Grove* and its progeny and should be summarily rejected. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 410 (2010). The notice provisions referenced by HP (Mem. at 39) are state procedural rules that conflict with Rule 23 and therefore are displaced and unenforceable in federal court. *Id* at 410.

Courts across multiple jurisdictions have concluded that when a consumer protection state requires pre-suit notice, it is imposing a procedural restriction beyond those required by Rule 23, so it is preempted under *Shady Grove. See In re Dealer Mgmt. Sys. Antitrust Litig.*, 2023 WL 4305901 *46 (N.D. Ill. June 29, 2023) (denying summary judgment motion, the Court held that state statutes in Hawaii, Utah and New Jersey that require pre-suit notice to bring class actions are procedural, not substantive, in nature and conflict with Rule 23; consequently, they are unenforceable in federal court under *Shady Grove*); *In re Restasis Antitrust Litig.*, 355 F. Supp. 3d 145, 155-56 (E.D.N.Y. 2018) (denying motion to dismiss on basis that pre-suit notice statutes conflict with Rule 23 and are insufficient to bar class action under Rule 12(b)(6)); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 253–54 (D. Conn. 2015) (a "plain reading" of Hawaii' pre-suit notice statute reflects that the notice requirement is procedural). HP's motion should be denied.

### II. Plaintiffs' Antitrust Claims are Adequately Pled.

Next, HP targets Plaintiffs' claims that derive from state and federal antitrust laws, Counts III – XXX. Contrary to HP's assertions, Plaintiffs adequately allege antitrust violations stemming from HP's exclusionary behavior in the aftermarket for replacement ink cartridges.

20

### A. Plaintiffs plausibly allege monopolization and exclusionary conduct in violation of Section 2 of the Sherman Act.

In Counts III, V, and VI-XXX, Plaintiffs allege that HP employed a bait and switch on consumers who bought the Class Printers, locking them in by removing their aftermarket ink choices. Plaintiffs allege that these actions violated Section 2 of the Sherman Act, 15 U.S.C. 2.

A violation of Section 2 targets both the possession of monopoly power and the conduct used to obtain or keep it. The Supreme Court has framed the inquiry in two related ways: a monopolization claim requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power," as opposed to growth from "a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

The Supreme Court has set standards for exclusionary conduct in a single-brand aftermarket. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 476 (1992) (Section 2 claim stated based on defendant's practice of selling primary market product, then imposing new restrictions on aftermarket replacement supplies, plus consumers' lack of awareness of these restrictions or their costs, and the high cost of switching brands in primary market). At bottom, "[w]hat the Supreme Court held in [*Kodak*] is not that firms with market power are forbidden to deal in complementary products, but that they can't do this in ways that take advantage of customers' sunk costs." *Schor v. Abbott Lab'ys*, 457 F.3d 608, 614 (7th Cir. 2006).

There are two "interrelated circumstances" in which a company may, in violation of *Kodak*, take advantage of customers' sunk costs:

> [T]he focus in aftermarket repair cases should be on two interrelated circumstances. The first involves a change in policy after the consumer has made a significant expenditure in the product.

21

But that doesn't mean a lack of knowledge and availability of information regarding repairs after the consumer has made a significant expenditure in the product is irrelevant. Indeed, this is the second circumstance that a court should consider.

The first is similar to a bait-and-switch; whereas, the second involves the inability of the customer to determine "all in cost" or "life-cycle cost" for the product.

*In re Deere & Co. Repair Serv. Antitrust Litig.*, No. 3:22-cv-50188, 2023 WL 8190256, at \*19 (N.D. Ill. Nov. 27, 2023).

Both circumstances are alleged here. The FAC alleges that (1) HP enacted a change in policy, removing the Class Printers' ability to accept many non-HP inks through post-sale firmware restrictions; (2) when customers bought the Class Printers, HP's intent to block competitors' cartridges was not generally known; (3) HP locked in an appreciable percentage of its customers through this change; (4) the high switching costs of buying new printers precludes primary market competition from adequately policing the aftermarket; (4) HP was able to charge supracompetitive prices in the aftermarket after this switch. FAC, ¶¶ 160-166.

The Court should therefore deny HP's motion.

1. **In a single-brand aftermarket case, "exclusionary conduct" focuses on whether the *Kodak* factors are present.**

HP's primary argument is that Plaintiffs have failed to allege exclusionary conduct sufficient to violate Section 2. Oddly, HP spends little time denying that Plaintiffs adequately pled all the *Kodak* factors relevant to aftermarket cases. The FAC plainly alleges that HP engaged in "a bait-and-switch" by imposing post-sale restrictions on the Class Printers' ability to accept ink cartridges and also alleges informational and switching costs. *In re Deere*, 2023 WL 8190256, at \*19. FAC, ¶¶ 160-166.

Still, HP claims that "even in aftermarket cases, a plaintiff must allege the defendant engaged in the 'willful acquisition or maintenance of that power' through exclusionary conduct." Mem., at 25 (citing *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 396–97 (7th Cir. 2000)). While

22

not clear, HP appears to assert that the *Kodak* factors, by themselves, do not count as sufficient "exclusionary conduct" to support a Section 2 claim in the context of an aftermarket. If that is HP's argument, it is incorrect. The case HP cites, *Goldwasser*, does not support any such claim. *Goldwasser*'s sole mention of *Kodak* is produced below in full:

> The Supreme Court has had a number of occasions on which to address the elements of a Section 2 monopolization case, most recently in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). There, . . . the Court reviewed what it takes to prove monopolization:
>
>> The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*Goldwasser,* 222 F.3d at 396–97. This is the entirety of *Goldwasser*'s discussion of *Kodak*.

The *Goldwasser* court never addresses whether the *Kodak* factors, without more, count as sufficient "willful acquisition or maintenance" of monopoly power in an aftermarket. But in a later decision, the Seventh Circuit made a statement supporting Plaintiffs' view. It held that under *Kodak*, a company may not "take[s] advantage of customers' sunk costs." *Schor,* 457 F.3d at 614 (construing *Kodak*). This language supports the view that exclusionary conduct necessarily exists if, as in *Kodak*, the defendant employs a "bait-and-switch" to control the aftermarket. *In re Deere*, 2023 WL 8190256, at *19. In other words, intentional monopolization exists when the defendant imposes restrictions on the aftermarket (here, inks) after consumers have already bought the primary market product (here, printers).

HP is not the first to argue that in addition to proving a bait-and-switch, a plaintiff must allege further "exclusionary conduct." The Third Circuit has squarely rejected this argument, holding that in the *Kodak* context, "any proof that the primary market and the aftermarket are separate for antitrust purposes will necessarily include substantial evidence of predatory conduct."

23

*Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 406–07 (3d Cir. 2016); *see also In re Deere*, 703 F. Supp. 3d at 898 (favorably citing *Avaya*'s discussion of *Kodak* factors).

Much like HP, the *Avaya* defendant sought to vacate a verdict for aftermarket monopolization by arguing "there was insufficient evidence of predatory conduct." 838 F.3d at 406. The *Avaya* court agreed that "in a *traditional* § 2 claim, a plaintiff would have to point to specific, egregious conduct that evinced a predatory motivation and a specific intent to monopolize." *Id*. (emphasis added). "But in the context of a *Kodak* claim," this traditional analysis did not apply. *Id*. It was enough to show "any proof" that "through some combination of price discrimination and post-sale surprise in the aftermarket, the defendant has managed to dissociate a competitive primary market from an aftermarket that the defendant dominates." *Id*. "In *Kodak*, [the aftermarket] domination was through control over proprietary parts; [in *Avaya*], it [was] alleged to exist through control of proprietary software." *Id*. at 406-07.

In rejecting the argument that more exclusionary conduct is required, *Avaya* drew from *Kodak*'s discussion of this topic. The *Avaya* panel observed that in *Kodak*, the Supreme Court did not require additional "predatory" conduct beyond the post-sale surprise that convinced it to treat the primary market and the aftermarket as separate for antitrust purposes. *Id*. at 407 ("In considering the predation prong of § 2 claims, the Court in *Kodak* merely incorporated its prior analysis of market separation to conclude that the plaintiffs had 'presented evidence that Kodak took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen its monopoly share of the Kodak service market.'").

This Court should reach the same conclusion. So long as the *Kodak* factors are alleged (which they are here), exclusionary conduct exists under Section 2. Just as in *Avaya*, HP is using "post-sale surprise" and its control over printer-embedded software, or "firmware," to monopolize

24

an aftermarket. HP's control over the Class Printers' firmware allowed HP to alter functionality after sale, disabling third-party cartridges. FAC ¶¶ 47–53, 58–60, 94, 98, 107-115. HP used that embedded control to separate the competitive printer market from the aftermarket for replacement ink and to dominate the latter. *Id*. By itself, this is sufficient exclusionary conduct under Section 2 of the Sherman Act.

Relatedly, HP attempts to narrow this reading of *Kodak* by reframing Plaintiffs' Section 2 claim as if it rises or falls on a refusal-to-deal theory. It does not. Nor does *Kodak* require that exclusionary conduct take the form of a classic refusal to deal. The Court in *Kodak* rejected the defendant's argument its conduct amounted only to a unilateral refusal to deal. *Kodak*, 504 U.S. at 463 n.8. HP's conduct, as alleged here, is analogous. Plaintiffs do not premise their Section 2 claim on a duty-to-deal theory or on the unilateral termination of a prior voluntary course of dealing. Plaintiffs allege that HP used its control over the functionality of printers already sold to consumers to disable third-party cartridges through firmware updates, foreclosing competition in the replacement-ink aftermarket. FAC ¶¶ 47–53, 58–60, 94, 98. This conduct is not a passive refusal to transact with rivals; it is a technological restriction designed to prevent consumers from using competing products. And that restriction took the form of a "post-sale surprise." *Avaya*, 838 F.3d at 406. HP only sabotaged the Class Printers' ability to accept non-HP inks after Class Members had purchased them. *Id*., ¶¶113, 115. This is sufficient exclusionary conduct.

HP's framing the issue as a "refusal to deal" does not diminish this point. In *Verizon v. Trinko*, the Supreme Court reaffirmed that unilateral refusals to deal are generally lawful absent narrow exceptions. 540 U.S. 398, 409–11 (2004). But *Trinko* did not hold that exclusionary conduct must take the form of a terminated prior course of dealing to be actionable. Section 2 reaches conduct that "impairs the opportunities of rivals" and harms the competitive

25

process. *Kodak*, 504 U.S. at 483. Plaintiffs allege precisely that: HP altered product functionality post-sale to prevent the use of rival cartridges, maintaining monopoly power in the aftermarket. FAC ¶¶ 58–60, 94, 98. HP's attempt to reduce the Section 2 analysis into a refusal-to-deal framework ignores the nature of the alleged conduct. Plaintiffs do not claim that HP was required to supply competitors. HP's use of its control over its own product to exclude competitors from the aftermarket qualifies as exclusionary conduct under Section 2, consistent with *Kodak*.

To conclude, in an aftermarket monopolization case, the plaintiff's burden is to allege the existence of a bait-and-switch, through which the defendant maintains an aftermarket monopoly by exploiting "customers' sunk costs." *Schor,* 457 F.3d at 614. Plaintiffs allege that here. The specific *Kodak* factors are discussed below.

### 2.   Plaintiffs allege a change in policy.

First, Plaintiffs allege a switch in policy. FAC ¶ 108. In *Kodak*, the switch arose out of unilateral changes to the parts and repair policies after customers had already purchased equipment. 504 U.S. at 440, 473–77. Because the change "was not foreseen at the time of sale, buyers had no ability to calculate these higher costs at the time of purchase and incorporate them into their purchase decision." *Id.* at 473–74. So, *Kodak*'s concern is largely based on a threat of unfair surprise for customers in the aftermarket, a threat which could be reduced if the aftermarket terms were clearly stated in a primary market contract.

Similarly, here, when consumers purchased the Class Printers, it was possible to use non-HP replacement cartridges. *Id.* ¶¶ 13–14, 38, 47–53. HP marketed its printers as allowing consumer choice, while criticizing third-party cartridges on quality grounds. *Id.* ¶¶ 34–38. Only later did HP disable functionality through remotely issued firmware updates. FAC ¶¶ 1, 6–16, 40–43, 58–63. As in *Kodak*, by making it impossible to use third-party ink in these models, HP changed its policy toward them so that it may "take advantage of customers' sunk costs." *Schor,* 457 F.3d at 614.

26

### 3. HP's planned restrictions were not "generally known" when the Class Printers were purchased.

Second, Plaintiffs allege that consumers were unaware of this switch at the point of sale. FAC ¶ 109. Millions of customers purchased HP printers without knowing that HP would later disable third-party cartridges. *Id.* These customers accounted for an appreciable share of HP's total printer market. *Id.* Indeed, HP's own internal estimates showed that approximately 25% of all printer customers and 30% of inkjet customers purchased non-HP replacement ink prior to the firmware updates. *Id.* Such a market would not have existed if consumers "generally knew" HP would later block third-party cartridges. Indeed, before HP's change it policy, expected that a 10% rise in its prices would lead to a 6-7% drop in its aftermarket share. *Id.* ¶ 48. But after HP's scheme, it raised prices at the same time it reduced those customers buying non-HP ink to less than 10% of the total. *Id.* ¶¶ 95, 101-102.

As explained in Section I above, HP's "may not work" language misled consumers. In fact, HP admitted that by failing to disclose its plan to "block cartridges" not containing HP chips, it had caused "customer confusion," "dissatisfaction," and "misunderstandings." FAC, ¶¶ 81-82. Rather than repeat this discussion, Plaintiffs incorporate their arguments in Section I of this brief as to why HP misled consumers at the point of sale.

Merits aside, HP is raising a fact-bound challenge about consumers' knowledge. This is not a proper argument for a Rule 12(b)(6) motion. This court recently denied a similar motion to dismiss a *Kodak* tying claim, concluding that "[w]hether Plaintiffs knew of the repair policy and the extent of that knowledge is a factual dispute better resolved later in this case, rather than in a Rule 12 motion." *In re Deere & Co.*, No. 32023 WL 8190256, at \*20; *accord In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1306 (N.D. Cal. 2008) ("The fact that Apple disputes whether Plaintiffs 'knowingly placed [Apple] in a monopoly position' merely creates a factual

27

dispute better suited for resolution at a later stage of this litigation."). This Court should reach the same conclusion here.

### 4. Plaintiffs plausibly allege significant information and switching costs.

The next *Kodak* factor addresses "the existence of significant information and switching costs." *Kodak*, 504 U.S. at 473. Under *Kodak*, the relevant question is "the existence of significant information and switching costs." 504 U.S. at 473. "Information costs are costs that prevent consumers from obtaining all relevant information about a product at the time of sale. Switching costs are borne by customers who have already purchased a product and who would then incur some cost in switching to another product." *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 818 (6th Cir. 1997). Here, Plaintiffs allege both.

Plaintiffs allege they were coerced into accepting HP's inflated ink prices because (1) they did not know HP would engage in its firmware update when they bought their printers, and (2) the costs of switching to a new printer exceed the costs of buying HP's ink. FAC ¶¶ 21, 27. As to information costs, consumers purchased HP printers without sufficient knowledge that HP would later deploy firmware updates to disable third-party cartridges. FAC ¶¶ 34–39, 47–53. HP publicly framed the issue as one of consumer choice and product quality, suggesting that non-HP ink "may not work," while never disclosing that HP itself would later impose a technological block. *Id.* ¶¶ 36–38. As stated in the pleadings, at the time of sale, customers had "no reason to suspect" that HP would later sabotage compatibility. *Id.* ¶ 39.

As to switching costs, HP argues that "several hundred dollars" in switching costs cannot lock in an appreciable number of consumers. Mem., at 34. This argument would come as news to the 45% of Americans who report being unable to cover an unexpected $1,000 expense,[5]

---

[5] Konish, Lorie, *44% of Americans Can't Pay an Unexpected $1,000 Expense From Savings. 'We're Just Not Wired to Save,' Expert Says*, CNBC (Jan. 24, 2024),

particularly where replacing a printer to avoid HP's ink would require discarding a functioning device and purchasing a new one costing several hundred dollars. *Id.* ¶¶ 24, 98. A full HP-branded replacement set may cost approximately $100. *Id.* ¶ 98. Faced with that choice, an ordinary consumer with ongoing printing needs would rationally purchase HP ink—however reluctantly—rather than incur the higher upfront cost of a new printer. *Id.* ¶¶ 25–30, 98. Plaintiffs have expressly alleged that it is "not practical or economically rational to purchase a new printer" simply to avoid HP's replacement cartridges. *Id.* ¶ 98.

Despite real-world evidence, HP claims "[o]ne court has held that switching costs of $3,000 . . . were not sufficiently high to lock customers into a printer brand." Mem., at 34 (citing *Xerox Corp. v. Media Sciences, Inc.*, 660 F. Supp. 2d 535, 348 (S.D.N.Y. 2009)). But *Xerox* did not hold that such costs were categorically insufficient. Instead, the court explained that "[t]he significance of the $3,100 price tag depends entirely on individual users' cost structures." 660 F. Supp. 2d at 547. In *Xerox*, the printer models were primarily sold to "business user[s]," including "large customers [who] [we]re likely to be purchasing printers 'all the time.'" *Id.* at 541, 548. The court granted summary judgment against plaintiff not because switching costs were too low, but because plaintiff—Xerox's competitor—"offer[ed] *no evidence of actual user behavior* in the market for color workgroup printers." *Id.* (emphasis added). While the plaintiff's expert presented evidence of economic theory, real-world evidence was lacking: "A lock-in phenomenon must be shown, not assumed." *Id.* (internal citation omitted).

Just as a lock-in cannot be assumed without real-life examples, neither should the Court adopt HP's assumption that the costs here do not lock in consumers. The *Xerox* court itself denied

---

https://www.cnbc.com/2024/01/24/many-americans-cannot-pay-for-an-unexpected-1000-expense-heres-why.html.

a motion to dismiss, finding the complaint "adequately alleged" an aftermarket monopoly despite Xerox's theory that this could not occur due to "the modest cost of color printers." *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 387 (S.D.N.Y. 2007).

Unlike the plaintiff in *Xerox*, Plaintiffs here are consumers who did purchase HP ink—despite preferring third-party ink—because the costs of switching printers were too steep. On top of that, Plaintiffs allege that before HP's firmware restrictions, it knew that a 10% rise in its prices would lead to a 6-7% drop in its aftermarket share for ink. FAC ¶ 48. But after HP's scheme, it raised prices at the same time it reduced those customers buying non-HP ink to less than 10% of the total. *Id*. ¶¶ 95, 101-102. These facts establish the "actual consumer behavior" that was missing from the summary judgment record in *Xerox*.

### 5. Plaintiffs plausibly allege the relevant market HP dominates.

Next, HP claims Plaintiffs have not defined a relevant market in which it exercises exclusionary conduct. HP is mistaken. To state a claim under Section 2 of the Sherman Act, "a plaintiff must allege that the defendant has market power within a 'relevant market,'" consisting of both product and geographic markets. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044, 1045 n.4 (9th Cir. 2008). The product market "must encompass the product at issue as well as all economic substitutes for the product." *Id.* at 1045. "[S]ince the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Id.* Dismissal is only appropriate "if the 'relevant market' definition is facially unsustainable." *Id.*

First, Plaintiffs allege both a relevant product market and a relevant geographic market. The FAC does so by alleging a United States aftermarket for replacement ink cartridges compatible with HP printers. FAC ¶¶ 24–26, 107–110, 115. The geographic market for replacement ink reflects commercial reality as described in the FAC. Replacement cartridges are marketed and sold

30

nationwide, including through online platforms that ship directly to consumers across state lines. *Id.* ¶¶ 30, 54, 89. On these allegations, a nationwide geographic market is consistent with how replacement ink is actually distributed and purchased. *Id.* ¶¶ 47–53, 94, 98. Competition for those sales occurs on a nationwide scale, and consumers face the same set of sellers regardless of where they reside. *Id.*

In these circumstances, alleging a national market is consistent with commercial reality. *See AliveCor, Inc. v. Apple Inc.*, 592 F. Supp. 3d 904, 914 n.6 (N.D. Cal. 2022) (recognizing the United States as relevant geographic market at pleading stage). Because the FAC pleads a coherent aftermarket in which consumers purchase ink throughout the country, and sellers compete nationally, there is no "fatal legal defect" in its geographic market allegations. *Newcal*, 513 F.3d at 1045.

Second, even accepting HP's premise that "not all ink works with all printers," there is still a well-defined aftermarket for replacement cartridges compatible with specific HP printer models within a given series. The FAC does not allege a market for "all ink for all printers." It alleges an aftermarket for cartridges designed to function in particular HP models within a series, exactly how HP structures and markets its products. FAC ¶¶ 38–39, 47–53, 58–60, 62–63. As HP's own product lines reflect, a single cartridge set is marketed to work across multiple printer models within the same series—for example, the OfficeJet Pro 6900 series, which includes models such as the 6954, 6958, 6962, 6968, 6975, and 6978. Likewise, the OfficeJet Pro 8030 series encompasses models demarcated by the same leading digits, and HP sells a single cartridge type compatible with each of those models. In that commercial setting, the competitive universe is clear: for a given model within a series, consumers may purchase HP-branded cartridges or third-party cartridges designed to function in that same device. *Id.* ¶¶ 47–53, 94, 98.

31

From the consumer's perspective, non-HP replacement cartridges designed for use in a given HP printer model serve the same function as HP-branded cartridges: they produce printed pages in a printer the consumer already owns. They are purchased for the identical purpose and compete on price, quality, and availability. That is reasonable interchangeability in the antitrust sense, products that are substitutes "for the purposes for which they are produced, price, use and qualities considered." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003). When HP raises the price of its cartridges, consumers would ordinarily switch to third-party cartridges compatible with that model. The FAC alleges that HP implemented firmware restrictions to prevent that substitution. FAC ¶¶ 47–53, 58–60, 94, 98. The cross-elasticity of demand between HP ink cartridges and non-HP ink cartridges compatible with the same HP printer model defines a cognizable aftermarket for replacement ink for HP printers. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995).

Third, HP's own disclosures recognize the aftermarket as a unified competitive space. When evaluating "unprofitable customers," HP grouped ink sales together and analyzed aftermarket ink revenue as a single stream. FAC ¶ 115. HP did not treat HP 62 ink as competing in a different economic universe from HP 63 ink; it treated ink revenue as a consolidated aftermarket tied to its installed printer base. *Id.* A firm's internal recognition of an aftermarket and its installed-base economics is powerful evidence that the market is economically real. *See Newcal*, 513 F.3d at 1050 (looking to commercial realities).

In a monopolization claim, "a plaintiff must allege that the defendant has market power within a 'relevant market,'" consisting of both product and geographic markets. *Newcal*, 513 F.3d at 1044, 1045 n.4. The product market "must encompass the product at issue as well as all economic substitutes for the product." I*d.* at 1045. "[S]ince the validity of the 'relevant market' is

32

typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Id.* Dismissal is only appropriate "if the 'relevant market' definition is facially unsustainable." *Id.*

HP's reliance on cases disfavoring single-brand markets ignores that this case is similar to the circumstances recognized in *Kodak*. Contrary to HP's characterization of the alleged market as merely an "aftermarket for its own brand," the relevant market for replacement cartridges compatible with the Class Printers arises from HP's post-sale lock-in of consumers after they purchased the printers. *Kodak* itself made clear that a derivative aftermarket may constitute a relevant market where the defendant exercises post-sale control over a product in a manner that locks in consumers after they have made a substantial investment in the foremarket product. *Kodak*, 504 U.S. at 476–77. Here, Plaintiffs define the relevant market as the nationwide aftermarket for replacement ink cartridges compatible with the Class Printers. FAC ¶ 30. Plaintiffs further allege that, at the time consumers purchased HP printers, third-party cartridges were compatible and functioned as economic substitutes. *Id*. ¶¶ 47–53. Only after consumers had invested in HP printers did HP deploy firmware updates that disabled non-HP cartridges and made continued use of the printers contingent on purchasing HP-branded ink. *Id*. ¶¶ 58–63, 94, 98, 106. For that reason, the relevant market at issue in this case is far from a traditional single-brand aftermarket; rather, it is a market created by HP's post-sale lock-in, precisely the type of derivative aftermarket recognized in *Kodak*.

This case is distinguishable from *Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997), which HP cites to argue that Plaintiffs' alleged relevant market is an impermissible single-brand market. In *Queen City*, the restriction arose from express contractual provisions that franchisees knowingly accepted at the outset, and thus, the limitation was disclosed, contractual,

and part of the original bargain. *Id.* Here, by contrast, the Plaintiffs allege that third-party cartridges functioned as economic substitutes at the time consumers purchased the Class Printers. FAC, ¶¶ 34–39, 47–53. HP's own marketing framed the issue as consumer choice, asserting that non-HP ink "may not work" or might be of inferior quality, while repeatedly representing that customers were free to choose. *Id.* ¶¶ 36–38. In fact, it is HP's own argument that Plaintiffs were not coerced because they did not know third-party cartridges would be disabled in the future. Mem., at 20. At no point did HP disclose that it would later deploy firmware to disable third-party cartridges. *Id.* ¶¶ 39, 58–63.

HP's reliance on *Harley-Davidson* is misplaced for a similar reason. In *Harley-Davidson,* the Seventh Circuit affirmed dismissal because the challenged policy was disclosed and available at the time of purchase, and plaintiff did not allege concealment, post-sale change, or substantial switching costs. *In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*, 151 F.4th 922, 936 (7th Cir. 2025). Here, by contrast, HP did not sell the Class Printers with a clear disclosure that it would later deploy firmware to block third-party cartridges. At the time of purchase, third-party cartridges functioned as substitutes, and consumers were led to believe they were free to choose among them. FAC ¶¶ 34–39, 47–53. HP's messaging suggested that non-HP ink "may not work" due to quality concerns—not that HP itself would impose a technological lockout after sale. FAC ¶¶ 36–39. Unlike *Harley-Davidson*, where the policy was disclosed and available at the time of purchase, Plaintiffs allege a post-sale restriction that consumers did not anticipate and could not evaluate when they bought their printers. FAC ¶¶ 39, 58–63, 94, 98, 106. Therefore, the aftermarket for ink replacement cartridges became HP-exclusive only after HP disabled compatibility with rival cartridges.

**6.    The relevant aftermarket need not be pleaded at the submarket level.**

HP seems to argue that Plaintiffs were required, *at the pleading stage*, to subdivide the alleged aftermarket into separate printer-series submarkets because cartridges are not cross-compatible across all models. Mem., at 26. That argument simply does not reflect the governing pleading standard. Even assuming that particular printer series could ultimately constitute economically distinct submarkets, antitrust law does not require Plaintiffs to break down the alleged aftermarket into its smallest possible economic units in order to survive Rule 12(b)(6). Nor does Rule 12 require Plaintiffs to align their class definition with every potential submarket permutation. HP's position improperly conflates merits-based market-definition analysis and Rule 23 considerations with Rule 8's minimal pleading standard.

The Seventh Circuit has expressly rejected attempts to impose heightened pleading burdens in antitrust cases. In *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967 (7th Cir. 1995), the court reaffirmed that antitrust plaintiffs need only provide "a short and plain statement of the claim," and are not required to plead "the particulars" of market structure at the outset. *Id*. at 976. Courts in this District have applied that principle specifically to market definition, recognizing that it is a "deeply fact-intensive inquiry" and that, at the pleading stage, the question is only whether it is conceivable the plaintiff could prove the alleged market. *JamSports & Ent., LLC v. Paradama Prods., Inc.*, 2003 WL 1873563, at *6 (N.D. Ill. Apr. 15, 2003).

Consistent with that framework, disputes over the proper level of market granularity are factual questions inappropriate for resolution on a motion to dismiss. As the Ninth Circuit explained in *Newcal Indus., Inc. v. IKON Office Solutions, Inc.*, 513 F.3d 1038 (9th Cir. 2008), dismissal is warranted only where a market definition is "facially unsustainable." *Id.* at 1045. Because the validity of a relevant market is typically a factual matter, alleged markets may proceed past Rule 12 subject to later testing through discovery and summary judgment. *Id*. The court further

35

clarified that while a plaintiff must ultimately show economic distinctness if it relies on a submarket theory, it "need not necessarily establish [that] in the complaint." *Id.*

Likewise, although "well-defined submarkets may exist," a plaintiff need only be able to show their economic distinctness — not plead them with precision at the outset. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018). The principles of interchangeability and cross-elasticity of demand that HP invokes guide the ultimate economic analysis; they do not impose a heightened pleading requirement. To the extent internal variation within the alleged aftermarket may later justify subdivision, that issue belongs at class certification, not at the Rule 12 stage. Courts routinely address such refinements after factual development. *See*, *e.g.*, *McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d 461 (E.D. Pa. 2009); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 337 (N.D. Ill. 1997) (noting that market variation may "at most" require subclasses at certification).

Applying those principles here, HP's argument asks the Court to resolve factual questions about market granularity at the pleading stage. Plaintiffs allege that replacement ink was expected to function within defined printer families—such as OfficeJet, DeskJet, and DesignJet—when consumers purchased the Class Printers. FAC ¶¶ 13–14, 47–53. Ink compatibility operated within those series, meaning cartridges designed for a given line of HP printers worked across models within that same product family. *Id.* ¶¶ 34–39, 47–53. That interoperability is what made third-party cartridges viable economic substitutes at the time of purchase.

HP ignores those allegations and instead assumes that variation across printer models defeats the plausibility of the alleged aftermarket. But Plaintiffs explain why consumers relying on cartridges compatible within a series would not reasonably view switching to an entirely different printer ecosystem as an interchangeable alternative. *Id.* ¶¶ 47–53, 94, 98. For those consumers, the relevant competitive constraint was ink designed to work with their specific HP

printer family, not ink generally compatible across unrelated devices. HP's firmware updates disrupted that compatibility after sale. FAC ¶¶ 58–63, 94, 98, 106. Cartridges that previously worked within a given printer line were rendered unusable through post-sale software restrictions. Id. To the extent HP now points to incompatibility across models, that condition arises from HP's own conduct—not from the structure of the market when consumers made their purchase decisions. *Id*. ¶¶ 47–53, 58–63.

At most, HP raises a factual dispute about how finely the aftermarket should be defined— whether at the level of all HP-compatible replacement ink or by printer-series submarkets. Plaintiffs plausibly allege that ink was expected to work within defined printer families, supporting the existence of economically distinct submarkets tied to those series. *Id*. ¶¶ 13–14, 34–39, 47–53. Whether those submarkets should ultimately be refined is a question for discovery and class certification, not Rule 12. Accordingly, Rule 12(b)(6) does not require Plaintiffs to resolve that economic question now.

### B. The FAC plausibly alleges an unlawful tie and exclusionary conduct under Section 1 of the Sherman Act.

In Count VI, Plaintiffs sufficiently plead an unlawful tying arrangement. The FAC alleges a straightforward course of conduct: HP sold printers that were compatible with third-party cartridges, and later issued firmware updates that blocked those cartridges and disabled the printers unless consumers purchased HP-branded ink. That conduct is the kind of coercive restraint antitrust law addresses, because it uses control over the tying product—HP printers—to force purchases in the tied market—ink cartridges. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984); *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 592 (7th Cir. 2008).

"[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied

product that the buyer either did not want at all, or would have preferred to purchase elsewhere on different terms." *Jefferson Parish*, 466 U.S. at 12. The same coercive conduct exists here.

As for what exclusionary conduct must be alleged in aftermarket cases, Plaintiffs incorporate their discussion above as to their aftermarket monopolization claims. Plaintiffs also incorporate their discussion of the relevant market definition. Below, Plaintiffs seek to address any remaining arguments specific to their tying claim under Section I of the Sherman Act.

When HP placed the Class Printers into the market, they were fully compatible with third-party cartridges. FAC ¶¶ 38–39, 115. Consumers, in fact, purchased and used those cartridges, demonstrating that they did not wish to be limited to HP-branded ink. *Id*. ¶¶ 47–48, 50–53. Only after consumers had made that investment did HP deploy firmware updates that disabled the printers' ability to function with non-HP cartridges, making continued use of the printer contingent upon the installation of HP ink. *Id*. ¶¶ 58–60, 62–63, 106. In practical terms, once HP altered the functionality of the printers, consumers could not continue using the tying product they already owned without purchasing the tied product from HP. FAC ¶¶ 94, 98, 106. That is precisely the type of exploitation *Jefferson Parish* identifies—control over one product leveraged to eliminate meaningful competitive choice in another market. 466 U.S. at 12.

HP's conditioning argument rests on a rule that *Kodak* does not impose. HP insists that a tying arrangement can exist only if, when the consumer purchases the tying product, the seller expressly conditions that sale on an agreement to purchase the tied product, and that no coercion can be alleged if the consumer was unaware of such a condition at that moment. Mem., at 19–20. But *Kodak* itself did not turn on whether the defendant announced its restriction at the outset of sale. It turned on whether the defendant later exploited its control over the primary product to force purchases in the aftermarket. 504 U.S. at 458–61. The challenged conduct in *Kodak* was a

38

unilateral policy change that occurred after equipment was sold. *Id*. at 458. The Court did not hold that conditioning must exist at the moment of sale; it held that control over the tying product may be leveraged post-sale to foreclose competition in the tied market. *Id*. at 476–77.

The FAC alleges precisely that. Plaintiffs purchased HP printers that functioned with third-party cartridges, FAC ¶¶ 38–39, 115, but HP removed that ability post-sale. *Id*. ¶¶ 58–60, 62–63, 106. After those updates, consumers could not continue using the printers they already owned without purchasing HP ink. *Id*. ¶¶ 94, 98, 106. That is not an absence of conditioning; it is conditioning in its most direct form. The Court's earlier dismissal turned on the absence of allegations that HP, in practice, required consumers to accept the firmware update or forgo use of their printers. Dkt. 96 at 10–11. The FAC now alleges exactly that. Further, conditioning may be inferred from conduct that, as a practical matter, leaves buyers without a meaningful alternative, or makes it "unreasonably difficult or costly" to use the tying product without purchasing the tied product from the defendant. *Viamedia, Inc. v. Comcast Corp*., 951 F.3d 429, 471 (7th Cir. 2020) (quoting *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272 (6th Cir. 2015)); *Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1418 (11th Cir. 1987); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1180 (1st Cir. 1994).

HP is wrong to suggest that Plaintiffs must allege market power in the primary market for printers, as compared to the aftermarket for ink cartridges. In Kodak itself, "Kodak lacked market power in the primary equipment market; after all, that was the premise of the question presented to the Supreme Court." *In re Deere*, 2023 WL 8190256, at *17 (N.D. Ill. Nov. 27, 2023). But "Even if a manufacturer does not have power in a primary market, it still may have power in an aftermarket and be liable under the antitrust laws for conduct in that market." *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1345 (Fed. Cir. 2014).

Likewise, HP's "reasonable interchangeability" argument misreads the FAC and what Plaintiffs are actually required to plead at this stage. Whether HP has sufficient power in the printer market does not depend on whether a commercial printer is interchangeable with a consumer all-in-one at the moment of purchase; it depends on whether HP can use post-sale control over the printer a consumer already owns to force aftermarket purchases the consumer would otherwise make elsewhere. FAC ¶¶ 58–60, 62–63, 94, 98, 106; *Kodak*, 504 U.S. at 476–77. Once HP disables third-party cartridges through firmware and makes continued printer use contingent on HP ink, the relevant competitive constraint is not "other printers" in the abstract—it is whether the buyer can turn elsewhere for the tying product as a practical matter. FAC ¶¶ 94, 98, 106; *Collins Inkjet*, 781 F.3d at 272; *Tic-X-Press*, 815 F.2d at 1418. Thus, Plaintiffs sufficiently alleged a primary U.S. market for printers and that HP holds a substantial share of that market—more than enough, at this stage, to plausibly support an inference of market power.

## Conclusion

For these reasons, the Court should deny HP's Motion to Dismiss.

Dated: February 27, 2025

Respectfully submitted,

/s/ *Jimmy Mintz*
Jimmy Mintz (*Pro hac vice*)
Bryson Harris Suciu DeMay, PLLC
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL 33134
Tel.: (786) 879-8200
jmintz@brysonpllc.com


/s/ *Peggy Wedgworth*
Peggy J. Wedgworth (*Pro hac vice*)
Milberg Coleman Bryson Phillips
Grossman, PLLC
405 East 50th Street
New York, NY 10022
Tel: 212-594-5300
pwedgworth@milberg.com

Melissa K. Sims
Milberg Coleman Bryson Phillips
Grossman, PLLC
Illinois Bar Number: 6231297
227 West Monroe Street
Suite 2100
Chicago, Illinois 60606
Tel.: (865) 247-0080
msims@milberg.com


*Attorneys for Plaintiffs and the Proposed Class*